Meiram Bendat (Cal. Bar No. 198884)
PSYCH-APPEAL, INC.
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (310) 564-0040
mbendat@psych-appeal.com

D. Brian Hufford (subject to *pro hac vice* admission)
Jason S. Cowart (subject to *pro hac vice* admission)
ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

Jason M. Knott (subject to *pro hac vice* admission)
Andrew Caridas (subject to *pro hac vice* admission)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
jknott@zuckerman.com
acaridas@zuckerman.com

*Attorneys for Plaintiffs*

**UNITED STATED DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| GARY ALEXANDER, on his own behalf and on behalf of his beneficiary son, JORDAN ALEXANDER, and all others similarly situated, CORINNA KLEIN, on behalf of herself and all others similarly situated, and DAVID HAFFNER, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS<br><br>Defendant. | Case No. 3:14-cv-5337<br><br>**CLASS ACTION COMPLAINT** |

1

# TABLE OF CONTENTS

2  SUMMARY OF PLAINTIFFS' ALLEGATIONS ..................................................... 2

3  DEFENDANT, JURISDICTION AND VENUE .................................................... 7

4  UBH'S GUIDELINES APPLICABLE TO PLAINTIFFS' CLAIMS ...................... 7

5  UBH's Guidelines Related to Outpatient Treatment ...................................... 10

6  UBH's Guidelines Related to Intensive Outpatient Treatment ................................ 12

7  UBH's Guidelines Related to Borderline Personality Disorder ............................ 15

   Summary of Ways in Which UBH's Guidelines Violate Generally Accepted
8     Standards of Care ................................................................................ 16

9  UBH'S BREACH OF FIDUCIARY DUTY AND IMPROPER DENIAL OF
      ALEXANDER'S CLAIMS ............................................................ 18
10
   UBH'S BREACH OF FIDUCIARY DUTY AND IMPROPER DENIAL OF KLEIN'S
11    CLAIMS ....................................................................................... 27

12  UBH'S BREACH OF FIDUCIARY DUTY AND IMPROPER DENIAL OF HAFFNER'S
      CLAIMS ....................................................................................... 34
13
   CLASS ACTION ALLEGATIONS ....................................................... 45
14
   COUNT I
15    CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS BROUGHT ON
      BEHALF OF PLAINTIFFS AND THE CLASS ................................. 47
16
   COUNT II
17    CLAIM FOR IMPROPER DENIAL OF BENEFITS BROUGHT ON BEHALF OF
      PLAINTIFFS AND THE CLASS ...................................................... 49
18
   COUNT III
19    CLAIM FOR EQUITABLE RELIEF OUGHT ON BEHALF OF PLAINTIFFS AND
      THE CLASS ................................................................................. 49
20
   COUNT IV
21    CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF BROUGHT ON
      BEHALF OF PLAINTIFFS AND THE CLASS ................................. 50
22
   REQUESTED RELIEF ...................................................................... 50

23

24

25

26

27

28

1     1.     According to the National Institute of Mental Health, an estimated 26 percent of American adults suffer from some type of mental health condition each year, with six percent suffering from a severe mental health condition such as schizophrenia or major depression. About 11 percent of adolescents have a depressive disorder by age 18. The seriousness of this problem is highlighted by the fact that suicide consistently ranks as the third leading cause of death for young people ages 15-24. Individuals with borderline personality disorder, who constitute 6 percent of patients in primary care settings, 10 percent of patients in outpatient clinics, and 20 percent of psychiatric inpatients, also face a significant risk of suicide.

2.     According to the Substance Abuse and Mental Health Services Administration ("SAMHSA"), an estimated nine percent of Americans twelve or older were classified with a substance use disorder in 2010. Between 2007 and 2010, about 38 percent of Americans twelve or older who needed substance abuse treatment did not receive treatment because they lacked insurance coverage, and could not afford the cost without coverage. The World Health Organization reports that mental health and substance use disorders are among the leading causes of disability in the United States, and the Centers for Disease Control and Prevention reports that 25 percent of all years of life lost to disability and premature mortality are a result of mental illness. When substance use disorders are inadequately treated, they can complicate care for co-occurring mental health disorders and medical conditions.

3.     Despite these alarming statistics, Defendant United Behavioral Health, which adjudicates mental health and substance abuse claims for more than one in five Americans, is violating legal duties it owes to health insurance plan participants and beneficiaries by improperly restricting the scope of their insurance coverage for outpatient mental health and substance abuse treatment. These restrictions are inconsistent with the terms of the relevant

insurance plans and generally accepted standards of mental healthcare. They were also adopted and applied by United Behavioral Health in breach of its fiduciary duties.

4.      Because they have been, and are likely to continue to be, harmed by Defendant's misconduct, Plaintiffs Corinna Klein and David Haffner bring this complaint on behalf of themselves and all others similarly situated, and Plaintiff Gary Alexander brings this action on his own behalf and on behalf of his beneficiary son, Jordan Alexander, and all others similarly situated. In support of their claims, Plaintiffs allege upon personal knowledge as to themselves and their own acts, and upon information and belief based upon, inter alia, the investigation made by and through their attorneys (including review of publicly available information concerning Defendant's guidelines and correspondence sent by Defendant to Plaintiffs) as to all other matters, as follows:

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

5.      Plaintiffs Gary Alexander, Corinna Klein, and David Haffner are each insured by a health insurance plan that is sponsored by their (or, in the case of Corinna Klein, her father's) employer and governed by the Employee Retirement Income Security Act of 1974 ("ERISA") ("Plaintiffs' Plans").

6.      Plaintiffs' Plans cover in- and out-of-network treatment for sickness, injury, and mental illness and substance use disorders described in the *Diagnostic and Statistical Manual* ("DSM") of the American Psychiatric Association. As such, Plaintiffs' Plans cover outpatient psychotherapy as well as more structured and comprehensive services such as care in an intensive outpatient program ("IOP"). To be entitled to insurance benefits for receiving such treatment, Plaintiffs' Plans require that the treatment be medically necessary, as defined by generally accepted standards of care.

CLASS ACTION COMPLAINT                                                    CASE NO. 3:14-cv-5337

7.     Plaintiffs' Plans have delegated responsibility for adjudicating mental health and substance abuse claims to Defendant United Behavior Health ("UBH"). Pursuant to this delegation, UBH has developed Level of Care Guidelines ("LOCs") and Coverage Determination Guidelines ("CDGs"), which its claims representatives use to adjudicate mental health and substance abuse claims. UBH has also promulgated and applied a proprietary Algorithms for Effective Reporting and Treatment ("ALERT") program to identify chronically ill patients whose treatment needs exceed UBH's unilaterally selected tolerance for coverage. Plaintiffs' Plans and their sponsors/employers have no substantive role in the creation, promulgation, or content of UBH's ALERT program, LOCs, CDGs, or in UBH's decision to approve or deny any claim.

8.     UBH's CDGs purport to identify, on a condition-by-condition basis, the benefits that are available pursuant to health plans insured and/or administered by UBH, the "best practices" (as defined by generally accepted standards of care) that a mental healthcare provider should follow when treating the condition, and related "level of care" criteria (drawn from UBH's LOCs, discussed below). UBH's CDGs instruct UBH reviewers to consult insureds' particular plan terms before deciding whether particular benefits are covered.

9.     UBH asserts that its LOCs are a set of "objective" and "evidence-based" criteria used to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing. UBH's LOCs set forth criteria that its claims reviewers are supposed to apply to determine whether a particular level of mental healthcare is both covered by plan terms and consistent with generally accepted standards of care. Unlike UBH's CDGs, however, UBH's LOCs do not instruct UBH reviewers to consult insureds' particular plan terms before deciding whether a given benefit is covered.

CLASS ACTION COMPLAINT                                                        CASE NO. 3:14-cv-5337

10. In light of its central role in the mental health and substance abuse claim adjudication process, UBH is an ERISA fiduciary as defined by 29 U.S.C. Section 1104(a). As such, it is legally required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers, so long as such terms are consistent with ERISA. As a fiduciary, UBH owes a duty of loyalty and care to plan participants and beneficiaries. It must also refrain from any conduct that violates state or federal law.

11. UBH suffers from an inherent conflict of interest in its role as mental health and substance abuse claims administrator. Every claim denied by UBH saves money for UBH's corporate affiliates and artificially increases the profit of its parent entity, UnitedHealth Group Incorporated ("UHG"). The Alexander, Klein, and Haffner plans are "fully-insured," meaning that all health care benefits under those plans are paid by Defendant UBH's corporate affiliates, UnitedHealthcare Insurance Company ("UHIC") (for the Alexander and Haffner plans) and Oxford Health Plans, Inc. ("Oxford") (for the Klein plan), which are owned by UHG. Thus, every mental health claim denied by UBH allows one of its affiliates to save money and artificially increases the profit of UHG.

12. Against this backdrop, UBH has violated its fiduciary duties, as detailed herein. Although UBH asserts in its guidelines and in communications with insureds that its LOCs and CDGs are consistent with generally accepted standards of care, and that it applies generally accepted standards of care in making benefit determinations, neither is true.

CLASS ACTION COMPLAINT                                                    CASE NO. 3:14-cv-5337

13.     Generally accepted standards of care related to outpatient mental health and substance abuse treatment are promulgated by the American Psychiatric Association ("APA"), the American Association of Child and Adolescent Psychiatry ("AACAP"), the American Association of Community Psychiatrists ("AACP"), the American Society for Addiction Medicine ("ASAM"), the Association for Ambulatory Behavioral Healthcare ("AABH"), and a body of published, peer-reviewed research.

14.     Generally speaking, these standards identify a host of criteria as being relevant to determining whether outpatient treatment, and at which frequency, is the appropriate level of care for any particular patient, recognize that outpatient treatment is the least restrictive level of mental healthcare, and call for outpatient treatment when the patient's condition may be chronic in nature (i.e., non-acute) and require ongoing care.

15.     UBH's LOCs and CDGs are much more restrictive than the generally accepted standards of care in the mental health community. Indeed, in the last 3 years, UBH has amended its guidelines to make them even more focused on the presence of acute symptoms (and therefore more restrictive), despite the fact that generally accepted guidelines highlight prevention of relapse and chronic considerations. As detailed herein, whereas UBH's guidelines restrict coverage for outpatient mental health and substance abuse treatment to "acute" situations that can be addressed quickly, such restrictions on outpatient treatment are not found in any of the generally accepted standards of care, or for that matter, in any of the Plaintiffs' Plans that UBH administers.

16.     Plaintiff Alexander's Plan provides mental health and substance abuse coverage, but excludes coverage where the treatment is inconsistent with generally accepted standards of care or UBH's LOCs. Plaintiff Klein's Plan covers such treatment so long as it is "consistent

CLASS ACTION COMPLAINT                                                      CASE NO. 3:14-cv-5337

with standards of good medical practice"; it does not reference UBH's LOCs at all. Plaintiff Haffner's Plan covers treatment consistent with generally accepted standards of care and excludes mental health services determined to not meet such standards in the "professional judgment of healthcare providers."

17.     Thus, in developing its guidelines, UBH had a fiduciary duty to Plaintiffs (and to other members of plans administered by UBH) to promulgate and apply guidelines that are consistent with Plaintiffs' Plans and generally accepted standards of care. UBH breached this duty by supplanting generally accepted treatment standards in the mental health field with standards that promote the self-serving, cost-cutting preferences of UBH and its corporate affiliates. By adopting guidelines that are inconsistent with, and much more restrictive than, those that are generally accepted in the medical community, UBH breached its fiduciary duty to act solely in the interests of participants and beneficiaries for the "exclusive purpose" of "providing benefits" with reasonable "care, skill, prudence, and diligence" and in accordance with Plaintiffs' Plans.

18.     UBH has also violated its fiduciary obligations under ERISA by improperly denying outpatient treatment claims that were covered by Plaintiffs' Plans. These claims would have been covered based on the terms of Plaintiffs' Plans and generally accepted treatment standards, but were denied as a result of UBH's improper adoption and application of restrictive benefit determination guidelines, which it relied upon to deny Plaintiffs' claims.

19.     In order to remedy UBH's breach of fiduciary duty and other ERISA violations, Plaintiffs bring class claims against UBH under 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3)(A) and 1132(a)(3)(B). Through this action, Plaintiffs seek appropriate equitable and injunctive relief under ERISA to compel UBH to change its policies and practices so as to comply with its

CLASS ACTION COMPLAINT                                              CASE NO. 3:14-cv-5337

fiduciary obligations and to make benefit determinations which are consistent with Plaintiffs' plans, generally accepted medical standards, and applicable law.

## DEFENDANT, JURISDICTION AND VENUE

20.   Defendant United Behavioral Health ("UBH") operates under the brand name OptumHealth Behavioral Solutions, is a corporation organized under California law, and its principal place of business is located in San Francisco, California. UBH is responsible for drafting and promulgating the internal level of care and coverage determination guidelines referenced herein. It also adjudicates mental healthcare and substance abuse claims on behalf of UnitedHealthcare Insurance Company ("UHIC") and Oxford Health Plans, Inc. ("Oxford").

21.   UBH, UHIC, and Oxford are all, indirectly, wholly owned and controlled subsidiaries of UnitedHealth Group Incorporated ("UHG"). These companies do not operate independently and in their own interests, but solely serve to fulfill the goals and policies of UHG and generate revenue for UHG.

22.   Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

23.   Personal jurisdiction exists over Defendant, and this District is the proper venue, because it conducts significant operations in this District, it regularly communicates with insureds who reside in this district, and it is headquartered in this district.

## UBH'S GUIDELINES APPLICABLE TO PLAINTIFFS' CLAIMS

24.   UBH has developed its own Level of Care Guidelines and Coverage Determination Guidelines that it uses to determine whether any given level of mental health and substance abuse treatment is covered by its administered health plans. In its "Introduction to the 2014 Level of Care Guidelines," UBH asserts that its guidelines "reflect [UBH's] understanding

of current best practices in care" and that using those guidelines "reduces undesirable variation from evidence-based practice."

25.     UBH reiterates these principles in two separate documents, *Guideline Evidence Base for Level of Care Guidelines* and *Guideline Evidence Base for Coverage Determination Guidelines*. In those documents, which purport to provide the primary sources for UBH's LOCs and CDGs, UBH identified the guidelines of several nationally recognized medical associations (such as AACAP, AACP, and ASAM) as setting generally accepted standards of clinical practice for outpatient and intensive outpatient treatment of mental health and substance use disorders.

26.     The 2014 UBH Level of Care Guidelines Common Criteria, applicable to all levels of care for both mental health and substance abuse disorders and incorporated by reference into all level-specific UBH Level of Care Guidelines and all condition-specific UBH Coverage Determination Guidelines, maintain that for a treatment to be covered it must:

> Improve the member's presenting problems within a reasonable period of time. Improvement of the member's condition is indicated by the reduction or control of the *acute* signs and symptoms that necessitated treatment in a level of care. Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within the broader framework of the member's recovery and resiliency goals.

27.     In its related 2014 CDGs for mental health conditions and substance use disorders, UBH also imported "additional outpatient considerations" from Centers for Medicare and Medicaid Services publications:

> •     Some patients may undergo a course of treatment which increases their level of functioning, but then reach a point where further significant increase is not expected. When stability can be maintained without further treatment or with less intensive treatment, the services are no longer necessary (Centers for Medicare and Medicaid Benefits Policy Manual, 2013).

CLASS ACTION COMPLAINT                                            CASE NO. 3:14-cv-5337

• If a patient reaches a point in his/her treatment where further improvement does not appear to be indicated, and there is no reasonable expectation of improvement, outpatient services are no longer considered reasonable or necessary (Centers for Medicare and Medicaid, Local Coverage Determination (LCD), 2013).

Contrary to UBH's assertions, its guidelines are in fact inconsistent with, and much more restrictive than, evidence-based generally accepted standards of care. For example, even though UBH treats the above Medicare publications as establishing generally accepted standards of care, it conspicuously omits from its citation to those publications the following provisions from the very same Medicare guidelines (which apply equally to outpatient and IOP levels of care):

The treatment must, at a minimum, be designed to reduce or control the patient's psychiatric symptoms so as to prevent relapse . . . and improve or maintain the patient's level of functioning.

It is not necessary that a course of therapy have as its goal restoration of the patient to the level of functioning exhibited prior to the onset of the illness, although this may be appropriate for some patients. ***For many other psychiatric patients, particularly those with long-term, chronic conditions, control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization is an acceptable expectation of improvement.*** "Improvement" in this context is measured by comparing the effect of continuing treatment versus discontinuing it. Where there is a reasonable expectation that if treatment services were withdrawn the patient's condition would deteriorate, relapse further, or require hospitalization, this criterion would be met.

There are no specific limits on the length of time that services may be covered. There are many factors that affect the outcome of treatment; among them are the nature of the illness, prior history, the goals of treatment, and the patient's response. As long as the evidence shows that the patient continues to show improvement in accordance with his/his individualized treatment plan, and the frequency of services is within accepted norms of medical practice, coverage may be continued.

28. Moreover, as early as 2006, the APA *Practice Guideline for the Treatment of Patients With Substance Use Disorders, Second Edition,* noted that, "if addiction is reconceptualized along the lines of a chronic rather than an acute disease model, as

9

recommended by McLellan et al., the distinction between a 'treatment episode' and 'aftercare' should be removed and the different modalities of care (e.g., inpatient, outpatient) be reconsidered as part of a continuous, long-term treatment plan."

### UBH's Guidelines Related to Outpatient Treatment

29.     UBH's guidelines for mental health and substance abuse services recognize that individuals who pose an imminent or current risk of harm to self or others should be hospitalized. Thus, as a  precondition to all levels of mental health and substance abuse services other than psychiatric hospitalization, including outpatient treatment, the guidelines require that members should ***not*** be "in imminent or current risk of harm to self or others and/or property."

30.     As an additional precondition to outpatient coverage, however, the 2014 UBH LOCs for Outpatient Treatment of Mental Health Conditions and Substance Use Disorders require evidence of "***acute*** changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission)."

31.     In its 2013 (and preceding) guidelines such as the LOC for Continued Service Criteria, applicable to all levels of care for both mental health and substance abuse and incorporated by reference into all UBH Coverage Determination Guidelines, UBH specified that coverage should be denied for any level of care absent "evidence that relapse or a significant deterioration in functioning would be ***imminent*** if the member was transitioned to a lower level of care or, in the case of outpatient care, was discharged." This requirement was reinforced by UBH's 2013 (and preceding) Coverage Determination Guidelines for all mental health and substance use disorders, which required "***compelling evidence*** that continued treatment in the current level of care is required to prevent ***acute*** deterioration or exacerbation of the member's current condition."

CLASS ACTION COMPLAINT                                        CASE NO. 3:14-cv-5337

32.     These requirements do not reflect generally accepted standards of care. In fact, the Child and Adolescent Level of Care Utilization System (CALOCUS) developed by AACAP and AACP, and recognized as a generally accepted standard of care by UBH, expressly notes that "it may be desirable for a child or adolescent to remain at a higher level of care to preclude relapse and unnecessary disruption of care, and to promote lasting stability. A child or adolescent may make the transition to another level of care when, *after an adequate period of stabilization and based on the family's and treatment team's clinical judgment*, the child or adolescent meets the criteria for the other level of care." Further, both CALOCUS and the Level of Care Utilization System for Psychiatric and Addictive Services ("LOCUS"), developed by AACP for use in adult populations, note that *"In most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."*

33.     Similarly, in its patient placement criteria for all levels of care, ASAM notes:

Given the current understanding of substance use disorders as having a *chronic, long-term, remitting and relapsing course, it should be expected that effective treatment should match this chronic course.* In fact, treatment should be regarded as a dynamic, longitudinal process, rather than as a discrete episode of care. While it may encompass one or several acute episodes, it also must endure over the long term. *A now outdated approach viewed discrete time-limited episodes of program enrollment as adequate "doses" of treatment. In that view, any further care, also typically time-limited, was regarded as "aftercare" rather than ongoing care—as though the active part of treatment had ended.*

The current view of addiction as a chronic disorder supports a stance of therapeutic optimism and an attitude of persistence toward the treatment-refractory patient. It also reinforces the need for chronic attention and vigilance in response to a chronic vulnerability, even in the improved patient.

34.     UBH's guidelines also fail to mention that Medicare expressly covers "psychoanalysis using special techniques to gain insight into and treat a patient's unconscious motivations and conflicts using the development and resolution of a therapeutic transference to achieve therapeutic effect." Psychoanalysis typically occurs between four to five times a week

over a number of years and is particularly well suited for patients with comorbid psychiatric disorders (such as depression and anxiety). Likewise, UBH omits any discussion that psychodynamic psychotherapy, an evidence-based treatment consisting of multiple weekly sessions for a number of years, is particularly well suited for patients with comorbid mental illnesses and personality disorders.

## UBH's Guidelines Related to Intensive Outpatient Treatment

35. Generally accepted standards of care recognized by UBH, such as the APA's *Practice Guideline for the Treatment of Patients With Substance Use Disorders, Second Edition*, state that:

> [I]ntensive outpatient programs can provide an intensive, structured treatment experience for individuals with substance use disorders who require more services than those generally available in traditional outpatient settings . . . [T]hese programs are sometimes used as "step-down" programs for individuals leaving hospital or residential settings who are at a high risk of relapsing because of problems with motivation, the presence of frequent cravings or urges to use a substance, poor social supports, immediate environmental cues for relapse and/or availability of substances, and co-occurring medical and/or psychiatric disorders. The goal of such a "step-down" approach is to stabilize patients by retaining them in treatment and providing more extended intensive outpatient monitoring of relapse potential and co-occurring disorders.

36. Additional generally accepted standards of care recognized by UBH, such as AABH's *Standards and Guidelines for Partial Hospitalization Programs*, underscore that "[g]iven the relatively lower acuity levels of individuals served in IOP programs compared to PHP programs, IOP services are delivered with a less intensive focus on crisis stabilization, safety issues, and acute symptomotology. Instead IOP's attend more to monitoring and maintaining stability, decreasing moderate symptomotology, increasing functioning, and assisting with integration into community life." Therefore, AABH states that "[t]he average

CLASS ACTION COMPLAINT

CASE NO. 3:14-cv-5337

length of stay in IOP's may range from under 30 calendar days up to 90 calendar days (or in some instances up to as much as one year)."

37.     Further, the APA has determined that "the decision to move to a less intensive level of care should consider these factors plus the clinician's assessment of a patient's readiness and ability to benefit from the less restrictive setting." In support of its recommendations, the APA cites that "individuals who received regular outpatient care when intensive outpatient care would have been recommended as more appropriate had poorer drinking outcomes. In individuals who received residential as compared with intensive outpatient treatment, there also was a trend for a better outcome."

38.     UBH's more recent guidelines are inconsistent with these generally accepted standards as well. The 2013 and 2014 CDGs for Substance Use Disorders addressed all levels of care and replaced UBH's CDG for Intensive Outpatient Program for Substance Abuse Disorders ("IOP-SAD"). The CDG for IOP-SAD defines "Intensive Outpatient Treatment Program" as "a freestanding or hospital-based program that encompasses half-day programs. IOP provides services for at least 9 hours per week, and can be used to treat Substance-Use Disorders or can specialize in the treatment of co-occurring Substance-Use Disorders and mental health conditions." The 2013 and 2014 CDGs for Substance Use Disorders define IOP as a "freestanding or hospital-based program that maintains hours of service for at least 3 hours per day, 2 or more days per week." The later CDGs also discuss the availability of "overnight housing coupled with an Intensive Outpatient Program" if "[t]he member's living situation is unsupportive or high risk, and is undermining the member's recovery and resilience; or [r]outine attendance at the Intensive Outpatient Program is hindered by the lack of transportation."

CLASS ACTION COMPLAINT                                                    CASE NO. 3:14-cv-5337

39.     Consistent with the APA's *Practice Guideline for the Treatment of Patients With Substance Use Disorders, Second Edition*, UBH's CDG IOP-SAD states the "Goals of Intensive Outpatient Treatment include *[t]o provide an extended and structured treatment experience* for individuals requiring more intensive services than those generally available in traditional outpatient settings until such intensive services are no longer required and routine outpatient care can continue." The CDG IOP-SAD states that "*[t]he focus of interventions in an IOP setting is to help patients develop skills associated with abstinence, motivational enhancement and relapse prevention* that will assist them in maintaining an adequate level of functioning in their home, school, work and community environments." Additionally, the CDG IOP-SAD provides that "[w]hen supported by the benefit plan, coverage may be available for intensive outpatient programs that are provided with less intensity to members who are recovering from severe and persistent mental health conditions."

40.     Despite generally accepted standards of care intending IOP "to provide an extended and structured treatment experience," which was confirmed by the 2012 CDG IOP-SAD, UBH's superseding 2013 and 2014 CDGs for Substance Use Disorders conspicuously omit any such discussion. Instead, UBH's IOP guidelines have become progressively more focused on "acute" criteria. For example, whereas the 2013 CDG excludes coverage for IOP "without evidence-based treatment of symptoms," the 2014 CDG excludes coverage for IOP "without evidence-based treatment of *acute* symptoms."

41.     Further, whereas the CDG IOP-SAD instructs that discharge from IOP should be considered for "[i]ndividuals who have achieved the goals in his/her treatment plan, resolving the problem that necessitated admission *and who have a demonstrated motivation* to continue outpatient treatment," the 2013 and 2014 CDGs entirely omit considerations of "demonstrated

CLASS ACTION COMPLAINT                                                        CASE NO. 3:14-cv-5337

motivation" prior to discharge. Yet the failure to consider "demonstrated motivation" at all stages of care, including prior to discharge, directly contradicts *The ASAM Criteria,* which UBH acknowledges both in its CDGs and the *Guideline Evidence Base for Level of Care Guidelines* as setting generally accepted standards of care for substance abuse treatment.

### UBH's Guidelines Related to Borderline Personality Disorder

42.    Recognized by the APA as "the most common personality disorder in clinical settings," borderline personality disorder ("BPD") "causes marked distress and impairment in social, occupational, and role functioning, and it is associated with high rates of self-destructive behavior (e.g., suicide attempts) and completed suicide." The APA notes in its *Practice Guideline for the Treatment of Patients With Borderline Personality Disorder* that:

> There is a large clinical literature describing psychoanalytic/psychodynamic individual therapy for patients with borderline personality disorder. Most of these clinical reports document the difficult transference and countertransference aspects of the treatment, but they also provide considerable encouragement regarding the ultimate treatability of borderline personality disorder. Therapists who persevere describe substantial improvement in well-suited patients. Some of these skilled clinicians have reported success with the use of psychoanalysis four or five times weekly.

> * * *

> There are no studies demonstrating that brief therapy or psychotherapy less than twice a week is helpful for patients with borderline personality disorder.

43.    Despite generally accepted standards of care for the treatment of BPD as promulgated by the APA, the National Institute of Clinical Excellence ("NICE"), and a substantial body of peer-reviewed research, UBH's *Guideline Evidence Base for Coverage Determination Guidelines* conspicuously fails to list a single generally accepted standard of care governing UBH's admission, continued stay, and discharge criteria for the treatment of BPD. Instead, UBH indicates in its *Guideline Evidence Base for Coverage Determination Guidelines* that personality disorders are "non-covered conditions." This deliberate self-selection starkly

offends not just generally accepted standards of care but also the express coverage terms of the plans that UBH administers.

44.     Ironically, while all of UBH's CDGs direct that "[t]he treatment plan should always address co-occurring behavioral and medical conditions including substance use disorders" and "maintain[] that treatment should be consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines," UBH's CDGs for Personality Disorders indicate that:

> Treatments for the primary diagnosis of a Personality Disorder are excluded. Indications for coverage are limited to circumstances where:
>
> • The Personality Disorder is a secondary diagnosis; and
> • The primary diagnosis is a covered conditions; and
> • Treatment is principally focused on the primary diagnosis.

45.     Despite generally accepted standards of care clearly recognizing BPD as a severe mental illness clearly treatable in its own right, UBH's CDGs pay lip service to such by relegating BPD to, at most, a "secondary diagnosis" that is effectively not eligible for coverage. Even when BPD is comorbid with other psychiatric illnesses, UBH's CDGs artificially attempt to distinguish between "primary" and "secondary diagnoses" to circumvent coverage. This artifice directly contradicts the APA's DSM, which notes that "[t]he multiaxial distinction among Axis I, Axis II [personality], and Axis III [medical] disorders does not imply that there are fundamental differences in their conceptualization."

### Summary of Ways in Which UBH's Guidelines Violate Generally Accepted Standards of Care

46.     For the reasons discussed herein, UBH's LOCs and CDGs related to outpatient treatment and IOP are inconsistent with generally accepted standards of care (and therefore Plaintiffs' Plans) in four key respects. First, UBH's guidelines require patients to demonstrate

by "compelling evidence" that treatment is necessary to prevent "acute" deterioration of their conditions. Generally accepted standards of care, in contrast, call for treatment unless there is "clear and compelling" evidence that a lower level of care is more appropriate (i.e., the burden of proof is reversed), do not condition treatment on the acute risk of deterioration, and instead focus on long-term recovery, recognizing that extended and intensive outpatient treatment is often necessary to address chronic conditions and promote lasting stability. Second, UBH's guidelines require patients to demonstrate "acute changes" in their conditions or circumstances that now warrant treatment, even though generally accepted standards articulate no such requirement and call for treatment when chronic symptoms are present. Third, UBH's guidelines ignore patient motivation and clinician assessments of patients' readiness and ability to benefit from lower levels of care. Fourth, UBH's guidelines call for the denial of claims seeking treatment for borderline personality disorder when that diagnosis is primary, despite the fact that generally accepted standards of care do not contain such a restriction.

47.     The fact that UBH's guidelines are more restrictive than its plans or generally accepted standards of care is not particularly surprising. As early as 2009, ASAM cautioned in its *Public Policy Statement on Managed Care, Addiction Medicine, and Parity* that when an insurer like UBH "develops its own treatment level of care and continuing stay guidelines for authorizing or denying requested treatment rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

## UBH'S BREACH OF FIDUCIARY DUTY
## AND IMPROPER DENIAL OF ALEXANDER'S CLAIMS

48.    Plaintiff Gary Alexander and his son, Jordan Alexander, reside in Layton, Utah. Jordan Alexander turned 18 on April 2, 2014.

49.    Gary Alexander is a participant in the "Granite Construction Health Plan" (the "Alexander Plan") and Jordan Alexander is a beneficiary of the Alexander Plan. Their non-grandfathered, large group plan is a fully-insured healthcare policy issued by UHIC in Utah with an effective date of November 1, 1997 and a restatement effective date of January 1, 2013. The plan renews annually on January 1.

50.    According to the Certificate of Coverage ("COC") that governs the Alexander Plan, all benefits are paid pursuant to the terms of the Alexander Plan, which is "offered and underwritten" by UHIC. The Alexander COC identifies the "Plan Administrator" and "Named Fiduciary" as Granite Construction. The COC explains, however, that the Plan Sponsor retains all fiduciary responsibilities with respect to the Plan "except to the extent the Plan Sponsor has delegated or allocated to other persons or entities one or more fiduciary responsibility with respect to the Plan." It then explains that UHIC is the "Claims Fiduciary." In that capacity, the COC explains that the plan is "administered on behalf of the Plan Administrator by UnitedHealthcare Insurance Company" and that, as such, UHIC handles "claims processing, claims payment, and [] appeals." It further explains that "Benefits under this Policy will be paid only if we decide in our discretion that you are entitled to them. We also have discretion to determine eligibility for benefits and to interpret the terms and conditions of the benefit plan." It also explains that UHIC "may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Policy." Pursuant to this authority, UHIC has delegated responsibility for adjudicating all mental health and substance abuse claims

CLASS ACTION COMPLAINT                                                                   CASE NO. 3:14-cv-5337

to UBH, which the Alexander Plan refers to as the "Mental Health/Substance Use Disorder Designee."

51.     In a section entitled, "Prudent Actions by Plan Fiduciaries," the Alexander Plan states:

> In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

52.     The Alexander Plan pays benefits for in- and out-of-network, in- and outpatient treatment of mental illnesses, including substance abuse, "consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines." The Alexander Plan defines "scientific evidence" as "the results of controlled clinical trials or other studies published in peer-reviewed, medical literature generally recognized by the relevant medical specialty community" and "prevailing medical standards and clinical guidelines" as "nationally recognized professional standards of care including, but not limited to, national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines."

53.     The Alexander Plan provides for two levels of internal appeals prior to administrative exhaustion.

54.     The Alexander Plan defines Intensive Outpatient Treatment ("IOP") as "a structured outpatient Mental Health or Substance Use Disorder treatment program that may be free-standing or Hospital-based and provides services for at least three hours per day, two or more days per week."

55.     The Alexander Plan expressly indicates that the "authorization requirements listed under Mental Health Services and Substance Use Disorder Services in the Schedule of Benefits are deleted. The following services are added to the list of services requiring pre-service notification under Pre-service Benefit Confirmation in the Schedule of Benefits:   intensive outpatient program benefits." The Alexander Plan also requires that "for Non-Network Benefits you must notify us before the following services are received: intensive outpatient program treatment" and provides that "If you fail to notify us as required, Benefits will be reduced to 50% of Eligible Expenses."

56.     On April 9, 2012, Becky Alexander, mother of then 16-year-old Jordan Alexander, contacted UBH to inquire about adolescent substance abuse treatment for her son. Despite Jordan's comorbid substance abuse, conduct disorder, and ADHD, and his clear need for a structured program, UBH initially provided Ms. Alexander with referrals only to outpatient, masters-level therapists reimbursed at a lower rate than doctoral-level psychologists and psychiatrists (who provide psychotherapy).

57.     Over the next year, UBH consistently rejected providers' recommendations that Jordan's severe mental and substance abuse conditions necessitated a higher level of treatment than routine outpatient psychotherapy. In April 2012, the University of Utah Neuropsychiatric Institute contacted UBH to provide pre-service notification of Jordan's admission to its partial hospitalization program ("PHP"). UBH case manager Traci Babcock, LCSW informed the facility that no certification was in place for PHP and provided a referral to IOP, a lower level of care, at Salt Lake Behavioral Health, farther from Jordan's home.

CLASS ACTION COMPLAINT                                                                CASE NO. 3:14-cv-5337

58.     In June 2012, however, when Salt Lake Behavioral Health contacted UBH to provide pre-service notification of Jordan's admission to IOP, Ms. Babcock categorically denied Jordan's care.

59.     On July 15, 2013, Ms. Alexander informed UBH case manager Cynthia Johnson that Jordan was "picked up by police and was in jail 14 days; per mother mbr [member] is now on House arrest; per mother mbr drug of choice was meth; unsure of want mbr is using now or how he is getting drugs."

60.     That same day, Salt Lake Behavioral Health contacted UBH to provide pre-service notification that Jordan had been hospitalized and to inform UBH that Jordan had also been diagnosed with additional mental health disorders including Bipolar I Disorder (manic, severe, with medication non-compliance), polysubstance dependence, and Obsessive Compulsive Disorder. Jordan was reported to be medication non-compliant and to have assaulted his sister's boyfriend within the past week. The hospital records reflect that:

> Imminent risk of harm to self is present. The patient's imminent risk to others is significant right now and because of that he is on precautions. He has been out of control. It is high to moderate. His risk of harm to others is moderate on a chronic basis.

61.     UBH denied Jordan's admission to Salt Lake Behavioral Health. In the wake of this denial, Salt Lake Behavioral Health's Adolescent Psychiatric Director and Medical Director, Dr. Duncan Wallace, recommended that Jordan be placed in a secured residential treatment program. UBH denied this request as well.

62.     On August 8, 2013, Ms. Alexander contacted UBH case manager Claudine Allen, LPC to inquire about "options for the member." Ms. Allen noted:

> The member is doing meth and has relapsed again. The mother is upset because the insurance denies everything she is trying to accomplish[]. The member was recommended for residential by the providers at Cooper Hill but Optum denied it.

The member was referred by insurance to a partial program but th[e] closes[t] partial program is an[] hour bus ride for the member. The mother wants to know what we are going to do to help. This CA found OON facilities that have worked with insurance before. This CA [Care Advocate] explained the pre auth process.

63.     On August 22, 2013, Ralph W. Knapp, M.D. of Life Line for Youth Treatment Center ("Life Line") evaluated Jordan and determined that:

About two months ago he had an encounter with the police and ended up in a high speed chase resulting in charges for avoiding arrest, possession and no license. He was placed at Farmington Bay Detention Center for two weeks. They recommended that he be given an evaluation at Salt Lake Behavioral Hospital where he went for two weeks. There his medications were continued and trazodone was added to help him with his sleeping problems. The recommendation by the hospital was that he receive a long-term drug treatment program which resulted in his coming here to Life-Line.

* * *

I see him as having a significant amphetamine addiction with signs and symptoms of ADHD and major depressive disorder. He may or may not be bipolar which will be evaluated while he is here in the program. He definitely needs a long-term intensive drug treatment program where he can be removed from his environment and the exposure to drugs.

64.     The following day, Life Line contacted UBH to provide pre-service notification that it had prescribed for Jordan a six- to nine-month course of residential treatment for amphetamine dependence, oppositional defiant disorder, and ADHD. UBH conducted a preauthorization review and this time determined that Jordan did not qualify for either residential treatment or PHP. Instead, UBH proposed IOP, to which Jordan was admitted on August 25, 2013.

65.     Upon Jordan's IOP admission at Life Line, and contrary to the express terms of the Alexander Plan—which had previously been amended to remove preauthorization for mental health and substance abuse benefits—UBH conducted a preauthorization review on September 3, 2013. On September 10, 2013, Life Line explained to UBH Peer Reviewer Lin Zhu, Ph.D. that:

CLASS ACTION COMPLAINT                                        CASE NO. 3:14-cv-5337

[Member] has had a "hard life." He was dealing drugs and was in a high speed chase with the police 2 months ago. Mbr also faces burglary charge. Mbr was put on probation, but smoked spice. He then went to court and the court ordered him to RTC LOC, which UBH denied and mbr ended up in IOP LOP. Mbr was living with GF's cousin and dealing drugs from there. GF was pregnant and then left mbr. UR does not know what mbr will do if UBH coverage for IOP stops.

Nonetheless, Dr. Zhu decided that **_"the member had been authorized for and had attended 12 IOP visits through 9/9/2013 at the time of this peer review."_** Dr. Zhu concluded that this short IOP dose was adequate, and so informed Life Line:

This reviewer explained UBH's CDG [Coverage Determination Guideline] for SUD [Substance Use Disorder] IOP LOC [Level of Care]. Given that mbr's last use was 2 months ago and currently has no SUD symptoms, mbr will not likely to continue meeting CDG for ongoing IOP, especially at 5 days per week with boarding. Instead, this reviewer offered 3 more sessions so that facility can address this issue with mbr and family and allow them to make treatment decisions. UR confirmed that if mbr and family decide to leave OON [out-of-network] facility, they will make appropriate OP [outpatient] referrals as mbr needs ongoing support to address his challenges and stressors.

66. On September 12, 2013, Life Line contacted UBH to request additional IOP time:

The UR [utilization reviewer] stated the mother is concerned about the mber [member] coming home because he was still using when he was under house arrest. He is making progress, but he is not being honest about his criminal activity. The team also feels if the member goes back home he will use. He thinks he can be sober and sell drugs. The UR is thinking the member is going to need 12 sessions to step him down to outpatient. No changes in medications.

67. On September 13, 2013, Life Line again informed Dr. Zhu of substantial relapse concerns should Jordan's IOP coverage be terminated. Specifically, Life Line advised Dr. Zhu that Jordan's parents were paying for sober living (since UBH denied residential treatment) while Jordan was in IOP. Life Line also advised that Jordan's family relationships were highly strained and that his parents did not trust Jordan's ability to maintain sobriety at such an early juncture. Specifically, Dr. Zhu noted that:

Mbr [member's] mother expressed concern about mbr returning home. Mbr reportedly was using while he was on house arrest before, so mother does not

trust that mbr can maintain sobriety. Mbr also reportedly stole mother's car before. They have "a terrible relationship."

While Dr. Zhu "highlighted that mbr is minor, someone (mother, probation, court) should have supervision or responsibility over him and ensure that he continue with OP [outpatient] LOC [level of care] community sober supports, school" (all of which UBH had known to have failed or been inadequate for Jordan given his psychopathology, needs, and treatment resistance), Dr. Zhu nonetheless issued "a non-coverage determination:"

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UnitedHealthcare Insurance Company, Inc. members.

> Based on the available information, I am issuing a non-coverage determination for Substance Use Disorder intensive outpatient treatment at Lifelines *from 09/12/2013 and forward.*

> The member's situation at present does not appear to meet *Coverage Determination Guideline criteria for intensive outpatient treatment for Substance Use Disorders*. The Coverage Determination Guideline states that this level of care is indicated based on the type and severity of symptoms present, and the intensity of services required.

> Specifically,

>> • The member continues to use substances despite appropriate motivation.
>> • Although the member has been actively participating in treatment, he or she is experiencing an intensification of symptoms and deterioration in functioning despite modification of the treatment plan.
>> • The member has a non-supportive living situation creating an environment in which the member's substance use is likely to worsen without the intensity and support provided in an intensive outpatient program.

> The evidence available at the time of review indicates the member no longer meets these criteria, based on report that you have maintained sobriety for over two months and currently do not have substance use symptoms that are in the moderate to severe range of intensity. It does not appear that you have any functional impairment. Although you may still face challenges, they are appropriate to be addressed in a less intensive setting. Care can continue at the routine outpatient level in conjunction with community support (such as 12-step meetings, home group, and sponsorship.

68.     UBH based its adverse IOP determination on a CDG that was not consistent with generally accepted medical standards or even permitted for use by the Alexander Plan. Rather than regarding IOP as intended "to provide an extended and structured treatment experience" or assessing Jordan's "demonstrated motivation to continue with outpatient treatment" prior to IOP discharge, as generally accepted standards of care required, Dr. Zhu only focused on the purported lack of "moderate to severe" symptoms and lack of immediate functional impairments. Further, although generally accepted standards of care like CALOCUS and LOCUS required a "clear and compelling rationale" to select a lower level of care, Dr. Zhu ignored that burden of proof. And rather than recognizing the provision in the CDG supporting continued care—namely, that the member had a "non-supportive living situation creating an environment in which the member's substance use is likely to worsen without the intensity and support provided in an intensive outpatient program"—Dr. Zhu disregarded it.

69.     In a September 16, 2013 urgent appeal, UBH Peer Reviewer Tracie Webb, Ph.D. noted:

> Initially when the member came in, [Life Line] requested residential due to unstable home life, legal issues, and ongoing usage. RTC was denied and member was sent to IOP instead. The provider and Dr. Zhu discussed the member stepping down to routine outpatient. The provider is concerned that the member's mother does not have the skills to help the member maintain sobriety. He has not lived with his mother in a long time. The member and his family has concerns about finances; [Life Line] doesn't believe the member's mother can afford sober living. The provider is concerned that when the member is not in a structured environment he does not do well. The member's insight is improving in regards to understanding the impact of use but he still believes he can participate in the drug life without using himself. He is looking for a permanent sponsor and he is working the steps; he is currently on Step 4. The member's mother has come in for 1 session and was hesitant to come in at first; she supports him but is concerned about him coming in right now and is concerned that his progress will be interrupted. The facility believes she needs some therapeutic involvement regarding assertiveness, creating and maintaining boundaries. The member's mother has not been able to participate in the multifamily group.

* * *

There are other adults in his life but reestablishing trust is a major issue as they do not want to be involved. The facility wants him to continue to work on his inventory of past decisions and create a timeline to see how he got to where he is, to continue to involve his family in his treatment especially regarding development of boundaries, & the member's mother has committed to coming to at least 1 session with the member each week and make more family group meetings.

* * *

[Life Line] wants to be able to contact the child's mother but she wants nothing to do with the member or his family. The facility would like another week or 2 of IOP to get his mother more engaged and interacting with the member on a healthier level and to get his environment more structured. The member attends IOP Sx [sessions] weekly; and he attends fellowship groups while living in the sober living facility. The aftercare plan would be for him to go home to live with his mother and continue in routine OP. The member would come in for individual & group session and aftercare group (2x weekly).

70.    Despite the above, and without regard for the Alexander Plan providing for two levels of internal appeals, Dr. Webb issued a "Final Adverse Determination":

United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UnitedHealthcare Insurance Company, Inc. members.

* * *

Based on a review of the available information, I am upholding Peer Reviewer non-coverage determination for substance use disorder intensive outpatient services under the out-of-network outpatient mental health benefit provided by Lifelines *effective 09/13/2013 and forward*.

Rationale: The member's situation at present does not appear to meet Coverage Determination Guideline criteria for intensive outpatient treatment for Substance Use Disorders. The Coverage Determination Guideline states that this level of care is indicated based on the type and severity of symptoms present, and the intensity of services required.

* * *

This is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted.

71.    Thus, like Dr. Zhou, Dr. Webb ignored generally accepted medical standards and applied UBH's CDG, which was inconsistent with those standards and not permitted for use by

CLASS ACTION COMPLAINT                                    CASE NO. 3:14-cv-5337

the Alexander Plan. Rather than regarding IOP as intended "to provide an extended and structured treatment experience" or assessing Jordan's "demonstrated motivation to continue with outpatient treatment" prior to IOP discharge, as called for by generally accepted standards of care, Dr. Webb only focused on the purported lack of "moderate to severe" symptoms and lack of immediate functional impairments. Additionally, Dr. Webb failed to provide a "clear and compelling rationale" to select a lower level of care as required by generally accepted standards of care like CALOCUS and LOCUS. Simultaneously, she disregarded the provision supporting continued IOP, namely that the member had a "non-supportive living situation creating an environment in which the member's substance use is likely to worsen without the intensity and support provided in an intensive outpatient program."

72.     Accordingly, Jordan Alexander either exhausted his internal administrative remedies or should be deemed to have done so due to futility. Moreover, administrative exhaustion is not a prerequisite to a breach of fiduciary duty claim.

73.     Since September 13, 2013, Jordan Alexander continued to receive the critically-needed IOP services from Life Line and the Alexanders consequently incurred nearly thirty thousand dollars of unreimbursed expenses. In light of Jordan Alexander's chronic and severe mental illnesses and substance abuse, it is expected that he will continue to require such treatment in the future.

74.     Pursuant to his status as an Alexander Plan participant and to a Durable Power of Attorney executed by Jordan Alexander since his eighteenth birthday, Plaintiff Gary Alexander brings this suit.

## UBH'S BREACH OF FIDUCIARY DUTY
## AND IMPROPER DENIAL OF KLEIN'S CLAIMS

75.     Plaintiff Corinna Klein resides in Santa Barbara, California.

CLASS ACTION COMPLAINT                                                    CASE NO. 3:14-cv-5337

76.     Plaintiff Klein is a participant in the "Legal Aid Society Group Health Plan" (the "Klein Plan"). Her non-grandfathered, large group plan is a fully-insured healthcare policy issued by Oxford Health Plans, Inc. in New York with an effective date of January 1, 2014. It is renewed annually on January 1. The Klein Plan is subject to ERISA and New York state law.

77.     According to the "ERISA Information" provided in the Oxford Member Handbook for the Klein Plan, "Generally, the Plan Administrator or Plan Sponsor is your employer." Further, "Oxford, as the insurer, provides a Certificate of Coverage to you identifying specific benefits and administrative components of your Plan."

78.     Pursuant to the Certificate of Coverage ("COC") that governs the Klein Plan, benefits are paid "in accordance with the terms and conditions of this Certificate. According to the COC, "[u]nless otherwise indicated in this Certificate, determinations as to Medical Necessity are made by Us, and such determinations are solely within Our discretion."

79.     The Klein Plan's "Information About Your Oxford Coverage" explains that "[t]he Plan Administrator (generally the Plan Sponsor) is responsible for the publication and distribution of the SPD [Summary Plan Description]," that "[t]he Certificate of Coverage is not your SPD. Oxford, as the insurer, provides a Certificate of Coverage to you identifying specific benefit and administrative components of your Plan," and that "[w]hen coverage is provided under Oxford's insurance company, it means Oxford Health Insurance, Inc. In addition, it can also include third parties to whom we delegate responsibility for providing administrative services relating to coverage, such as utilization management." Pursuant to this authority, Oxford has delegated responsibility for all mental health and substance abuse claims to UBH.

80.     The Oxford Member Handbook for the Klein Plan further provides a "Statement of ERISA Rights," enumerating "Prudent Actions By Plan Fiduciaries:"

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

81.   The Klein Plan covers in- and out-of-network, in- and outpatient treatment for "mental, nervous or emotional disorders or ailments" and "substance use disorders." The Klein Plan specifically identifies bipolar disorder as a "Biologically Based Mental Illnesses." The Klein Plan specifically pays benefits for outpatient psychotherapy and psychopharmacology "consistent with standards of good medical practice."

82.   The Klein Plan expressly provides that "You may go directly to a non-Network Provider for an office visit to receive Covered Services. You do not need a referral from your PCP [primary care physician] or Precertification from Us."

83.   The Klein Plan provides for two internal appeals prior to the exhaustion of administrative remedies.

84.   To treat chronic depression and anxiety resulting from bipolar disorder and post-traumatic stress disorder as well as to prevent a relapse of substance abuse, Plaintiff Klein has sought psychotherapy and medication management from an out-of-network psychiatrist, Mark Leffert, M.D., at a twice-weekly frequency since December 2013.

85.   On August 12, 2014, "due to claims pattern," UBH flagged Plaintiff Klein's office-based mental health care "for ALERT team review" and scheduled a call between Dr. Leffert and UBH Associate Medical Director Leslie Moldauer for August 27, 2014.

86.   Since Dr. Moldauer refused to conduct her review while Plaintiff Klein was present in Dr. Leffert's office during the scheduled call, on September 2, 2014 UBH National Medical Director James Slayton sent Plaintiff Klein and Dr. Leffert a demand for treatment

information "within forty-five (45) days," including: current diagnoses, symptoms, treatment plan (including measurable goals and interventions), clinical progress towards measurable goals, estimated length of treatment episode, and current medications, dosages, and frequency. The letter warned that "[f]ailure to submit the information by this deadline may result in this request being denied."

87.     Accordingly, on September 15, 2014, Dr. Leffert faxed Dr. Slayton a clinical summary of Plaintiff Klein's treatment, advising that:

> Despite the adjunctive use of psychotropic medications, Ms. Klein has suffered from bouts of severe depression and anxiety for an extended duration. Her Bipolar Disorder and PTSD have severely interfered with her abilities to engage in meaningful relationships and work, commensurate with her education, training, and intelligence.
>
> Because Ms. Klein continues to function far below her baseline potential, her treatment goals include, but are not limited to, the development of coping skills, strategies, and insight to:
>
>     1) Prevent alcohol relapse and promote lasting recovery;
>     2) Encourage self-care through compliance with medications currently prescribed by me [listing the medications];
>     3) Improve frustration tolerance and self-soothing skills;
>     4) Process extensive trauma;
>     5) Enhance ability to develop, manage, and sustain supportive relationships;
>     6) Promote educational and employment functioning at baseline potential.
>
> In light of the patient's continued symptoms and impairments, and based on generally accepted medical standards promulgated by the American Psychiatric Association and the American Society for Addiction Medicine, Ms. Klein requires psychotherapy (90836) and medication assessment and management (99214), currently at a frequency of twice weekly.
>
> Please note that this clinical report is limited to a retrospective consideration of the patient's case. In light of Ms. Klein's current psychopathology and the inevitable fluctuations (and potential for rapid decompensation) inherent to severe mental illness, prevailing clinical standards of care dictate that I cannot offer predictions for future frequency and duration of outpatient treatment. I am certain that UBH, likewise, is in no position to make prospective care determinations in the outpatient context, if that is in fact what UBH seeks to undertake here.

CLASS ACTION COMPLAINT                                                    CASE NO. 3:14-cv-5337

88.     Nonetheless, on September 22, 2014, UBH Associate Medical Director Leslie Moldauer M.D. curtailed Plaintiff Klein's prescribed care:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to Oxford Health Plan NY/POS members. The availability of benefit coverage for a service is determined by the terms of your benefit plan. To review information about your specific plan coverage, please refer to the benefit information provided by your health plan.

> I have reviewed the plan for your ongoing treatment with Mark Leffert, MD. Based on my review of the available documentation and all information received to date, I have determined that coverage is available under your benefit plan at the reduced frequency of one standard session per week. Coverage is available at a reduced frequency for the following reason(s):

> You are being treated for problems with your mood. You have been in treatment with Dr. Leffert on a twice weekly basis. You appear to be stable on your medications. ***You are not in a crisis nor are you dangerous to yourself of others***. ***The use of multiple weekly therapy sessions typically is limited to acute exacerbations of illness, or in the context of a clinically urgent situation.***

> Based on our ***UBH Level of Care Guideline for Mental Health Outpatient Level of Care***, it is my determination that no further authorization can be provided for multiple weekly therapy visits ***from 09/22/2014 forward***. Care could continue on a weekly basis.

> Our decision was based on clinical guidelines. The guidelines used for this decision are based on the following:

> Centers for Medicare and Medicaid Services. (2013). Local Coverage Determination: Psychiatric Diagnostic Evaluation and Psychotherapy Services.

> Centers for Medicare and Medicaid Services. (2014). Local Coverage Determination: Psychiatry and Psychology Services.

89.     On October 21, 2014, Dr. Leffert faxed UBH an urgent appeal, which stated in part:

Medical Necessity

> … UBH has … breached the express terms of Ms. Klein's Plan by denying her benefits based on its proprietary guidelines. While Ms. Klein's Plan defines

31

"Medically Necessary" as treatment "appropriate with regard to standards of good medical practice," nowhere does the Plan grant UBH permission to render coverage determinations based on internally-developed guidelines. This is because insurer guidelines simply do not set the standards of good medical practice, which are established by peer-reviewed, medical literature generally recognized by the relevant medical specialty community and by national consensus statements, nationally recognized clinical guidelines, and national medical specialty society guidelines.

In her September 22, 2014 letter, Dr. Moldauer claimed that Ms. Klein's twice weekly psychotherapy could not be approved "based on [the] UBH Level of Care Guideline for Mental Health Outpatient Level of Care," modeled after CMS Local Coverage Determinations. Again, the Plan does not permit UBH to ration care based on a proprietary guideline that is inconsistent with "scientific evidence," "prevailing medical standards," and the very CMS Local Coverage Determinations cited by Dr. Moldauer. A faithful review of these CMS policies reveals they say nothing about "multiple weekly therapy sessions typically [being] limited to acute exacerbations of illness, or in the context of a clinically urgent situation." In fact, the CMS Local Coverage Determinations (on which UBH's Level of Care Guideline is ostensibly based) specifically allow for the treatment of chronic conditions with psychoanalysis, an even more intensive (and costly) outpatient regimen, and reiterate that:

> The treatment must, at a minimum, be designed to reduce or control the patient's psychiatric symptoms so as to prevent relapse . . . and improve or maintain the patient's level of functioning (CMS Publication 100-02, Medicare Benefit Policy Manual, Chapter 6, Section 70.1).
>
> ***It is not necessary that a course of therapy have as its goal restoration of the patient to the level of functioning exhibited prior to the onset of the illness, although this may be appropriate for some patients. For many other psychiatric patients, particularly those with long-term, chronic conditions, control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization is an acceptable expectation of improvement.*** "Improvement" in this context is measured by comparing the effect of continuing treatment versus discontinuing it. Where there is a reasonable expectation that if treatment services were withdrawn the patient's condition would deteriorate, relapse further, or require hospitalization, this criterion would be met (CMS Publication 100-02, Medicare Benefit Policy Manual, Chapter 6, Section 70.1).
>
> As long as the evidence shows that the patient continues to show improvement in accordance with his/her individualized treatment

plan, and the frequency of services is within accepted norms of medical practice, coverage may be continued (CMS Publication 100-02, Medicare Benefit Policy Manual, Chapter 6, Section 70.1).

Additionally, according to the UBH Level of Care Guidelines Evidence Base, the CMS Local Coverage Determinations are not even used by UBH with respect to "Continued Stay Criteria." Rather, the UBH Level of Care Guidelines Evidence Base indicates that only the American Association of Community Psychiatrists ("AACAP") Level of Care Utilization System for Psychiatric and Addiction Services ("LOCUS") applies with respect to continued outpatient treatment. LOCUS expressly indicates, ***"In most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."*** Not only did Dr. Moldauer fail to provide "a clear and compelling rationale" to merit a reduction of session frequency at this point in time, but she improperly relied on acute hospitalization criteria ("crisis" and "dangerousness to self/others") to restrict Ms. Klein's access to outpatient care.

Had Dr. Moldauer actually followed generally accepted medical guidelines and scientific research pertaining to Ms. Klein's case, she would have noted that the American Society for Addiction Medicine (ASAM) specifically recommends continued care at the prescribed level when "[t]he patient is making progress, but has not yet achieved the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals." She would have also noted the following publications, all of which support continued treatment at the prescribed, twice weekly frequency.

Leichsenring, F., & Rabung, S. (2008). Effectiveness of long-term psychodynamic psychotherapy: A meta-analysis. *JAMA*, 300 (13), 1551-1565.

Freedman, N., Hoffenberg, J. D., Vorus, N., & Frosch, A. (1999). The effectiveness of psychoanalytic psychotherapy: The role of treatment duration, frequency of sessions, and the therapeutic relationship. *JAPA*, 47, 741-772.

de Maat, S., de Johnge, F., Schoevers, R., & Dekker, J. (2009). The effectiveness of long-term psychoanalytic therapy: A systematic review of empirical studies. *Harvard Review of Psychiatry*, 17(1), 1-23.

90.     Not only did UBH not respond to Plaintiff Klein's urgent appeal within 72 hours, as required by ERISA, but UBH entirely failed to respond to the appeal even within the 30-day outer limit for standard appeals set by Plaintiff Klein's Plan and ERISA. To date, neither

CLASS ACTION COMPLAINT                                   CASE NO. 3:14-cv-5337

Plaintiff Klein nor Dr. Leffert has received any response from UBH concerning the October 21, 2014 urgent appeal. Accordingly, Plaintiff Klein either exhausted her administrative remedies or should be deemed to have done so due to futility. Moreover, administrative exhaustion is not a prerequisite to a breach of fiduciary duty claim.

91.     UBH based its denial of benefits to Plaintiff Klein on a CDG that was not consistent with generally accepted medical standards of care or even permitted for use by the Klein Plan. Generally accepted medical standards of care allow for psychotherapy and medication evaluation and management at a twice-weekly frequency when a patient has a chronic condition. They do not condition treatment on the acute risk of deterioration, and instead focus on long-term recovery, recognizing that extended and intensive outpatient treatment is often necessary to address chronic conditions and promote lasting stability. They also do not require patients to show acute changes to their conditions before treatment can be received. Yet Dr. Moldauer required acute hospitalization criteria—such as dangerousness or other clinically urgent situations—and denied twice-weekly outpatient care on that basis. Further contradicting the requirements of generally accepted medical practices, Dr. Moldauer failed to proffer any "clear and compelling rationale" to select a lower standard of care.

92.     Since September 22, 2014, Plaintiff Klein has continued to receive twice-weekly psychotherapy and medication management from Dr. Leffert, which Defendant has prospectively denied. These unreimbursed claims will amount to thousands of dollars. In light of Plaintiff Klein's chronic and severe mental illnesses, it is expected that she will continue to require such treatment in the future.

## UBH'S BREACH OF FIDUCIARY DUTY
## AND IMPROPER DENIAL OF HAFFNER'S CLAIMS

93.     Plaintiff David Haffner resides in Washington, D.C.

CLASS ACTION COMPLAINT                                    CASE NO. 3:14-cv-5337

94.     David Haffner is a participant in the "Science Systems and Applications, Inc. Health and Medical Plan" (the "Haffner Plan"). His non-grandfathered, large group plan is a fully-insured healthcare policy issued by UHIC in Maryland with an effective date of January 1, 2011. The Haffner Plan renews on January 1 each year. It is subject to ERISA and Maryland state law.

95.     According to the Certificate of Coverage ("COC") that governs the Haffner Plan, all benefits are paid pursuant to the terms of the Haffner Plan, which is "offered" and "underwritten" by UHIC. The Haffner Plan's COC identifies the "Plan Sponsor" and "Plan Administrator" as Science Systems and Applications, Inc. The COC explains, however, that the "Plan Sponsor retains all fiduciary responsibilities with respect to the Plan except to the extent the Plan Sponsor has delegated or allocated to other persons or entities one or more fiduciary responsibility with respect to the Plan." It then explains that UHIC is the "Claims Fiduciary." In that capacity, the COC explains that the plan is "administered on behalf of the Plan Administrator by UnitedHealthcare Insurance Company" and that, as such, UHIC handles "claims processing, claims payment, and [] appeals." It further explains that UHIC has discretion to "interpret benefits under the Policy," "interpret the other terms, conditions, limitations and exclusions set out in the Policy," and "make factual determinations related to the Policy and its Benefits." It also explains that UHIC "may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Policy." Pursuant to that authority, UHIC has delegated all of its discretion to UBH for purposes of mental health and substance abuse claims administration.

96.     In a section entitled, "Prudent Actions by Plan Fiduciaries," the Haffner Plan states:

CLASS ACTION COMPLAINT                                    CASE NO. 3:14-cv-5337

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

97.     The Haffner Plan defines "health care provider" as "an individual who is licensed or otherwise authorized in the State of Maryland to provide health care services in the ordinary course of working or practice of a profession and is a treating provider of a Covered Person."

98.     The Haffner Plan covers "medical education services that are provided in a Physician's office by appropriately licensed or registered healthcare professionals when both of the following are true: [1] Education is required for a disease in which patient self-management is an important component of treatment [and 2] There exists a knowledge deficit regarding the disease which requires the intervention of a trained health professional."

99.     The Haffner Plan covers treatment for "Mental Illness," defined as "those mental health or psychiatric diagnostic categories that are listed in the current *Diagnostic and Statistical Manual* of the American Psychiatric Association" with the exception of "Treatment for Mental Illnesses that in the ***professional judgment of health care providers*** are deemed untreatable or not medically necessary." In other words, the Haffner Plan does not permit Defendant, which is not a health care provider and which, according to the COC, "do[es] not make decisions about the kind of care you should or should not receive" and "do[es]n't determine whether the pending health service is necessary or appropriate," to substitute its judgment of "medical necessity" for that of health care providers.

100.     The Haffner Plan pays benefits for in- and out-of-network, in- and outpatient mental health services including psychotherapy, "consistent with nationally recognized

scientific evidence as available, and prevailing medical standards and clinical guidelines." The Haffner Plan defines "scientific evidence" as "the results of controlled clinical trials or other studies published in peer-reviewed, medical literature generally recognized by the relevant medical specialty community" and "prevailing medical standards and clinical guidelines" as "nationally recognized professional standards of care including, but not limited to, national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines."

101.   The Haffner Plan expressly provides that effective January 1, 2011, "[p]rior authorization requirements no longer apply to mental health conditions, neurobiological disorders (autism spectrum disorders) and substance use disorders."

102.   The Haffner Plan provides for two internal appeals prior to the exhaustion of administrative remedies.

103.   Plaintiff Haffner has suffered from severe mental illnesses, including Bipolar Disorder, Obsessive Compulsive Disorder, and Borderline Personality Disorder for the better part of his life. To treat his chronic mental illnesses and their attendant impairments, including occupational and relational conflicts, Plaintiff Haffner has been prescribed various medications and has attempted different psychotherapies, such as behavioral and psychodynamic modalities, with the help of various clinicians. All of Plaintiff Haffner's mental illnesses are covered conditions by his health plan.

104.   In 2011, Plaintiff Haffner submitted claims to UBH for twice weekly, 45 minute psychotherapy (with medical evaluation and management) visits (CPT code 90807) with an out-of-network psychiatrist, Michael S. Diamond, M.D. in Chevy Chase, Maryland. These claims were paid without protest until July 25, 2011, when UBH's ALERT program flagged Plaintiff

Haffner for a "utilization review [] for 12 or more visits within the last 6 weeks." Thus, in a subsequent August 29, 2011 letter, Plaintiff Haffner was advised that "If your provider does not contact UBH within 45 days, your outpatient treatment may be denied."

105.   On September 27, 2011, Dr. Diamond informed UBH case manager Ashley Baker, LPC that despite Plaintiff Haffner's psychotropic medication compliance, he continued to suffer from moderate impairments in all areas of functioning. Dr. Diamond also described ongoing, moderate psychosocial stress, and identified treatment goals to reinforce Plaintiff Haffner's ability to maintain work relationships, increase his social supports, and improve his mood. Dr. Diamond also relayed that Plaintiff Haffner previously met with a behaviorist to address symptoms specific to obsessive-compulsive disorder. Despite the Haffner Plan's express requirement that UBH should defer to the healthcare provider's professional judgment regarding the medical necessity of mental health services, Ms. Baker determined that a concurrent "peer review [was] indicated due to question of medical necessity."

106.   Subsequently, in a December 1, 2011 concurrent review, Cristiana Motet-Grigoras, a UBH Associate Medical Director based in California, concluded that:

> The diagnoses includes Personality Disorder NOS that is probably the focus of the intensive psychotherapy. The therapy is not behaviorally focused or he would not need to see another behavioral therapist.
>
> *  *  *
>
> The rationale for my decision is based on a review of the behavioral health services that the member is receiving, review of COC/SPD for BH/EAP - POS, review of UBH Coverage Determination Guidelines for Outpatient Treatment of BAD, OCD, Personality Disorders.

107.   In fact, Plaintiff Haffner had several consultations in 2011 with Dr. Leopold O. Walder, a Maryland-based behavioral therapist, and Dr. Walder recommended that Plaintiff

38

Haffner reduce behavioral therapy for obsessive-compulsive disorder and continue to receive psychodynamic psychotherapy from Dr. Diamond.

108.   Despite Plaintiff Haffner's complex treatment needs, on December 5, 2011 Dr. Motet-Grigoras issued an adverse benefit determination for prospective claims dated *"12/01/2011 forward*:"

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UnitedHealthcare Insurance Company members. The availability of benefit coverage for a service is determined by the terms of your benefit plan. To review information about your specific plan coverage, please refer to the benefit information provided by your health plan.

> I have reviewed the plan for your outpatient ongoing treatment with Michael Diamond, MD. Based on my review of the available documentation and all information we have received to date, I have determined that coverage is available under your benefit plan at the reduced frequency of one time per month. Coverage is available at a reduced frequency for the following reason(s):

> Based on my review of the available documentation and all information received to date, I have determined that coverage is available under your benefit plan at the *reduced frequency of monthly medication management sessions with this provider in addition to the therapy you appear to receive with another therapist for outpatient treatment.* Coverage is available at a reduced frequency for the following reason/reasons: *There is no clear and compelling evidence, nor any prevailing national standards of clinical practice that indicate that continued treatment at this level of care and at the frequency of two (2) times weekly with Michael S Diamond, MD is required to prevent acute deterioration or exacerbation that would then require a higher level of care.* It has been determined that ongoing treatment can safely take place in standard outpatient therapy sessions, CPT Code 90806 (typically 50 minutes or less) with a therapist and monthly medication management sessions (CPT Code 90862) with the psychiatrist basis. The use of multiple weekly therapy sessions typically is limited to acute exacerbations of illness, or in the context of a clinically urgent situation. While you are reportedly still exhibiting clinical symptoms caused by a covered behavioral health diagnosis, they are not at a severity level that would require two times weekly therapy sessions with this provider. *You receive psychotherapy already from another therapist that I recommend you direct you future psychotherapy needs to.*

109.   While recognizing that borderline personality disorder was "probably the focus of the intensive psychotherapy" by Dr. Diamond (a psychiatrist reimbursed by UBH at $215 per session), Dr. Motet-Grigoras nonetheless directed Plaintiff Haffner to behavioral therapy for obsessive-compulsive disorder by Dr. Walder (a psychologist reimbursed by UBH at $150 per session), who recommended only sporadic behavioral care.

110.   In her determination, Dr. Motet-Grigoras did not identify the CDGs upon which she relied. Her case notes and UBH's other statements reveal that she relied on the "UBH Coverage Determination Guidelines for Outpatient Treatment of BAD [Bipolar Affective Disorder], OCD [Obsessive Compulsive Disorder], Personality Disorders." All of these CDGs condition outpatient treatment on "compelling evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition." This is the standard that Dr. Motet-Grigoras actually applied in her September 5, 2012 adverse determination (requiring "*clear and compelling evidence . . . that acute deterioration or exacerbation that would then require a higher level of care*").

111.   In its *Level of Care Guidelines Evidence Base*, UBH specifically acknowledges that the American Association of Community Psychiatrists' Level of Care Utilization System for Psychiatric and Addiction Services ("LOCUS") establishes initial and continued level of care criteria. LOCUS states that "*[i]n most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise.*" Instead of following this standard, Dr. Motet-Grigoras required Plaintiff Haffner to justify his continued treatment to prevent deterioration and maintain a functional level. This was contrary to generally accepted medical standards.

112.   Additionally, generally accepted medical standards clearly recognize borderline personality disorder as an enduring, disabling condition treatable in its own right, primarily through multiple weekly sessions of psychodynamic psychotherapy. In fact, according to the American Psychiatric Association *Practice Guideline for the Treatment of Patients with Borderline Personality Disorder*, which UBH acknowledges as the evidence base for its CDGs:

> There is a large clinical literature describing psychoanalytic/psychodynamic individual therapy for patients with borderline personality disorder. Most of these clinical reports document the difficult transference and countertransference aspects of the treatment, but they also provide considerable encouragement regarding the ultimate treatability of borderline personality disorder. Therapists who persevere describe substantial improvement in well-suited patients. Some of these skilled clinicians have reported success with the use of psychoanalysis four or five times weekly.
> ***There are no studies demonstrating that brief therapy or psychotherapy less than twice a week is helpful for patients with borderline personality disorder.***

In violation of this standard, Dr. Motet-Grigoras relied on UBH's CDG for Personality Disorders, which specifically exempts treatment for borderline personality disorder from primary consideration for reimbursement, and determined that Plaintiff Haffner was only entitled to once-weekly care.

113.   Finally, as in Plaintiff Klein's case described above, UBH's prospective claims denial violated 29 U.S.C. § 1185(d) (incorporating 42 U.S.C. § 300gg-19(a)(1)(C)), which requires UBH to allow its insureds "***to receive continued coverage pending the outcome of the appeals process***." Rather than pend her December 5, 2011 adverse determination during the appeals process, Dr. Motet-Grigoras effected it as of "12/01/2011 forward."

114.   On December 19, 2011, UBH's ALERT program continued to flag Plaintiff Haffner as at "risk for Frequent Outpatient Visits and High Utilization-Member Payee."

CLASS ACTION COMPLAINT                                                      CASE NO. 3:14-cv-5337

115.   On April 16, 2012, Plaintiff Haffner formally appealed UBH's December 5, 2011 adverse determination and submitted a carbon copy of his letter to Maryland Insurance Administration:

The APA states that intensive psychodynamic psychotherapy is a recognized and effective treatment for BPD, and further, that there are no studies demonstrating that psychotherapy less than twice a week is helpful for patients. UBH recommended I direct any continued therapy needs to Dr. Leopold Walder, PhD. because in the past I have seen Dr. Walder in the past for therapy.

* * *

However please note that Dr. Walder's role in my treatment has been adjunctive, and in the past year we have met only infrequently. Dr. Walder and Dr. Diamond have communicated regularly throughout my treatment, and each has acknowledged to me in clear terms that their respective areas of expertise in treatment are mutually independent inasmuch as two effective psychological treatments can be.

* * *

My treatment with Dr. Walder at this stage is supportive and meant to consolidate behavioral strategies and concepts that I learned from him during a period of more intensive therapy with him.

* * *

However it has always been agreed that Dr. Diamond has the primary overall responsibility for my treatment. He is optimal for this role due to his clinical expertise in the conditions from which I suffer and for his comprehensive knowledge of my case. Your letter of adverse determination naively assumed a switch to Dr. Walder for all of my therapy needs would be appropriate. In the light of the centrality of Borderline Personality Disorder to my symptom complex, it was grossly inappropriate for UBH to recommend I direct my "future psychotherapy needs" to Dr. Leopold Walder. He is not psychodynamic therapist.

* * *

UBH's decision to limit my medical coverage following a sloppy clinical evaluation, with extremely short notice, and for a matter having significant consequences for my welfare, is abhorrent. I look forward to you taking prompt and decisive action to rectify this situation. An apology from UBH would also be appreciated.

116.   On May 4, 2012, UBH Senior Compliance Specialist Amy Henson responded by letter to Linda McGlone, Insurance Investigator at the Maryland Insurance Administration Appeals and Grievance Unit:

> This letter is in response to the above-referenced complaint dated and received April 25, 2012. United Behavioral Health (UBH) administers the mental health/substance abuse benefit for United Healthcare Insurance Company.
>
> The complaint stated that UBH member, David Haffner, would like UBH to provide continued benefit coverage of non-routine twice weekly outpatient therapeutic treatment services with out-of-network provider, Michael S. Diamond, M.D.
>
> As explained in greater detail below, UBH issued an adverse benefit determination for continued benefit coverage of the requested services for dates of service ***December 1, 2011 and forward***.
>
> Please note that ***UBH conducts initial clinical reviews*** of outpatient care to ensure that UBH members receive care that meets the ***UBH Clinical Coverage Guidelines. These guidelines are based on the National Standards of Care and best practice guidelines for the member's given diagnosis.*** These standards of care are required by the member's benefit plan for any treatment covered by the member's plan regardless of the provider or whether the treatment provided is in-network or out-of-network. As part of the management of this member's plan, the clinical update is required to ensure that the member's care is meeting the Coverage Determination Guidelines. The out-of-network provider is not obligated to complete this clinical review. However, ***if the provider declines to complete the clinical update, UBH will likely pursue an administrative denial*** due to not receiving information necessary to make a determination regarding authorization of benefit coverage. Both in-network and out-of-network providers are welcome to visit the website ubhonline.com to view the guidelines for their clients' specific diagnosis.

117.   In a subsequent May 17, 2012 letter, UBH Regional Medical Director, Andrew Martorana, M.D. upheld the benefits denial:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UnitedHealthcare Insurance Company members. The availability of benefit coverage for a service is determined by the terms of your benefit plan. To review information about your specific plan coverage, please refer to the benefit information provided by your health plan.

* * *

To appeal you need to show that your condition has to be treated with two (2) sessions per week by Michael S Diamond, MD in addition to you receiving therapy from the other therapist you see.

* * *

After fully investigating the substance of the appeal, including all aspects of clinical care involved in this treatment episode, I have determined that benefit coverage is not available for the following reason(s):

Based on the available clinical information, the member's Certificate of Coverage for SSAI, and UBH Coverage Determination Guidelines covering Personality Disorders, Outpatient treatment of Obsessive Compulsive Disorder, and Outpatient treatment of Bipolar Disorder, it is my determination to uphold the previous non-coverage determination. There is no evidence that twice weekly psychotherapy sessions are needed to **prevent deterioration or to treat an urgent situation.** The alternative treatment recommended for coverage is continued medication management sessions with Dr. Diamond and weekly behaviorally focused sessions with the member's current therapist, L. Walder, or another of his choosing.

* * *

This is the Final Determination of your internal appeal. All internal appeals through UBH have been exhausted.

118.   Like Dr. Motet-Grigoras, Dr. Martorana made a decision forbidden by the Haffner Plan, based on a CDG that was inconsistent with generally accepted medical standards. He ignored generally accepted medical standards and instead improperly predicated his coverage denial on UBH's CDGs by: 1) requiring "compelling evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition;" 2) failing to recognize Borderline Personality Disorder as a primary psychiatric condition, as provided for in the American Psychiatric Association's *Diagnostic and Statistical Manual*; and 3) failing to acknowledge the lack of evidence for less than twice-weekly treatment, namely with psychodynamic psychotherapy. Additionally, Dr. Martorana failed to provide a "clear and compelling rationale" to deviate from the evidence-based,

44

prescribed course of psychodynamic psychotherapy, as required by LOCUS (but strikingly disregarded by UBH's Level of Care Guideline for Outpatient Mental Health Treatment).

119.  Further, while Dr. Walder recommended only adjunctive behavioral therapy for Plaintiff Haffner, Dr. Martorana nonetheless continued to improperly reference such care as ongoing and to direct Plaintiff Haffner for additional "behaviorally focused sessions," for which no recent claims had been submitted.

120.  Last, although Plaintiff Haffner's Plan provides for two internal levels of appeal, Dr. Martorana (the UBH Regional Medical Director) prematurely and conclusively decreed that UBH would no longer entertain any further objections: "This is the Final Determination of your internal appeal. All internal appeals through UBH have been exhausted." Accordingly, Plaintiff Haffner either exhausted his internal administrative remedies or should be deemed to have done so due to futility. Moreover, administrative exhaustion is not a prerequisite to a breach of fiduciary duty claim.

121.  Since December 1, 2011, Plaintiff Haffner continued to submit claims for twice-weekly psychotherapy with Dr. Diamond, which Defendant rejected. These unreimbursed claims have exceeded thousands of dollars. In light of Plaintiff Haffner's chronic and severe mental illnesses, it is expected that he will continue to require such treatment in the future.

## CLASS ACTION ALLEGATIONS

122.  Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

123.  UBH serves as the claims administrator for mental health and substance abuse treatment claims for other health insurance plans that define covered outpatient (and intensive outpatient) treatment in the same way as the Alexander, Klein, and Haffner Plans. The policies

and practices that UBH followed with respect to the claims filed by Plaintiffs are the same as those that have been applied by UBH to other similarly situated insureds seeking mental health and substance abuse treatment benefits under their health plans.

124.   As such, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring their claims on behalf of a putative class of similarly situated individuals as noted in the counts below. The class (the "Class") is defined as follows:

> All participants or beneficiaries in an insurance plan governed by ERISA, for which UBH has been delegated the authority to make coverage decisions with respect to claims for mental health and substance abuse-related treatment, who sought and were denied coverage for all or a portion of outpatient or intensive outpatient treatment for mental health or substance use disorders, within the applicable statute of limitations.

125.   The members of the Class can be objectively ascertained through the use of information contained in UBH's files because UBH knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

126.   There are so many persons within the putative classes that joinder is impracticable.

127.   Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of each of the class. Such common questions of law and fact include, but are not limited to, the following:

A.   What legal duties does ERISA impose upon UBH when it serves as a claims administrator for mental health and substance abuse claims;

B.   Whether UBH engages in a fiduciary act when it develops and utilizes mental health and substance use level of care and coverage determination guidelines;

C.   Whether UBH's LOCs and CDGs are consistent with those that are generally accepted in the medical community;

CLASS ACTION COMPLAINT                                          CASE NO. 3:14-cv-5337

D.     Whether UBH's development and utilization of these guidelines constitutes a breach of fiduciary duty;

E.     Whether UBH engages in a fiduciary act when it adjudicates a claim for benefits;

F.     What remedies are available if UBH is found liable for the claims alleged.

128.    Certification is desirable and proper because Plaintiffs' claims are typical of the claims of the members of the classes Plaintiffs seek to represent.

129.    Certification is also desirable and proper because Plaintiffs will fairly and adequately protect the interests of the classes they seek to represent. There are no conflicts between the interests of Plaintiffs and those of other members of the classes, and Plaintiffs are cognizant of their duties and responsibilities to the entire class. Plaintiffs' attorneys are qualified, experienced and able to conduct the proposed class action litigation.

130.    It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

131.    The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the class through numerous separate actions.

## COUNT I

### CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS
### BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

132.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

CLASS ACTION COMPLAINT                                      CASE NO. 3:14-cv-5337

133.   This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B) to clarify Plaintiffs' right to future benefits and enforce their rights under their Plans.

134.   As the entity responsible for making mental health and substance abuse benefit determinations under Plaintiffs' Plans, and responsible for developing internal practices and policies to facilitate such determinations, UBH is an ERISA fiduciary.

135.   As an ERISA fiduciary, and pursuant to 29 U.S.C. Section 1104(a), UBH is required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers. It must conform its conduct to a fiduciary duty of loyalty and may not make misrepresentations to its insureds.

136.   UBH violated (and continues to violate) these duties by adopting the restrictive level of care and coverage determination guidelines discussed herein and applying them to claims submitted by Plaintiffs and the Class. Despite the fact that the health insurance plans that insure Plaintiffs and the Class provide for insurance coverage for outpatient and IOP mental health and substance abuse treatment, the fact that generally accepted standards of care are widely available and well-known to UBH, and that fact that UBH asserted that its guidelines were consistent with those that are generally accepted, UBH developed guidelines that are far more restrictive than those that are generally accepted. In doing so, UBH did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." It did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of Plaintiffs' Plans.

137.   Instead, UBH elevated its own interests and those of its corporate affiliates above the interests of plan participants and beneficiaries. By promulgating improperly restrictive guidelines, UBH artificially decreases the number and value of covered claims, thereby benefiting its corporate affiliates at the expense of insureds.

138.   Plaintiffs and the members of the Class seek the relief identified below to remedy this claim.

**COUNT II**

**CLAIM FOR IMPROPER DENIAL OF BENEFITS**
**BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS**

139.   Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

140.   This count is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

141.   UBH denied the insurance claims for outpatient and IOP treatment submitted by Plaintiffs and other members of the Class in violation of the terms of Plaintiffs' Plans and the insurance plans that insure members of the Class.

142.   Plaintiffs and the members of the Class have been harmed by Defendant's improper benefit denials because they were deprived of insurance benefits they were owed.

143.   Plaintiffs and the members of the Class seek the relief identified below to remedy this claim.

**COUNT III**

**CLAIM FOR EQUITABLE RELIEF**
**BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS**

144.   Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

CLASS ACTION COMPLAINT                                    CASE NO. 3:14-cv-5337

145.   This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts I and/or II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

146.   Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

147.   In order to remedy these harms, Plaintiffs and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV

### CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF
### BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

148.   Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

149.   This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B).

150.   Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

151.   Additionally, by engaging in this misconduct, UBH caused its corporate affiliates to be unjustly enriched insofar as they were not required to pay benefit claims, and shared in that unjust enrichment.

152.   In order to remedy these harms, Plaintiffs and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

### REQUESTED RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendant as follows:

A.     Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

50

CLASS ACTION COMPLAINT                                    CASE NO. 3:14-cv-5337

1   B.  Appointing the Plaintiffs as Class Representatives for the Class;

2   C.  Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as counsel for the

3 Class;

4

5   D.  To remedy Count I, or alternatively pursuant to Count III, declaring that UBH's

6 internal guidelines complained of herein were developed and utilized in violation of UBH's

7 fiduciary duties;

8   E.  To remedy Count I, or alternatively pursuant to Count III, issuing a permanent

9 injunction ordering UBH to stop utilizing the guidelines complained of herein, and instead adopt,

10 develop, and utilize guidelines that are consistent with generally accepted medical practices;

11   F.  To remedy Count II, or alternatively pursuant to Count III, ordering UBH to

12 reprocess claims for outpatient and IOP treatment that it previously denied (in whole or in part)

13 pursuant to new guidelines that are consistent with generally accepted medical standards and the

14 Class's plans;

15

16   G.  Pursuant to Count IV, ordering UBH to pay a surcharge or other make whole

17 relief to Plaintiffs and members of the Class in an amount equivalent to the revenue UBH

18 generated for providing mental health and substance abuse-related claims administration services

19 with respect to claims filed by Plaintiffs and members of the Class, expenses that UBH's

20 corporate affiliates saved due to UBH's wrongful denials, the additional revenue UBH received

21 as a result of those savings, the out-of-pocket costs that Plaintiffs and members of the Class

22 incurred following UBH's wrongful denials, and/or pre-judgment interest;

23

24   H.  Awarding Plaintiffs' disbursements and expenses for this action, including

25 reasonable attorneys' fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. §

26 1132(g); and

27

28

CLASS ACTION COMPLAINT         CASE NO. 3:14-cv-5337

1    I.    Granting such other and further relief as is just and proper.

2

3    Dated: December 4, 2014

4                                         Respectfully submitted,

5

6                                         /s/ Meiram Bendat
                                          Meiram Bendat (Cal. Bar No. 198884)
7                                         PSYCH-APPEAL, INC.
                                          8560 West Sunset Boulevard, Suite 500
8                                         West Hollywood, CA 90069
                                          Tel: (310) 598-3690, x.101
9                                         Fax: (310) 564-0040
                                          mbendat@psych-appeal.com
10

11                                        D. Brian Hufford (subject to *pro hac vice* admission)
                                          Jason S. Cowart (subject to *pro hac vice* admission)
12                                        ZUCKERMAN SPAEDER LLP
                                          1185 Avenue of the Americas, 31st Floor
13                                        New York, NY 10036
                                          Tel: (212) 704-9600
14                                        Fax: (212) 704-4256
                                          dbhufford@zuckerman.com
15                                        jcowart@zuckerman.com

16

17                                        Jason M. Knott (subject to *pro hac vice* admission)
                                          Andrew Caridas (subject to *pro hac vice* admission)
18                                        ZUCKERMAN SPAEDER LLP
                                          1800 M Street, NW, Suite 1000
19                                        Washington, DC 20036
                                          Tel: (202) 778-1800
20                                        Fax: (202) 822-8106
                                          jknott@zuckerman.com
21                                        acaridas@zuckerman.com

22                                        *Attorneys for Plaintiffs*

23

24

25

26

27

28

CLASS ACTION COMPLAINT                                    CASE NO. 3:14-cv-5337