Meiram Bendat (Cal. Bar No. 198884)
PSYCH-APPEAL, INC.
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
399 Park Avenue, 14th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

Caroline E. Reynolds (admitted *pro hac vice*)
Andrew Caridas (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
creynolds@zuckerman.com
acaridas@zuckerman.com

*Attorneys for Plaintiffs and Michael Driscoll*

## UNITED STATED DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| GARY ALEXANDER, on his own behalf and on behalf of his beneficiary son, JORDAN ALEXANDER, and all others similarly situated, CORINNA KLEIN, on behalf of herself and all others similarly situated, and DAVID HAFFNER, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 3:14-CV-05337-JCS <br><br><br><br><br> __INTERVENOR COMPLAINT__ |

Defendant.

)
)
)
)
)
MICHAEL DRISCOLL, on his own behalf and
)
on behalf of his daughter, Sara Driscoll, and
)
all others similarly situated,
)
)
              Intervenor Plaintiff,
)
)
      v.
)
)
UNITED BEHAVIORAL HEALTH
)
(operating as OPTUMHEALTH BEHAVIORAL
)
SOLUTIONS),
)
)
              Defendant.
)
)

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

SUMMARY OF INTERVENOR PLAINTIFF'S ALLEGATIONS ........................................... 2

DEFENDANT, JURISDICTION AND VENUE ........................................................ 6

UBH'S GUIDELINES APPLICABLE TO DRISCOLL'S CLAIMS ....................................... 6

UBH'S BREACH OF FIDUCIARY DUTY AND IMPROPER DENIAL OF
    DRISCOLL'S CLAIMS ................................................................... 13

CLASS ACTION ALLEGATIONS ................................................................ 20

COUNT I
    CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS BROUGHT ON
    BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS ..................................... 23

COUNT II
    CLAIM FOR IMPROPER DENIAL OF BENEFITS BROUGHT ON BEHALF OF
    INTERVENOR PLAINTIFF AND THE CLASS .............................................. 24

COUNT III
    CLAIM FOR EQUITABLE RELIEF BROUGHT ON BEHALF OF INTERVENOR
    PLAINTIFF AND THE CLASS .......................................................... 25

COUNT IV
    CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF BROUGHT ON
    BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS ................................... 25

REQUESTED RELIEF ........................................................................ 26

INTERVENOR COMPLAINT
CASE NO. 3:14-CV-05337-JCS

# INTRODUCTION

Like current Plaintiff Gary Alexander, whose son Jordan was repeatedly denied coverage for intensive outpatient treatment ("IOP") of mental illness and substance use disorder, Intervenor Plaintiff Michael Driscoll experienced United Behavioral Health's denial of coverage for his daughter Sara's[1] medically-necessary IOP based on United Behavioral Health's application of flawed and overly-restrictive coverage determination guidelines United Behavioral Health itself created.

Mr. Driscoll has been grievously harmed by United Behavioral Health's misconduct in promulgating flawed guidelines and then applying those guidelines to wrongfully deny his daughter's coverage. The harm he suffered is identical to the harm suffered by the current Plaintiffs in this case, and by the putative class members those Plaintiffs seek to represent. Mr. Driscoll accordingly seeks to intervene in this action, and to join the current Plaintiffs in bringing complaint against United Behavioral Health on behalf of himself and all others similarly situated. In support of his claims, Mr. Driscoll alleges upon personal knowledge as to himself and his daughter, and upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys (including review of publicly available information concerning United Behavioral Health's guidelines and correspondence sent by United Behavioral Health to Intervenor Plaintiff) as to all other matters, as follows:

---

[1] Because of the severe and deeply personal nature of the trauma suffered by Michael Driscoll's daughter, the pseudonym "Sara" is used throughout.

1.      Mr. Driscoll and his daughter Sara are insured by a health insurance plan sponsored by his employer and governed by the Employee Retirement Income Security Act of 1974 ("ERISA") (the "George Washington University Plan" or the "GWU Plan").

2.      The GWU Plan covers treatment for sickness, injury, mental illness, and substance use disorders. The GWU Plan provides that intensive outpatient treatment is a covered benefit so long as it is consistent with generally accepted standards of mental healthcare.

3.      The GWU Plan has delegated responsibility for adjudicating mental health and substance abuse-related claims to Defendant United Behavioral Health ("UBH"). Pursuant to this delegation (as well as similar designations from the other plans that UBH administers), UBH has developed "level of care" guidelines ("LOC Guidelines") and "coverage determination" guidelines ("CDGs"), which it provides to its claims representatives for use in adjudicating mental healthcare claims.

4.      UBH's CDGs purport to identify, on a condition-by-condition basis, the benefits that are available pursuant to health plans insured and/or administered by UBH and the "best practices" (supposedly as defined by generally accepted standards of care) that a mental healthcare provider should follow when treating the condition, and fully incorporate the "level of care" criteria found in UBH's LOCs. UBH's CDGs instruct UBH reviewers to consult the insured's particular plan terms before deciding whether particular benefits are covered.

5.      UBH asserts that its LOCs are a set of "objective" and "evidence-based" criteria used to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing. UBH's LOCs set forth criteria that its claims

INTERVENOR COMPLAINT
CASE NO. 3:14-CV-05337-JCS

reviewers are supposed to apply to determine both whether a particular level of mental healthcare is covered by the terms of the Plan and that such level of care is consistent with generally accepted standards of care.

6.     The GWU Plan has no substantive role in the creation, promulgation or content of any of these guidelines, or in UBH's decision to approve or deny any claim.

7.     In light of its central role in the mental health and substance abuse-related claim adjudication process, UBH is an ERISA fiduciary as defined by 29 U.S.C. Section 1104(a). As such, it is legally required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and defraying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers, so long as such terms are consistent with ERISA. As a fiduciary, UBH owes a duty of loyalty to plan participants and beneficiaries. It must also refrain from any conduct that violates state or federal law.

8.     UBH suffers from an inherent conflict of interest in its role as mental health and substance abuse claims administrator. Every claim denied by UBH saves money for UBH's corporate affiliates and artificially increases the profit of its parent entity, UnitedHealth Group Incorporated ("UHG"). While the GWU Plan is "self-funded," meaning that health care benefits are paid, in the first instance, from the assets of the Plan's sponsor, most self-funded plans have stop-loss provisions that obligate the insurer to pay benefits that exceed a certain threshold. Thus, every claim UBH denies makes it less likely that such a stop-loss threshold will be crossed and reduces the possible stop-loss liability of UBH's affiliate, UnitedHealthcare Insurance Company ("UHIC").

9.      Against this backdrop, UBH has violated its fiduciary duties, as detailed herein.

10.     Generally accepted standards of care related to intensive outpatient mental health and substance abuse treatment are promulgated by the American Psychiatric Association ("APA"), the American Association of Community Psychiatrists ("AACP"), the American Society for Addiction Medicine ("ASAM"), the Association for Ambulatory Behavioral Healthcare ("AABH"), and a body of published, peer-reviewed research. Generally speaking, these standards identify a host of criteria as being relevant to determining whether outpatient treatment, and at which frequency, is the appropriate level of care for any particular patient; recognize that outpatient treatment is the least restrictive level of mental healthcare; and call for outpatient treatment when the patient's condition may be chronic in nature (i.e., non-acute) and require ongoing care.

11.     UBH's LOCs and CDGs are much more restrictive than the generally accepted standards of care in the mental health community. Indeed, in the last 3 years, UBH has amended its guidelines to make them even more focused on the presence of acute symptoms (and therefore more restrictive), despite the fact that generally accepted guidelines highlight prevention of relapse and chronic considerations. As detailed herein, whereas UBH's guidelines restrict coverage for outpatient mental health and substance abuse treatment to "acute" situations that can be addressed quickly, such restrictions on outpatient treatment are not found in any of the generally accepted standards of care, or for that matter, in the GWU Plan that UBH administers.

12.     The GWU Plan provides mental health and substance abuse coverage, but excludes coverage when the treatment sought is inconsistent with generally accepted standards of care. It also specifies that "[t]he Claims Administrator develops and maintains clinical

policies that describe the Generally Accepted Standards of Medical Practice scientific evidence, prevailing medical standards and clinical guidelines supporting its determinations regarding specific services. Thus, in developing its guidelines, UBH had a fiduciary duty to Mr. Driscoll and his daughter (and to other members of plans administered by UBH) to promulgate and apply guidelines that reflect generally accepted standards of care. UBH breached this duty by supplanting generally accepted treatment standards in the mental health field with standards that promote the self-serving, cost-cutting preferences of UBH and its corporate affiliates. By adopting guidelines that are inconsistent with, and much more restrictive than, those that are generally accepted in the medical community, UBH breached its fiduciary duty to act solely in the interests of participants and beneficiaries for the "exclusive purpose" of "providing benefits" with reasonable "care, skill, prudence, and diligence" and in accordance with the GWU Plan.

13.     UBH has violated its legal obligations under ERISA by improperly denying intensive outpatient treatment claims that were covered by the GWU Plan. These claims would have been covered based on the terms of the GWU Plan and generally accepted treatment standards, but were denied as a result of UBH's promulgation of improperly restrictive benefit determination guidelines, which it then relied upon to deny Mr. Driscoll's daughter's claims.

14.     In order to remedy UBH's breach of fiduciary duty and other ERISA violations, Mr. Driscoll brings individual and class claims against UBH under 29 U.S.C. § 1132(a)(1)(B), 1132(a)(3)(A) and 1132(a)(3)(B). Through this action, Mr. Driscoll seeks appropriate equitable and injunctive relief under ERISA to compel UBH to change its policies and practices so as to comply with its fiduciary obligations and to make benefit determinations which are consistent with the GWU Plan, generally accepted medical standards, and applicable law.

## DEFENDANT, JURISDICTION AND VENUE

15.     Defendant United Behavioral Health ("UBH"), operating under the brand name OptumHealth Behavioral Solutions, is a corporation organized under California law with its principal place of business located in San Francisco, California. UBH is responsible for drafting and promulgating the internal level of care guidelines and coverage determination guidelines referenced herein. It also adjudicates all mental healthcare and substance abuse claims for the GWU Plan.

16.     UBH and UHIC are both wholly owned and controlled subsidiaries of UnitedHealth Group Incorporated ("UHG"). These companies do not operate independently and in their own interests, but solely serve to fulfill the goals and policies of UHG and generate revenue for UHG.

17.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.

18.     Personal jurisdiction exists over UBH, and this District is the proper venue, because UBH conducts significant operations in this District, regularly communicates with insureds who reside in this District, and is headquartered in this District.

## UBH'S GUIDELINES APPLICABLE TO DRISCOLL'S CLAIMS

19.     UBH has developed its own LOCs and CDGs that it uses to determine whether any given level of mental health and substance abuse treatment is covered by its administered health plans, and which were the basis of UBH's denial of Mr. Driscoll's daughter's claim. UBH asserts that its guidelines "reflect [UBH's] understanding of current best practices in care" and that using those guidelines "reduces undesirable variation from evidence-based practice."

20.     UBH reiterates these principles in two separate documents, *Guideline Evidence Base for Level of Care Guidelines* and *Guideline Evidence Base for Coverage Determination*

*Guidelines*. In those documents, which purport to provide the primary sources for UBH's LOCs and CDGs, UBH identified the guidelines of several nationally recognized medical associations (such as AACP and ASAM) as setting generally accepted standards of clinical practice for intensive outpatient treatment of mental health and substance use disorders.

21.     Consistent with these generally accepted standards, UBH's 2012 CDG applicable to IOP for substance abuse disorders states the "Goals of Intensive Outpatient Treatment include *[t]o provide an extended and structured treatment experience* for individuals requiring more intensive services than those generally available in traditional outpatient settings until such intensive services are no longer required and routine outpatient care can continue." The 2012 CDG states that "*[t]he focus of interventions in an IOP setting is to help patients develop skills associated with abstinence, motivational enhancement and relapse prevention* that will assist them in maintaining an adequate level of functioning in their home, school, work and community environments." Additionally, the 2012 CDG provides that "[w]hen supported by the benefit plan, coverage may be available for intensive outpatient programs that are provided with less intensity to members who are recovering from severe and persistent mental health conditions."

22.     Despite generally accepted standards of care intending IOP "to provide an extended and structured treatment experience," which was confirmed by the 2012 CDG UBH's superseding 2013 CDG for Substance Use Disorders, which served as the basis for denying Mr. Driscoll's daughter's claims, conspicuously omit any such discussion. Instead, UBH's IOP guidelines have become progressively more focused on "acute" criteria. For example, whereas the 2013 CDG excludes coverage for IOP "without evidence-based treatment of symptoms," the 2014 CDG excludes coverage for IOP "without evidence-based treatment of *acute* symptoms."

23.     Further, whereas the 2012 CDG instructs that discharge from IOP should be considered for "[i]ndividuals who have achieved the goals in his/her treatment plan, resolving the problem that necessitated admission ***and who have a demonstrated motivation*** to continue outpatient treatment," the 2013 CDG entirely omits considerations of "demonstrated motivation" prior to discharge. Yet the failure to consider "demonstrated motivation" at all stages of care, including prior to discharge, directly contradicts generally accepted standards, including *The ASAM Criteria,* which UBH acknowledges both in its CDGs and the *Guideline Evidence Base for Level of Care Guidelines* as setting generally accepted standards of care for substance abuse treatment.

24.     The 2013 CDG defines IOP as a "freestanding or hospital-based program that maintains hours of service for at least 3 hours per day, 2 or more days per week." The CDG also discusses the availability of "overnight housing coupled with an Intensive Outpatient Program" if "[t]he member's living situation is unsupportive or high risk, and is undermining the member's recovery and resilience; or [r]outine attendance at the Intensive Outpatient Program is hindered by the lack of transportation."

25.     In its 2013 (and preceding) guidelines such as the LOC for Continued Service Criteria, applicable to all levels of care for both mental health and substance abuse and incorporated by reference into all UBH Coverage Determination Guidelines, UBH specified that coverage should be denied for any level of care absent "evidence that relapse or a significant deterioration in functioning would be ***imminent*** if the member was transitioned to a lower level of care or, in the case of outpatient care, was discharged." This requirement was reinforced by UBH's 2013 (and preceding) Coverage Determination Guidelines for all mental health and substance use disorders, which required "***compelling evidence*** that continued treatment in the

current level of care is required to prevent ***acute*** deterioration or exacerbation of the member's current condition."

26.    UBH's guidelines have gotten no better since Sara Driscoll was denied coverage for IOP. UBH's 2015 LOC Guidelines incorporate UBH's 2015 LOC Guidelines for Common Criteria for all Levels of Care ("Common Criteria"). Admission to, or continued stay in, an IOP is only permitted under the Rehabilitation LOC Guidelines to the extent it is consistent with the Common Criteria.

27.    The Common Criteria, which are applicable to treatment at every level of care, and which are virtually identical to the 2014 version, continue to myopically focus on the presence and treatment of "acute" symptoms, and the possibility of deterioration with respect to such symptoms. The Common Criteria authorize admission to treatment only when (among other requirements):

- The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to ***acute*** changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission)….

-AND-

- …. Assessment and/or treatment of ***acute*** changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission) require the intensity of services provided in the proposed level of care….

28.    The Common Criteria also require, for admission to any treatment, that "[t]here is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time," and go on to explain that "[i]mprovement of the member's condition is indicated by the reduction or control of the ***acute*** signs and symptoms that necessitated treatment in a level of care."

29.     UBH asserts that its guidelines "reflect [UBH's] understanding of current best practices in care." In fact, however, UBH's guidelines are inconsistent with, and much more restrictive than, generally accepted standards of care.

30.     For example, the Level of Care Utilization System for Psychiatric and Addictive Services ("LOCUS"), developed by AACP for use in adult populations, has six dimensions: (1) risk of harm; (2) functional status; (3) co-morbidity; (4) recovery environment; (5) treatment and recovery history; and (6) engagement in recovery. Each dimension has a five point rating scale, from least to most severe. For each of the five possible ratings within each dimension, a set of criteria is clearly defined. Only one criterion needs to be met for that rating to be selected, and for each dimension, the highest rating in which at least one of the criteria is met is the rating that should be assigned. In case of any ambiguity or doubt, "the highest score in which it is more likely than not that at least one criterion has been met should generally be assigned. . . . [A]ny errors should be made on the side of caution."

31.     Based on these scores, LOCUS determines whether a patient should be placed in IOP, as opposed to a higher or lower standard of care. For example, a rating of 3 out of 5 in dimensions 1, 2, 3, 4 or 6, or a rating of 2 out of 5 in dimension 5 generally indicate that placement in an IOP setting is appropriate. When a choice between two levels of care must be made, "[i]n most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."

32.     Similarly, the ASAM guidelines also set forth six analogous dimensions for determining the appropriate level of care: (1) Acute Intoxication and/or Withdrawal Potential; (2) Biomedical Conditions and Complications; (3) Cognitive, Behavioral, and Emotional

Conditions and Complications; (4) Readiness to Change; (5) Relapse, Continued Use or Continued Problem Potential; and (6) Recovery Environment.

33.     ASAM also explicitly acknowledges that "chronicity of the addictive disorder or the patient's cognitive limitations" may compromise "readiness to change" and necessitate IOP:

> Given the current understanding of substance use disorders as having a ***chronic, long-term, remitting and relapsing course, it should be expected that effective treatment should match this chronic course.*** In fact, treatment should be regarded as a dynamic, longitudinal process, rather than as a discrete episode of care. While it may encompass one or several acute episodes, it also must endure over the long term. ***A now outdated approach viewed discrete time-limited episodes of program enrollment as adequate "doses" of treatment. In that view, any further care, also typically time-limited, was regarded as "aftercare" rather than ongoing care—as though the active part of treatment had ended.***

> The current view of addiction as a chronic disorder supports a stance of therapeutic optimism and an attitude of persistence toward the treatment-refractory patient. It also reinforces the need for chronic attention and vigilance in response to a chronic vulnerability, even in the improved patient.

34.     Moreover, as early as 2006, the APA *Practice Guideline for the Treatment of Patients With Substance Use Disorders, Second Edition,* which UBH recognizes as reflecting generally accepted standards of care, noted that, "if addiction is reconceptualized along the lines of a chronic rather than an acute disease model, as recommended by McLellan et al., the distinction between a 'treatment episode' and 'aftercare' should be removed and the different modalities of care (e.g., inpatient, outpatient) be reconsidered as part of a continuous, long-term treatment plan."

35.     The APA's *Practice Guideline* also states that:

> [I]ntensive outpatient programs can provide an intensive, structured treatment experience for individuals with substance use disorders who require more services than those generally available in traditional outpatient settings . . . [T]hese programs are sometimes used as "step-down" programs for individuals leaving hospital or residential settings who are at a high risk of relapsing because of problems with motivation, the presence of frequent cravings or urges to use a substance, poor social supports, immediate environmental cues for relapse and/or

11

availability of substances, and co-occurring medical and/or psychiatric disorders. The goal of such a "step-down" approach is to stabilize patients by retaining them in treatment and providing more extended intensive outpatient monitoring of relapse potential and co-occurring disorders.

36.     Additional generally accepted standards of care recognized by UBH, such as AABH's *Standards and Guidelines for Partial Hospitalization Programs*, underscore that "[g]iven the relatively lower acuity levels of individuals served in IOP programs compared to PHP programs, IOP services are delivered with a less intensive focus on crisis stabilization, safety issues, and acute symptomotology. Instead IOP's attend more to monitoring and maintaining stability, decreasing moderate symptomotology, increasing functioning, and assisting with integration into community life." Therefore, AABH states that "[t]he average length of stay in IOP's may range from under 30 calendar days up to 90 calendar days (or in some instances up to as much as one year)."

37.     Further, the APA has determined that "the decision to move to a less intensive level of care should consider these factors plus the clinician's assessment of a patient's readiness and ability to benefit from the less restrictive setting." In support of its recommendations, the APA cites that "individuals who received regular outpatient care when intensive outpatient care would have been recommended as more appropriate had poorer drinking outcomes. In individuals who received residential as compared with intensive outpatient treatment, there also was a trend for a better outcome."

38.     For the reasons discussed herein, UBH's LOCs and CDGs related to IOP are inconsistent with generally accepted standards of care (and therefore the GWU Plan) in three key respects. First, UBH's guidelines require patients to demonstrate by "compelling evidence" that treatment is necessary to prevent "acute" deterioration of their conditions. Generally accepted standards of care, in contrast, call for treatment unless there is "clear and compelling"

evidence that a lower level of care is more appropriate (i.e., the burden of proof is reversed), do not condition treatment on the risk of acute deterioration, and instead focus on long-term recovery, recognizing that extended and intensive outpatient treatment is often necessary to address chronic conditions and promote lasting stability. Second, UBH's guidelines require patients to demonstrate "acute" changes in their conditions or circumstances that now warrant treatment, even though generally accepted standards articulate no such requirement and call for treatment when chronic symptoms are present. Third, UBH's guidelines ignore generally accepted factors for determining the appropriate level of care, such as patient motivation and clinician assessments of patients' readiness and ability to benefit from lower levels of care.

39. The fact that UBH's guidelines are more restrictive than its plans or generally accepted standards of care is not particularly surprising. As early as 2009, ASAM cautioned in its *Public Policy Statement on Managed Care, Addiction Medicine, and Parity* that when an insurer like UBH "develops its own treatment level of care and continuing stay guidelines for authorizing or denying requested treatment rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

## UBH'S BREACH OF FIDUCIARY DUTY
## AND IMPROPER DENIAL OF DRISCOLL'S CLAIMS

40. Plaintiff Michael Driscoll resides in Vienna, Virginia. His daughter, Sara Driscoll, resides in Los Angeles, California.

41. Michael Driscoll is a participant in the GWU Plan and Sara Driscoll is a beneficiary of the GWU Plan. Their non-grandfathered, large group plan is a self-funded healthcare policy subject to ERISA.

42. According to the GWU Plan, UHIC and its affiliates are the designated "Claims Administrator" responsible for making benefit determinations and adjudicating appeals under the GWU Plan. UHIC has "the discretion and authority to decide whether a treatment or supply is a Covered Health Service and how the Eligible Expenses will be determined and otherwise covered under the Plan." The GWU Plan identifies the "Plan Administrator" as the George Washington University or its designee. The GWU Plan provides that the George Washington University and UHIC "have the sole and exclusive discretion" to interpret benefits under the plan and interpret plan terms. It also explains that UHIC "may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Plan." Pursuant to this authority, UHIC has delegated responsibility for adjudicating all mental health and substance abuse claims to UBH, which the GWU Plan refers to as the "Mental Health/Substance Use Disorder (MH/SUD) Administrator."

43. In a section entitled, "Your ERISA Rights," the GWU Plan states:

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, who are called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union, or any other person may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

44. The GWU Plan pays benefits for in- and out-of-network, in- and outpatient treatment of mental illnesses and substance use disorders, unless such treatment is:

- not consistent with generally accepted standards of medical practice for the treatment of such conditions;

- not consistent with services backed by credible research soundly demonstrating that the services or supplies will have a measurable and beneficial health outcome, and therefore considered experimental;

14

-        not consistent with the Mental Health/Substance Use Disorder Administrator's level of care guidelines or best practices as modified from time to time; or

-        not clinically appropriate for the patient's Mental Illness, substance use disorder or condition based on generally accepted standards of medical practice and benchmarks.

45.        The GWU Plan provides for two levels of internal appeals.

46.        The GWU Plan provides coverage for "Intensive Outpatient Treatment," which it defines as "a structured outpatient mental health or substance-related and addictive disorders treatment program that may be free-standing or Hospital-based and provides services for at least three hours per day, two or more days per week."

47.        Sara Driscoll has struggled with emotional and behavioral problems from a very young age. She first began seeing a therapist when she was only four years old due to difficulty adjusting to preschool, and she continued seeing therapists on and off throughout elementary school. In the fifth grade, Sara admitted to her parents that she was contemplating suicide, and was subsequently admitted to residential treatment. The treatment revealed significant early childhood trauma.

48.        Sara was hospitalized for the first time when she was in the eleventh grade, due to increasingly severe suicidal ideations. She was hospitalized at Dominion Hospital in Virginia for a period of over 30 days over 4 separate admissions from November 2008 through January 2009. While in treatment, Sara revealed an additional traumatic episode from the prior summer. While hospitalized, Sara struggled with panic attacks and dissociative episodes. She was ultimately diagnosed with post-traumatic stress disorder after initially being misdiagnosed with bipolar disorder.

49.        Sara managed to complete high school and began college at Drew University in August 2010. In October, she came home to be admitted to a partial hospitalization program at

the Inova Kellar Center in Virginia. She then went back to school to complete the semester. Between February and November 2011, Sara had multiple episodes of fainting. Physicians were unable to diagnose the cause but as a result, she came home and began working at a restaurant. Sara's condition was later diagnosed as postural orthostatic tachycardia syndrome.

50.     Sara suffered yet another traumatic episode in March 2012. Although in therapy at the time, Sara refused to discuss the events with her therapist because she felt that she was not ready to deal with her trauma.

51.     In the aftermath of the most recent trauma, Sara attempted suicide twice. She was hospitalized briefly after each attempt but continued to experience significant post-traumatic stress as she was forced to relive her experiences.

52.     During the year 2013, Sara began to experience frequent dissociative episodes. One of Sara's friends reported to her mother that Sara had taken the drug MDMA. Sara was also abusing alcohol and marijuana, as well as Xanax that she had been prescribed.

53.     In or around April 2013, Sara suffered third degree burns as a result of a seizure, and had to have two skin graft surgeries. At this time, Sara became increasingly unstable, frequently mentioning her suicidal ideations.

54.     In or around July 2013, once Sara was medically well enough to be admitted for more intensive psychiatric treatment, her parents took her to The Meadows, a residential treatment in Arizona. After Sara completed the standard 45-day length of stay at The Meadows, Sara's condition, including her suicidal ideation, was still too severe for her to step down to a lower level of care.

55.     Accordingly, Sara was admitted to The Ranch, a residential treatment center in Tennessee, for about thirty days of mental health and substance abuse treatment. During this

16

time, Sara's grandmother and uncle passed away and Sara's condition worsened to the extent that her therapists at The Ranch suggested that she might need hospitalization.

56.     Sara did not feel safe at The Ranch, and after less than one month at The Ranch, Sara's parents transferred her to Sierra Tucson residential treatment center in Arizona. After about 45 days of treatment there, Sara was still very unstable, having dissociative episodes. Sara's treatment team at Sierra Tucson recommended three months of extended care.

57.     On September 10, 2013, Sara began intensive outpatient treatment at The Canyon at Santa Monica in California ("Canyon"). She stayed in a sober living house, a highly-regulated environment, during this time.

58.     At Canyon, Sara was diagnosed with complex post-traumatic stress disorder, alcohol dependence, polysubstance dependence, general anxiety disorder, and major depressive disorder.

59.     On or before September 23, 2013, the facility conducted a behavioral health screening of Sara which revealed that Sara had "[s]ignificant potential for dangerous behavior." Specifically, the facility noted:

> -Current suicidal or homicidal ideation with expressed intentions or past history of carrying out such behavior but without means for carrying out the behavior, or with some expressed inability or aversion to doing so, or with ability to contract for safety.
> -Recent pattern of excessive substance use resulting in disinhibition and significant aggression toward self or others with no demonstrated ability to abstain from use. – Clear compromise of ability to care adequately for oneself or to be adequately aware of environment.
> -May have impaired reality testing.

60.     Sara's providers further noted that Sara's "[u]ncontrolled substance use" posed a "serious threat to health if unabated" and that Sara had "[p]sychiatric symptoms" that "significantly impair[ed] functioning." They concluded—based on Sara's history of trauma,

substance abuse, and suicide attempts—that IOP was the appropriate level of care for her condition.

61.     On the day of Sara's admission to Canyon, the facility called UBH to confirm that pre-authorization for treatment was not required and that Sara had out-of-network benefits. UBH confirmed both points.

62.     Some time before January 24, 2014, however, Canyon received a claim denial for Sara's treatment based on the facility's failure to receive pre-authorization for service. A representative from Canyon called UBH on January 24 and inquired about the denial only to be told, again, that pre-authorization was not required. The Canyon representative was told to resubmit Sara's claim for benefits.

63.     In a treatment progress report for September 10, 2013 through February 19, 2014, Canyon's Program Director, Melissa G. Drake, noted that after Thanksgiving:

> [Sara] reported a recent medical condition that was causing her a lot of stress (vaginal bleeding after having sex for the first time in a long time). She shared how this occurrence was a trigger for her dealing with other areas of her life, both current (personal relationship) and . . . past trauma . . . Sara continued to report how she can be quick to re-traumatize herself when her mind remembers the past. . . In early February, Sara reported that her follow up visit to her gynecologist, turned into a very triggering drug use event. She was able to process her cravings around using. But throughout February she reported anxiety, continuing triggers, cravings, and confusion about her current relationship and the recurring memories of the trauma . . . . In both individual and group sessions, she seemed able to utilize the tools that she has learned but continues to need ongoing cues to help her maintain her sobriety.

64.     Ms. Drake further noted, "[c]urrent prognosis is guarded, secondary to Sara's fragile state of sobriety; as she tries to resolve the impact of trauma in her life, and learning to develop trust in her relationship with others."

65.     UBH's internal records reflect that on February 28, 2014, UBH received an appeal of the initial adverse benefit determination from Canyon. In a letter to Canyon dated

March 26, 2014, UBH Associate Medical Director, Eugene Kwon, M.D., upheld the initial adverse benefit determination. Applying UBH's CDG for Treatment of Substance Use Disorders, Dr. Kwon concluded:

> [T]he services you are receiving are not consistent with generally accepted standards of medical practice. There were no significant medical issues. You did not have withdrawal symptoms. You did not have behavioral issues. You were able to participate in treatment. . . . It appears that care could have safely continued in Substance Use Disorder Outpatient.

66. It does not appear that this letter was ever sent to either Michael or Sara Driscoll, as required by ERISA with respect to an appeal denial.

67. According to a June 2, 2014 letter from UBH Regional Medical Director Andrew Martorana, M.D., on May 9, 2014, Canyon submitted an appeal of UBH's claim denial. In his letter Dr. Martorana once again upheld the initial adverse benefit determination. Applying UBH's CDG for Treatment of Substance Use Disorders, Dr. Martorana stated:

> It did not appear that you had psychosocial dysfunction to the extent that Intensive Outpatient services were required. You were active in your treatment. You remained sober. It did not appear that a more structured setting was required in order to prevent Inpatient treatment. Ongoing treatment could be provided in an office based setting.

68. Dr. Martorana's letter made no reference to Dr. Kwon's March 26, 2014 letter, or to any prior appeals. Nevertheless, the letter stated that "[t]his is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted. Please refer to the enclosed form(s) for information about your available options to appeal or dispute this determination."

69. Uncertain of the status of her appeal rights, Sara sent UBH a letter on July 28, 2014 requesting that it reconsider its adverse benefit determination. She explained that it had only been through the support of her IOP that she had been able to maintain her sobriety and

stop herself from engaging in self-harm or substance abuse. She described recurring nightmares and recent events that had triggered her to relive trauma and consider self-harm.

70.     On August 8, 2014, Sara received a letter from UBH instructing her to submit a request for external review if she wished to appeal UBH's denial of her appeals. Thereafter, Sara's appeal was submitted for external review. On February 25, 2015, an external reviewer from the Medical Review Institute of America, Inc. upheld UBH's denials, citing UBH's guidelines.

71.     UBH based its adverse benefit determination on a CDG that was not consistent with generally accepted medical standards. Rather than regarding IOP as intended "to provide an extended and structured treatment experience" or assessing Sara's "demonstrated motivation to continue with outpatient treatment" prior to discharge from IOP, as generally accepted standards of care required, Dr. Kwon and Dr. Martorana only focused on the fact that Sara was "active" in her IOP and had remained sober. What should have been proof that IOP was working, and that it should have been maintained, was instead treated by UBH as an excuse to discharge immediately to a much less intensive treatment setting. While generally accepted standards of care like CALOCUS and LOCUS required a "clear and compelling rationale" to select a lower level of care, UBH ignored that burden of proof.

## CLASS ACTION ALLEGATIONS

72.     Mr. Driscoll incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

73.     UBH serves as the claims administrator for mental health and substance abuse treatment claims for other health insurance plans that define covered outpatient (and intensive outpatient) treatment in the same way as the GWU Plan (*i.e.* treatment that is consistent with

generally accepted medical standards and UBH's level of care guidelines). The policies and practices that UBH followed with respect to the claims filed on behalf of Sara Driscoll are the same as those that have been applied by UBH to other similarly situated insureds seeking mental health and substance abuse treatment benefits under their health plans.

74.     As such, pursuant to Federal Rule of Civil Procedure 23, Mr. Driscoll brings his claims on behalf of a putative class of similarly situated individuals as noted in the counts below. The class (the "Class") is defined as follows:

> All participants or beneficiaries in an insurance plan governed by ERISA, for which UBH has been delegated the authority to make coverage decisions with respect to claims for mental health and substance abuse-related treatment, who sought and were denied coverage for all or a portion of outpatient or intensive outpatient treatment for mental health or substance use disorders, within the applicable statute of limitations.

75.     The members of the Class can be objectively ascertained through the use of information contained in UBH's files because UBH knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

76.     There are so many persons within the putative classes that joinder is impracticable.

77.     Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of the class. Such common questions of law and fact include, but are not limited to, the following:

A.     What legal duties does ERISA impose upon UBH when it serves as a claims administrator for mental health and substance abuse claims;

B.     Whether UBH engages in a fiduciary act when it develops and utilizes mental health and substance use level of care and coverage determination guidelines;

21

C.     Whether UBH's LOCs and CDGs are consistent with those that are generally accepted in the medical community;

D.     Whether UBH's development and utilization of these guidelines constitutes a breach of fiduciary duty;

E.     Whether UBH engages in a fiduciary act when it adjudicates a claim for benefits;

F.     What remedies are available if UBH is found liable for the claims alleged.

78.     Certification is desirable and proper because Mr. Driscoll's claims are typical of the claims of the members of the classes Mr. Driscoll seeks to represent.

79.     Certification is also desirable and proper because Mr. Driscoll will fairly and adequately protect the interests of the class he seeks to represent. There are no conflicts between the interests of Mr. Driscoll and those of other members of the class, and Mr. Driscoll is cognizant of his duties and responsibilities to the entire class. Mr. Driscoll's attorneys are qualified, experienced and able to conduct the proposed class action litigation.

80.     It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

81.     The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the class through numerous separate actions.

**COUNT I**

**CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS
BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS**

82.     Mr. Driscoll incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

83.     This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B) to clarify Mr. Driscoll's and the Class's right to future benefits and enforce their rights under their Plans.

84.     As the entity responsible for making mental health and substance abuse benefit determinations under Mr. Driscoll's and members of the Class's Plans, and responsible for developing internal practices and policies to facilitate such determinations, UBH is an ERISA fiduciary.

85.     As an ERISA fiduciary, and pursuant to 29 U.S.C. Section 1104(a), UBH is required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers. It must conform its conduct to a fiduciary duty of loyalty and may not make misrepresentations to its insureds.

86.     UBH violated (and continues to violate) these duties by adopting the restrictive level of care and coverage determination guidelines discussed herein and applying them to claims submitted by Mr. Driscoll and the Class. Despite the fact that the health insurance plans that insure the Driscolls and the Class provide for insurance coverage for outpatient and IOP mental health and substance abuse treatment, the fact that generally accepted standards of care are widely available and well-known to UBH, and the fact that UBH asserted that its guidelines

INTERVENOR COMPLAINT
CASE NO. 3:14-CV-05337-JCS

were consistent with those that are generally accepted, UBH developed guidelines that are far more restrictive than those that are generally accepted. In doing so, UBH did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." It did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of Mr. Driscoll's or the Class's Plans.

87.     Instead, UBH elevated its own interests and those of its corporate affiliates above the interests of plan participants and beneficiaries. By promulgating improperly restrictive guidelines, UBH artificially decreases the number and value of covered claims, thereby benefiting its corporate affiliates at the expense of insureds.

88.     Mr. Driscoll and the members of the Class seek the relief identified below to remedy this claim.

## COUNT II

### CLAIM FOR IMPROPER DENIAL OF BENEFITS
### BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS

89.     Mr. Driscoll incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

90.     This count is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

91.     UBH denied the insurance claims for IOP treatment submitted on behalf of Sara Driscoll and by other members of the Class in violation of the terms of the GWU Plan and the insurance plans that insure members of the Class.

92.      Mr. Driscoll and the members of the Class have been harmed by Defendant's improper benefit denials because they were deprived of insurance benefits they were owed.

93.     Mr. Driscoll and the members of the Class seek the relief identified below to remedy this claim.

## COUNT III

### CLAIM FOR EQUITABLE RELIEF
### BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS

94.     Mr. Driscoll incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

95.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts I and/or II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

96.     Mr. Driscoll and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

97.     In order to remedy these harms, Mr. Driscoll and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV

### CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF
### BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS

98.     Mr. Driscoll incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

99.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B).

100.    Mr. Driscoll and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

101.    Additionally, by engaging in this misconduct, UBH caused its corporate affiliates to be unjustly enriched insofar as they were not required to pay benefit claims, and shared in that unjust enrichment.

102.    In order to remedy these harms, Mr. Driscoll and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

## REQUESTED RELIEF

WHEREFORE, Mr. Driscoll demands judgment in his favor against Defendant as follows:

A.    Certifying the Class and Mr. Driscoll's claims, as set forth in this Complaint, for class treatment;

B.    Appointing Mr. Driscoll as a Class Representative for the Class;

C.    Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as counsel for the Class;

D.    To remedy Count I, or alternatively pursuant to Count III, declaring that UBH's internal guidelines complained of herein were developed and utilized in violation of UBH's fiduciary duties;

E.    To remedy Count I, or alternatively pursuant to Count III, issuing a permanent injunction ordering UBH to stop utilizing the guidelines complained of herein, and instead adopt, develop, and utilize guidelines that are consistent with generally accepted medical practices;

F.    To remedy Count II, or alternatively pursuant to Count III, ordering UBH to reprocess claims for outpatient and IOP treatment that it previously denied (in whole or in part) pursuant to new guidelines that are consistent with generally accepted medical standards and the Class's plans;

G. Pursuant to Count IV, ordering UBH to pay a surcharge or other make whole relief to Mr. Driscoll and members of the Class in an amount equivalent to the revenue UBH generated for providing mental health and substance abuse-related claims administration services with respect to claims filed by Mr. Driscoll and members of the Class, expenses that UBH's corporate affiliates saved due to UBH's wrongful denials, the additional revenue UBH received as a result of those savings, the out-of-pocket costs that Mr. Driscoll and members of the Class incurred following UBH's wrongful denials, and/or pre-judgment interest;

H. Awarding Mr. Driscoll's disbursements and expenses for this action, including reasonable attorneys' fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

I. Granting such other and further relief as is just and proper.


Dated: February 12, 2016

Respectfully submitted,


/s/ D. Brian Hufford
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
399 Park Avenue, 14th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

Meiram Bendat (Cal. Bar No. 198884)
PSYCH-APPEAL, INC.
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

Caroline Reynolds (admitted *pro hac vice*)
Andrew Caridas (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
creynolds@zuckerman.com
acaridas@zuckerman.com

*Attorneys for Plaintiffs and Michael Driscoll*