JENNIFER S. ROMANO (SBN 195953)
jromano@crowell.com
JEFFREY H. RUTHERFORD (SBN 181695)
jrutherford@crowell.com
ANDREW HOLMER (SBN 268864)
aholmer@crowell.com
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071
Phone: (213) 622-4750
Fax: (213) 622-2690

NATHANIEL P. BUALAT (SBN 226917)
nbualat@crowell.com
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
Phone: (415) 986-2800
Fax: (415) 986-2827

APRIL N. ROSS (admitted *pro hac vice*)
aross@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116

Attorneys for Defendant
UNITED BEHAVIORAL HEALTH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **DAVID WIT et al.**, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED BEHAVIORAL HEALTH**, <br><br> Defendant. | Case No. 14-cv-02346 JCS <br> Related Case No. 14-cv-05337 JCS <br><br> **UNITED BEHAVIORAL HEALTH'S POST-TRIAL BRIEF** <br><br> Hon. Joseph C. Spero <br><br> REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED |

1    **GARY ALEXANDER et al.**,

2                       Plaintiffs,

3         v.

4    **UNITED BEHAVIORAL HEALTH**,

5                       Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     PLAINTIFFS' CLAIMS ...................................................................................... 3

III.    STANDARD OF REVIEW ................................................................................. 5

    A.    The Abuse Of Discretion Standard Applies To Acts Of Plan Interpretation .......... 5

        1.    The Abuse Of Discretion Standard Of Review Has "Particular Significance" In ERISA Cases .................................................... 6

        2.    UBH's Interpretation Of Class Members' Plans Must Be Upheld If It Was Reasonably Based On The Plans Read As A Whole ..................... 7

        3.    The Abuse Of Discretion Standard Applies Even When There Is A Conflict Of Interest ..................................................................... 9

    B.    Plaintiffs Concede That The Abuse Of Discretion Standard Applies To Counts II and IV For Wrongful Denial Of Benefits ............................................. 11

    C.    ERISA Does Not Support Plaintiffs' Attempt To Impose A De Novo Standard Of Review For Count I And Count III ................................................. 12

        1.    The Abuse Of Discretion Standard Applies To Count I Under § 1132(a)(1)(B) Because Claims For "Breach Of Fiduciary Duty" Under § 1132(a)(1)(B) Must Relate To Plan Interpretation ................... 12

        2.    The Abuse of Discretion Standard Applies to Count III Under § 1132(a)(3) .......................................................................... 13

IV.     PLAINTIFFS' BURDEN OF PROOF AT TRIAL ........................................... 16

V.      THE GUIDELINES ARE INCORPORATED INTO AND REFLECT PLAN TERMS, AND ARE NOT SUBJECT TO CHALLENGE AS A FIDUCIARY ACT ................................................................................... 17

    A.    Plan Terms Are Immune From Judicial Review Under ERISA ......................... 18

    B.    The Guidelines Are Incorporated Into The Coverage Terms Of The Plans, And Are Not Subject To Challenge Under ERISA ........................................... 18

        1.    Plaintiffs Admit That Language In Class Members' Plans Is Sufficient To Incorporate The Level Of Care Guidelines By Reference .......................................................................... 18

        2.    Plaintiffs' Arguments That UBH Was Acting As A Fiduciary In Developing The Guidelines Have No Merit .......................................... 20

    C.    Plaintiffs' Attack On The Custodial Care CDGs Is A Back-Door Attack On The Express Terms Of Many Class Members' Plans ........................................ 23

VI.     TO THE EXTENT UBH'S PROMULGATION AND APPLICATION OF THE GUIDELINES IS A FIDUCIARY ACT IN WHOLE OR IN PART, UBH DID NOT ABUSE ITS DISCRETION IN CONSTRUING THE PLAN TERMS ..................................................................................... 25

    A.    UBH Acted In Good Faith When It Developed And Subsequently Applied The Guidelines Using A Nationally-Accredited Process Driven By Clinical, Not Financial, Considerations ............................................... 25

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

1. The Guidelines Were Reviewed And Approved Through An
Annual Process That Sought And Incorporated Feedback From
Internal And External Behavioral Health Professionals As Well As
National Professional Organizations .......................................................... 26

2. UBH's Process For Developing Its Guidelines Exceeded National
Accreditation Standards ............................................................................ 28

3. Plaintiffs Offered No Evidence That Any Challenged Guideline
Provision Was Influenced By Financial Considerations ............................ 30

   a. Benefit Expenses Did Not Influence The Content of the
   Challenged Guidelines .................................................................. 30

   b. The "Three Vignettes" Plaintiffs Identify As Evidence Of A
   Conflict Of Interest Are Irrelevant ............................................... 33

4. UBH's Utilization Management Program Relies On The Exercise
Of Clinical Judgment And Results In Approval Of Over 90% Of
Benefit Requests ....................................................................................... 36

B. Plaintiffs Did Not Offer Classwide Proof That The Guidelines Are An
Unreasonable Interpretation Of The Terms Of The Class Members' Plans ......... 40

1. The Plans Define Class Members' Rights, And Vary Widely In
What Is Covered ........................................................................................ 40

   a. The Plans Do Not Cover All Services That Are Consistent
   With Generally Accepted Standards Of Care .............................. 41

   b. Class Members' Plans Contain Numerous Exclusions,
   Limitations, And Definitions That Directly Impact
   Plaintiffs' Criticisms Of The Guidelines In This Case ................. 41

C. Regardless Of Other Plan Terms, The Evidence Shows That The
Guidelines Reflect A Reasonable Interpretation Of Generally Accepted
Standards of Care ............................................................................................... 46

1. There Is No Single Set Of Criteria That Defines The Generally
Accepted Standard ..................................................................................... 47

2. The Guidelines Are Written And Construed Consistent With
Generally Accepted Standards of Care ...................................................... 48

3. The Guidelines Require A Comprehensive Assessment Of The
Member's Entire Presentation ................................................................... 49

4. The Guidelines Appropriately Seek To Match Patients With The
Least Restrictive Level Of Care Where Treatment Is Expected To
Be Both Safe And Effective ...................................................................... 54

5. The Guidelines Account For Both Acute And Chronic Conditions ......... 57

   a. Both Acute And Chronic Conditions And Symptoms Should
   Be Assessed And Considered To Determine The
   Appropriate Level Of Care ........................................................... 58

   b. The LOCGs Call For Assessment And Coverage Of
   Treatment For Chronic Conditions And Symptoms .................... 60

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-ii-

1

**TABLE OF CONTENTS**
(continued)

2
Page

3
      c.    Guideline Language Referring To The "Why Now" Factors and "Acute Changes" Are Not An Unreasonable

4
          Interpretation Of Generally Accepted Standards of Care............ 64

5
      d.    It Is Consistent With Generally Accepted Standards Of Care To Expect Treatment Will Improve Presenting Problems

6
          Within a Reasonable Period of Time............................................ 67

      e.    Coverage Does Not End When An "Acute Crisis" Has

7
          Passed ........................................................................................... 72

8
  6.    The Guidelines Account For Co-Occurring Behavioral And Mental Health Conditions ................................................................................. 74

9
  7.    The Guidelines Account For Treatment That Is Necessary To Prevent Deterioration Or Maintain A Level Of Functioning .................. 79

10
  8.    The Guidelines Account For The Member's Motivation To Recover...... 82

11
  9.    The Guidelines Account For The Unique Needs Of Children And Adolescents........................................................................................... 83

12
  10.   UBH's Definitions Of Custodial Care And Active Treatment Are Consistent With The Plans And With Generally Accepted

13
       Standards Of Care ................................................................................. 85

14
  D.   The Feedback UBH Received On Its Guidelines Demonstrates That UBH's Interpretation Of Generally Accepted Standards Of Care Is Reasonable............. 89

15
  E.   Plaintiffs Failed To Offer Classwide Proof That UBH's Guidelines Are Inconsistent With Plan Terms And Generally Accepted Standards Of Care

16
      For Residential Treatment Of Substance Use Disorders ..................... 91

17
  F.   Plaintiffs Failed To Offer Classwide Proof That Their Critiques Apply Equally To Each Of The Level Of Care Guidelines At Issue In Each Of

18
      The Years In The Class Period.............................................................. 93

19
VII.   PLAINTIFFS FAILED TO SATISFY THEIR BURDEN OF CLASSWIDE PROOF WITH RESPECT TO THE CDGS .............. 94

20
  A.   Plaintiffs Did Not Offer Classwide Proof That Each Of The CDGs Incorporated The LOCGs ..................................................................... 94

21
  B.   Plaintiffs Did Not Offer Classwide Proof That The CDGs Were Designed

22
      To Reflect Generally Accepted Standards Of Care.............................. 97

VIII.  PLAINTIFFS FAILED TO OFFER CLASSWIDE PROOF THAT ANY

23
      OF THE "FLAWS" THEIR EXPERTS IDENTIFIED IN THE GUIDELINES WAS RELEVANT TO OR AFFECTED CLASS

24
      MEMBERS' BENEFIT DECISIONS .................................................... 98

25
IX.    PLAINTIFFS FAILED TO PROVE THAT THEY HAVE ARTICLE III STANDING TO BRING THEIR CLAIMS.................................... 100

26
X.     PLAINTIFFS ARE NOT ENTITLED TO FINDINGS OF LIABILITY ON COUNTS III AND IV UNDER § 1132(A)(3) BECAUSE THOSE

27
      CLAIMS ARE DUPLICATIVE OF COUNTS I AND II ................................. 103

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

UBH'S POST-TRIAL BRIEF
CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

1

**TABLE OF CONTENTS**
**(continued)**

2
                                                                                    **Page**

3    XI.          PLAINTIFFS DID NOT CARRY THEIR BURDEN WITH RESPECT TO
                  THE STATE MANDATE CLASS ................................................................. 103

4
             A.   Plaintiffs Did Not Prove UBH Violated Texas Law ......................................... 104

5            B.   Plaintiffs Did Not Prove UBH Violated Illinois Law....................................... 105

6            C.   Plaintiffs Did Not Prove UBH Violated Rhode Island Law ............................. 107

             D.   Plaintiffs Did Not Prove UBH Violated Connecticut Law ............................... 107

7    XII.         CLASS MEMBERS FAILED TO EXHAUST THEIR
                  ADMINISTRATIVE REMEDIES................................................................. 108

8
     XIII.        CONCLUSION ........................................................................................... 112
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iv-

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

5

*Abatie v. Alta Health & Life Ins. Co.*,
    458 F.3d 955 (9th Cir. 2006) ............................................................................10, 11

*Amato v. Bernard*,
    618 F.2d 559 (9th Cir. 1980) ................................................................................ 109

*Barnes v. AT&T Pension Benefit Plan*,
    270 F.R.D. 488 (N.D. Cal. 2010) .......................................................................... 112

*Barnett v. S. Cal. Edison Co. Long Term Disability Plan*,
    633 F. App'x 872 (9th Cir. 2015) ............................................................................. 9

*Bd. of Trustees of Bay Area Roofers Health & Welfare Tr. Fund v. Westech Roofing*,
    No. 12-CV-05655-JCS, 2014 WL 4383062 (N.D. Cal. Sept. 4, 2014) ................................. 16

*Biba v. Wells Fargo & Co.*,
    No. C09-3249 MEJ, 2010 WL 4942559 (N.D. Cal. Nov. 10, 2010) ...................................... 99

*Black & Decker Disability Plan v. Nord*,
    538 U.S. 822 (2003) .................................................................................................. 8

*Boesel v. Chase Manhattan Bank, N.A.*,
    62 F. Supp. 2d 1015 (W.D.N.Y. 1999) ..................................................................... 9

*Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*,
    410 F.3d 1173 (9th Cir. 2005) ........................................................................... 7, 48

*Brosted v. Unum Life Ins. Co. of Am.*,
    421 F.3d 459 (7th Cir. 2005) ............................................................... 16, 17, 20, 99

*Burke v. Pitney Bowes Inc. Long-Term Disability Plan*,
    544 F.3d 1016 (9th Cir. 2008) ................................................................................. 9

*Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*,
    572 F.3d 76 (2d Cir. 2009) ................................................................................... 111

*Carrier v. Aetna Life Ins. Co.*,
    116 F. Supp. 3d 1067 (C.D. Cal. 2015) ................................................................. 99

*Casatelli v. Horizon Blue Cross Blue Shield of New Jersey*,
    No. 2:09-cv-6101 (SDW)(MCA), 2010 WL 3724526 (D.N.J. Sept. 13, 2010) ................... 111

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Cator v. Herrgott & Wilson, Inc.*,
  609 F. Supp. 12 (N.D. Cal. 1984) ...................................................................... 8, 67

*Champion v. Black & Decker (U.S.), Inc.*,
  550 F.3d 353 (4th Cir. 2008) ...................................................................................... 29

*Churchill v. Cigna Corp.*,
  No. CIV.A. 10-6911 WL 3563489 (E.D. Pa. Aug. 12, 2011) ............................................. 111

*Conkright v. Frommert*,
  559 U.S. 506 (2010) .................................................................................. 6, 7, 10, 11

*Corenco Corp. v. Schiavone & Sons, Inc.*,
  362 F. Supp. 939 (S.D.N.Y. 1973) ...................................................................... 16

*Cruz v. Dollar Tree Stores, Inc.*,
  No. 07-2050 SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011) ............................................. 17

*Curtiss-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995) ...................................................................................... *passim*

*Des Roches v. California Physicians' Services.*
  320 F.R.D. 486, (N.D. Cal. 2017) .......................................................................... 110

*Diaz v. United Agr. Employee Welfare Ben. Plan and Tr.*,
  50 F.3d 1478 (9th Cir. 1995) .......................................................................... 109

*Dilts v. Penske Logistics, LLC*,
  No. 08-CV-318-CAB BLM, 2014 WL 305039, at *3 (S.D. Cal. Jan. 21, 2014) ................... 17

*Elizabeth L. v. Aetna Life Ins. Co.*,
  No. CV 13-2554 SC, 2015 WL 799417 (N.D. Cal. Feb. 23, 2015) ...................................... 46

*Espencheid v. DirectSat USA, LLC*,
  705 F.3d 770 (7th Cir. 2013) ..........................................................................17, 20

*Evans v. Eaton Corp. Long Term Disability Plan*,
  514 F.3d 315 (4th Cir. 2008) .......................................................................... 6, 8

*Firestone Tire & Rubber Co. v. Burch*,
  489 U.S. 101 (1989) .......................................................................................... 10

*Forsyth v. Humana, Inc.*,
  114 F.3d 1467 (9th Cir. 1997) ........................................................................ 103

*Fortlage v. Heller Ehrman LLP.*,
  No. C-08-3406 VRW, 2009 WL 6391364 ( N.D. Cal. Dec. 18, 2009) ................................ 11

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ........................................................................................ 101

CROWELL
& MORING LLP
ATTORNEYS AT LAW

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..................................................................................................8

*Gilliam v. Nev. Power Co.*,
   488 F.3d 1189 (9th Cir. 2007) ...............................................................................9

*Graddy v. Blue Cross BlueShield of Tenn., Inc.*,
   No. 4:09-CV-84, 2010 WL 670081 (E.D. Tenn. Feb. 19, 2010)......................16, 99

*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
   302 F.3d 18 (2nd Cir. 2002) .............................................................................23, 46

*Hein v. F.D.I.C.*,
   88 F.3d 210 (3d Cir. 1996) ...............................................................................16, 99

*Hinman v. John Alden Life Ins. Co.*,
   No. 08-CV-1070-PK, 2010 WL 466155 (D. Or. Feb. 8, 2010).............................. 7

*Hinshaw v. Unum Life Ins. Co. of Am.*,
   677 F. App'x 433 (9th Cir. 2017) ....................................................................10, 11

*Hobson v. Metro. Life Ins. Co.*,
   574 F.3d 75 (2d Cir. 2009) .............................................................................10, 11

*In re Household Int'l Tax Reduction Plan*,
   441 F.3d 500 (7th Cir. 2006) .......................................................................110, 111

*John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan*,
   26 F.3d 360 (2d Cir. 1994) ................................................................................. 14

*Jones v. Kodak Medical Assistance Plan*,
   169 F.3d 1287 (10th Cir. 1999). ........................................................19, 20, 21, 23

*Katz v. Comprehensive Plan of Grp. Ins.*,
   197 F.3d 1084 (11th Cir. 1999) ......................................................................... 103

*Korotynska v. Metro. Life Ins. Co.*,
   474 F.3d 101 (4th Cir. 2006) .............................................................................. 16

*Lafferty v. Providence Health Plans*,
   436 F. App'x 780 (9th Cir. 2011) .......................................................8, 40, 47, 57

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
   No. 07-CV-9329 (SHS), 2017 WL 5664850 (S.D.N.Y. Nov. 27, 2017)............... 15

*Lees v. Munich Reinsurance Am., Inc.*,
   No. 14-2532 (MAS) (TJB), 2016 WL 164611 (D. N.J. Jan. 13, 2016) ................. 15

CROWELL
& MORING LLP
ATTORNEYS AT LAW

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................ 101

*MacDonald v. Pan Am. World Airways, Inc.*,
   859 F.2d 742 (9th Cir. 1988) ............................................................................ 7

*Marlo v. United Parcel Serv., Inc.*,
   251 F.R.D. 476 (C.D. Cal. 2008) ........................................................ 17, 40, 94

*Marlo v. United Parcel Service*,
   639 F.3d 942 (9th Cir. 2011) .............................................................. 17, 46, 94

*Mass. Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985) ........................................................................................ 103

*Meidl v. Aetna, Inc.*,
   No. 15-CV- 1319(JCH), 2017 WL 1831916 (D. Conn. May 4, 2017) ................................ 102

*Metro. Life Ins. Co. v. Glenn*,
   554 U.S. 105 (2008) .............................................................................. 5, 10, 11

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
   823 F.3d 948 (9th Cir. 2016) ..................................................................... *passim*

*O'Neil v. Ret. Plan for Salaried Emps. of RKO General, Inc.*,
   37 F.3d 55 (2d Cir. 1994) ............................................................................... 6

*Otto v. Employee Ret. Income Plan - Hourly W.*,
   No. CV-1405426-JAK, 2015 WL 12516690 (C.D. Cal. Mar. 13, 2015) ................................. 9

*Pacific Shores Hosp. v. United Behavioral Health*,
   764 F.3d 1030 (9th Cir. 2014) ......................................................................... 22

*Patel-Puri v. Metro. Life Ins.*
   Co., No. C-05-0455 MMC, 2008 WL 2609711 (N.D. Cal. June 27, 2008) ................................ 98

*Payne v. POMCO Grp.*,
   No. 10 Civ. 7285 (BSJ), 2011 WL 4576545 (S.D.N.Y. Sept. 30, 2011) ................................. 99

*Pergosky v. Life Ins. Co. of N. Am.*,
   No. CIV.A. 01-4059, 2003 WL 1544582 (E.D. Pa. Mar. 24, 2003) ....................................... 42

*Rochow v. Life Ins. Co. of N. Am.*,
   780 F.3d 364 (6th Cir. 2015) (en banc) .............................................................. 103

*Romberio v. Unumprovident Corp.*,
   385 F. App'x 423 (6th Cir. 2009) .......................................................... 16, 98, 99

Crowell
& Moring LLP
ATTORNEYS AT LAW

*Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan,*
 85 F.3d 455 (9th Cir. 1996) ........................................................................42, 103

*Salomaa v. Honda Long Term Disability Plan,*
 642 F.3d 666 (9th Cir. 2011) ................................................................................ 8

*Schultz v. Stoner,*
 308 F. Supp. 2d 289 (S.D.N.Y. 2004) ..........................................................11, 13

*Shroyer v. New Cingular Wireless Servs., Inc.,*
 No. CV 06-1792-R FMO, 2006 WL 5444358 (C.D. Cal. May 26, 2006) ............. 21

*Skinner v. Northrop Grumman Ret. Plan B,*
 673 F.3d 1162 (9th Cir. 2012) ........................................................................... 99

*Slack v. Int'l Union of Operating Engineers,*
 No. C-13-5001 EMC, 2014 WL 4090383 (N.D. Cal. Aug. 19, 2014) ................ 101

*Spinedex Physical Therapy, USA, Inc. v. United Healthcare of Arizona, Inc.,*
 No. CV-08-004457-PHX-ROS, 2012 WL 8147128 (D. Ariz. Oct. 24, 2012) ..............101, 102

*Spokeo, Inc. v. Robins,*
 136 S. Ct. 1540 (2016) .................................................................................101, 102

*Stephens v. Pension Ben. Guar. Corp.,*
 755 F.3d 959 (D.C. Cir. 2014) .......................................................................... 109

*Stockwell v. City & Cty. of S. F.,*
 No. C 08-5180 PJH, 2015 WL 2173852 (N.D. Cal. May 8, 2015) ............17, 20, 40

*Taft v. Equitable Life Assur. Soc.,*
 9 F.3d 1469 (9th Cir. 1993) ........................................................................6, 8, 48

*Tibble v. Edison Int'l,*
 729 F.3d 1110 (9th Cir. 2013) ......................................................................13, 14

*Tolson v. Avondale Indus.,*
 141 F.3d 604 (5th Cir. 1998) ........................................................................... 103

*Tussey v. ABB, Inc.,*
 746 F.3d 327 (8th Cir. 2014) ............................................................................. 14

*Varity Corp. v. Howe,*
 516 U.S. 489 (1996) ................................................................................. *passim*

*Virtue v. Int'l Bhd. of Teamsters Ret. & Family Prot. Plan,*
 886 F. Supp. 2d 32 (D.D.C. 2012) ..................................................................... 13

Crowell
& Moring LLP
Attorneys At Law

*Voight v. Metro. Life Ins. Co.*,
    28 F. Supp. 2d 569 (C.D. Cal. 1998) ...................................................................48, 90

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................ 109

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................................. 101

*Webb v. The Hartford Fin. Servs. Grp., Inc.*,
    608 F. Supp. 2d 1218 (C.D. Cal. 2009) ....................................................40, 48, 90

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    No. MDL092074PSGFFMX, 2013 WL 12130034 (C.D. Cal. July 19, 2013) .................... 111

*Wells v. Cal. Physicians' Serv.*,
    No. C05-01229 CRB, 2007 WL 926490 (N.D. Cal. Mar. 26, 2007).................................. 101

*Williby v. Aetna Life Ins. Co.*,
    __ F.3d __, No. 15-56394, 2017 WL 3482390 (9th Cir. 2017)................................................ 7

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) ..............................................................7, 15, 21, 46

*Zhu v. Fujitsu Grp. 401(K)Plan*,
    No. C-03-1148RMW, 2003 WL 24030329 (N.D. Cal. Sept. 9, 2003) .................................. 13

*Zurich Am. Ins. Co. v. O'Hara*,
    604 F.3d 1232 (11th Cir. 2010) ................................................................................ 111

**Federal Statutes**

29 U.S.C. §132(a)(1)(B) .................................................................................................. 112

29 U.S.C. § 1104 .............................................................................................................. 12

29 U.S.C. § 1104(a)(1)....................................................................................................... 6

29 U.S.C. § 1104(a)(1)(A)(ii).......................................................................................... 35

29 U.S.C. § 1104(a)(1)(D) ............................................................................................... 21

29 U.S.C. § 1132(a)(1)(B) ...................................................................................... *passim*

29 U.S.C. § 1132(a)(3)............................................................................................ *passim*

**State Statutes**

215 Ill. Comp. Stat. 5/370c(b)(3) ................................................................................... 105

Crowell
& Moring LLP
Attorneys At Law

215 Ill. Comp. Stat. § 5/370c(b)(3) (eff. Aug. 18, 2011)........................................ 105

27 R.I. Gen. Laws § 27-38.2-1(g) ....................................................................... 107

Conn. Gen. Stat. § 38a-591c(a)(3)........................................................................ 107

2016 Conn. Legis. Serv. P.A. 16-175 (S.B. 372) .................................................. 107

**Regulations**

28 Tex. Admin. Code § 3.8003 (2017) .................................................................. 104

**Other Authorities**

Ill. Gen. Assembly re Full Text of HB0001, Governor's Message, *available at*
    http://www.ilga.gov/legislation/fulltext.asp?DocName=09900HB0001gms&G
    A=99&SessionId=88&DocTypeId=HB&LegID=83490&DocNum=0001&GA
    ID=13&Session= ............................................................................................. 106

Ill. Senate Tr., 2015 Reg. Sess. No. 52 ................................................................. 106

Rest. (Third) of Trusts § 50.................................................................................... 10

Treatment and Coverage of Substance Abuse Disorders and Mental Illness Annual
    Report at 2, *available at*
    https://insurance.illinois.gov/newsrls/2017/01/MHSUDWGRptToGA_Jan2017
    .pdf ................................................................................................................. 106

Crowell
& Moring LLP
Attorneys At Law

1

## I.    INTRODUCTION

2          In their post-trial brief, Plaintiffs attempt to answer the wrong question. The question is

3    not whether "UBH's Level of Care Guidelines were more restrictive than generally accepted

4    standards of care," but whether Plaintiffs proved on a classwide basis that UBH's guidelines are

5    such an unreasonable interpretation of the class members' plans that their creation and use

6    constitutes an abuse of UBH's discretion, and whether that abuse of discretion amounts to a

7    breach of fiduciary duty or improper denial of benefits under ERISA.

8          Plaintiffs chose to narrow this case to a classwide, facial challenge to 222 Level of Care

9    Guidelines ("LOCGs") and Coverage Determination Guidelines ("CDGs") created and used by

10   UBH to guide coverage determinations for mental health or substance use disorder treatments

11   under employer-sponsored behavioral health benefit plans governed by ERISA. Plaintiffs allege

12   that UBH breached a fiduciary duty and improperly denied benefits to the class under 29 U.S.C.

13   § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) because the guidelines are more restrictive than

14   permitted under the plans.

15         It is undisputed that plan terms are not subject to challenge under ERISA and that UBH

16   has wide discretion to interpret the plans. Thus, to the extent Plaintiffs challenge guidelines that

17   are incorporated into or reflect the plan terms, those guidelines are immune from challenge under

18   ERISA. To the extent Plaintiffs challenge UBH's interpretation of the plans in creating and using

19   the guidelines, their claims must be reviewed under the deferential abuse of discretion standard.

20   This is the case for all of Plaintiffs' claims, regardless of whether they are styled as "breach of

21   fiduciary duty" or as "denial of benefits" and regardless of whether they are brought under 29

22   U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3). To prevail in this case on any Count, Plaintiffs

23   had the burden to prove on a classwide basis that the guidelines are an unreasonable interpretation

24   of the plans.

25         At trial, Plaintiffs relied almost exclusively on two experts who testified, based solely on

26   the words on the page, that the guidelines are too restrictive because they focus too much on

27   "acute" symptoms and progress toward recovery and do not focus enough on issues like chronic

28   symptoms, co-morbid conditions, prevention of deterioration, and distinctions based on age. In

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    contrast, UBH offered testimony of its independent experts and six board-certified psychiatrists

2    involved in creating, approving, and applying the guidelines, who testified that attention to acute

3    symptoms and recovery is consistent with sound clinical practice and that the guidelines do, in

4    fact, account for numerous individualized circumstances of the member, including chronic

5    symptoms, co-morbid conditions, potential deterioration, and age. UBH's psychiatrists'

6    interpretation of the guidelines is not "*post hoc*." It is informed by years of professional practice

7    and training, and their experience in creating, interpreting, and applying the guidelines challenged

8    in this case. It is this practical, clinically-oriented interpretation that causes UBH to authorize

9    over 90 percent of all benefit requests and, in the small minority of instances when UBH denies

10   coverage, to regularly *authorize* coverage at an alternative level of care.

11          Plaintiffs cast this case as a classic battle of the experts, but there is a critical distinction.

12   Because the Court must review UBH's interpretation of the plans — including the meaning of the

13   term "generally accepted standards of care" — using the deferential abuse of discretion standard,

14   it is not enough for Plaintiffs to persuade the Court that their interpretation of the plans or of

15   "generally accepted standards of care" is the better one. Nor is it enough for Plaintiffs to persuade

16   the Court that it would have created guidelines different from those created by UBH. Rather, to

17   satisfy this heightened standard, Plaintiffs must show that UBH's interpretation of each class

18   member's health benefit plan, as reflected in the guidelines, is illogical, implausible, or

19   unsupported by the factual record.

20          Plaintiffs did not carry this heavy burden. While Plaintiffs promote their preferred third-

21   party guidelines, they also admit there is no single set of generally accepted standards identifying

22   the appropriate level of care for the wide range of individuals seeking all manner of substance use

23   and mental health treatment. Providers, professional groups, health plans, and governmental

24   entities use a variety of sources, including third-party guidelines, to determine whether treatment

25   is medically necessary or covered under a health benefit plan. None of these sources is *the*

26   generally accepted standard of care. Indeed, because it is so accepted that companies like UBH

27   will create their own set of guidelines, two accreditation organizations have designed best

28   practices for creating and updating these company-specific guidelines. UBH followed those

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  practices in developing the LOCGs (including portions of the LOCGs that Plaintiffs contend are

2  incorporated into the CDGs). Consistent with these accreditation standards, UBH developed and

3  updated the LOCGs with input from external providers and sub-specialty groups, its own clinical

4  leadership, and appropriate clinical oversight committees, including review and approval by

5  multiple board-certified psychiatrists.

6         The testimony from both Plaintiffs' and UBH's experts demonstrates that the guidelines

7  are a reasonable interpretation of the plans, were created in good faith, and are consistent with

8  generally accepted standards of care. Plaintiffs and their experts may prefer other guidelines that

9  emphasize particular criteria more and other criteria less, but that is not the relevant question. The

10  question is whether Plaintiffs have proven that UBH's guidelines are illogical, implausible, or

11  unsupported by the facts. Plaintiffs did not do this, and should not prevail in their facial challenge.

12         This is a class action, and Plaintiffs failed to satisfy their burden of classwide proof as to

13  each and every element of their claims. They did not prove on a classwide basis that the

14  guidelines were developed as part of UBH's fiduciary duties. They did not prove on a classwide

15  basis that the guidelines are inconsistent with the language in each of the plans. They did not

16  prove that the alleged "flaws" in the guidelines caused damage to each of the class members.

17  And, they did not prove that the injunctive remedies they seek (including the "reprocessing"

18  injunctive remedy) will cure a specific irreparable harm to each of the class members. While this

19  was a class action trial, Plaintiffs offered none of the necessary classwide evidence to prove the

20  elements of their claims. The evidence supports judgment in favor of UBH on all Counts.

21  **II.    PLAINTIFFS' CLAIMS**

22         In the operative complaints, Plaintiffs allege four Counts. Count I alleges a "breach of

23  fiduciary duty" under 29 U.S.C. § 1132(a)(1)(B) (*See Wit* First Am. Compl. ("FAC"), ECF No.

24  39, at 61–63; *Alexander* Compl., *Alexander* ECF No. 1, at 47–50), which provides an ERISA plan

25  participant a cause of action "to recover benefits due to him under the terms of his plan, to

26  enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the

27  terms of the plan." Count II is also pleaded under § 1132(a)(1)(B), but styled as a claim for

28  "improper denial of benefits." (*Wit* FAC, ECF No. 39, at 63–64; *Alexander* Compl., *Alexander*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    ECF No. 1, at 49.) Counts III and IV are brought under § 1132(a)(3), (*Wit* FAC, ECF No. 39, at

2    64; *Alexander* Compl., *Alexander* ECF No. 1, at 49–50), which authorizes plan members "to

3    enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or . . .

4    obtain other appropriate equitable relief."

5         The underlying basis for each of Plaintiffs' Counts is identical: Plaintiffs allege that UBH,

6    as claims administrator of the class members' plans, developed guidelines allegedly inconsistent

7    with generally accepted standards of care, which Plaintiffs say each plan prohibits. In the

8    complaints, Plaintiffs seek the following relief:

9        1.  pursuant to Count I, or alternatively pursuant to Count III, a declaration that the
             guidelines are inconsistent with generally accepted standards of care;
10

11       2.  pursuant to Count I, or alternatively pursuant to Count III, an injunction requiring
             UBH to develop new, compliant guidelines;

12       3.  pursuant to Count II, or alternatively pursuant to Count III, a declaration that UBH's
             denial of claims for benefits based on the guidelines was improper; and
13

14       4.  pursuant to Count II, or alternatively pursuant to Count III, a remand requiring UBH
             retroactively to reprocess all class members' benefits claims under new, compliant
15           guidelines.

16   (*See Wit* FAC, ECF No. 39, at 64–66; *Alexander* Compl., *Alexander* ECF No. 1, at 50–51.)[1]

17   Although Plaintiffs previously ascribed these remedies to specific Counts in the complaints,

18   Plaintiffs now seek *all* forms of declaratory and injunctive relief noted above under *each* of their

19   Counts.[2] (Joint [Proposed] Final Pretrial Order, ECF No. 296, at 9:9–11:17.)

20        Irrespective of the relief sought, the core question under each Count is the same: whether

21   UBH's interpretation of the plans in creating the guidelines was an abuse of discretion. As

22

23        [1] The only form of relief Plaintiffs sought in connection with Count IV was the surcharge
     relief that the Court dismissed in its order granting in part UBH's motion for summary judgment.
24   (*See* Order, ECF No. 286, at 25:19–26:18.) Count IV is no longer at issue in this case.

25        [2] UBH objects to any attempt to amend the complaints. If the Court finds in Plaintiffs'
     favor on liability, UBH reserves the right to address deficiencies in Plaintiffs' proposed remedies
26   during the second phase of briefing on the issue of remedies. If Plaintiffs are permitted to amend
     their complaints to seek all forms of relief under all four Counts, it only underscores that Counts
27   III and IV are impermissibly duplicative of Counts I and II and that all four Counts hinge on the
     same question of plan interpretation and must be reviewed under the same deferential abuse of
     discretion standard.
28

explained below, whether framed as a claim for fiduciary breach or improper denial of benefits, all claims under § 1132(a)(1)(B)—including Plaintiffs' claims under Counts I and II—turn on whether a plan fiduciary abused its discretion in construing the terms of the plans. Thus, Plaintiffs can only prevail under Counts I and II if they proved that UBH was acting in a fiduciary capacity and that UBH abused its discretion in determining that the guidelines were consistent with the terms of class members' plans. The same fiduciary-capacity requirement and abuse of discretion standard apply to Counts III and IV. In addition, Counts III and IV independently fail because they are impermissibly duplicative of Counts I and II asserted under § 1132(a)(1)(B).

## III.   STANDARD OF REVIEW

### A.   The Abuse Of Discretion Standard Applies To Acts Of Plan Interpretation.

When an ERISA plan delegates authority to the plan administrator to interpret and apply plan terms, courts review disputes over the administrator's decision for abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (when a plan grants the administrator discretion, "a deferential standard of review [is] appropriate"). The plans at issue give UBH discretionary authority to determine benefits and construe the plan's terms.[3] (Trial Ex. 1653.) Accordingly, UBH's construction of plan terms and benefits, including terms relating to "generally accepted standards of care," must be reviewed under the deferential abuse of discretion

---

[3] Plaintiffs suggest that "UBH did not offer proof at trial that the plans, in fact, formally delegated discretion to UBH," and urge the Court to "apply de novo review to all of Plaintiffs' claims." (Plaintiffs' Post Trial Brief, ECF No. 392, p. 73 n. 52.) To the contrary, UBH offered a summary exhibit extracting relevant portions of each plan admitted into evidence, including provisions in each plan delegating authority to UBH to determine benefits and interpret plan terms. (Trial Ex. 1653.) UnitedHealthcare's Director of Product Strategy, Barry Dehlin, also testified that UBH is designated as the "mental health substance use disorder designee" for all of the plans in evidence (Trial Tr. 914:20–915:3 (Dehlin)), and through that delegation, the plan sponsor gives UBH the authority and discretion to interpret plan terms related to behavioral health benefits. (*See, e.g.*, *id.*, at 847:5–848:23, 870:3–871:14, 879:15–17; *see also* Trial Ex. 1653.) Plaintiffs identify no plan for which UBH lacks discretion to interpret plan terms. To the contrary, they admit that "UBH had, and exercised, 'discretionary authority or discretionary responsibility' in creating, amending, and applying the Guidelines." (ECF No. 392, at 78:25–79:2.)

CROWELL & MORING LLP
ATTORNEYS AT LAW

standard.[4]

### 1.    The Abuse Of Discretion Standard Of Review Has "Particular Significance" In ERISA Cases.

The abuse of discretion standard of review "has a particular significance in the context of ERISA." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323, 326 (4th Cir. 2008).

> The abuse of discretion standard in ERISA cases protects important values: the plan administrator's greater experience and familiarity with plan terms and provisions; the enhanced prospects of achieving consistent application of those terms and provisions that results; the desire of those who establish ERISA plans to preserve at least some role in their administration; and the importance of ensuring that funds which are not unlimited go to those who, according to the terms of the plan, are truly deserving. Thus, the language of discretion in an ERISA plan is a message to courts, counseling not judicial abdication, to be sure, but a healthy measure of judicial restraint.

*Id.* at 323 (internal citation omitted). "[D]eference [to plan administrators] protects these interests and, by permitting an employer to grant primary interpretive authority over an ERISA plan to the plan administrator, preserves the 'careful balancing' on which ERISA is based." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010). A "cavalier approach to the deference owed ERISA fiduciaries who contract for it would likely disserve that purpose, whatever the call on our compassion in a particular case, for the fact is that the price of greater coverage would almost certainly be lower benefits levels and lower levels of plan formation." *Evans*, 514 F.3d at 326 (internal quotations and edits omitted).

For this reason, the fiduciary duties imposed by ERISA, including the duty to act "solely in the interest of plan participants and . . . for the exclusive purpose of . . . providing benefits to plan participants and their beneficiaries" (29 U.S.C. § 1104(a)(1)), do "not require . . . that a fiduciary resolve every issue of interpretation in favor of the plan beneficiaries." *O'Neil v. Ret.*

---

[4] Courts sometimes use "arbitrary and capricious" to describe this deferential standard of review, but as the Ninth Circuit has explained, in the ERISA context that is a "distinction without a difference." *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1471 n.2 (9th Cir. 1993), *overruled on other grounds in Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 n.2 (9th Cir. 2008).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   *Plan for Salaried Emps. of RKO General, Inc.*, 37 F.3d 55, 61 (2d Cir. 1994); *see also Wright v.*

2   *Or. Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (same). "[A] fiduciary obligation . .

3   . does not necessarily favor payment over nonpayment," because "[t]he common law of trusts

4   recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a

5   trustee to take impartial account of the interests of all beneficiaries." *Varity Corp. v. Howe*, 516

6   U.S. 489, 514 (1996). In other words, a fiduciary does not breach any duty by reasonably

7   interpreting and applying plan terms.

8            **2.      UBH's Interpretation Of Class Members' Plans Must Be Upheld If It
                      Was Reasonably Based On The Plans Read As A Whole.**

9

10          Plaintiffs' Claims Chart (ECF No. 395) demonstrates that their "facial" challenge to the

11  guidelines hinges on specific words and phrases that appear in dozens of discrete sections in at

12  least fifteen different guidelines (not including the hundreds of CDGs Plaintiffs largely ignore). It

13  is not enough for Plaintiffs' experts to disagree with the guidelines, or to say they would have

14  chosen different words. A "mere tally of experts is insufficient to demonstrate that an ERISA

15  fiduciary has abused its discretion, for even a single persuasive medical opinion may constitute

16  substantial evidence upon which a plan administrator may rely in adjudicating a claim." *Boyd v.*

17  *Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173,1179 (9th Cir. 2005); *see Hinman v.*

18  *John Alden Life Ins. Co.*, No. 08-CV-1070-PK, 2010 WL 466155, at *7 (D. Or. Feb. 8, 2010)

19  (same); *see also Williby v. Aetna Life Ins. Co.*, __ F.3d __, No. 15-56394, 2017 WL 3482390, at

20  *7 (9th Cir. 2017) (quotation omitted) ("[T]he existence of a single persuasive medical opinion

21  supporting the administrator's decision can be sufficient to affirm . . . .").

22          Under the abuse of discretion standard, "the plan administrator's interpretation of the plan

23  will not be disturbed if reasonable" and made in good faith. *Conkright*, 559 U.S. at 521

24  (quotation omitted); *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 744 (9th Cir.

25  1988) (quotation omitted) (an ERISA administrator's "decision is not arbitrary or capricious if it

26  is based on a reasonable interpretation of the plan's terms and was made in good faith"). In

27  determining whether the administrator's interpretation is reasonable, "[t]he court must look to the

28  plain language of the [plan]." *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 958 (9th Cir.

2016) (quotation omitted). The question is not "whose interpretation of the plan documents is most persuasive, but whether the administrator's interpretation is unreasonable." *Id.* (quotation and alterations omitted); *see also Lafferty v. Providence Health Plans*, 436 F. App'x 780, 781 (9th Cir. 2011) (quotation omitted) ("Reasonableness does not mean that [the Court] would make the same decision" in interpreting the plan terms). "Even if the provisions of the plan are susceptible to more than one reasonable interpretation, the Court must give way to the trustee's interpretation." *Cator v. Herrgott & Wilson, Inc.*, 609 F. Supp. 12, 18 (N.D. Cal. 1984).

Thus, the Court may not merely substitute its view, or the views of Plaintiffs' experts or treating providers, for UBH's view. *Id.*; *accord Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician"). Rather, the test for an abuse of discretion is whether UBH's interpretation of the plan terms, as reflected in its guidelines, was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Lafferty*, 436 F. App'x at 781, *quoting Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). "In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." *Taft*, 9 F.3d at 1473 The abuse of discretion standard:

> convey[s] an unmistakable message: that as a matter of priority as well as sequence, discretion is first, and review for abuse is only a posterior check on judgment which strays too far from the mark....
>
> [T]he standard draws a line – or rather, demarcates a region – between the unsupportable and the merely mistaken, between the legal error, disorder of reason, severe lapse of judgment, and procedural failure that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not. At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance. The 'deference that is the hallmark of abuse-of-discretion review,' is deference enough to appreciate reasonable disagreement.

*Evans*, 514 F.3d at 322 (internal citations omitted), *quoting Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).

Moreover, the question is not whether the administrator's construction represents a

1   reasonable interpretation of a single term, read in isolation, but whether the administrator's

2   construction is a reasonable interpretation of the plan taken as a whole. *Barnett v. S. Cal. Edison*

3   *Co. Long Term Disability Plan,* 633 F. App'x 872, 874 (9th Cir. 2015) (no abuse of discretion

4   where administrator construed plan by reading "two sentences together in a manner that did not . .

5   . conflict[] with the plain language of the plan"); *Otto v. Employee Ret. Income Plan - Hourly W.*,

6   No. CV-1405426-JAK (PLAx), 2015 WL 12516690, at *19 (C.D. Cal. Mar. 13, 2015) (no abuse

7   of discretion where "the administrator's interpretation is consistent with the goals of the plan"),

8   *aff'd sub nom. Otto v. Employee Ret. Income Plan*, 667 F. App'x 660 (9th Cir. 2016); *Boesel v.*

9   *Chase Manhattan Bank, N.A.*, 62 F. Supp. 2d 1015, 1029 (W.D.N.Y. 1999) (claims that an

10  ERISA plan administrator improperly interpreted plan terms do "not turn upon one section of the

11  plan viewed in isolation, but rather, upon an interpretation of the plan as a whole."). "An ERISA

12  plan is a contract," and the "intended meaning of even the most explicit language can, of course,

13  only be understood in the light of the context that gave rise to its inclusion." *Gilliam v. Nev.*

14  *Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal quotes and edits omitted).

### 3.   The Abuse Of Discretion Standard Applies Even When There Is A Conflict Of Interest.

17      Plaintiffs contend that the Court should view UBH's conduct "with skepticism" because

18  UBH operated under a structural conflict of interest when it developed the guidelines and applied

19  them in reviewing class members' benefit requests. To prove that UBH operated under a

20  structural conflict of interest, Plaintiffs must prove that UBH acted in the "dual role of

21  administering and funding an ERISA plan." *Burke v. Pitney Bowes Inc. Long-Term Disability*

22  *Plan*, 544 F.3d 1016, 1024 (9th Cir. 2008). UBH did not act in a dual role for the majority – 62

23  percent – of class members because those class members were enrolled in self-funded plans for

24  which the plan sponsor, not UBH, paid all claims. (Trial Ex. 711, at ¶¶ M & N.)[5] Even for the

---

25      5 Plaintiffs' counsel stated in closing argument that "the trial [evidence] is devoid of those
26  proportions." (Trial Tr. 1866:22–1867:15.) However, the parties' Stipulation Concerning Per-
    Member-Per-Month Rates sets forth the total number of benefit decisions at issue, broken down
27  between self-funded and fully-insured plans. (Trial Ex. 711, at ¶¶ M & N.) Those raw numbers
    reflect that class members with self-funded plans account for 62 percent of the benefit decisions
28  at issue, compared to 38 percent for members with fully-insured plans.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

minority of class members with fully-insured plans, UBH mitigated any structural conflict by charging a fee that attempted to account for the cost of potential claims payouts. (Trial Tr. 840:4-841:21 (Dehlin).) This fact is significant because "the conflict question is less clear where (as here) the plan administrator is not the employer itself but rather a professional insurance company . . . because the insurance company typically charges a fee that attempts to account for the cost of claims payouts, with the result that paying an individual claim does not come to the same extent from the company's own pocket." *Metro. Life Ins.*, 554 U.S. at 114. While the law "treats insurance company administrators and employers alike in respect to the *existence* of a conflict," courts "can nonetheless take account" of the inherently reduced nature of the conflict "so far as it treats those, or similar, circumstances as diminishing the *significance or severity* of the conflict in individual cases." *Id.* at 115.

In any event, the mere existence of a structural conflict of interest does not alter the applicable standard of review. When "the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict," *Conkright*, 559 U.S. at 512, including where the same entity that makes coverage decisions also pays the benefits. *Metro. Life Ins.*, 554 U.S. at 112,115–16; *see also* Rest. (Third) of Trusts § 50 notes to cmts. a & b (2003) ("[E]ven when a possibility of conflict of interests is present, a court will decline to intervene without a showing of abuse."). Courts simply weigh the conflict "as a factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 115 (1989) (quotation omitted). That exercise "requires a case-by-case balance." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006). Most important, the "deference to be given to the administrator doesn't change unless the plaintiff shows that the administrator was, in fact, influenced by the conflict of interest." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009). *Accord Hinshaw v. Unum Life Ins. Co. of Am.*, 677 F. App'x 433, 434 (9th Cir. 2017) (summary judgment proper where plaintiff failed to demonstrate "whether the administrator's conflict of interest impacted its decision"). A conflict "should prove less important (perhaps to the vanishing point)" where the circumstances indicate that the conflict did *not* influence the administrator's decision. *Metro. Life Ins.*, 554 U.S. at 117.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    Thus, even if UBH was operating in a "dual role" as both the administrator and funder of

2    a subset of plans, that is but one factor for the Court to consider in its abuse of discretion analysis,

3    and even then only to the extent Plaintiffs have proven that the conflict actually influenced

4    UBH's decision with respect to the specific guidelines at issue. *Hobson.*, 574 F.3d at 83;

5    *Hinshaw*, 677 F. App'x at 434; *Fortlage v. Heller Ehrman LLP.,* No. C-08-3406 VRW, 2009 WL

6    6391364, at *23 ( N.D. Cal. Dec. 18, 2009). *Accord Metro. Life Ins.,* 554 U.S. at 117; *Abatie*, 458

7    F.3d at 968 ("The level of skepticism with which a court views a conflicted administrator's

8    decision may be low if a structural conflict of interest is unaccompanied, for example, by any

9    evidence of malice, of self-dealing, or of a parsimonious claims-granting history.").

10    To inject a level of "skepticism" into the Court's deferential review, Plaintiffs bore the

11    burden of proving a causal connection between the financial incentives they allege and the criteria

12    they challenge. *Hobson,* 574 F.3d at 83; *Fortlage,* 2009 WL 6391364, at *23. *Accord Metro. Life*

13    *Ins.,* 554 U.S. at 117; *Abatie*, 458 F.3d at 968. As set forth in Section VI.A.3 (p. 29), Plaintiffs did

14    not carry that burden at trial.

15    **B.      Plaintiffs Concede That The Abuse Of Discretion Standard Applies To**
       **Counts II and IV For Wrongful Denial Of Benefits.**
16

17    Plaintiffs concede that abuse of discretion is the appropriate standard of review for their

18    "Claim Two" for wrongful denial of benefits (Counts II and IV). (Oct. 5, 2017 Hrg. Tr., at 18:2–4

19    (THE COURT: So you agree that for the denial of benefits claim, abuse of discretion applies?

20    MR ABELSON: Correct."); Trial Tr. 1846:3–4 (Closing Argument) (Plaintiffs' counsel arguing:

21    "First, what standard do we use in evaluating that question? I note for Claim 2 it's abuse of

22    discretion."); ECF No. 392, at 75:10–16.); *see also Schultz v. Stoner*, 308 F. Supp. 2d 289, 303

23    (S.D.N.Y. 2004) (applying abuse of discretion standard to § 1132(a)(3) fiduciary breach claim

24    relating to interpretation of plan terms). Thus, UBH's denial of benefits for each of the class

25    members must be upheld if it was based upon a reasonable interpretation of the terms of that class

26    member's plan, read as a whole. *Conkright,* 559 U.S. at 521; *Moyle*, 823 F.3d at 958.

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

C.     **ERISA Does Not Support Plaintiffs' Attempt To Impose A De Novo Standard Of Review For Count I And Count III.**

Notwithstanding their admission that Counts II and IV must be reviewed for abuse of discretion, Plaintiffs seek to use Counts I and III – self-styled as a single "Claim" for "breach of fiduciary duty" – as a back door to *de novo* review. ERISA forecloses this maneuver. Plaintiffs' claims all involve the same core question – whether the guidelines are a reasonable interpretation of the class members' plans. ERISA does not allow an end-run around the abuse-of-discretion standard by reframing a benefits claim as a fiduciary-breach claim. The abuse of discretion standard therefore applies regardless of whether Plaintiffs' claims are styled as claims for "denial of benefits" or "breach of fiduciary duty," and regardless of whether they assert their claims under § 1132(a)(1)(B) or § 1132(a)(3).

1.     **The Abuse Of Discretion Standard Applies To Count I Under § 1132(a)(1)(B) Because Claims For "Breach Of Fiduciary Duty" Under § 1132(a)(1)(B) Must Relate To Plan Interpretation.**

Plaintiffs bring Count I for breach of fiduciary duty under 29 U.S.C. § 1132(a)(1)(B). Plaintiffs aver that UBH violated three supposedly-distinct fiduciary duties: (i) "a duty of *loyalty*;" (ii) "a duty of *care*;" and (iii) "a duty to *comply with plan terms*." (ECF No. 392, at 73:7–14 (emphasis in original).) Plaintiffs concede, as they must, that "[w]hen the Court evaluates the last of these questions – *i.e.*, whether UBH faithfully complied with plan terms – it applies abuse of discretion review." (*Id*. at 73: 15–16.) However, Plaintiffs incorrectly argue that as to the *other* fiduciary duties (which come from a different section of ERISA, 29 U.S.C. § 1104), the Court should evaluate the very same conduct – UBH's development and use of the guidelines – under a different standard of review.

Plaintiffs' characterization of Count I as a claim for breach of UBH's duties of loyalty and care (statutory duties not part of 29 U.S.C. § 1132(a)(1)(B)), and their assertion that such claims are subject to a non-deferential *de novo* review are baseless. Plaintiffs are unable to distinguish their claims for breach of the duties of loyalty and care from their claim for a breach of the duty to properly construe plan terms. This is because a claim for breach of the duty of loyalty or care that is divorced from interpretation of the plan terms is not cognizable under 29 U.S.C. §

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1132(a)(1)(B). Section 1132(a)(1)(B) only authorizes a beneficiary to bring claims "to recover benefits due to him *under the terms of his plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits *under the terms of the plan*." *See also Varity Corp.*, 516 U.S. at 512 (section 1132(a)(1)(B) "provides a remedy for breaches of fiduciary duty *with respect to the interpretation of plan documents and the payment of claims*") (emphasis added). In other words, there is no claim for breach of fiduciary duty under § 1132(a)(1)(B) *independent* from the terms of class members' plans, and Plaintiffs cannot enforce § 1104's separate statutory duties under § 1132(a)(1)(B). *Virtue v. Int'l Bhd. of Teamsters Ret. & Family Prot. Plan*, 886 F. Supp. 2d 32, 36 (D.D.C. 2012) ("while § 1132(a)(1)(B) allows enforcement of the 'terms of the plan,' it does not allow enforcement of ERISA provisions"). Plaintiffs cite no authority allowing such a claim.

Because § 1132(a)(1)(B) is limited to claims relating to the interpretation of plan terms and benefits, which Plaintiffs admit are subject to review for abuse of discretion, the abuse of discretion standard applies to all claims asserted under that section, including Count I. *Tibble v. Edison Int'l*, 729 F.3d 1110, 1129 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015) ("As to issues of plan interpretation that do not implicate ERISA's statutory duties, they are subject to *Firestone*" abuse of discretion review); *see also Zhu v. Fujitsu Grp. 401(K)Plan*, No. C-03-1148RMW, 2003 WL 24030329, at *2 (N.D. Cal. Sept. 9, 2003) ("A claim for breach of fiduciary duty is actually a claim for benefits when a resolution of the claim rests upon an interpretation and application of an ERISA regulated plan").

### 2. The Abuse of Discretion Standard Applies to Count III Under § 1132(a)(3).

Plaintiffs also urge the Court to apply *de novo* review to Count III for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). This is equally unavailing. "[A] section [1132](a)(3) challenge . . . predicated on a plan interpretation . . . does not nullify the terms of the plan granting the administrator the right and responsibility, in the first instance, to interpret the plan provisions . . . ." *Schultz v*, 308 F. Supp. 2d at 303 (applying abuse of discretion standard to § 1132(a)(3) fiduciary breach claim relating to interpretation of plan terms).

As with Count I, Plaintiffs try to avoid deferential review of Count III by casting their attack on UBH's creation and application of the guidelines as a breach of the duties of loyalty and care. (ECF No. 392, at 73:7–75:9.) But Count III is indistinguishable from the other Counts, which are subject to review for abuse of discretion. Indeed, Plaintiffs concede that "the central issue in this case" as to *all of their claims* is their "facial" attack on the guidelines. (ECF No. 392, at 87:9–12.) Plaintiffs also admit that this "central issue" of developing and applying the guidelines is *inherently* discretionary. (Trial Tr. 14:17–20 (Opening Statement) (Plaintiffs' counsel arguing that "the exercise of discretion" is "inherent in both . . . developing the guidelines and using them to make clinical coverage determinations"); *accord* ECF No. 299, at 19:27 – 20:2 (arguing that "UBH had, and exercised, 'discretionary authority or discretionary responsibility' in creating, amending, and applying its guidelines").) And Plaintiffs also admit that this discretionary "act of writing and amending the guidelines was the method by which UBH decided to interpret the plans." (Trial Tr. 1833:16-20 (Closing Argument); *see also* ECF No. 392, at 78:21–24 (arguing that the guidelines "constitute UBH's interpretation of plan requirements").) Whether brought under § (a)(1)(B) or § (a)(3), and whether labeled a claim for benefits or a breach of fiduciary duty, that same discretionary act is subject to a single standard of review: abuse of discretion.[6] *Varity Corp.*, 516 U.S. at 514–15 (when basis for claim is that administrator

---

[6] Plaintiffs rely on the Second Circuit's decision in *John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan*, 26 F.3d 360 (2d Cir. 1994), to argue that *Firestone's* abuse of discretion deference "does not apply" to claims for breach of the duties of loyalty and care. (ECF No. 392, at 74:7–10.) Plaintiffs try to distinguish the Ninth Circuit's holding in *Tibble* – that issues of plan interpretation are subject to *Firestone* deference – on the ground that the plaintiff in *Tibble* did not separately allege breaches of the duties of loyalty or care. (Id., at 74 n.54.) But, in *Tibble*, the Ninth Circuit held "that the Firestone framework can govern issues of plan interpretation, even when they arise outside the benefits context" – i.e., outside of section (a)(1)(B). *Tibble*, 729 F.3d at 1129. As the Ninth Circuit explained, "[n]ot applying *Firestone* deference" to all claims touching on plan interpretation risks "uniformity problems" because "parts of a plan could be assigned one meaning when litigated under section 1132(a)(1)(B) and another meaning when litigated, like here," as a breach of fiduciary duty. *Id*. 1129. Plaintiffs propose precisely the "uniformity problems" the Ninth Circuit cautioned against, asking the Court to review identical conduct – UBH's development and use of its guidelines – under two different standards of review. Following the Ninth Circuit, the majority of Circuits have refused to override the abuse of discretion standard under such circumstances, including in cases involving alleged breach of the duties of loyalty and care. *See, e.g., Tussey v. ABB, Inc.*, 746 F.3d 327, 355 (8th Cir. 2014) (applying abuse of discretion standard to claims that administrator (Continued...)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   misconstrued plan terms, abuse of discretion standard does not change simply because fiduciary-

2   breach claim is pleaded under § 1132(a)(3)); *Lees v. Munich Reinsurance Am., Inc.*, No. 14-2532

3   (MAS) (TJB), 2016 WL 164611, at *4 (D. N.J. Jan. 13, 2016) ("[E]ven if Plaintiff asserted his

4   claim for . . . breach of fiduciary duty theory under § 1132(a)(3), the same arbitrary and

5   capricious standard that the Court applied to Plaintiff[']s § 1132(a)(1) claim . . . would apply").

6   As the Court already noted in response to Plaintiffs' duty of loyalty argument, "if [UBH]

7   interpreted the plan properly" it "didn't do anything wrong." (Oct. 5, 2017 Hrg. Tr., at 19:25–

8   20:1.); *see also Wright*, 360 F.3d at 1100 (no breach of ERISA duty of loyalty where plan

9   administrator "complied with the plan's lawful terms" because "ERISA does no more than protect

10  the benefits which are due to an employee under a plan").

11       Plaintiffs insist that the nationally-accredited process by which UBH developed its

12  guidelines is itself a breach of these duties of loyalty and care. (ECF No. 392, 82:11–85:16.) As

13  an initial matter, Plaintiffs never pled such claims, and these claims were not certified for class

14  action treatment by the Court. And, the very case Plaintiffs cite in support of this proposition,

15  *Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07-CV-9329 (SHS), 2017 WL 5664850, at *10

16  (S.D.N.Y. Nov. 27, 2017), demonstrates precisely why Plaintiffs' process-based claims are

17  indistinguishable from UBH's discretionary act of plan interpretation. As the *Leber* court

18  acknowledged, "a prerequisite to establishing liability for any fiduciary breach" is a showing

19  "that the fiduciary breaches actually caused losses" to the plan or its members. *Id.* at *10. Even if

20  UBH's *process* for developing the guidelines constituted a stand-alone breach of UBH's fiduciary

21  duties of loyalty or care (it did not), Plaintiffs must still demonstrate that such a breach caused a

22  substantive injury to the class. Plaintiffs fail to identify any alleged injury to the class stemming

23  from UBH's process for developing the guidelines other than the resulting content of the

24  guidelines, which Plaintiffs admit reflect an act of plan interpretation.[7] (Trial Tr. 1833:16-20

25  _____

26  breached duties of duties of loyalty and care because "[l]ike most circuits to address the issue, we
    see no compelling reason to limit Firestone deference to benefit claims").

27      7 As discussed in Section VIII (p. 97), Plaintiffs failed to prove on a classwide basis that
    UBH's conduct caused class members any cognizable injury at all.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    (Closing Argument); ECF No. 392, at 78:21–24.)

2          Ultimately, as the Court has already recognized, Plaintiffs' assertions about the duty of

3    loyalty and the duty of care are "just another way of talking about the conflict of interest," which

4    Plaintiffs "can[not] just separate" from UBH's discretionary act of plan interpretation. (Oct. 5,

5    2017 Hrg. Tr., at 19:19–21.); *see also Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th

6    Cir. 2006) (alleged breaches of fiduciary duties were adequately addressed by the traditional

7    factors for assessing abuse of discretion, including conflict of interest). No matter what Plaintiffs

8    call it, that act of plan interpretation – on which all of their claims rest – is subject to review for

9    abuse of discretion. *Varity Corp.*, 516 U.S. at 514–15.

10   **IV.    PLAINTIFFS' BURDEN OF PROOF AT TRIAL**

11         For all Counts, Plaintiffs bore the burden to prove on a classwide basis and by a

12   preponderance of the evidence that:

13         (1)    UBH owed a fiduciary duty to all class members under their ERISA plans to

14                develop and apply guidelines that are solely consistent with generally accepted

15                standards of care, without regard to plan exclusions and other terms that govern

16                what healthcare services are covered under the plans;

17         (2)    UBH abused its discretion in interpreting the plans by developing and using

18                guidelines that were more restrictive than generally accepted standards of care;

19         (3)    UBH's abuse of discretion in interpreting the plans caused damage to the class

20                members; and

21         (4)    Plaintiffs are entitled to the relief sought.

22   *Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 465 (7th Cir. 2005); *see also Romberio v.*

23   *Unumprovident Corp.*, 385 F. App'x 423, 429 (6th Cir. 2009); *Hein v. F.D.I.C.*, 88 F.3d 210, 224

24   (3d Cir. 1996); *Graddy v. Blue Cross BlueShield of Tenn., Inc.*, No. 4:09-CV-84, 2010 WL

25   670081, at *8 (E.D. Tenn. Feb. 19, 2010); *Corenco Corp. v. Schiavone & Sons, Inc.*, 362 F. Supp.

26   939, 944 (S.D.N.Y. 1973); *Bd. of Trustees of Bay Area Roofers Health & Welfare Tr. Fund v.*

27   *Westech Roofing*, No. 12-CV-05655-JCS, 2014 WL 4383062, at *3 (N.D. Cal. Sept. 4, 2014).

28         In addition, even if Plaintiffs could prove the above elements, no relief is available under

1    Counts III and IV brought under 29 U.S.C. § 1132(a)(3) if adequate remedies are available under

2    § 1132(a)(1)(B). *Moyle*, 823 F.3d at 959.

3              Plaintiffs bore the burden to prove each of the elements of their claims "at trial through

4    evidence . . . common to the class rather than individual to its members." *Stockwell v. City & Cty.*

5    *of S. F.*, No. C 08-5180 PJH, 2015 WL 2173852, at *6 (N.D. Cal. May 8, 2015) (quotation

6    omitted); *see also Dilts v. Penske Logistics, LLC*, No. 08-CV-318-CAB BLM, 2014 WL 305039,

7    at *3 (S.D. Cal. Jan. 21, 2014) ("Plaintiffs' class action was certified on the basis that Plaintiffs

8    would establish at trial by common evidence" the elements of their claims as to all of "the absent

9    class members.") If "[t]hat evidence did not materialize," Plaintiffs are not entitled to a classwide

10   judgment. *Id.*

11             The common evidence necessary to support a classwide determination is evidence that

12   applies "to the class as a whole." *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050 SC, 2011 WL

13   2682967, at *7 (N.D. Cal. July 8, 2011). "Evidence will not support a classwide determination

14   "where plaintiffs have provided no reliable means of extrapolating that [evidence] to the class as a

15   whole." *Id.* at *5, citing *Marlo v. United Parcel Service* ("*Marlo II*"), 639 F.3d 942 (9th Cir.

16   2011). Anecdotal evidence about a handful of class members, plans, or benefit decisions "can't

17   support an inference about the [circumstances] of thousands" of class members. *Espencheid v.*

18   *DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013). "Instead, "[c]ommon proof of some kind

19   is necessary to support [a] classwide determination." *Marlo v. United Parcel Serv., Inc.* ("*Marlo*

20   *I*"), 251 F.R.D. 476, 483, 488 (C.D. Cal. 2008). The "existence of a policy," even a common

21   policy, "does not necessarily establish" classwide proof of liability if "the policy may have

22   accurately" applied to some individuals, but not others. *Marlo II*, 639 F.3d at 948. Plaintiffs failed

23   to carry their burden of classwide proof on each of their claims.

24   **V.      THE GUIDELINES ARE INCORPORATED INTO AND REFLECT PLAN**
              **TERMS, AND ARE NOT SUBJECT TO CHALLENGE AS A FIDUCIARY ACT**
25

26             It was Plaintiffs' threshold burden to prove that UBH acted as a fiduciary and not as a

27   settlor when it created the guidelines and used them to determine whether class members were

28   entitled to benefits under the terms of their ERISA plans. *Brosted*, 421 F.3d at 465 (ERISA

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    plaintiff bears the burden of establishing "that the defendants are plan fiduciaries"). Plaintiffs

2    failed to prove on a classwide basis that UBH's development and use of the guidelines are

3    fiduciary acts subject to judicial review under ERISA. UBH is entitled to judgment on all of

4    Plaintiffs' claims for this reason alone.[8]

5              A.       **Plan Terms Are Immune From Judicial Review Under ERISA.**

6         "ERISA does not create any substantive entitlement to employer-provided benefits . . . ."

7    *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). Rather, "[e]mployers or other

8    plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or

9    terminate welfare plans." *Id*. Because the plan sponsor has the exclusive right to determine

10   whether to offer benefits at all, and, if offered, what the terms of that plan will be, a challenge to

11   the plan's terms "is not a cognizable complaint under ERISA . . . ." *Id*.[9]

12             B.       **The Guidelines Are Incorporated Into The Coverage Terms Of The Plans,**
                        **And Are Not Subject To Challenge Under ERISA.**
13

14                      1.       **Plaintiffs Admit That Language In Class Members' Plans Is Sufficient**
                                 **To Incorporate The Level Of Care Guidelines By Reference.**

15        After years of arguing that the guidelines are not incorporated by reference into the class

16   members' plans, Plaintiffs take the position that the precise language at issue in the plans is

17   sufficient to incorporate the guidelines by reference when that same language appears in the

18   CDGs. As Plaintiffs' own argument now confirms, the class members' plans incorporate UBH's

19   LOCGs as terms of the plans in one of two primary ways.

20         *First*, many plans expressly exclude from coverage "services which are not consistent

21   with [UBH's] level of care guidelines or best practices as modified from time to time." (Trial Ex.

22   225, at 225-106–107; Trial Tr. 878:21–879:10 (Dehlin); *see also* Trial Ex. 1647, at 1647-0063;

23   Trial Ex. 1653 (summarizing similar plan exclusions in other class members' plans).) Where the

24   same language appears in certain CDGs, Plaintiffs argue that those CDGs incorporate the LOCGs

25   ───────────────
          8 Plaintiffs' failure to offer classwide proof that UBH's development and use of the
26   guidelines was a fiduciary act also illustrates why the class should be decertified, as UBH will
     more fully explain when permitted to move to decertify the class.

27        9 Other state or federal laws may prescribe what services must be covered in a health
     benefit plan, but Plaintiffs state no claims based on such laws.
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    by reference. (ECF No. 392, at 5:16–20 (Plaintiffs arguing that the CDG exclusion for services

2    that "are not consistent with . . . [UBH's] level of care guidelines as modified from time to time"

3    is sufficient to incorporate the LOCGs by reference); Trial Ex. 880, at 880-0009:2–5 (same); Trial

4    Tr. 1840:5-11 (same).) Having taken the position that the same language incorporates the LOCGs

5    *in their entirety* into the CDGs, Plaintiffs effectively concede that the plans incorporate the

6    LOCGs *in their entirety* where they use the same language.[10]

7         *Second*, many plans, either in addition to, or in lieu of the LOCG exclusion, refer to

8    UBH's "clinical protocols that describe the scientific evidence and prevailing medical standards

9    and clinical guidelines supporting our determinations regarding specific services" in defining

10   "Covered Health Services." (*See* Trial Ex. 225, at 225-0090–91; Trial Ex. 1653 (summarizing

11   similar references in other plans).) This is a direct reference to UBH's guidelines, which describe

12   the behavioral health benefits "covered in the plan." (Trial Tr. 854:3–855:10 (Dehlin).) Again,

13   Plaintiffs argue that virtually identical language in certain CDGs is sufficient to incorporate the

14   LOCGs into those documents. (*See* ECF No. 392, at 6:1-5 (Plaintiffs arguing that the "language

15   with a statement that UBH 'maintains clinical protocols that include the Level of Care Guidelines

16   which describe the scientific evidence, prevailing medical standards and clinical guidelines

17   supporting our determinations regarding treatment" is sufficient to incorporate the LOCGs by

18   reference); Trial Ex. 880, at 880-0009:10–15 (same).)

19        Regardless of Plaintiffs' position, *Jones v. Kodak Medical Assistance Plan* underscores

20   that this plan language incorporates UBH's LOCGs into the plans. In *Jones*, two plan

21   beneficiaries sued under ERISA after the plan administrator denied their claims for treatment for

22   substance use disorder based on the administrator's internally-developed admission criteria.

23   *Jones*, 169 F.3d 1287, 1289–90 (10th Cir. 1999). The trial court granted summary judgment in

24   favor of the plan, in part, because "the criteria upon which the Plan Administrator based his

---

25        [10] Plaintiffs cannot have it both ways. Either (1) this language is sufficient to incorporate
26   the LOCGs, in which case the LOCGs are incorporated into the plans and are not subject to
     judicial review under ERISA, or (2) this language is insufficient to incorporate the LOCGs into
27   the plans or the CDGs, in which case Plaintiffs failed to present any evidence that the LOCG
     provisions they challenge apply to class members whose benefit determinations were made using
28   a majority of the CDGs. *See* Section V.B.1 (p. 18).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   decision were part of the Plan and thus could not be reviewed." *Id.* at 1289. The Tenth Circuit

2   affirmed, holding that "the Plan Summary expressly authorized [the administrator] to determine

3   eligibility for substance abuse treatment according to its own criteria," and this was sufficient to

4   incorporate those criteria into the terms of the plan. *Id.* at 1292. The "criteria did not need to be

5   listed in plan documents to constitute part of the plan." *Id.*

6           Here, the language incorporating the LOCGs into the plans is even stronger than in *Jones*.

7   The plans do not merely "authorize [UBH] to determine eligibility . . . according to its own

8   criteria"; they specifically refer to UBH's "level of care guidelines" and exclude coverage for

9   treatment that is not consistent with those guidelines.[11] Also, unlike in *Jones*, Plaintiffs *agree* that

10  the precise language is sufficient to incorporate UBH's LOCGs in their entirety. Thus, UBH's

11  guidelines at issue here are "shielded from judicial review." *See Jones*, 169 F.3d at 1292; *see also*

12  *Curtiss-Wright Corp.*, 514 U.S. at 78 (critique of plan terms "is not a cognizable complaint under

13  ERISA"). Based on this argument alone, UBH is entitled to judgment in its favor.

14              **2.      Plaintiffs' Arguments That UBH Was Acting As A Fiduciary In
                         Developing The Guidelines Have No Merit.**
15

16          Despite affirmatively arguing that the language found in the plans is sufficient to

17  incorporate the LOCGs for other purposes, Plaintiffs persist in denying that the LOCGs are

18  incorporated into the plans and that UBH was acting as a settlor when it created those guidelines.

19  Plaintiffs' arguments are unavailing.

20          First, Plaintiffs argue that "UBH cannot possibly prove that it was a 'settlor' of the plans it

21  administers, because it does not 'adopt, modify, or terminate' them," and "not a single plan

22

23          11 Plaintiffs offered no proof of any plan without the incorporation language. Regardless,
    a handful of exceptions would not save their claims. Plaintiffs bore the burden of proving on a
24  classwide basis that the guidelines represent a fiduciary act rather than an act of plan design.
    *Brosted*, 421 F.3d at 465 (ERISA plaintiff bears the burden of establishing "that the defendants
25  are plan fiduciaries"); *Stockwell*, 2015 WL 2173852, at *6 (class action plaintiff must prove her
    claims "at trial through evidence . . . common to the class rather than individual to its members").
26  Evidence relating to a handful of plans is not sufficient to support a classwide judgment as to all
    of the plans. *See Espencheid*, 705 F.3d at 775 ("What can't support an inference about the
27  [circumstances] of thousands of [class members] is evidence of the experience of a small,
    unrepresentative sample of them").

28

1    identifies UBH as a Plan Sponsor." (ECF No. 392, at 93:1–3.) But the question is not whether

2    UBH was the sponsor of the class members' plans (although the undisputed evidence shows that

3    UBH played a settlor role in crafting plan language for UnitedHealthcare plans). (Trial Tr.

4    842:23-843:6 (Dehlin).) The question is whether the plans, by design, incorporate UBH's

5    guidelines. Whether the plan sponsor incorporated the LOCGs by reference or physically attached

6    UBH's guidelines as an addendum to the plan, they have the same legal effect as terms of the

7    plan. *See Shroyer v. New Cingular Wireless Servs., Inc.*, No. CV 06-1792-R FMO, 2006 WL

8    5444358, at *1 (C.D. Cal. May 26, 2006), *rev'd on other grounds*, 498 F.3d 976 (9th Cir. 2007)

9    (document incorporated into agreement by reference has same effect "as if the terms and

10   conditions had been printed within the body of the agreements").

11       Where the plan sponsor has elected to incorporate as plan terms UBH's guidelines "as

12   amended from time to time," UBH cannot violate ERISA by promulgating or applying those

13   guidelines, as the plan requires. *Wright*, 360 F.3d at 1100 (no breach of ERISA duty of loyalty

14   where plan administrator "complied with the plan's lawful terms" because "ERISA does no more

15   than protect the benefits which are due to an employee under a plan"); 29 U.S.C. § 1104(a)(1)(D)

16   (imposing fiduciary duty to comply with plan terms).[12] Where UBH's guidelines are incorporated

17   as plan terms, the act of creating or modifying those guidelines is itself a settlor function, which

18   the plan sponsor has delegated to UBH. *See Jones*, 169 F.3d at 1292 (holding that third-party

19   benefits administrator performs a settlor function in drafting medical necessity criteria).

20       Second, Plaintiffs contend that the guidelines cannot be incorporated into class members'

21   plans as a matter of plan design because UBH modifies its guidelines annually and, Plaintiffs

22   argue, "UBH *cannot* 'rewrite plan terms.'" (ECF No. 392, at 93:4–5, quoting Trial Tr. 916:22–23

---

23       12 Plaintiffs cite no authority for their position that whether a plan term adopted by the
24   settlor can be subject to challenge depends on who wrote the provision or who the plaintiff chose
     to sue. Insurance companies like UnitedHealthcare and UBH frequently write the language in the
25   plan, which they then offer as a "product" to employers. (Trial Tr. 834:23 – 836:21, 842:7–843:6,
     857:5 – 9 (Dehlin).) By Plaintiffs' logic, virtually every plan term would be subject to challenge
26   under ERISA because an insurance company, rather than the plan's settlor, wrote the language in
     the first place – a result that is incompatible with ERISA. *Curtiss-Wright Corp.*, 514 U.S. at 78.
27   The settlor's act of adopting a plan term is an act of plan design and, once adopted, the plan term
     is not subject to challenge under ERISA. *Id.*

28

1    (Dehlin).) Whether UBH can amend a plan during the plan's effective term is irrelevant to

2    whether the plan incorporates the UBH guidelines in effect on the plan's effective date.

3    Moreover, the plans expressly anticipate and confer on UBH the authority to "modify" its

4    guidelines "from time to time."[13] *See e.g.*, Trial Ex. 225-106-107; *see also Curtiss-Wright Corp.*,

5    514 U.S. at 76 (statement in plan that the sponsor "reserves the right at any time to amend the

6    plan" is sufficient to delegate amendment authority to a third-party benefits administrator).

7        Third, Plaintiffs argue that regardless of whether the plans incorporate the guidelines, this

8    does not "mean that [UBH is] free to put anything in its Guidelines, regardless of the plans' other

9    terms." (ECF No. 93:23–24; *see also* Trial Tr. 879:6-14 (Dehlin).) But the sponsor is "free under

10   ERISA, for any reason at any time, to adopt" terms of coverage.[14] *Curtiss-Wright Corp.*, 514 U.S.

11   at 78. Plaintiffs' citation to *Pacific Shores Hospital v. United Behavioral Health* only underscores

12   that ERISA allows a plan sponsor to incorporate UBH's LOCGs as terms of the plan. In *Pacific*

13   *Shores*, the Ninth Circuit described UBH's LOCGs as "plan documents" and treated them

14   accordingly, reviewing UBH's application of the inpatient and continued service criteria to the

15   facts of the plaintiffs' case for abuse of discretion. *Pacific Shores Hosp.*, 764 F.3d at 1042 . As

16   terms of the plans adopted and incorporated by the settlors of the class members' plans, the

17   guidelines themselves do not implicate ERISA's fiduciary requirement, and each of Plaintiffs'

18   claims fails as a matter of law.

19

20

21

22        [13] Plaintiffs offered no evidence that such changes would require a formal amendment to the plan terms.

23        [14] Plaintiffs contend that permitting a plan sponsor to incorporate the guidelines into the
     terms of a plan would amount to an unlawful exculpatory clause. (ECF No. 392, at 94 n.60.) Not
24   so. A plan sponsor's decision to incorporate the guidelines by reference into the terms of the plan
     no more exonerates UBH from fiduciary liability than the sponsor's decision to write any other
25   exclusion or limitation on coverage into the plan. UBH has a fiduciary obligation to faithfully
     apply the terms of the plan, and its application of the guidelines to the individual facts of a
26   specific beneficiary's claim for benefits is a fiduciary act subject to review for abuse of
     discretion. *See Pacific Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1042 (9th Cir.
27   2014) (describing UBH's LOCGs as "plan documents" and reviewing UBH's application of the
     inpatient and continued service criteria to the facts of the plaintiffs' case for abuse of discretion).

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1
2

C.      **Plaintiffs' Attack On The Custodial Care CDGs Is A Back-Door Attack On The Express Terms Of Many Class Members' Plans.**

3      Even if the Court finds that the LOCGs are not fully incorporated as plan terms, Plaintiffs

4    still cannot challenge specific coverage terms in the guidelines taken directly from the plans. In

5    those instances, Plaintiffs' facial challenge is nothing more than an impermissible back-door

6    attack on the terms of the plan itself, and plan terms are immune from challenge under ERISA.

7    *Curtiss-Wright Corp.*, 514 U.S. at 78; *Jones*, 169 F.3d at 1292; *Harris Tr. & Sav. Bank v. John*

8    *Hancock Mut. Life Ins. Co.*, 302 F.3d  18, 29 (2nd Cir. 2002) ("adherence to [plan] terms by a

9    plan administrator cannot constitute a breach of its fiduciary duties").

10     Plaintiffs' experts spent significant time at trial attacking UBH's definition of "custodial

11    care" in its seven Custodial Care CDGs. That testimony is irrelevant because Plaintiffs' experts

12    myopically focused on whether the definition of "custodial care" in the CDGs is consistent with

13    generally accepted standards of care, wholly ignoring the relevant plan terms.[15] UBH did not craft

14    the CDGs' definition of "custodial care" from whole cloth. Each CDG states on its face that it is

15    based on specific benefit plan documents, and that it applies only where the definition of

16    custodial care in the CDG is consistent with the definition of custodial care in the member's plan.

17    (Trial Exs. 47-0002, 84-0002, 108-0002, 148-0002, 195-0002, 221-0002.) Every plan in evidence

18    specifically excludes coverage for "custodial care" and defines that term. (Trial Ex. 1654

19    (summarizing custodial care definitions and exclusions in class members' plans); Trial Tr. 895:20

20    – 897:6 (Dehlin) (explaining Exhibit 1654).) The definition of "custodial care" reflected in

21    UBH's Custodial Care CDGs either tracks the plan language verbatim or reasonably interprets the

22    plan language of the majority of the plans in evidence. (Trial Ex. 1654; Trial Tr. 455:24 – 456:19

23    (Niewenhous) ("Q: And this [Custodial Care] CDG is interpreting that plan language [relating to

24    "custodial care"]? A: That is correct, yes.").) Regardless of whether Plaintiffs believe that

25    definition of custodial care is too broad, ERISA does not permit them to challenge plan

26

27      15 As discussed in Section VI.C.10 (p. 85), UBH's Custodial Care CDGs are consistent
      with generally accepted standards of care.

28

1   language.[16]

2        Nor can Plaintiffs salvage their challenge to the Custodial Care CDGs by pointing out that

3   some plans define custodial care differently, or more narrowly, than that term is defined in the

4   CDGs. The face of every Custodial Care CDG at issue cautions that the terms of an individual

5   member's plan "may differ greatly from the standard benefit plans upon which [the Custodial

6   Care CDG] is based," and "[i]n the event that . . . there is a conflict between this document and

7   the [member's plan], the *enrollee's specific benefit document supersedes these guidelines*." (Trial

8   Ex. 10, at 10-0002 (emphasis added); *accord* Trial Exs. 47-0002, 84-0002, 108-0002, 148-0002,

9   195-0002, 221-0002.); (Trial Tr. 457:11–13 (Niewenhous) (if the CDG is inconsistent with a

10  member's individual plan, "UBH should not apply the definition in [the] CDG.").)  If Plaintiffs'

11  grievance with the Custodial Care CDGs is truly a facial challenge, the inquiry ends there because

12  the guidelines state on their face that they are only used where the definition of custodial care in

13  the CDG is consistent with the definition in the member's plan. Plaintiffs offered no evidence to

14  the contrary at trial.

15       Plaintiffs argue that regardless of what the CDGs say on their face, UBH *applied* the

16  Custodial Care CDG in two instances when "the plan language does *not* match UBH's overly-

17  restrictive definition." (ECF No. 392, at 58:8–17.)[17] Plaintiffs offered no such evidence at trial,

18  ───────────

19       16 This is equally true of the definition of "custodial care" in the residential treatment
    LOCGs. Like the CDGs, the definition of "custodial care" in the LOCGs is derived from plan
    language defining "custodial care," not by general reference to "generally accepted standards of
20  care." (Trial Tr. 1707:11–20 (Triana) ("the source of" the definition of custodial care in the
    LOCGs "was the plan language"); *accord* Trial Ex. 1260, at 1260-0003 (guideline feedback chart
21  noting proposed changes to definition of custodial care with comment from Mr. Niewenhous that
    UBH "cannot change a definition of custodial care" because the definition is derived from
22  plans).)

23       17 Plaintiffs' reliance on sample member 3262 for an as-applied attack on the Custodial
    Care CDGs is particularly suspect because that member's benefit request was actually approved
24  on appeal using the same Custodial Care CDG. (Trial Ex. 899-0010 to -11 (appeal decision for
    Member 3262 overturning initial benefit denial); Trial Ex. 1655-0001 (summary exhibit re
    member appeals); Trial Tr. 1540:13 – 1544:1 (Bridge) (sample member 3262 was approved for
25  benefits using the Custodial Care CDG). Sample member 3262 further highlights that Plaintiffs
    have not met their burden of proving on a classwide basis that class members' requests for
26  benefits were even denied. Other class members also received the benefits they requested on
    appeal. (Trial Ex. 1655; Trial Tr. 1484:10–17, 1502:10–12, 1503:18– 1505:4 (Bridge) (testifying
27  that an overturn on appeal results in authorization and discussing sample class members whose
    benefit denials were overturned on appeal).)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   presumably because they expressly (and repeatedly) disavowed any challenge to how the

2   guidelines were applied. But even if evidence about how the Custodial Care CDG was applied in

3   a particular case *was* relevant to Plaintiffs' classwide facial challenge, there is no evidence in the

4   record to support Plaintiffs' unfounded hyperbole that UBH "takes the most restrictive possible

5   definition provided in any plan language" and applies it to all plans. (ECF No. 392, at 57:5–

6   58:22.)[18]

7       Plaintiffs' failure to offer classwide proof that the Custodial Care CDGs on their face are

8   inconsistent with the plan definitions of "custodial care" is alone sufficient to find in UBH's favor

9   with respect to each of the Custodial Care CDGs challenged by Plaintiffs.

10  **VI.   TO THE EXTENT UBH'S PROMULGATION AND APPLICATION OF THE
        GUIDELINES IS A FIDUCIARY ACT IN WHOLE OR IN PART, UBH DID NOT
11      ABUSE ITS DISCRETION IN CONSTRUING THE PLAN TERMS**

12      If the Court concludes UBH was acting as a fiduciary, and that the guidelines reflect

13  UBH's interpretation of plan terms, rather than plan terms themselves, UBH's development of the

14  guidelines is subject to review for abuse of discretion. Thus, the question for the Court at the

15  liability phase is whether Plaintiffs carried their burden of demonstrating by a preponderance of

16  the evidence, using classwide proof, that UBH's guidelines are an illogical or unreasonable

17  interpretation of the terms of all of the class members' plans. Plaintiffs did not carry that burden.

18      **A.   UBH Acted In Good Faith When It Developed And Subsequently Applied
            The Guidelines Using A Nationally-Accredited Process Driven By Clinical,
19          Not Financial, Considerations.**

20      UBH's LOCGs and CDGs facilitate the exercise of its discretion to make coverage

21  determinations and inform conversations with providers about proposed treatment for UBH

22  members. (Trial Tr. 297:21-298:12 (Niewenhous).) UBH's guidelines promote access to

23  treatment that is evidence-based and medically necessary. (Trial Tr. 447:4-14 (Niewenhous); see

24  also Trial Tr. 961:15-18 (Martorana) ( "[We] [w]ant to make sure that [members are] getting

25  ─────────────────

26      18 With respect to the two specific benefit determinations, Plaintiffs argue that UBH
    should not have applied its Custodial Care CDG to those particular class members' benefit
    requests. Plaintiffs cannot now challenge the application of the Custodial Care CDG to particular,
27  individualized benefit determinations. Those claims are not suitable for classwide proof or
    adjudication, were not pled in the complaint, and were not certified for trial.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   treatment that's evidence based as opposed to things that aren't evidence based which may or

2   may not help them").) UBH's focus on promoting evidence-based treatment is consistent with

3   generally accepted standards of care. For example, AACAP's Principles of Care for Treatment of

4   Children and Adolescents with Mental Illnesses in Residential Treatment Centers provides: "The

5   best intervention for serious mental health issues that cannot be treated in the child's home

6   environment is a facility that has a multidisciplinary treatment team providing safe, evidence-

7   based care that is medically monitored." (Trial Ex. 693-0003; Trial Tr. 1428:23-1430:5 (Allchin)

8   (describing importance of evidence-based care); see also Trial Ex. 662-0294 (ASAM criteria)

9   (requiring Level 3.7 facilities to include "[e]vidence-based practices").)

10           **1.**      **The Guidelines Were Reviewed And Approved Through An Annual**

11                     **Process That Sought And Incorporated Feedback From Internal And**
                  **External Behavioral Health Professionals As Well As National**

12                     **Professional Organizations.**

13          Throughout the class period, UBH annually reviewed its guidelines to ensure they

14   remained consistent with generally accepted standards of care and evidence-based practices.

15   (Trial Tr. 1688:5-15 (Triana).) For the LOCGs, the review process involved four discrete stages:

16   solicitation of internal and external input, drafting of new guidelines pursuant to this input and

17   other research, revision of the drafts by a working group, and, finally, committee approval.

18          The first stage of the guideline creation process typically started in June of the preceding

19   year. (Trial Tr. 937:18-22 (Martorana).) UBH distributed its guidelines to internal and external

20   behavioral health professionals and professional societies to solicit suggestions for updates to the

21   guidelines. (Trial Tr. 937:22-938:2 (Martorana).) The internal reviewers consisted of behavioral

22   health professionals with at least a masters-level education, including several board-certified

23   psychiatrists. (Trial Tr. 1689:22-1690:1 (Triana).) A number of internal commentators were also

24   board-certified specialists in areas such as addiction medicine. (*See, e.g.*, Trial Ex. 1235.)

25          UBH also sought comments from both external clinicians and from professional societies.

26   The external clinicians were selected from UBH's provider network. (Trial Tr. 1691:10-16,

27   1692:8-11 (Triana).) Commentary from professional societies came from two sources. First, a

28   number of professional societies were invited to join UBH's Behavioral Specialty Advisory

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    Council ("BSAC"). (Trial Tr. 743:24-744:4, 1691:25-1692:5 (Triana).) Members of the BSAC

2    included "the American Psychiatric Association, the American Psychological Association, the

3    National Association of Social Workers, National Association of Psychiatric Health Systems,

4    ASAM, and several others." (Trial Tr. 1692:2-5 (Triana).) Additionally, Dr. Rhonda Robinson-

5    Beale, UBH's Chief Medical Officer for External Affairs from 2011 to 2014, was responsible for

6    liaising with external organizations, including subspecialty organizations, consumer organizations

7    and governmental organizations, in order to elicit feedback on the guidelines. (Trial Ex. 1657, at

8    12:11-13:17, 16:04-17: 16, 31:02-15, 40:07-17, 68:01-14, (Robinson-Beale).)

9         At times, UBH also hired external consultants. For example, following the release of a

10   new version of the ASAM criteria in 2013, Dr. Robinson-Beale hired one of the authors, Gerald

11   Shulman, to review UBH's 2013 LOCGs and substance use CDGs and identify any conflicts

12   between them and the new ASAM criteria. (Trial Tr. 1564:7-1565:19 (Robinson-Beale).) Mr.

13   Shulman reviewed the guidelines and communicated to UBH that he was "impressed" and that

14   the guidelines "found the optimal balance between the best clinical care and cost savings." (Trial

15   Ex. 1033-0002; Trial Ex. 1657 at 172:19-173:14, (Robinson-Beale).) UBH considered Mr.

16   Shulman's comments and incorporated some of his suggestions.[19]

17        In the second stage of the annual update process, masters-level social workers reviewed

18   the feedback and used the information to draft updated guidelines. Between 2011 and 2016, Jerry

19   Niewenhous and Loretta Urban performed this task; the job transitioned to Erik Rockswold in

20

21        19 Dr. Robinson-Beale and her colleague, Dr. Alam, reviewed Mr. Shulman's work,
     including his redlined comments and proposed edits to the UBH guidelines. Based on that review,
     they understood that for those provisions where Mr. Shulman suggested no modifications –
22   including numerous provisions and phrases Plaintiffs challenge like "presenting problems,"
     "current condition," "less intensive" level of care, "acute symptoms," improvement, "custodial
23   care" and "active treatment" – it was Mr. Shulman's opinion that those provisions were consistent
     with the ASAM criteria. (See Trial Ex. 1657, at 179:5-181:25 (Robinson-Beale); Trial Tr. 1629:7-
24   18 (Alam).) Mr. Shulman suggested minimal edits to the Common Criteria and intensive
     outpatient criteria (Trial Ex. 412-0048 to -52), and did not suggest any changes to the criterion
25   that co-occurring conditions can be "safely managed." (Trial Ex. 412-0068.) Mr. Shulman's
     suggested edits to the admission criteria for residential rehabilitation largely affirmed that UBH's
26   criteria were appropriate for ASAM Level 3.7, and Mr. Shulman suggested no substantive
     changes to UBH's definition of "custodial care" and "active treatment" in the residential
27   rehabilitation criteria. (Trial Ex. 412-0093 to -96.) He also emphasized that "imminent danger" is
     a requirement for ASAM Levels 3.3 and 3.5. (Trial Ex. 412-0100.)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

UBH'S POST-TRIAL BRIEF
CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

1   2017. (Trial Tr. 1696:8-14 (Triana); Trial Ex. 1661 at 15:19-24, 42:5-43:2 (Urban); Trial Ex. 904

2   at 18:20-24 (Rockswold).) In addition to using the feedback as a source of information for their

3   drafts, they also conducted research throughout the year to track changing practice modalities.

4   This research included review of governmental sources, national guidelines and consensus

5   statements, clinical position papers, graded reviews of the literature, and well-designed research

6   published in peer-reviewed journals. (Trial Tr. 309:24-310:6 (Niewenhous).) UBH's hierarchy of

7   clinical evidence set forth the weight to be given to these sources. (Trial Tr. 309:24-312:8

8   (Niewenhous); *see, e.g.*, Trial Ex. 281-0002 (discussing hierarchy of evidence).)

9       The draft LOCGs were then sent to the LOCG Work Group. The LOCG Work Group

10  included UBH's Chief Medical Officer, who met with the group by phone to discuss all of the

11  feedback as well as all of the potential changes.

12      The revised LOCGs were then sent to the Behavioral Policy and Analytics Committee

13  (between 2011 and 2016) or the Utilization Management Committee (2017) for review and

14  approval. (Trial Tr. 697:25-698:12, 742:14-22 (Triana).) The BPAC was composed of numerous

15  medical doctors, social workers, and psychologists. Members of the BPAC also included an

16  employee from the legal department, the finance department, the regulatory department, and the

17  affordability department. (Trial Tr. 787:14-25 (Triana).) [20]

18          **2.      UBH's Process For Developing Its Guidelines Exceeded National
19                    Accreditation Standards.**

20      Among the factors that apply in assessing whether UBH abused its discretion are "whether

21  the decision-making process was reasoned and principled" and "any external standard relevant to

22

23          20 UBH applied a similar process in developing the CDGs. (Trial Tr. 1724:14–23
    (Triana).) A masters-level social worker reviewed the evidence base and used that information to
24  create an initial working draft. (Trial Ex. 1661, at 12:8–13:1, 38:15– 41:12 (Urban).) The draft
    CDG was then submitted to subject-matter experts – clinicians with a relevant specialty – within
25  UBH for additional comment. (*Id.*, at 42:5–19.) Where appropriate, UBH solicited input on a
    CDG from external providers. (*Id.* at 12: 19–13:1.) Each CDG was then submitted to UBH's
26  Coverage Determination Committee, which reviewed the proposed CDG "line by line" for
    additional comments or revisions. (*Id.*, at 42:20; *see also* Trial Tr. 337:21–23 (Niewenhous).)
27  Each CDG was presented for final review and approval by the BPAC. (Trial Tr. 1724:3–8
    (Triana).)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   the exercise of discretion." *Champion v. Black & Decker (U.S.), Inc.*, 550 F.3d 353, 359 (4th Cir.

2   2008). In addition to the testimony from Dr. Triana, Mr. Niewenhous, and Ms. Urban regarding

3   the rigorous year-round process UBH employed to update its guidelines each year, Thomas

4   Goddard, Ph.D., an expert in utilization management accreditation, offered his opinion that

5   UBH's process for the LOCGs (including provisions of the LOCGs contained in the CDGs)

6   meets the "gold standard" for national accreditation of utilization review programs and exceeded

7   standards in the industry. (Trial Tr. 1766:2-8 (Goddard).) UBH witness John Beaty affirmed that

8   UBH was accredited by the two leading accreditation agencies throughout the class period. (Trial

9   Ex. 1658, at 87:03-88:14(Beaty) (UBH has been accredited by URAC since at least 1995 and by

10  NCQA since at least 2003).)

11          The National Committee for Quality Assurance ("NCQA") and URAC (formerly known

12  as the Utilization Review Accreditation Commission) are national organizations that accredit

13  utilization management processes. (Trial Tr. 1766:6-8 (Goddard).) Together, NCQA and URAC

14  "dominate the field" and represent the "gold standard" for such accreditation in the industry.

15  (Trial Tr. 1766:2-8 (Goddard).) URAC is governed by a large, diverse board of directors

16  composed of stakeholders that include the American Medical Association, consumer

17  organizations, regulators, and behavioral health provider organizations such as the American

18  Psychiatric Association. (Trial Tr. 1766:24-1767:13 (Goddard).) This diversity of input and

19  governance is designed to accentuate the credibility of URAC's accreditation standards. (Trial Tr.

20  1767:14-20 (Goddard).)

21          To earn accreditation, both URAC and NCQA impose "substantial" requirements that

22  health insurers must meet in developing their utilization management program and medical

23  necessity guidelines, including consultation with practicing providers with relevant medical

24  knowledge, consideration of evidence-based treatment, and a process for annual review of clinical

25  guidelines. (Trial Tr. 1768:18-1769:4 (Goddard); *see also* Trial Exs. 1012-0154 (URAC Health

26  Utilization Management, Version 7.0, HUM 1 Review Criteria); 1011-0007 (NCQA UM 2

27  Clinical Criteria for UM Decisions).) Dr. Goddard and Mr. Beaty confirmed that UBH's process

28  for creating and updating its LOCGs not only satisfies, but exceeds, the requirements set forth by

1   URAC and NCQA and is consistent with best practices in the field. (Trial Ex. 1658, Trial Tr. at

2   83:22-85:07 (Beaty); Trial Tr. 1769:12-1774:25, 1776:11-17 (Goddard).)

3       Plaintiffs offered no evidence to refute Dr. Goddard's and Mr. Beaty's testimony that

4   UBH's guideline development process exceeded NCQA's and URAC's nationally recognized

5   standards. This evidence demonstrates that UBH's process for creating the guidelines was

6   "reasoned and principled," was undertaken in good faith, and was a reasonable exercise of UBH's

7   discretion.[21]

8           **3.      Plaintiffs Offered No Evidence That Any Challenged Guideline**
            **Provision Was Influenced By Financial Considerations.**
9

10      The evidence described above demonstrates that the guidelines are the result of the

11  reasonable, diligent, and good faith efforts of countless doctors, psychologists, psychiatrists,

12  social workers, providers, consultants, and third-party organizations working together over the

13  course of nearly a decade through a nationally-accredited process to ensure that the members of

14  the plans UBH administers have access to high quality and appropriate treatment available under

15  the terms of each member's health benefit plan. Plaintiffs nonetheless make the unfounded

16  accusation that "UBH's guideline development process was infected by its consideration of its

17  own self-interest." (ECF No. 392, 1:17-19.)

18      Despite extensive pre-trial discovery and cross-examination of the key UBH employees

19  who drafted the guidelines and chaired the committees tasked with approving them, Plaintiffs

20  never uncovered or introduced any evidence demonstrating that UBH allowed financial

21  considerations to influence the LOCG or CDG criteria they challenge in this case.

22          **a.      Benefit Expenses Did Not Influence The Content of the**
            **Challenged Guidelines.**
23

24      Plaintiffs proceed on conjecture and inference, criticizing UBH for "regularly prepar[ing]

25  detailed financial forecasts," "track[ing] its performance" against those forecasts, "noting

26  ───────────
    21 Even if Plaintiffs had alleged claims for breach of the duties of loyalty or care that were
27  independent of plan interpretation, the unrefuted evidence that UBH's process exceeded the
    standard of care set by the two "gold standard" accreditation organizations more than satisfies
    UBH's duties of care and loyalty.
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    monthly trends," and attempting to control costs. (ECF No. 392, 66:21-67:7.) None of this routine

2    business activity should be surprising, and none of it implies nefarious intent.[22] Budgeting,

3    forecasting, and monitoring financial indicators do not amount to a conflict of interest, and fall

4    well short of proving UBH intentionally drafted overly-restrictive guidelines to further its

5    "bottom line."  (*Id.* at 1:19).

6         Nor does the fact that certain members of BPAC were aware of UBH's financial

7    performance prove a conflict of interest or that this awareness influenced the content of the

8    guidelines. To a person, every UBH witness who testified about the guideline development

9    process confirmed that clinical considerations, not financial considerations, drove the

10   development of the criteria. The BPAC met about 180 times between 2011 and 2016. (Trial Tr.

11   786:11–15.) Dr. Lorenzo Triana, who was the Senior Vice President of Behavioral Medical

12   Operations and chaired the BPAC, only recalled three instances where benefit expense was

13   discussed in any context at a BPAC meeting, none of which has any bearing on issues in this

14   case. (Trial Tr. 698:17-24, 786:2 (Triana).)[23] Likewise, despite years of discovery, depositions,

15   and trial testimony, Plaintiffs identified only one instance nearly eight years ago when the BPAC

16   discussed average length of stay ("ALOS"), although Plaintiffs failed to offer the document into

17   evidence or present any evidence about the context in which ALOS came up at that 2010 BPAC

18   _____

19        [22] For example, Plaintiffs argue that Dr. Triana was "assessed, in his performance
     evaluation, based on whether UBH met its benefit expense targets," citing a single 2012

20   performance evaluation. (ECF No. 392, at 68:6–8, citing Trial Ex. 850.) The performance
     evaluation notes that "as a result of significant focus on maintaining UM activities as the CAC's

21   transitioned to CAOM, OBHS is projected to outperform the budgeted BenEx targets for 2012."
     (Trial Ex. 850-0003.)  A "CAC" is a regional "Care Advocacy Center." (Trial Tr. 1804:11-15

22   (Niewenhous).) As the performance evaluation elsewhere notes, however, Dr. Triana's role in this
     transition was related to medical director staffing, not revisions to the guidelines. Dr. Triana

23   "[p]rovided leadership and guidance to the medical director and clinical staff as they transitioned
     from the traditional CAC staffing model to the integrated CAOM staffing model." (Trial Ex. 850-

24   0002.) The fact that Dr. Triana was given high marks for helping maintain clinical staffing levels
     during an administrative transition, while laudable, is irrelevant.

25        [23] The three times Dr. Triana recalled were: (1) an instance involving "the potential
     adoption of the Milliman Guidelines"; (2) the development of a CDG for Transcranial Magnetic

26   Stimulation ("TMS"); and (3) the "development of a CDG for lab services." (Trial Tr. 786:16–23
     (Triana).) None of these guidelines are at issue in this case (*see* Trial Ex. 880), and Plaintiffs

27   offered no evidence regarding the Milliman Guidelines or the CDG for lab services. The TMS
     guideline is discussed in more detail below.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    meeting. (Trial Tr. 1753:12–1756:18 (Triana); see also Trial Tr. 787:3 – 13 (Triana) (testifying

2    that he could not remember any other instances when ALOS was discussed at a BPAC meeting).)

3            UBH's former Chief Medical Officer Dr. Rhonda Robinson-Beale, who served on both

4    the BPAC and the LOCG Work Group, similarly testified that she could not remember a single

5    time when a BPAC member rejected a recommendation to change the LOCGs based on its

6    potential impact on benefit expense, and she was never involved in any discussions about how

7    changes to the LOCGs would impact benefit expense. (Trial Ex. 1657 at 202:07-18, 210:14-

8    211:02 (Robinson-Beale); see also id. at 105:15-21; Trial Tr. 1696:25–1697:5 (Triana).) Dr. Irvin

9    "Pete" Brock, UBH's former Senior Vice President of Affordability, a licensed psychiatrist who

10   served on both the BPAC and the LOCG Work Group, also was not aware of a single instance in

11   which the "affordability group proposed and operationalized" any initiative "related to reducing

12   benefit expense through changes in the level of care guidelines." (Trial Ex. 1660 at 268:23–269:5

13   (Brock).) And former employee Mr. Rockswold, who participated in updating the LOCGs in

14   2017, testified that he had never been asked or participated in any conversation about whether or

15   how any change to the LOCGs would affect UBH's expenses, profits, or other metrics like

16   ALOS. (Trial Ex. 904, at 221:03, 222:01-06, 222:22-225:19 (Rockswold).)

17           Plaintiffs again rely on innuendo rather than evidence when they note that Dr. Brock and a

18   member of UBH's finance department, Fred Motz, served on the BPAC. As noted above, Dr.

19   Brock is a licensed psychiatrist and senior clinician in his own right with over 30 years of clinical

20   experience as a practicing psychiatrist. (Trial Ex. 1660 at 13:6–25:1 (Brock).) Plaintiffs offered

21   no evidence that Dr. Brock's presence or participation on the BPAC related to the control of

22   benefit expense. And while it is true that Mr. Motz served as a non-voting member of the BPAC

23   for a time, he rarely attended meetings or contributed to the discussion. (Trial Tr. 788: 4-99;

24   1719:18–21, 1745:15 – 1746:1 (Triana); see also Trial Ex. 1657, at 202:19–203:2 (Robinson-

25   Beale).)[24]

26           ─────────────
             [24] Plaintiffs note that Dr. Brock's successor, Nisha Patterson, sits on the Utilization

27   Management Committee. (ECF No. 392. at 67:21–24.) As Dr. Martorana testified, the Utilization
     Management Committee has broader responsibility than the BPAC and is responsible for

28   overseeing a host of "utilization management issues" beyond just approving the Guidelines. (Trial
     (Continued...)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

Plaintiffs rely on this smokescreen of irrelevant facts because there is no evidence that UBH allowed financial considerations to improperly influence the LOCG or CDG criteria they challenge in this case. UBH has no financial incentive to promulgate guidelines that are more restrictive than generally accepted standards of care. As Dr. Brock explained, in the world of medicine, "quality is inversely related to cost." (Trial Ex. 1660 at 34:13–17 (Brock).) It is true that for the minority of plans for which UBH bears the risk of paying medical costs, denying an individual member's request for benefits will mean that UBH does not have to pay for those medical expenses at that time. But, promulgating overly-restrictive guidelines that deny or prematurely end effective treatment "actually would be more expensive" in the long-run because, in the aggregate, restricting access to effective treatment results in higher readmissions, longer lengths of stay, and higher overall benefit expense. (Trial Ex. 1660 at 218:5-22 (Brock).) Plaintiffs' expert, Dr. Plakun made the same point when he testified that denying treatment that is necessary to effectively treat a member's underlying chronic conditions leads to increased readmission rates. (Trial Tr. 491:22–492:14 (Dr. Plakun).)

### b. The "Three Vignettes" Plaintiffs Identify As Evidence Of A Conflict Of Interest Are Irrelevant.

Plaintiffs point to "three vignettes" that they claim prove UBH improperly considered financial impact when developing the guidelines. (ECF No. 392, at 69:1–2.)

First, Plaintiffs cite a 2016 request to defer changes to a specific guideline relating to applied behavioral analysis ("ABA") for the treatment of autism spectrum disorder. (ECF No. 392, at 68:13-72:26.) In December 2016, UBH's Head of Behavioral Health noted that the proposed changes could have a significant "financial impact," and asked to delay the change until

---

Tr. 928:2–7; *see also* Trial Ex. 552 (August 2016 UM Committee meeting minutes noting numerous items of business, including issues of accreditation, provider contracting, and audits).) Plaintiffs offered no evidence about the nature of Ms. Patterson's role on the Utilization Management Committee, let alone that Ms. Patterson had any role in developing any of the guidelines at issue. And while Plaintiffs contend that "another affordability representative, Michael Powell, was also on the BPAC through at least 2015" (ECF No. 392, at 67:22–23), they again fail to offer any evidence of Mr. Powell's role on the BPAC or that he played any role in developing the guidelines. (Trial Exs. 332-0002, 368-0002, 423-0002, 482-0002, 519-0002.)

1 | it could be made in conjunction with the annual pricing cycle with UBH's customers. (Trial Ex.

2 | 812-0001.)

3 |      The ABA guideline is not challenged in this case and is therefore irrelevant. There is no

4 | evidence that any similar considerations factored into the development, promulgation, or

5 | application of the guidelines Plaintiffs challenge. If relevant for any purpose, this evidence shows

6 | that UBH changed a guideline even though the change could have a "significant financial

7 | impact," and the only question from a financial perspective was when the change should be

8 | effective.

9 |      Second, Plaintiffs point to UBH's consideration of coverage for transcranial magnetic

10 | stimulation ("TMS") in 2013 and 2014. (ECF No. 392, at 69:18–70:18.) Like ABA, the TMS

11 | guideline is not at issue in this case. Until 2013, UBH considered TMS to be an unproven

12 | technology for treatment of treatment-resistant depression ("TRD"), and, therefore, excluded

13 | from coverage. (Trial Tr. 766:9-14, 766:21-23.) Starting in 2013, new scientific evidence

14 | emerged, and UBH reexamined whether TMS should be considered proven for TRD. (*Id.*, at

15 | 766:24–767:13.) Although UBH's financial analysis demonstrated that adding TMS as a covered

16 | benefit would increase benefit expense, UBH determined that TMS was proven for certain

17 | indications of TRD and decided to cover it, meaning that UBH also had to develop a new

18 | guideline. (*Id.*, at 767:16-21, 805:18-21.)

19 |      Around that same time, a few self-funded health plans decided to add TMS as a covered

20 | benefit, and UBH began approving benefits for members of those plans. (Trial Tr. 805:22-25

21 | (Triana).) In November 2013, UBH's Clinical Policy Committee recommended against

22 | expanding the TMS benefit beyond the few self-funded customers that had specifically added it,

23 | because there was "no evidence of an enduring treatment effect," meaning a "return on

24 | investment could not be determined." (Trial Ex. 749-0005.) However, UBH moved forward with

25 | adding the benefit across all of its commercial plans. (Trial Ex. 758-0003.) UBH first expanded

26 | the TMS benefit to its fully-insured plans, and later added the benefit to the rest of its self-funded

27 | plans that had not asked specifically for TMS coverage. (Trial Tr. 806:1-6 (Triana).)

28 |      Despite this evidence, Plaintiffs still contend UBH decided to "approve TMS only when

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    someone else . . . would be on the hook for the expense." (ECF No. 392, 70:5–7.) The evidence

2    reveals *exactly the opposite*. With the exception of the handful of self-funded plans that initially

3    asked for TMS, UBH expanded TMS to the plans where UBH "would be on the hook" *first*. UBH

4    then expanded the benefit to the self-funded plans that had neither asked for nor anticipated the

5    extra expense. (Trial Tr. 805:22–806:13 (Triana).)

6    Finally, Plaintiffs point to three occasions over the course of the class period – in 2012,

7    2014, and 2016 – in which UBH considered switching to the ASAM criteria for level of care

8    placement decisions related to the treatment of substance use disorders.[25] (Trial Tr. 802:14–16

9    (Triana); Trial Ex. 430; Trial Ex. 524.) As one part of that analysis, UBH tried to determine

10   whether such a change would have an impact on benefit expense. (Trial Tr. 802:14–803:4

11   (Triana).) UBH was unable to estimate the potential impact on benefit expense, which was among

12   the reasons UBH decided not to adopt the ASAM criteria. (Trial Tr. 777:17 – 778:1 (Triana);

13   Trial Ex. 548-0034.) Dr. Triana explained that the *uncertainty* of whether such a "national level"

14   change would impact benefit expense was itself problematic. (Trial Tr. 803:10–21 (Triana).) For

15   self-funded employers, the uncertainty could result in unforeseen and unbudgeted costs that

16   would come out of the pool of available funds for the employer to pay benefits (*Id.* at 803:22–

17   804:1), while fully-insured customers could see their premiums increase. (*Id.* at 804:2-12.) The

18   fact that UBH considered the potential impact on employers and the pool of benefits those

19   employers provide to their employees is not evidence of a conflict of interest: *it is one of UBH's*

20   *obligations under ERISA*. 29 U.S.C. § 1104(a)(1)(A)(ii).

21   Plaintiffs emphasize that UBH's clinicians supported switching to ASAM, but Dr.

22   Martorana explained that the main advantage to ASAM was the possibility that UBH and "out of

23   network providers" (who are not as familiar with UBH's guidelines) would be able to "speak the

24   same language" during a peer review. (Trial Tr. 958:24–959:9 (Martorana).) No one at UBH

25   recommended a switch on the ground that UBH's guidelines were inconsistent with ASAM. The

26

27   [25] The supposedly separate decisions Plaintiffs describe in 2013 and 2014 (ECF No. 392, at 71:1–7) were part of a single analysis that resulted in one decision in 2014.

28

-35-

1  doctors who supported a switch to ASAM, including addiction specialists like Drs. Alam and

2  Triana, all thought that, like ASAM, UBH's guidelines were consistent with generally accepted

3  standards of care. (Trial Tr. 959:10-25 (Martorana) 1576:6-9 (Alam); 1725:23-1726:3 (Triana);

4  *see also* Trial Ex. 1657 at 186:21–187:5 (Robinson-Beale). (Dr. Robinson-Beale understood that

5  UBH's guidelines were consistent with ASAM.) This conclusion was supported by the limited

6  financial analysis UBH did have, which "did not identify a significant benex risk" (Trial Ex. 548-

7  0034), as well as the clinical prediction by UBH's substance use experts that, at minimum, a

8  switch to ASAM would have "no impact" on utilization and might even *reduce* benefit expense.

9  (Trial Tr. 1660:1–1661:3 (Alam).) As with ABA and TMS, UBH's decision not to adopt the

10  ASAM criteria only underscores that there is no evidence of financial considerations influencing

11  UBH's decisions on the content of the guidelines Plaintiffs challenge.

12     These are not representative "vignettes" – they are the *only* instances Plaintiffs could

13  identify despite years of discovery covering a six-year class period, and none relate to UBH's

14  guidelines challenged in this case. The evidence shows that UBH employees are not afraid to

15  discuss benefit expense when it is a relevant consideration. But, over the six-year class period,

16  benefit expense *never* came up in connection with the LOCGs or the CDGs at issue in this case

17  because it was a *non-factor* in the way UBH wrote them.

### 4.   UBH's Utilization Management Program Relies On The Exercise Of Clinical Judgment And Results In Approval Of Over 90% Of Benefit Requests.

20     While an important tool, the guidelines do not stand alone in instructing UBH's clinicians

21  on how to make coverage decisions under a member's benefit plan. UBH's Utilization

22  Management Committee issues an annual document called the Utilization Management Program

23  Description that fully sets forth the process by which UBH evaluates claims for healthcare

24  benefits, consistent with NCQA's and URAC's accreditation requirements. (Trial Tr. 941:3-11

25  (Martorana), 712:25-713:6 (Triana).) Dr. Triana and Dr. Alam explained that the utilization

26  management program is designed to let clinical judgment, not bare words on a page, drive

27  decision-making—indeed, clinical judgment plays "the biggest role" in making coverage

28  determination decisions. (Trial Tr. 795:12-23 (Triana), 1580:24-25 (Alam); *see also* Trial Tr.

731:18-732:1(Triana) ("[T]he guidelines augment . . . [Peer Reviewers'] clinical judgment.").)[26]

UBH's utilization management program as a whole is a reasonable exercise of UBH's discretionary authority to interpret plan terms and administer benefits for plan members. UBH has established a multi-level review process that ensures that only a medical doctor or Ph.D.-level psychologist can *deny* benefits based on the guidelines, and only after seeking direct input from the member's treating provider. The first level of review is performed by "Care Advocates," clinicians with a master's degree or higher in behavioral health. When a member requests coverage for treatment, a Care Advocate gathers clinical information from the provider, and assesses that information against the terms of the member's benefit plan and the appropriate LOCG or CDG (depending on the plan) to determine whether coverage should be authorized. (Trial Tr. 942:11-16 (Martorana).) UBH doctors are available in regularly scheduled "rounds" to assist the Care Advocates in assessing a case and authorizing coverage. (Trial Tr. 943:21-944:7 (Martorana).) Using the guidelines, UBH Care Advocates **authorize coverage in 90 percent or more of the cases**. (Trial Tr. 943:6-7 (Martorana).)

A Care Advocate cannot deny coverage. If the Care Advocate believes the services are not covered, the case is referred to a UBH physician, or Peer Reviewer, for a peer-to-peer review with the provider. (Trial Tr. 942:9-943:11 (Martorana).) Before the provider interaction, the UBH Peer Reviewer will review all the clinical information that the Care Advocate collected, as well as any prior medical history if available. (Trial Tr. 945:1-8 (Martorana).) The peer-to-peer review is a dynamic conversation between the UBH Peer Reviewer and the member's provider. Among other things, the peer-to-peer review allows the treating physician to provide new information that would support coverage. (Trial Tr. 944:19-25 (Martorana).) The Peer Reviewer can then authorize coverage based on that conversation. (Trial Tr. 946:18-21, 947:11-21 (Martorana).) If

---

[26] Financial considerations play no role in coverage determinations. UBH distributes an Affirmative Statement Regarding Financial Incentives to all clinical staff informing them that they will not be financially rewarded for denying coverage or making coverage decisions that result in underutilization. (Trial Tr. 950:7–951:1 (Martorana).) UBH does not set targets for the number of or percentage of denied benefit requests, and UBH's peer reviewers are neither compensated nor evaluated based on the number of requests they deny or authorize. (Trial Tr. 951:2–12 (Martorana).)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   the Peer Reviewer determines coverage is not provided under the member's plan and the

2   guidelines, the Peer Reviewer will inform the provider, and in almost every case, offer coverage

3   for an alternative level of care that the Peer Reviewer concludes is a better match for the

4   member's current needs and is provided under the member's plan and the guidelines. (Trial Tr.

5   947:22-948:18 (Martorana), 1379:13-21 (Allchin).) If the provider or member rejects the

6   alternative level of care, UBH sends a written non-coverage determination letter to both the

7   provider and the member notifying them of the decision and the member's appeal rights under the

8   plan. (Trial Tr. 948:3-6 (Martorana).) The alternative level of care offered remains available to

9   the member, as long as it is medically necessary. (Trial Tr. 948:17-18 (Martorana).)

10          Throughout this process, UBH clinicians not only can, but must, use their clinical

11  judgment and apply that judgment to the member-specific facts and the UBH guidelines. (Trial

12  Tr. 949:17-19 (Martorana).) On their face, the guidelines are clear that they are not to be followed

13  blindly, but used as a tool to "augment – but not replace – sound clinical judgment," taking into

14  account the unique circumstances and needs of the member:

15              The Level of Care Guidelines are used flexibly, and are intended to
                augment – but not replace – sound clinical judgment. Use is
16              informed by the unique aspects of the case, the member's benefit
                plan, services the provider can offer to meet the member's
17              immediate needs and preferences, alternatives that exist in the
                service system to meet those needs, and the member's broader
18              recovery, resiliency, and well-being goals.

19  (Trial Tr. 964:12-19 (Martorana) (discussing 2017 LOCGs' Use and Limitations section, Trial

20  Ex. 8-0004); *see also* Trial Exs. 1-0004; 2-0004; 3-0005; 4-0006; 5-0007; 6-0007; 7-0007.)

21          As Dr. Martorana explained, each Peer Reviewer exercises his individual clinical

22  judgment just as he would in his own private practice, with the goal of understanding the member

23  in his totality. (Trial Tr. 965:7-9 (Martorana).) This exercise of clinical judgment imbues the bare

24  words on the page with meaning and context. And Dr. Martorana explained that clinical judgment

25  can lead the Peer Reviewer to grant coverage even where the guidelines do not provide for it.

26  (Trial Tr. 949:20-22 (Martorana).) The guidelines expressly provide this authority to UBH

27  physicians:

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1

2

3

4

> Exceptions may be made to the Level of Care Guidelines such as when there is a superceding [sic] contractual requirement or regulation or when a medical director authorizes a case-specific exception from using evidence-based treatment when the member's condition has not responded to treatment as anticipated.

5

6

7

8

9

10

11

12

13

14

15

16

(Trial Ex. 8-0004 (2017 LOCGs' Use and Limitation section); *see also* Trial Exs. 1-0004; 2-0005; 3-0005; 4-0006; 5-0007; 6-0007; 7-0007; *see also* Trial Tr. 965:23-966:8 (Martorana).) This is not a theoretical power. Peer Reviewers not only can but *do* depart from the guidelines and authorize coverage when their clinical judgment suggests it is warranted. (*See, e.g.*, Trial Tr. 1404:25-1405:2 (Allchin).)[27] The LOCGs are written by clinicians, for clinicians who are instructed to use the guidelines through the lens of their clinical judgment. UBH regularly checked to ensure that its reviewers consistently understood the guidelines by measuring "inter-rater reliability" and found that UBH's clinicians consistently interpret the LOCGs in the same way as Drs. Martorana, Allchin, and Alam explained, not in the hyper-technical, legalistic manner Plaintiffs and their experts propose. (Trial Tr. 735:10–736:13 (Triana) ("Q: . . . And would you agree that the results of the IRR process indicate that UBH's clinicians are and have been applying the LOCGs consistently? A: Yes.").)

17

18

19

20

21

22

23

24

25

Throughout their Post-Trial Brief, Plaintiffs ask the Court to ignore or dismiss a host of evidence about how the guidelines are used and what they mean to the people who wrote, approved, and applied them in making benefit determinations, and to defer instead to their two experts' subjective opinions about what certain words *could* mean or how they *might* be used. But the fact that Plaintiffs frame their case as a "facial" challenge does not mean that words in the guidelines must be assessed in a vacuum, divorced from context, explanation, intent, or practical construction. If that were the case, no trial would have been needed. The question is not whether the guidelines *could* be read in a manner inconsistent with the plans, but whether they *are* read that way, and *are* used that way by UBH's clinicians. Viewing the evidence in its entirety shows

26

27

28

---

27 Dr. Martorana clarified that while Peer Reviewers can depart from the guidelines to allow coverage, they cannot depart from the guidelines to deny coverage. (Trial Tr. 950:1-3 (Martorana).)

CROWELL & MORING LLP
ATTORNEYS AT LAW

1   that UBH's interpretation of the plans, as reflected in the language of the guidelines and UBH's

2   larger utilization management program, was not "(1) unreasonable, (2) illogical, or (3) without

3   support in inferences that may be drawn from the factual record." *Lafferty*, 436 F. App'x at 781.[28]

4       **B.**    **Plaintiffs Did Not Offer Classwide Proof That The Guidelines Are An Unreasonable Interpretation Of The Terms Of The Class Members' Plans.**

5

6         At trial, Plaintiffs bore the burden to prove that UBH's guidelines amounted to an

7   unreasonable interpretation of class members' plans. *Webb v. The Hartford Fin. Servs. Grp., Inc.*,

8   608 F. Supp. 2d 1218, 1224 (C.D. Cal. 2009). They failed to satisfy that burden as individual

9   plaintiffs, and they also failed to satisfy that burden classwide with evidence that is common to

10   the class as a whole. *Stockwell*, 2015 WL 2173852, at \*6; *Marlo I*, 251 F.R.D. at 488.

11       **1.**    **The Plans Define Class Members' Rights, And Vary Widely In What Is Covered.**

12

13         As explained by Mr. Dehlin, each class member's plan covers only those healthcare

14   services defined as "covered health services" by the plan documents and not otherwise excluded

15   or limited by other terms of the plan. (*See, e.g.*, Trial Tr. 845:23-25 (Dehlin); Trial Ex. 225-0032

16   (COC for Granite Construction).) The class members' plans do not cover all health services, and

17   they vary in many respects. (*See, e.g.*, Trial Tr. 842:7-9; 845:1-22, 858:7-859:19 (Dehlin); *see*

18   *also* Trial Ex. 225-0032; Trial Ex. 2014-0164.) Most importantly for this case, the class members'

19   plans vary in how they define "covered health services." (Trial Tr. 856:23-857:1 (Dehlin); *see*

20   *also* Trial Tr. 869:8-14 (noting differing definitions of "covered mental health services"); Trial

21   Ex. 225-0102 (sample COC for Granite Construction); Trial Tr. 870:3-871:1 (Dehlin); Trial Ex.

22

23         28 During an exchange with the Court about the meaning of the term "clear and

24   compelling" that appears in the LOCG Continued Service Criteria only for 2011, Dr. Simpatico testified that he did not believe that term to have a medical meaning, "would not be following the

25   [LOCGs] as a script," and would look to generally accepted standards of care to augment his interpretation of their criteria. (Trial Tr. 1241:25–1242:2 (Simpatico).) Plaintiffs cite this

26   testimony to argue that Dr. Simpatico "could not reconcile the discrepancies between the guidelines and the sources that do reflect generally accepted standards of care." (ECF No. 392, at

27   60:9–11.) But Dr. Simpatico was simply recognizing that trained clinicians will use their clinical judgment and expertise to inform their interpretation and application of the guidelines. This

28   confirms the testimony of UBH's clinicians.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   233-0047 to -48 (sample COC for Science Systems and Applications); Trial Tr. 872:16-873:15

2   (Dehlin); Trial Ex. 1539-0053 (sample SPD for Wells Fargo).)[29] The plans also vary in the extent

3   to which they cover treatment at specific levels of care. (*See, e.g.*, Trial Tr. 867:19-869:7

4   (Dehlin); Trial Ex. 225-0097 to -98 (sample COC for Granite Construction) (specific provisions

5   relating to residential treatment); Trial Tr. 873:16-875:7 (Dehlin); Trial Ex. 2014-0168 (specific

6   provisions relating to residential treatment).)

7           **a.      The Plans Do Not Cover All Services That Are Consistent With
                        Generally Accepted Standards Of Care.**
8

9           It is generally true that class members' plans in one way or another preclude coverage for

10  treatment that is *not* consistent with generally accepted standards of care. (Trial Exs. 892, 893.)

11  But it is equally true that the plans do not cover *all* services that are consistent with generally

12  accepted standards. (Trial Tr. 855:11–19 (Dehlin) (there is no "requirement that the plans cover

13  all treatment that falls within the scope of generally accepted standards of care.") If an exclusion

14  or limitation applies, or if the treatment is not included within the scope of covered health

15  services, treatment is not covered "even if the treatment would otherwise be consistent with

16  generally accepted standards of care." (Trial Tr. 876:13–15.) To understand what is covered

17  under any class member's plan, one must read the definition of covered services (both general

18  and specific) together with all relevant exclusions, limitations, and definitions. (*See, e.g.*, Trial.

19  Tr. 850:5-19 (Dehlin); *see also* Trial Tr. 851:17-856:22 (detailing, step-by-step, the Certificate of

20  Coverage provisions that must be referenced to determine what benefits a plan provides).)

21          **b.      Class Members' Plans Contain Numerous Exclusions,
                        Limitations, And Definitions That Directly Impact Plaintiffs'
22                      Criticisms Of The Guidelines In This Case.**

23          The class members' plans not only vary, they vary in ways that are directly relevant to

24

25

26          29 Some plans define "covered health services" as treatment that is "medically necessary."
        Even these plans vary in how they define "medically necessary" treatment. (*Compare* Trial Tr.
27      860:8-862:9 (Dehlin); Trial Ex. 1555-0138 (sample plan for PeaceHealth), *with* Trial Tr. 862:23-
        864:20 (Dehlin); Trial Ex. 1622-0085 (sample plan for KeyCorp).)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   Plaintiffs' criticisms of the guidelines in this case.[30] Plaintiffs' principle grievance with the

2   guidelines is that they "imposed requirements and limitations that severely restricted coverage in

3   violation of the terms of class members' plans." (ECF No. 392, at 3:13-15.) To prove that central

4   claim on a classwide basis, Plaintiffs were required to offer common proof applicable to the class.

5   Plaintiffs failed to do so because they chose not to offer evidence of what was actually covered or

6   not covered under the class members' plans. *Compare Saffle v. Sierra Pac. Power Co.*

7   *Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996) (remanding

8   to plan administrator to determine plaintiffs' eligibility for coverage only after first determining

9   the proper scope of coverage under plaintiffs' plan). On the other hand, UBH demonstrated

10  through the testimony of Mr. Dehlin and the more than 100 plans in evidence that the plans

11  frequently restrict coverage in the exact ways that Plaintiffs now say is inconsistent with those

12  very documents. Plaintiffs may not use ERISA to "rewrite the Plan to include covering . . .

13  something it clearly excludes." *Pergosky v. Life Ins. Co. of N. Am.*, No. CIV.A. 01-4059, 2003

14  WL 1544582, at *7 (E.D. Pa. Mar. 24, 2003) (court could not "expand coverage beyond the

15  provisions of the ERISA group Plan").

16          For example, Plaintiffs contend that the guidelines are facially incompatible with *every*

17  class member's plan because "[t]o meet the Guidelines' threshold requirements for coverage, a

18  member must show the presence of an acute crisis necessitating the level of care requested, and

19  once the crisis has passed, the guidelines provide that the member is no longer eligible for

20  continued coverage." (ECF No. 392, at 32:19–22.) Even if Plaintiffs were right that the guidelines

21  limit coverage to acute crisis situations (they do not), such a limitation is *explicitly* found in

22  certain class members' plans. For example, the plan at Exhibit 2023 provides that "Behavioral

23  Health Services [Are] Not Covered" if they "extend[] beyond the period necessary for *short-term*

24  *evaluation, diagnosis, treatment or crisis intervention*." (Trial Ex. 2023-0043 (emphasis added);

25  Trial Tr. 883:7 –884:11 (Dehlin).) And outpatient "therapeutic services, including intensive

26

27          30 The material variation in plan terms also demonstrates why the class should be
   decertified.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

outpatient therapy" are only available under that plan if they are for "short-term individual, family [or] group" treatment. (Trial Ex. 2023-0042.) One class representative's plan (Exhibit 233) likewise limits outpatient treatment, "including intensive outpatient therapy" to "short-term individual, family and group therapeutic services" and limits residential treatment to "Residential Crisis Services."[31] (Trial Ex. 233-0047; Trial Tr. 870:9–872:3 (Dehlin).) The plan at Exhibit 2014 similarly limits coverage for residential treatment to "short-term intervention[s] to stabilize the presenting problem within a reasonable period of time" (Trial Ex. 2014-0165; Trial Tr. 873:23–875:7 (Dehlin).) The plan at Exhibit 1539 provides that "[a]dmission to a residential treatment center is not intended for use solely as a long-term solution or to maintain the stabilization acquired during treatment in a residential facility or program." (Trial Ex. 1539-0053; Trial Tr. 872:4 – 873:15 (Dehlin).) And the plan at Exhibit 2011 "does not provide long-term care coverage" for *any* facility-based treatment, including residential care (whether for medical or behavioral health services). (Trial Ex. 2011-0081.)

Another of Plaintiffs' core complaints is that the guidelines "only permit UBH to approve coverage for admission to a given level of care if the treatment cannot be safely, efficiently, and effectively provided in *any less intensive level of care*." (ECF No. 392, at 43:10-12 (emphasis in original).) According to Plaintiffs, "the 'least restrictive' mantra is a thinly veiled way to ensure that in every choice between levels of care, UBH's Peer Reviewers will err toward the less expensive one." (*Id*. at 43 n.32.) Yet even if Plaintiffs had proven that a preference for less restriction on patient autonomy is an unreasonable interpretation of "generally accepted standards of care," the evidence demonstrates that this is not merely UBH's preference, but a mandate of many plans. For example, the plan at Exhibit 1548 excludes coverage for behavioral health services if they "[t]ypically do not result in outcomes demonstrably better than alternatives that

---

31 For these plans and ones with similar provisions, Dr Plakun's assertion that intensive outpatient treatment is "not at all limited to crisis stabilization" is wrong on its face. (Trial Tr. 486:9–10 (Dr. Plakun); *see also* ECF No. 392, at 21: 3–10 (citing testimony).) These plans explicitly limit intensive outpatient coverage to "short-term" treatment or "crisis intervention." Dr. Plakun's error is not surprising given his admission that he did not look at any of the plans. (Trial Tr. 660:2–12 (Dr. Plakun).)

1    are less intensive or more cost effective." (Trial Ex. 1548-0030; Trial Tr. 880:23 – 883:1

2    (Dehlin).) And the plan at Exhibit 2014 covers only services that are "the most cost-effective

3    method and yield a similar outcome to other available alternatives." (Trial Ex. 2014-0164.)

4    Likewise, the plan at Exhibit 2023 only provides coverage for treatment if it is "[r]endered in the

5    most cost-efficient manner and type of setting appropriate for the delivery of the service or

6    supply." (Trial Ex. 2023-0041.) As Mr. Dehlin explained, when assessing benefit requests for

7    members of plans with such provisions, UBH is "pretty much required" to consider the cost-

8    effectiveness of a requested treatment compared to other alternatives. (Trial Tr. 858:7–859:19

9    (Dehlin).)

10          Plaintiffs also contend that UBH's guidelines do not adequately provide coverage for

11   residential treatment at the lower-intensity ASAM Levels 3.1 and 3.5. (ECF No. 392, at 61:9–

12   63:9.) Yet Plaintiffs concede that ASAM "Levels 3.1 through 3.5 are 'clinically managed,' which

13   means that 'on-site physician services are not required'" under the ASAM criteria. (*Id.*, at 21:28–

14   22:1.) Plaintiffs argue that "the plans UBH administers do *not* exclude" these "sub-acute

15   residential treatment" levels and go so far as to call UBH's assertion to the contrary a "lie about a

16   non-existent plan exclusion . . . ." (*Id.* at 62:4–9.) Again, the plans tell a different story. Many

17   plans only cover residential treatment if it is provided "under the active participation and

18   direction of a physician." (Trial Tr. 868:6–19 (Dehlin) (discussing the plan at Exhibit 225.)

19   "Physician," typically a defined term in the plan, is sometimes explicitly limited to individuals

20   holding specific medical degrees or licenses. For example, one class representative's plan (Trial

21   Ex. 239) limits coverage for residential treatment to treatment that occurs "under the active

22   participation and direction of a Physician," and defines "Physician" as a "legally qualified"

23   individual holding one of eight specifically-defined medical degrees. (Trial Ex. 239-0105 to -06.)

24   By Plaintiffs' own definition, non-medical, residential treatment at ASAM Levels 3.1 and 3.5 is

25   not covered under such a plan.[32]

---

26          [32] Plaintiffs' insistence that UBH's position is a "lie" is especially puzzling because UBH

27   called out Exhibit 239 for this very point in its trial brief. (ECF No. 300, at 16-17 n.9.) Plaintiffs
     introduced no evidence supporting the position that ASAM Levels 3.1 or 3.5 should be covered
     under Exhibit 239 or plans with similar physician requirements for residential treatment.

28

1    Many of the class members' plans also address the concept of improvement and

2    maintenance of function in ways that directly refute Plaintiffs' assertion that the guidelines are

3    unreasonable interpretations of the plans. Plaintiffs contend, for example, that conditioning

4    coverage for treatment on an expectation that improvement will occur in the member's

5    "presenting problems" within a "reasonable period of time" is a classwide breach of UBH's

6    fiduciary duty to faithfully apply plan terms. (ECF No. 392, 32:26–34:16.) Yet this is exactly

7    what the plan at Exhibit 2014, and many others, requires. This plan limits coverage for residential

8    treatment to services that will "stabilize the presenting problem within a reasonable period of

9    time." (Trial Ex. 2014-0165; Trial Tr. 873:23–875:7 (Dehlin).) And Plaintiffs' assertion that UBH

10   "deliberately manipulated" the guidelines to "ensure that UBH's Guidelines would . . . preclude

11   any coverage for treatment aimed at maintenance" flies in the face of scores of plans in evidence

12   that exclude coverage for such treatment. (ECF No. 392, at 47:8–10.) At least 49 of the 111 plans

13   in evidence exclude services that are provided for the "primary purpose of meeting the personal

14   needs of the patient or maintaining a level of function . . . as opposed to improving that function

15   to an extent that might allow for a more independent existence." (Trial Ex. 1654-0001 to -9, 31

16   (summarizing plan exclusions using the quoted language or substantially similar language).)

17   Another 32 plans similarly exclude services "which do not seek to cure" or "are provided during

18   periods when the medical condition . . . is not changing" or when the member "has reached the

19   maximum level of physical or mental function possible. . . ." (*Id.* at 14, 16 (summarizing plan

20   exclusions with the quoted language or similar language).)[33]

21        Plaintiffs offered no evidence of what these and other plan provisions mean or how they

22   impacted the ERISA benefits available to each of the class members. This is a fundamental

23   failure of classwide proof, for the guidelines cannot be an unreasonable interpretation of class

24

25        [33] At trial, Plaintiffs suggested that certain unspecified provisions of certain unspecified
     plans may not be enforceable to the extent they violate the Mental Health Parity and Addiction
26   Equity Act (MHPAEA). (Trial Tr. 911:1 – 912:15.) But Plaintiffs dropped all allegations of parity
     violations years ago and offered no evidence to prove any such violations at trial. Compare *Wit*
27   Compl., ECF No. 1, ¶¶ 104–106, 109, 113 with Wit FAC, ECF No. 39 ; *Alexander* Compl.  ECF
     No. 1 .)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  members' plans if the guidelines imposed restrictions on coverage that were, in fact, *consistent*

2  with class members' plans. *Wright*, 360 F.3d at 1100; *Harris Tr. & Sav. Bank v*, 302 F.3d at 29;

3  *see also Elizabeth L. v. Aetna Life Ins. Co.*, No. CV 13-2554 SC, 2015 WL 799417, at *2, *4

4  (N.D. Cal. Feb. 23, 2015), *aff'd*, 689 F. App'x 551 (9th Cir. 2017) ("Plaintiffs cannot state a

5  claim for breach of fiduciary duty" against a plan administrator for "not paying claims it is not

6  required to pay in the first place"). All of these variations in plan terms reveal that Plaintiffs failed

7  to carry their burden of classwide common proof that the guidelines are inconsistent with the

8  class members' plans.

9      Plaintiffs make the bald argument that because UBH uses its guidelines across different

10  plans to standardize coverage determinations, class members are entitled to a uniform conclusion

11  about whether those guidelines are consistent with their plans. (*See, e.g.*, ECF No. 392, 79:4–23,

12  86:5–7.) They are wrong on the law. The reasonableness of even a uniform construction can only

13  be judged when compared against the terms of each plan, read as a whole. *Moyle*, 823 F.3d at 958

14  (The court must "look to the plain language" of the plan to determine whether administrator's

15  interpretation was reasonable). It was Plaintiffs' burden to offer common proof that the guidelines

16  are an unreasonable interpretation of the plans applicable to all class members. *Marlo II*, 639 F.3d

17  at 948 (The "existence of a policy," even a common policy, "does not necessarily establish"

18  classwide proof of liability if "the policy may have accurately" applied to some individuals, but

19  not others). They failed to satisfy that burden.

20     **C.**    **Regardless Of Other Plan Terms, The Evidence Shows That The Guidelines**
21         **Reflect A Reasonable Interpretation Of Generally Accepted Standards of Care.**

22      Plaintiffs ignore every provision in the class members' plans save one – the reference to

23  "generally accepted standards of care." Plaintiffs hitch their entire case to that phrase, and assert

24  that the guidelines constitute an abuse of UBH's discretion if they do not solely and purely reflect

25  generally accepted standards of care. As a legal matter, Plaintiffs are wrong, as the relevant

26  question is not whether the guidelines are consistent with abstract standards of care, but whether

27  (for each and every class member), the guidelines are consistent with the terms of the class

28  member's plan as a whole. Yet even if the only provision that mattered was the reference to

1   "generally accepted standards," Plaintiffs still failed to carry their burden of classwide proof and

2   failed at trial to demonstrate that UBH's interpretation of generally accepted standards is "(1)

3   illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in

4   the record." Lafferty, 436 F. App'x at 781. The question is not "whose interpretation… is most

5   persuasive, but whether [UBH]'s interpretation is unreasonable." Moyle, 823 F.3d at 958.

6   Plaintiffs did not prove that UBH's interpretation of generally accepted standards of care, as

7   reflected in the guidelines, was unreasonable, illogical, or implausible. As a result, Plaintiffs

8   failed to prove their ERISA claims.

9
10
        **1.**      **There Is No Single Set Of Criteria That Defines The Generally
Accepted Standard.**

11         The parties agree that generally accepted standards of care reflect national consensus

12   within the behavioral health community as to what constitutes appropriate treatment. (*See* ECF

13   No. 392 at 12:10-11; Trial Tr. 957:22-958:9 (Martorana) The parties also agree that there is no

14   single set of criteria that defines generally accepted standards of care. (*See* ECF No. 392 at 12:13-

15   14; Trial Tr. 958:3-9 Martorana).) At trial, Plaintiffs' and UBH's experts identified more than a

16   dozen resources that contribute to the formation or articulation of generally accepted standards of

17   care. (Trial Tr. 1152:6-12 (Simpatico), 1375:21 -1376:1 (Allchin), 1377:24-1378:4 (Allchin),

18   1378:17-19 (Allchin), 1575:25-1576:2 (Alam).) These include the sources Plaintiffs cite in their

19   Post-Trial Brief (ASAM criteria, LOCUS, CALOCUS, CASII, and the Medicare Benefit Policy

20   Manual) and many more, including American Psychiatric Association Clinical Practice

21   Guidelines, World Health Organization publications, and other guidelines issued by state

22   regulators (such as the Texas Department of Insurance (TDI) guidelines and New York's

23   LOCADTR guidelines), the Commission on Accreditation and Rehabilitation Facilities

24   ('CARF'), the Substance Abuse Mental Health Services Administration ("SAMHSA") and its

25   subagency the Center for Substance Abuse Treatment ("CSAT"), as well as peer-reviewed

26   research and publications. (Trial Tr. 1152:6-12 (Simpatico), 1377:24-1378:19 (Allchin), 958:3-9

27   (Martorana).)  All of these sources, but no one source alone, inform the generally accepted

28   standard of care.

1    Because there is no single source or definition of generally accepted standards of care,

2    UBH's interpretation of that phrase must be affirmed if it was reasonable. *Moyle* 823 F.3d 958. If

3    "reasonable people can disagree" about the proper interpretation of generally accepted standards

4    of care, UBH "cannot be characterized as acting arbitrarily for disagreeing with a plaintiff." *Webb*

5    608 F. Supp. 2d at 1227 *Boyd*, 410 F.3d at 1179 (a "mere tally of experts is insufficient to

6    demonstrate that an ERISA fiduciary has abused its discretion, for even a single persuasive

7    medical opinion may constitute substantial evidence upon which a plan administrator may rely in

8    adjudicating a claim.") Even an incorrect construction is not unreasonable unless it was "clearly

9    erroneous." *Voight v. Metro. Life Ins. Co.*, 28 F. Supp. 2d 569, 580 (C.D. Cal. 1998)

10   ("Reasonable minds might also disagree, but it was not so clearly erroneous as to constitute an

11   abuse of discretion."); *see also Taft*, 9 F.3d at 1473 ("In the ERISA context, even decisions

12   directly contrary to evidence in the record do not necessarily amount to an abuse of discretion.").

### 2.    The Guidelines Are Written And Construed Consistent With Generally Accepted Standards of Care.

15   The guidelines are intended to standardize coverage determinations, promote evidence-

16   based practices, and support members' recovery, resiliency, and well-being. (Trial Ex. 264-0002

17   (Care Advocacy Policy setting forth UBH policy, revised August 2014); Trial Ex. 265-0002 (Care

18   Advocacy Policy setting forth UBH policy, revised August 2015); *see also* Trial Tr. 937:15-17,

19   938:18-20 (Martorana); 1405:12-18 (Allchin) ("[W]e expect services to be within generally

20   accepted standards of practice that are backed by credible research and not considered

21   experimental, and are consistent with [UBH's] best practice guidelines.").) Each LOCG begins

22   with a statement of "Guiding Principles" that encapsulates UBH's approach to member care. (*See*

23   Trial Exs. 1-0002 to -03 (2011), 2-0002 to -03 (2012), 3-0003 to -04 (2013), 4-0003 (2014), 5-

24   0004 to -05 (2015), 6-0004 to -05 (January 2016), 7-0004 to -05 (June 2016), 8-0002 to -03

25   (2017); Trial Tr. 962:24-963:4 (Martorana) (discussing 2017 LOCGs).) From 2011 through 2013,

26   the LOCGs were organized around four Guiding Principles: (1) care should promote the

27   member's recovery, (2) care should be accessible, (3) care should be appropriate, and (4) care

28   should be effective. (*See* Trial Exs. 1-0002 to -03 (2011), 2-0002 to -03 (2012), 3-0003 to -04

1   (2013).) Since 2014, the LOCGs' "Guiding Principles" explain that UBH uses utilization

2   management and the LOCGs to "authorize services the provider can offer to meet the member's

3   immediate needs and preferences, and support the members' broader recovery, resiliency, and

4   wellbeing goals." (*See* Trial Exs.  4-0003 (2014), 5-0004 (2015), 6-0004 (January 2016), 7-0004

5   (June 2016), 8-0002 (2017); Trial Tr. 963:1-964:8 (Martorana) (discussing 2017 LOCGs).)

6          Plaintiffs criticize the LOCGs in eight particular respects, which they say apply to all

7   guidelines in all years and to all class members equally. As shown below, all of Plaintiffs'

8   critiques rest on their hired experts' speculation about how particular words or phrases may be

9   interpreted or understood by hypothetical reviewers making coverage determinations. But the

10  Court does not need to speculate, as Plaintiffs' experts do, about what the guidelines *might* mean,

11  or how they *might* be read or understood by some hypothetical user. The people who wrote them,

12  designed them, approved them, and use them every day came before the Court and told the Court

13  what they *do* mean and how they *are* read and understood by the *actual* users. The trial evidence

14  refutes Plaintiffs' speculative criticism and demonstrates that the guidelines are not an

15  unreasonable or illogical interpretation of generally accepted standards of care or the members'

16  benefit plans.

17              **3.      The Guidelines Require A Comprehensive Assessment Of The
                          Member's Entire Presentation.**

18

19         Plaintiffs contend that the LOCGs diverge from generally accepted standards in a

20  "fundamental structural way" by imposing "mandatory prerequisites for coverage, rather than

21  multi-dimensional assessment."  (ECF No. 392, 45:16, 46:12-13.) While the LOCGs do include

22  criteria that should all be met, those criteria are designed to be flexible enough to account for the

23  exercise of sound clinical judgment and the unique circumstances of each member, consistent

24  with the multi-dimensional tools Plaintiffs cite. Plaintiffs' overly-rigid reading of the LOCGs

25  cannot be squared with the express language of the Introduction to each LOCG providing that the

26  guidelines are to be "used flexibly," "are intended to augment – but not replace – clinical

27  judgment," and must be "informed by the unique aspects of the case." (Trial Tr. 964:12-19

28  (Martorana) (discussing 2017 LOCGs' Use and Limitations section, Trial Ex. 8-0004); *see also*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   Trial Exs. 1-0004; 2-0004; 3-0005; 4-0006; 5-0007; 6-0007; 7-0007).)

2   Under generally accepted standards of care, it is appropriate to consider a range of

3   medical, behavioral, psychosocial, and environmental factors when evaluating the appropriate

4   level of care for a patient's behavioral health treatment, but they do not need to be evaluated in a

5   formulaic way. (*See, e.g.*, Exs. 641-0010–13; 653-0008–018; 662-0064.) For example, the

6   American Psychiatric Association Practice Guidelines for the Psychiatric Evaluation of Adults

7   lists nine categories of information that should be reviewed and/or documented when assessing a

8   patient (*e.g.*, history of present illness, psychiatric history; substance use history; personal and

9   social history), and they do not call for the assignment of numerical values to the various

10  assessment categories.  (Trial Ex. 641-0010–13.) On the other hand, the LOCUS instrument calls

11  for an evaluation of six parameters (*e.g.*, risk of harm; medical, addictive, and psychiatric co-

12  morbidity; engagement and recovery status), and they do require the clinician to assign a

13  numerical value to each dimension and to apply these values to an algorithm. (Trial Ex. 653-0008

14  to -18.)[34]

15  The ASAM criteria resemble the LOCUS in structure, calling for assessment of six

16  dimensions, and assigning a score in each dimension in order to determine the appropriate level

17  of care. (Trial Ex. 662-0064; Trial Tr. 1338:24–1339:12 (Simpatico).) Whereas the LOCUS can

18  be used to address both "mental health and addictions," (Trial Ex. 653-0004), the ASAM criteria

19  is tailored to substance use disorders. The six dimensions of the ASAM criteria are not identical

20  to the dimensions in LOCUS. (Trial Ex. 662-0064.)

21  UBH's LOCGs likewise call for a thorough, individualized and holistic consideration of

22  the member's condition and healthcare needs when making coverage determinations. (*See, e.g.*

23  Trial Tr. 964:12-965:9 (Martorana) ("Well, we think it's important as we—as is present in our

---

[34] Dr. Simpatico, the only expert at trial with experience applying the LOCUS, testified
that this framework makes the LOCUS "largely aspirational" and "overly simplistic and
misleading . . . ."  (Trial Tr. 1340:3, 16–17). In fact, Dr. Simpatico testified that the Vermont
Department of Mental Health abandoned an attempt to use LOCUS' numerical algorithm because
the "placement decisions didn't work . . . ." (See Trial Tr. 1340:19–1341:10.) Dr. Plakun admits
even he does not use the LOCUS guidelines in assessing the appropriate level of care for his
patients. (Trial Tr. 503:11-14 (Dr. Plakun).)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    Best Practices Guidelines, to have a complete and thorough understanding of the totality of a

2    member who's presenting themselves for treatment.").) The LOCGs list a multitude of factors to

3    be used in determining the appropriate level of care based on individualized information obtained

4    from the treating provider. For example, the Common Criteria of the 2011 LOCGs required UBH

5    clinicians, before making a coverage determination, to obtain the following information from the

6    treating provider: the member's chief complaint; a description of the member's condition; the

7    precipitant for treatment; the member's current and past medical and psychiatric histories,

8    including the history of substance use; the member's family, vocational/educational and social

9    histories; findings of the mental status examination; and findings of the physical examination

10   when appropriate.  (Trial Ex. 1-0005.) The 2011 Common Criteria also instruct that when the

11   UBH clinician is assessing the treatment plan to determine whether the treatment is medically

12   necessary and covered under the health benefit plan, they should consider: the member's age and

13   level of development; the member's preferences, strengths, broader recovery goals and readiness

14   for change; risks including barriers to care; past response to treatment; the member's

15   understanding of his/her condition, its treatment and self-care; the role that the member's

16   family/social supports should play in treatment with the member's permission; interventions

17   needed to address co-occurring behavioral health or medical conditions; interventions that will

18   promote the member's participation in care, promote informed decision making, and support the

19   member's broader recovery goals; and involvement of the member's family/social supports in

20   treatment and discharge planning. (*Id.* at 0006.)

21          In subsequent years, the list of mental, behavioral, psychosocial and environmental factors

22   in the LOCGs for making individualized coverage decisions only grew. (Trial Ex. 2-0006, 08;

23   Trial Ex. 3-0007; Trial Ex. 4-0007 to -012; Trial Ex. 5-0010 to -12; Trial Ex. 6-0011 to -13; Trial

24   Ex. 7-0011 to -13; Trial Ex. 8-0007 to -08.) For example, the Clinical Best Practices section of

25   the Common Criteria in the 2016 LOCGs call for UBH clinicians to consider the following

26   individualized factors for each coverage decision: the member's chief complaint, the history of

27   the presenting illness, the "why now" factors leading to the request for service; the member's

28   mental status; the member's current level of functioning; urgent needs including those related to

CROWELL
& MORING LLP
ATTORNEYS AT LAW

the risk of harm to self, others, or property; the member's use of alcohol, tobacco, or drugs; co-occurring behavioral health and physical conditions; the history of behavioral health services; the history of trauma; the member's medical history and current physical health status; the member's developmental history; pertinent current and historical life information including the member's age, gender, sexual orientation, culture, spiritual beliefs, educational history, employment history, living situation, legal involvement, family history, relationships with family and other natural resources; the member's strengths; barriers to care; the member's instructions for treatment, or appointment of a representative to make decisions about treatment; and the member's broader recovery, resiliency and wellbeing goals. (Trial Ex. 6-0011 to -12; Trial Ex. 7-0011 to -12.) These same Clinical Best Practices also provide for consideration of the treatment plan, which addresses multiple factors including the short and long-term goals of treatment, how the member's family and other natural resources will participate in treatment when clinically indicated, and interventions that will enhance the member's recovery, resiliency and wellbeing. (Trial Ex. 6-0012.) Plaintiffs' expert, Dr. Fishman, agreed that such factors are "a good list of material to be included in a data set" and are consistent with generally accepted standards of care. (Trial Tr. 185:13-14 (Dr. Fishman).)

As Dr. Martorana explained at trial, the LOCGs call for UBH's reviewers to use the information collected through the Clinical Best Practices sections in determining an appropriate level of care. (Trial Tr. 981:6–10 (Martorana) (discussing the 2017 LOCG); *see also* Trial Tr. 997:11-21 (Martorana) (same).) UBH's doctors use that information "to understand the member in their totality . . . as [they] make [their] clinical judgments." (Trial Tr. 965:7–8 (Martorana).)[35] This is the same approach UBH doctors would take if they were treating the patients in their own private practice. (Trial Tr. 965:8–9 (Martorana).) The evidence plainly shows that the LOCGs call for a multi-dimensional assessment consistent with generally accepted standards of care.

---

[35] As a member progresses through treatment, the LOCGs allow for the consideration of conditions that are new and different from the member's original presentation. For example, during trial, Dr. Martorana provided the real example of a member who required reassessment when prescribed antidepressants unexpectedly triggered a manic episode. (Trial Tr. 992:6–16 (Martorana).) Under the LOCGs, such events trigger a reevaluation of the member's placement in a particular level of care. (Trial. Tr. 992:4–6 (Martorana).)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    Plaintiffs argue that the LOCGs' Common Criteria are inconsistent with generally

2    accepted standards of care because they "view a single factor . . . as a threshold requirement for

3    services to be provided or covered." (ECF No. 392, at 25:9–11.) Plaintiffs are comparing apples

4    and oranges. They conflate ASAM's six evaluative dimensions with the Common Criteria, but the

5    considerations reflected in ASAM's six dimensions are reflected in the Clinical Best Practices

6    section of the LOCGs, which Plaintiffs agree are "exhaustive" for "deciding how to effectively

7    treat someone. . . ." (ECF No. 392, at 46:15, 26.) Like ASAM, no one of these factors is

8    dispositive and all inform the UBH clinicians' assessment of whether the Common Criteria are

9    satisfied. The Common Criteria, in turn, reflect broader "principles" that "cut across all different

10   levels of care." (Trial Tr. 966:22-96725 (Martorana).) Most of those principles are undisputed,

11   like the notions that treatment must be effective, must keep the member safe, and must be

12   consistent with generally accepted standards of care. (Trial Ex. 1-0005 to -07; Trial Ex. 2-0006 to

13   -08; Trial Ex. 3-0007  to -09; Trial Ex. 4-0007 to -13; Trial Ex. 5-0008 to -09; Trial Ex. 6-0009 to

14   -10; Trial Ex. 7-0009 to -10; Trial Ex. 8-0006 to -07.) As discussed in more detail below, the

15   handful of principles that Plaintiffs do challenge in the Common Criteria, such as the idea that

16   treatment should address "acute changes" in a member's condition, or provide treatment in the

17   least restrictive level of care that is safe and effective, are also consistent with generally accepted

18   standards.

19       The evidence shows that the structure employed by the LOCGs is consistent with

20   generally accepted standards of care, and is used in both the CMS guidelines and the Texas TDI

21   guidelines. Like the LOCGs, CMS guidelines for "Outpatient Hospital Psychiatric Services"

22   (Medicare Benefit Policy Manual § 70.1) begin by articulating several "Coverage Criteria,"

23   which all "services must meet" for coverage. (Trial Ex. 656-0025 to -27.)  Like the LOCGs, these

24   mandatory coverage criteria include requirements of "Physician Supervision and Evaluation" and

25   a "Reasonable Expectation of Improvement." (Trial Ex. 656-0026 to -27.) These mandatory

26   criteria also provide that "[s]ervices are noncovered" if "stability can be maintained without

27   further treatment or with less intensive treatment." (Id.)  The CMS Medicare Benefit Policy

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    Manual employs a similar structure for "Partial Hospitalization Services."[36] (Trial Ex. 656-0031.)

2    The TDI guidelines employ a similar structure, detailing a host of mandatory admission criteria,

3    followed by separate continued service criteria and discharge criteria for each level of care. (Trial

4    Ex. 661-0011 to -28.)

5                   **4.      The Guidelines Appropriately Seek To Match Patients With The Least
                    Restrictive Level Of Care Where Treatment Is Expected To Be Both
6                   Safe And Effective.**

7          Plaintiffs also wrongly assert that the LOCGs "limit[t] coverage to services at the lowest

8    level of intensity that can keep the patient safe – whether that level is effective or not." (ECF No.

9    392, 45:14-15.) To the contrary, consistent with generally accepted standards of care and the plan

10   language, the LOCGs provide coverage for members in the least restrictive level of care that is

11   safe and effective for that member's individual needs. Plaintiffs' expert Dr. Plakun concedes that

12   the concept of "[t]he least restrictive level of care is a time honored and important aspect of the

13   provision of treatment." (Trial Tr. 511:5–7 (Dr. Plakun).)[37] Both Plaintiffs' and UBH's experts

14   agree: patients should be placed into the least restrictive level of care that is appropriate for their

15   treatment. (Trial Tr. 968:18-24 (Martorana), 1392:11-24 (Allchin), 511:5–7 (Dr. Plakun), 162:3-4

16   (Dr. Fishman) (acknowledging that the "least restrictive" treatment setting is a "generally

17   standard approach" and "an important principle").)

18         Under generally accepted standards: "[i]f there are certain signs or symptoms or criteria

19   that are disproportionately influential in the selection of a particular level of care, such that they

20   determine, as a practical matter, the most restrictive level of care because of the intensity of those

21         36 Partial hospitalization is an ambulatory or outpatient treatment setting that falls
22   between intensive outpatient treatment and residential treatment on the level of care continuum.
     (Trial Tr. 449:19–450:21 (Dr. Plakun) (partial hospitalization "is less intensive than residential");
23   *see also* Trial Tr. 90:16 – 91:9 (Dr. Fishman) (explaining that partial hospitalization is ASAM
     Level 2.5); Trial Tr. 934:24–935:24 (Martorana) (describing levels of care).)

24         37 Dr. Plakun expressed his opinion that "least restrictive" should refer to minimizing
25   restrictions on the patient's ability to exercise "choice about the nature of the treatment," rather
     than restrictions on the patient's autonomy and civil rights, but this testimony was inconsistent
26   with the ASAM criteria, APA guidelines, and CMS. (Trial Exs. 634-0022 (APA Practice
     Guidelines for the Treatment of Patients with Substance Use Disorders); 639-0016 (APA Practice
27   Guideline for the Treatment of Patients with Major Depressive Disorder); 662-037 (ASAM
     criteria); 1507-0017 (CMS' Local Coverage Determination for a Psychiatric Partial
     Hospitalization Program); Trial Tr. 511:15-18.)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   symptoms, the goal would be to ameliorate those symptoms to the point where it was no longer

2   necessary to stay at that level of care and ideally to move to a less restrictive level of care." (Trial

3   Tr. 1229:11-19 (Simpatico).) This is an important, foundational, well-established principle that

4   cuts across all manner of treatment and all levels of care. (Trial Tr. 968:18-22 (Martorana).)

5         The notion that patients should be treated in the least restrictive setting that is safe and

6   effective is reflected throughout the sources Plaintiffs cite. The APA's Practice Guideline for the

7   Treatment of Patients with Substance Use Disorders, 2nd edition, provides that "[i]ndividuals

8   should be treated in the least restrictive setting that is likely to prove safe and effective." (Trial

9   Ex. 634-0022; Trial Tr. 969:6-970:8 (Martorana).) Similarly, the APA's Practice Guideline for

10  the Treatment of Patients with Major Depressive Disorder, 3rd Edition, provides that "[t]he

11  psychiatrist should determine the least restrictive setting for treatment that will be most likely not

12  only to address the patient's safety, but also to promote improvement in the patient's condition."

13  (Trial Ex. 639-0016; Trial Tr. 18-971:20 (Martorana).) ASAM also specifically provides:

14  "Referral to the 'least intensive level of care that is effective' or to the 'least restrictive

15  environment for care' is generally the norm for members of the general public." (*See* Trial Ex.

16  662-0374) (ASAM criteria.)[38]

17        The concept of providing the least restrictive appropriate level of care takes on increased

18  significance with children and adolescents, because of the importance of school and family

19  structure. (Trial Tr. 1392:25-1393:15 (Allchin).) For example, children removed from a family

20  setting to a very restrictive level of care may view the switch as rejection by their parents. (Trial

21  Tr. 1393:10-18 (Allchin).) The AACAP's Principles of Care for Treatment of Children and

22  Adolescents with Mental Illnesses in Residential Treatment Centers provides:

23  
24          The best place for children and adolescents is at home with their
            families. A child or adolescent with mental illness should be treated
            in the safest and least restrictive environment and needed services

25  _____

26      38 The Centers for Medicare & Medicaid Services' Local Coverage Determination for
    Psychiatric Partial Hospitalization Program Admissions Criteria likewise refer to this

27  fundamental principle: "In general, patients should be treated in the least intensive and restrictive
    setting which meets the needs of their illness." (Trial Ex. 1507-0017; *see* Trial Tr. 1016:12-
    1017:2 (Martorana) (discussing same provision).)

28  

CROWELL
& MORING LLP
ATTORNEYS AT LAW

should be "wrapped-around" to provide more intensive home or community-based services.

(Trial Ex. 693-0002; *see* Trial Tr. 1426:22-1428:5 (Allchin); *see also* Trial Ex. 693-0005 ("The primary treatment goal is to return the child or adolescent to the community in order to resume the family, social, and educational functions that contribute to normal development.").)

Plaintiffs' experts do not really dispute this fundamental principle. Indeed, they agree that under generally accepted standards of care, "[p]eople generally are moving downward through the continuum of care as their treatment progresses." (Trial Tr. 471:18-19 (Dr. Plakun); *see also* 115:1-2 (Dr. Fishman) (patients should be safely transitioned between levels of care); Trial Ex. 5-0009 (2015 LOCGs).) In fact, Dr. Fishman testified that he had no objection to a provision in the 2013 Common Criteria requiring that the "member's current condition cannot be effectively and safely treated in a lower level of care even when [the] treatment plan is modified." (Trial Tr. 232:12-20 (Dr. Fishman) (discussing criteria at Trial Ex. 3-0006).) UBH's LOCGs appropriately promote coverage for treatment that is at the least restrictive level of care that is safe and effective based on an individualized assessment of the member with transitions between levels of care when appropriate based on changing needs.

The LOCGs do not "push" members to a lower level of care where the lower level of care is less effective or unsafe. Nor do the LOCGs require that UBH's clinicians err toward the less costly level of care, where the services cannot be safely, efficiently and effectively provided in a less intensive setting. The LOCGs are clear on their face that treatment is covered only if the member can be safely, efficiently, *and* effectively assessed and/or treated at the proposed level of care. (Trial Ex 6-0009, 7-0009, Trial Ex. 8-0007; Trial Tr. 967:12-968:24 , 1072:8-1073:5 (Martorana) (discussing these provisions and the importance of the least restrictive principle).) The LOCGs also do not provide that coverage ends as soon as it is safe to transition the member to a lower level of care, without regard to whether treatment at that level of care would be effective. This is reflected in the Admission Criteria, Continued Service Criteria, and Discharge

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    Criteria. For example, the 2011 Continued Service Criteria require that the "member continues to

2    meet the criteria for the current level of care." (Trial Ex. 1-0078.) This requires that every review,

3    at all levels of care and at all points in the course of treatment, include an evaluation of whether

4    the member can be safely, efficiently, and effectively treated in the proposed level of care, or in

5    the case of a discharge decision, at a lower level of care. (*See* Trial Exs. 1-0005; 2-0006; 3-0008;

6    4-0007; 5-0008; 6-0009; 7-0009; *see also* Trial Tr. 992:17–993:2 (Martorana) ("if we're going to

7    say that someone needs a less restrictive level of care, then they'd have to meet the guidelines all

8    over again for that").)

9          Plaintiffs introduced no evidence at trial proving general acceptance of their position that

10   treatment should be provided in the "*most* effective" level of care without consideration of

11   restrictiveness, intensity, efficiency or safety. The generally accepted sources quoted above reject

12   that notion in favor of the least restrictive level of care that is safe and effective. UBH did not

13   abuse its discretion in accounting for this well-established principle in the structure and language

14   of the LOCGs.

15          **5.      The Guidelines Account For Both Acute And Chronic Conditions.**

16         Plaintiffs claim that "[t]hroughout the class period, the guidelines give primacy to the

17   presence or absence of acute changes in symptoms and downplay or ignore other relevant

18   considerations" and "thus negate consideration of what is required to effectively treat the

19   member's underlying condition and any chronic symptoms." (ECF No. 392, 32:18-25.) But the

20   guidelines account for both acute and chronic conditions, and appropriately emphasize the need

21   for treatment designed to effectively address the reasons the member is seeking treatment at that

22   moment. While Plaintiffs or their experts may have chosen different language, or structured the

23   guidelines differently, that is not the question before the Court. UBH's criteria are not so illogical,

24   implausible, or without support in inferences that may be drawn from the facts in the record that

25   their consideration of acute and chronic conditions amounts to an unreasonable interpretation of

26   the plan terms, including the plans' reference to generally accepted standards of care. *See*

27   *Lafferty*, 436 F. App'x at 781; *see also Moyle*, 823 F.3d at 958.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1

2

>    **a.     Both Acute And Chronic Conditions And Symptoms Should Be
>            Assessed And Considered To Determine The Appropriate Level
>            Of Care.**

3    In the medical profession, the word "acute" can carry different (though sometimes related)

4    meanings, depending on the context in which the word is used. In some instances, "acute" or

5    "acuity" can refer to the *severity* of a patient's condition or symptoms. This concept of acuity is

6    reflected in Dimension One of the ASAM criteria, which asks whether the patient is suffering

7    from "acute intoxication." (Trial Tr. 80:1–24 (Dr. Fishman).) Dr. Fishman explained that "acute"

8    in that context refers to the severity of the patients' active intoxication and the likelihood of

9    severe withdrawal symptoms, which, "although unusual, in some cases would be life

10   threatening." (*Id.*) This concept of acuity is also reflected in terms like "acute inpatient" care,

11   which is the highest and most intensive level of care, and is oriented toward the "most medically

12   dangerous, most intensive needs." (Trial Tr. 85:22–86 12 (Dr. Fishman).) In other instances, the

13   term "acute" refers not to the severity of the patient's condition, but to the temporal question of

14   *how recently* a particular symptom manifested or changed. As Dr. Martorana explained, when

15   used in this context, "acute means that it's of a recent onset, immediate onset," a question distinct

16   from the question of severity. (Trial Tr. 1010:11 – 1011:1 (Martorana) (describing CMS guideline

17   discussing conditions that are *both* "severe" and "acute in nature"); Trial Tr. 1012:12-1013:1

18   (same); Trial Tr. 1309:1-16 (Simpatico) ("'acute' in this context refers to a departure from a

19   baseline in a timely manner that represent an actionable departure from a clinical baseline"); *see*

20   *also* Trial Ex. 1657 at 134:5-16 (Robinson-Beale) (concept of acuity in the LOCGs can refer to

21   "changes in symptoms, intensity of symptoms, or the appearance of new symptoms").)[39]

22   Both side's experts agree that under generally accepted standards of care, both the severity

23   and the temporal aspects of acuity are relevant to level of care placement decisions. With respect

24   to severity, for example, Dr. Fishman testified that primacy of patient safety is the reason the

---

[39] *See also* CMS Medicare Benefit Policy Manual for partial hospitalization (Trial Ex.
25   656-0029 to -33); Trial Tr. 1010:8-1012:25 (Martorana) (emphasis added) (the purpose of the
26   intermediate PHP level of care is to treat the patient's "serious presenting psychiatric symptoms"
27   and is characterized by patients with "an acute onset or decompensation of a covered . . . mental
     health disorder . . . .").)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1     ASAM criteria includes "acute intoxication" as the first dimension of patient assessment. (Trial

2     Tr. 80:10–24 (Dr. Fishman).) UBH agrees, which is why the notion that "the patient's safety is

3     the paramount thing" is reflected throughout the LOCGs. (Trial Tr. 1387:24–1388:25 (Allchin).)[40]

4     Similarly, the experts agreed at trial that, under generally accepted standards of care, the *temporal*

5     aspect of "acute symptoms" – that is, what has changed in the member's condition – "should and

6     must be considered" in making appropriate patient placement decisions. (Trial Tr. 164:17–165:25

7     (Dr. Fishman) (testifying that such an assessment is "so important" and "a vital clinical

8     concern"); *see also* Trial Tr. 491:16–19 (Dr. Plakun); Trial Tr. 1044:19–25 (Martorana); Trial Tr.

9     1401:1–19 (Allchin).) Dr. Simpatico explained that this temporal aspect of acuity is so important

10    because "generally speaking, someone will come to the attention of a behavioral healthcare

11    provider either because there's been a departure from a baseline – that is a change in their actual

12    presentation –  or their circumstances may have changed." (Trial Tr. 1210:2–24 (Simpatico); *see*

13    *also* Trial Tr. 192:17 – 21 (Dr. Fishman) ("patients usually seek treatment because of something

14    new"); Trial Tr. 1058:18-25 (Martorana); Trial Tr. 1303:12-15 (Simpatico) (describing acute

15    changes as "a departure from baseline . . . such that it likely is the basis for which someone comes

16    to the attention for seeking care or changing ongoing care.").)[41]

17         Considering, even focusing on, acute needs does not preclude consideration of chronic

18    conditions, as Plaintiffs falsely contend. (*See* Trial Tr. 1422:22–1423:2 (Allchin); Trial Tr.

19    1599:15-20 (Alam); *see also* Trial Tr. 972:2 – 21 (Martorana).) Indeed, "many mental illnesses

20    are by definition chronic mental illnesses" (Trial Tr. 1191:17–25 (Simpatico)), and the intensity

21    of chronic illnesses tend to "wax[] and wan[e]" over time. (Trial Tr. 92:2–13 (Dr. Fishman); *see*

22

23    _____

      40 Remarkably, Plaintiffs argue that "safe management" of a patient's condition "is often
24    the opposite of effective treatment." (ECF No. 392, at 40:9–10.) Even if Plaintiffs honestly
      believe that proposition to be true, it is not supported by the evidence.

25        41 Like severity, assessing the temporal notion of acuity is especially important for higher
      levels of care. Since residential treatment is a high-intensity 24-hour level of care, there is a
26    significant need to understand and address any new change that puts a member in this type of
      setting. As illustration, Dr. Martorana explained that if one reason a child is suddenly presenting
27    for treatment is due to an abusive living situation, understanding that fact will indicate that an
      outpatient treatment setting is "not going to be a good place for them to . . . conduct treatment, so
      you put them in a residential setting" instead. (Trial Tr. 1006:15-1007:2  (Martorana).)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    *also* Trial Tr. 1599:21 – 1600:1 (Alam) ("Most of what we treat now, whether it's substance use

2    disorders or mental health conditions, they are chronic conditions.").) In this way, Dr. Alam

3    explained, temporal acuity and chronicity are interconnected concepts in behavioral health

4    treatment and not mutually exclusive: "When you talk about acute symptoms, you're really

5    referring to the acute changes of a chronic condition." (Trial Tr. 1559:15-20 (Alam).)[42]

6              **b.      The LOCGs Call For Assessment And Coverage Of Treatment
                          For Chronic Conditions And Symptoms.**
7

8              At trial, the Court heard testimony from six board-certified psychiatrists who were

9    involved in conceiving, writing, reviewing, approving, and interpreting UBH's guidelines. All six

10   testified: UBH's guidelines direct Peer Reviewers and Care Advocates to consider both acute *and*

11   chronic conditions and symptoms when making coverage decisions . (Trial Ex. 1657, at 126:21–

12   129:08, 129:17–130:14, (Robinson-Beale); Trial Tr. 988:6–13, 1044:19–25 (Martorana); Trial Tr.

13   1396:22–1397:19 (Allchin); Trial Tr. 1599:9–20, 1604:19–1605:1 (Alam); *see also* Trial Tr.

14   1725:23 – 1726:11 (Triana) (opining that the LOCGs were consistent with generally accepted

15   standards of care); Trial Ex. 1659, at 214:4–11 (Bonfield) (explaining that the "why now" factors

16   in the LOCGs are designed to address the "root cause" of a member's illness so that the member

17   "doesn't have to keep presenting over and over," and are "relevant for people who do not have

18   severe symptomology").) This unrefuted testimony is consistent with the plain language of the

19   LOCGs and reflects a reasonable interpretation of plan terms and of generally accepted standards

20   of care.

21             To determine level of care placement, the LOCGs for each year directed UBH's clinicians

22   to assess the member's "current condition." (Exs. 1-0005, 2-0006, 3-0008, 4-0007, 5-0008, 6-

23   0009, 7-0009, 8-0007.) UBH's doctors explained that the "current condition" includes chronic

24   conditions, as it refers to *all* of the symptoms and ailments that the member is bringing to

25   treatment. (Trial Tr. 972:2–21; 1031:3–11, and 1031:12–20 (Martorana); Trial Tr. 1387:8–14

26   _____

27             42 Even when used in the context of severity, acuity and chronicity are not mutually
     exclusive, and are often related. As Dr. Plakun noted, many people suffer from "chronic and
     severe mental illness." (Trial Tr. 662:24 – 663:2 (Dr. Plakun).)
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  (Allchin).) The LOCGs then direct UBH's clinicians to determine whether the proposed level of

2  care will effectively treat the member's "current condition," which includes any chronic

3  condition. From 2011 through 2013, the LOCGs instructed UBH's reviewers to determine, in

4  every coverage decision, whether "[t]he member's *current condition* can be *most efficiently and*

5  *effectively treated* in the proposed level of care." (Trial Exs. 1-0005, 2-0006 and 3-0008

6  (emphasis added).) From 2015 through 2017, the LOCGs similarly directed reviewers to

7  determine whether the "acute changes" in a member's "current condition can be safely,

8  efficiently, and effectively assessed and/or treated in the proposed level of care." (Trial Exs. 5-

9  0008, 6-0009, 7-0009, 8-0007.) The 2014 LOCGs imposed a similar directive, phrased in a

10  different way. (Trial Ex. 4-0007 (requiring consideration of whether "the member's current

11  condition cannot be safely, efficiently and effectively assessed and/or treated in a less intensive

12  setting") *and* Trial Tr. at 1402:20 – 1403:4 (Allchin) (testifying that language identical to that

13  which appears in the 2014 LOCGs regarding effective treatment of the member's current

14  condition is "the flip side of the coin" of the 2015-2017 language cited above).)[43]

15      If the proposed level of care will not *effectively treat* the member's "current condition,"

16  including any chronic or ongoing illness, UBH's clinical reviewers are directed to offer coverage

17  at a level of care that is more likely to provide safe and effective treatment, even if that results in

18  a higher level of care. (Trial Exs. 1-0005, 2-0006, 3-0008, 4-0007, 5-0008, 6-0009, 7-0009 & 8-

19  0007 (2011-2017 LOCGs requiring effective treatment as condition for coverage); Trial Ex.

20  1186-0011 (2016 Utilization Management Program Descriptions requiring all benefit denials to

21  include "a statement of alternative services that would be available and authorized"); Trial Tr.

22  947:22 – 948:10 (Martorana) (same); Trial Tr. 1379:13–1380:12 (Allchin) (same, and noting the

23  alternative level authorized would be "the most appropriate least restrictive environment at that

24  point that would prove safe and effective," which might result in authorization for "a higher level

25

26      43 In addition to this language in the 2014 Common Criteria, the requirement that "the
   member's current condition can be safely, efficiently, and effectively assessed and/or treated in
27  this setting" separately appeared in the admission criteria for outpatient treatment of mental health
   conditions and substance use disorders. (Trial Ex. 4-0035 to -67.)
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   of care"); *see also* Trial Tr. 967:12–968:17 (Martorana) (discussing requirement that "current

2   condition can be safely, efficiently, and effectively" treated and noting that failure to satisfy that

3   criterion could result in higher level of care); Trial Tr. 975:7–14 (Martorana) (discussing same).)

4          Numerous other provisions in the LOCGs require consideration of a member's chronic

5   conditions and symptoms to determine the appropriate level of care. Beginning in 2013, the

6   LOCGs directed UBH's clinicians to consider "why now factors" or factors "leading to" or

7   "precipitating" admission. (*See, e.g.*, Trial Exs. 3-0007, 4-0007, 5-0008, 6-0009, 7-0009, 8-0013,

8   8-0026, 8-0032, 8-0035.) UBH's current and former clinicians all testified that, as used in the

9   LOCGs, terms such as these direct UBH's clinicians to consider "all the considerations that have

10  led this member to this point in time seeking treatment," including "chronic conditions if they

11  exist in the patient" seeking treatment. (Trial Tr. 1000:8–1001:12, 1003:3–8 (Martorana); *see also*

12  Trial Tr. 1396:22–1397:6 (Allchin) (concept of "why now" "includes not only acute issues but

13  chronic issues"); Trial Ex. 1657, at 128:10–129:8 (Robinson-Beale) (explaining that the "concept

14  of why now" takes into account "the different goals of chronic care versus acute care" because

15  "for chronic illnesses, you need to understand the total pieces that are going on, and be able to

16  address those"); Trial Tr. 1577:20–22 (Alam) ("why now" concept is "not limited to acute

17  factors"); Trial Tr. . 1659, at 214:4–1 (Bonfield) ("the purpose of the Why Now? factors is to

18  understand the root cause for why the person is presenting for treatment . . . so that that root cause

19  can be addressed and resolved and the person doesn't have to keep presenting over and over").)[44]

20         Each iteration of the LOCGs during the class period also required UBH clinicians to

21

22         ———————————————

    44 Other language in UBH's guidelines calls for consideration of chronic conditions and
23  symptoms, as well. For example, from 2011 through 2014, the preamble to the IOP criteria
    emphasized that, in addition to traditional IOP, lower-intensity, longer-term IOP treatment may
24  be appropriate for "members who are recovering from severe and persistent mental health
    conditions." (Trial Exs. 1-0018, 1-0042, 2-0020, 2-0047, 3-0022, 3-0052, 4-0027, 4-0059.) From
25  2015 through 2017, the preamble to the IOP criteria noted that IOP is for patients with "moderate
    signs and symptoms" (*i.e.*, not severe signs and symptoms), and the purposes of IOP include
    "monitor[ing] and maintain[ing] stability" for the member's condition. (Trial Exs. 5-0030, 5-
26  0055, 6-0032, 6-0062, 7-0032, 7-0062, 8-0014, 8-0032.) The preamble to the IOP criteria specific
    to substance use disorders from 2015 through 2017 went on to state that another purpose of IOP is
27  to "assist members with gaining the knowledge and life skills needed to prevent recurrence of a
    substance related disorder." (*Id.*)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    account for chronic symptoms and conditions through the Clinical Best Practices section

2    addressing patient evaluation and treatment planning. Dr. Martorana explained that UBH expects

3    treating clinicians to "take into account all the chronic aspects of a member's condition, if they

4    exist, as part of designing the treatment plan." (Trial Tr.  988:5–13 (Martorana).) The reason

5    UBH collects this information from the provider and requires a treatment plan that adequately

6    accounts for chronic conditions is to ensure those factors are also "considered [by UBH] when

7    evaluating whether a request for authorization should be authorized or denied." (Trial Tr. 981:6–

8    10 (Martorana).) Dr. Fishman agreed that the LOCGs specifically call for consideration of factors

9    that speak to chronicity. (Trial Tr. 189:16-20 (Dr. Fishman).) For example, addressing the 2015

10   LOCG Clinical Best Practices section, Dr. Fishman acknowledged that the section lists many

11   factors –  including the history of behavioral health services, the history of trauma, the member's

12   medical history and current physical health status, the member's developmental history, the

13   member's pertinent current and historical life information, the member's age, the member's

14   gender, the member's educational history, and the member's living situation – that relate to

15   chronicity. (Trial Tr. 189:16-190:14 (Dr. Fishman).) Similar provisions appear in every year of

16   the LOCGs, and Plaintiffs concede that these factors represent a "fairly exhaustive laundry list" of

17   considerations for making appropriate level of care decisions. (ECF No. 392, at 46:14–17.)

18          These provisions addressing a member's chronic conditions are not simply words on a

19   page: they reflect one of the LOCGs' core organizing principles. In every year since 2011, one of

20   the "Guiding Principles" set forth in the LOCGs is the goal that care should promote the

21   member's overall recovery, resiliency, and well-being. (Trial Exs. 1-0002, 2-0002, 3-0003, 4-

22   0003, 5-0004, 6-0004, 7-0004, 8-0002.) Dr. Martorana testified that this principle, which appears

23   numerous times throughout each year of the LOCGs (most notably in the definition of

24   "improvement"), emphasizes the need to "treat[] the member as a whole, not just as a symptom or

25   two," and promote treatment that will ensure a members' long-term ability to cope with his or her

26   illness. (Trial Tr. 985:4–20.) This patient-centric emphasis on recovery, resiliency, and well-being

27   throughout the guidelines speaks directly to the generally accepted standard that appropriate

28   behavioral health treatment (including decisions about the level of care) should advance "the

1    [member's] ability to bounce back from intermittent exacerbations of a chronic mental illness"

2    and should prepare the member for "possible future exacerbations or of remitting relapsing signs

3    and symptoms of their mental illness" over the long-term. (Trial Tr. 1283:23 – 1284:22

4    (Simpatico); *see also* Trial Tr. 1417:16–1420:11 (Allchin).)

5              **c.    Guideline Language Referring To The "Why Now" Factors and
                       "Acute Changes" Are Not An Unreasonable Interpretation Of
6                      Generally Accepted Standards of Care.**

7              Plaintiffs attempt to dismiss the substantial evidence that the LOCGs fully account for

8    chronic behavioral health conditions by focusing on the appearance of a handful of terms and

9    phrases in the guidelines – most notably, the phrases "acute changes" and "'why now' factors."

10   According to Plaintiffs, this language amounts to a "mandate" that the member "must show the

11   presence of an acute crisis" that "negate[s] consideration of what is required to effectively treat

12   the member's underlying condition and any chronic symptoms." (ECF No. 392, at 32:20–22.)

13   Plaintiffs can only reach this mistaken conclusion by dismissing the testimony of a half-dozen

14   board-certified psychiatrists as "*post-hoc* rationalization." *Id. at* 36:9.) Faced with the entirety of

15   the evidence at trial, Plaintiffs fail to carry their burden of classwide proof that the guideline

16   language referencing "acute changes" and "why now" factors is an unreasonable or illogical

17   interpretation of generally accepted standards of care.

18             As a threshold matter, these terms do not appear in many of the guidelines Plaintiffs

19   challenge in this case. In 2011, the Common Criteria did not reference "acute changes" at all, and

20   the phrase appears only in the definition of "improvement" in the 2012 and 2013 LOCGs. (Trial

21   Ex. 1-0005 to -07; 2-0006 to -09; 3-0007 to -11; Trial Tr. 1058:8–14 (Martorana).) Likewise,

22   neither the 2011 nor 2012 LOCGs use the phrase "why now," and the 2013 LOCGs use the term

23   "why now" only in a limited way that Plaintiffs do not challenge. (ECF No. 395 at 19-26.) The

24   reference to "why now" in connection with "acute changes" first appeared in the 2014 LOCGs,

25   and carried over into what became § 1.4 of the 2015 and 2016 LOCGs (with a minor punctuation

26   variation), providing that as one condition of admission:

27             The member's current condition cannot be safely, efficiently, and
               effectively assessed and/or treated in a less intensive setting due to
28             acute changes in the member's signs and symptoms and/or

1
2

> psychosocial and environmental factors (*i.e.*, the "why now" factors leading to admission).

3   (Trial Ex. 4-0007; Trial Ex. 5-0008; Trial Ex. 6-0009; Trial Ex. 7-0009.) In 2015 and 2016,

4   "acute changes" and "why now" also appeared in a parallel provision of the Common Criteria (§

5   1.5), which read:

6
7
8
9

> The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and/or treatment of acute changes in the members signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now factors" leading to admission) require the intensity of services provided in the proposed level of care.

10   (Trial Ex. 5-0008; Trial Ex. 6-0009.)

11         Neither "acute changes" nor "why now" appear in the 2017 LOCG Common Criteria. (*See*

12   *Trial* Tr. 1006:15–18, 107:3–108:14 (Martorana).) As part of its annual review process and in

13   response to external feedback, the language "acute changes" was removed from the 2017

14   Common Criteria and the criteria specific to Intensive Outpatient and Outpatient Guidelines.

15   (Trial Tr. 1007:3-1008:14 (Martorana).) This change was made in response to comments made by

16   the Clinical Social Workers Association, an organization focused on outpatient treatment only,

17   that had expressed some concern regarding the applicability of the phrase "acute changes" to the

18   outpatient context. (Trial Tr. 1007:3–19 (Martorana).) While UBH's clinicians disagreed because

19   the LOCGs account for the maintenance of function as an appropriate aim of treatment, they

20   nevertheless removed the "acute changes" language for the outpatient levels of care to be

21   responsive to the organization's comments. (Trial Tr. 1006:15-1007:2, 1008:2–9 (Martorana).)[45]

22         The "acute changes" language in the 2014, 2015, and 2016 Admission Criteria does not

23   preclude consideration of a member's chronic conditions or mandate that there be a crisis for

24   coverage to be approved. (Trial Tr. 1058:15-17, 1068:3-12, 1069:10-14, 1074:5-8 (Martorana).)

25
26
27
28

---

45   In light of the intensive nature of 24-hour residential treatment, UBH clinicians decided that it was appropriate to leave the "acute changes" language in the criteria for residential treatment because UBH "want[s] to understand what happened . . . what was the new change that happened that needs to be addressed that puts them into a 24-hour setting." (Trial Tr. 1006:19–1007:2 (Martorana).)

Crowell
& Moring LLP
Attorneys At Law

1   As discussed above, the evidence from the psychiatrists who created and used the guidelines

2   demonstrates that "acute changes" refers to recent changes in the members' condition, which may

3   or may not include severe symptoms or symptoms of underlying chronic conditions. On its face,

4   the "changes" necessary to satisfy this condition can be *either* changes in the member's "signs

5   and symptoms" *or* changes in the member's "psychosocial and environmental factors." And in

6   many cases, Dr. Alam explained, "[i]t's talking about the acute changes… of a chronic

7   condition." (Trial Tr. 1604:14–1605:1 (Alam).)

8        "Acute change" does not equate to "crisis." "Acute changes" expressly includes changes

9   to the member's psychosocial and environmental factors, which Dr. Martorana explained supports

10  a holistic understanding of the patient that accounts for not only changes to symptoms, but recent

11  changes to things like "where the person lives and whether they can support themselves" or

12  "relationships and family and education." (Trial Tr. 1058:2-7 (Martorana).) For someone with a

13  chronic illness, changes to any number of psychosocial or environmental factors "could change

14  the backdrop against which someone is maintained in a chronic condition possibly causing acute

15  changes" without any "acute crisis." (Trial Tr. 1303:16–1304:2 (Simpatico).) "Sometimes it's

16  external motivation" that constitutes the "acute change" leading the member to seek treatment.

17  (Trial Tr. 1396:22–1397:16 (Allchin).) Plaintiffs' expert agreed. Dr. Fishman admitted that, for

18  someone who is "just chronically miserable" and "just sick and tired of being sick and tired," the

19  decision to seek treatment "now and not yesterday" is itself "the acute change" that constitutes the

20  "why now." (Trial Tr. 192:17 –193: 10 (Dr. Fishman).)

21       Plaintiffs also urge the Court to dismiss the sworn, percipient testimony of multiple board-

22  certified psychiatrists who testified about the meaning of "why now" in the LOCGs as "*post-hoc*

23  rationalizations." (ECF No. 392, at 36:4–37:6.) Testimony from UBH's psychiatrists explaining

24  why they added this language and what is means is not "*post hoc*." It is real, credible evidence

25  supporting UBH's reasonable, good faith basis for including this language in the guidelines.[46]

---

26      46 The fact that UBH's clinicians disagree with the way Plaintiffs' experts subjectively

27  interpret the guidelines is not evidence of a "post hoc rationalization." It simply underscores that
    the subjective views of Plaintiffs' experts are out of sync with the true meaning of the guidelines,

28  or that reasonable minds – including different psychiatrists – can disagree. But as long as UBH's
    (Continued...)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  UBH's former Chief Medical Officer, Dr. William Bonfield, testified that adding "why now" was

2  his idea, and that the "why now" concept is designed to look beyond "symptom severity" and

3  address the "root cause" of a member's condition. (Trial Ex. 1659, at 176:21-177:09 (Bonfield).)[47]

4  UBH's former Chief Medical Officer for External Affairs, Dr. Rhonda Robinson-Beale, affirmed

5  that the purpose of adding "Why Now" was to take a more "holistic approach" that is "about

6  evaluating the whole patient . . . not just the symptoms." (Trial Ex. 1657, at 207:24–208:8

7  (Robinson-Beale); *see also* Trial Tr. 1054:11 – 17 (Martorana).)[48] Essentially, "why now"

8  instructs the clinician to ask: Why are you seeking treatment and will that treatment improve your

9  condition?

10      Plaintiffs' overly-simplified reading of "why now" and the kinds of "acute changes" that

11  warrant coverage under the LOCGs is contrary to the weight of the testimony and to the text of

12  §§ 1.4 and 1.5 themselves. The LOCGs' use of phrases like "why now" and "acute changes" is

13  consistent with standards of care.

14              **d.    It Is Consistent With Generally Accepted Standards Of Care
                        To Expect Treatment Will Improve Presenting Problems
15                      Within a Reasonable Period of Time.**

16      Plaintiffs also argue that the LOCGs restrict coverage to the stabilization of acute crises

17  because the LOCGs provide that there be "a reasonable expectation that services will improve the

18  member's presenting problems within a reasonable period of time." (ECF No. 392, at 32:27–

19  34:16; *see also* Trial Exs. 1-0005, 2-0007, 3-0008, 4-0009, 5-0008, 6-0010, 7-0010, 8-0007.)

20  _____

21  interpretation is reasonable, it should not be disturbed. *See Cator*, 609 F. Supp. 2d at 18 ("Even if
    the provisions of the plan are susceptible to more than one reasonable interpretation, the Court
    must give way to the trustee's interpretation.").

22      47 This example is strikingly similar to Dr. Plakun's "pot boiling over" analogy, and
23  further underscores that the concept behind the "why now" criteria is consistent with good
    medical practice.

24      48 Plaintiffs also contend that the "why now" concept cannot be as broad as all of the
25  percipient witnesses say because the Clinical Best Practices section of the 2014, 2015, and 2016
    LOCGs make reference to "why now" factors in addition to numerous clinical, psychosocial, and
    environmental factors that would otherwise be subsumed within the concept of "Why Now." But
26  as Dr. Alam testified, sometimes points in the LOCGs "are redundant because [UBH's]
    frontline," utilizes a "multidisciplinary team." (Trial Tr. 1601:11–24 (Alam). The LOCGs are
27  practical documents used daily by thousands of clinicians across the country with varying levels
    of experience. They are written accordingly.

28

CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

Crowell
& Moring LLP
Attorneys At Law

1    Plaintiffs contend that this "improvement" criterion is facially inconsistent with generally

2    accepted standards of care for two reasons. First, Plaintiffs assert UBH's definition of

3    improvement limits the concept of improvement to "reduction or control" of the member's "acute

4    symptoms." (ECF No. 392, at 32:27–34:16.) Second, Plaintiffs argue that it is inconsistent with

5    generally accepted standards of care to expect that improvement will occur "within a reasonable

6    period of time." (*Id.*)

7          "Presenting problems," as that term is used in the improvement provision from 2011

8    through 2017, refers to the issues, complaints, and conditions that a member presents for

9    treatment. (Trial Tr. 982:3-6, 1069:22-23 (Martorana); *see also* Trial Tr. 1073:6-10 (Martorana).)

10   Dr. Martorana explained that the concept of "presenting problems" is intended to convey "the

11   totality of . . . what the member is presenting" including any "co-morbidity or chronic [behavioral

12   health] or chronic medical issues" that "will impact [] how you treat this person effectively."

13   (Trial Tr. 983:1 – 8 (Martorana).) "Presenting problems" means exactly what the phrase suggests:

14   the totality of "problems" (chronic, recent, severe, co-morbid, etc.) that the member is

15   "presenting" at the time of treatment.

16         Under generally accepted standards of care, "the goal of treatment is to make people

17   better." (Trial Tr. 1229:4–11 (Simpatico).) Plaintiffs don't dispute that. Instead, Plaintiffs argue

18   that the phrase "presenting problems" must "on its face" be limited to "the immediate, acute

19   symptoms that brought the member to treatment" *to the exclusion* of "his or her underlying

20   condition." (ECF No. 392, at 33:3–4.) Plaintiffs point to no evidence about what the words

21   "presenting" or "problem" mean or explain why those terms are *necessarily* limited to an acute

22   crisis. Plaintiffs simply point to Dr. Fishman's unsubstantiated view that "language like

23   'presenting problems'" is similar to the concept of "why now." (*Id.*, citing Trial Tr. 99:1 – 4 (Dr.

24   Fishman) (discussing "presenting problems") and Trial Tr. 269:20 – 24 (discussing phrase

25   "factors that precipitated admission" in the preamble to the 2017 outpatient criteria).) Even if

26   that's true, the concept of "why now" described by Dr. Bonfield and Dr. Robinson-Beale is

27   consistent with Dr. Martorana's testimony that the phrase "presenting problems" is designed to

28   focus the reader on improvement in "the totality" of the member's condition, including any

CROWELL
& MORING LLP
ATTORNEYS AT LAW

chronic, underlying, or co-morbid conditions the member brings into treatment. (Trial Tr. 983:1–8 (Martorana); *see also* Trial Tr. 1396:22–1397:6 (Allchin) (describing "Why Now" as "why is this person presenting for some behavioral health or substance abuse intervention at this time," which includes "not only acute issues, but chronic issues, as well").)

The language and structure of the remainder of UBH's definition of improvement only confirm Dr. Martorana's testimony that "presenting problems" is much broader than an acute crisis. In 2011, the LOCGs did not use the phrase "acute symptoms" at all, instead defining improvement as follows:

> There must be a reasonable expectation that essential and appropriate services will improve the member's presenting problems within a reasonable period of time. "Improvement" in this context is measured by weighing the effectiveness of treatment against the evidence that the member's condition will deteriorate if treatment is discontinued in the current level of care. Improvement must also be understood within the framework of the member's broader recovery goals.

(Trial Ex. 1-0005.) In the 2012 LOCGs, the definition of improvement was changed to add the following bolded language:

> There must be a reasonable expectation that essential and appropriate services will improve the member's presenting problems within a reasonable period of time. **Improvement of the member's condition is indicated by the reduction or control of the acute symptoms that necessitated treatment in a level of care**. Improvement in this context is measured by weighing the effectiveness of treatment against the evidence that the member's condition will deteriorate if treatment is discontinued in the current level of care. Improvement must also be understood within the framework of the member's broader recovery goals.

(Trial Ex. 2-0007.)

As Dr. Martorana testified, the revised definition of improvement in 2012 "defines two ways that you can assess improvement." (Trial Tr. 982:7–20 (Martorana).) If a member is presenting with severe or "acute symptoms," improvement can be measured, in part, by either reduction or control of the member's symptoms. (*Id.*; Trial Exs. 2-0007, 3-0008, 4-0009, 5-0008, 6-0010, 7-0010, 8-0007; *see also* Trial Tr. 80:10–24, 105:8 – 12 (Dr. Fishman).) But since 2011, the LOCGs *also* have emphasized that improvement should be "measured by weighing the

Crowell
& Moring LLP
Attorneys At Law

1  effectiveness of treatment against the evidence that the member's condition will deteriorate if

2  treatment is discontinued in the current level of care," which must be understood within the

3  framework of the member's long-term recovery, resiliency and wellbeing. (Trial Exs. 2-0007, 3-

4  0008, 4-0009–10 , 5-0008–09 , 6-0010, 7-0010, 8-0007; Trial Tr. 982:16 – 18 (Martorana) ("and

5  then, also, you can consider improvement in someone by looking at and considering whether if

6  you took this level of care away would they then deteriorate."); *see also* Trial Tr. 1185:25–

7  1186:13 (Simpatico).)

8      In 2014, UBH reformatted its definition of improvement in the LOCGs to make it clear

9  that both articulations of improvement simply reflect the broader concept that treatment should

10  improve the member's condition. From 2014, and continuing through 2016, the LOCGs defined

11  improvement as follows:

12      1.8.    There is a reasonable expectation that services will improve
            the member's presenting problems within a reasonable
13          period of time.

14      1.8.1   Improvement of the member's condition is indicated
                by the reduction or control of the acute signs and
15              symptoms that necessitated treatment in a level of
                care.

16      1.8.2   Improvement in this context is measured by
                weighing the effectiveness of treatment against
17              evidence that the member's signs and symptoms will
                deteriorate if treatment in the current level of care
18              ends. Improvement must also be understood within
                the broader framework of the member's broader
19              recovery, resiliency and wellbeing.

20  (Trial Exs. 4-0009, 5-0008 to -09, 6-0010, 7-0010, 8-0007.)[49] In 2017, UBH made this even more

21  evident by removing the word "acute" from the definition of improvement altogether. (Trial Ex.

22  8-0007; Trial Tr. 1006:15–1008:14 (Martorana) (explaining that references to acuity were

23  removed from the 2017 LOCGs).)

24      This reformatting reflects that treatment is effective if it reduces or controls a patient's

25  acute symptoms *or* prevents the member's overall condition from deteriorating further because

26  _____

27      49 The 2014 LOCGs use identical language with an identical structure, but use a bullet-
point format as opposed to the numbered format in the 2015 and 2016 LOCGs. (Trial Ex. 4-
0009.)

28

Crowell
& Moring LLP
ATTORNEYS AT LAW

1   both forms of improvement are essential to ensure the member's long-term recovery, resiliency,

2   and wellbeing.[50] (Trial Tr. 982:7–983:20, 984:2–985:20 (Martorana).) As Dr. Martorana and Dr.

3   Simpatico both explained, this is just another way of articulating the generally accepted principle

4   that treatment should be effective. (Trial Tr. 983:9–15 (Martorana); Trial Tr. 1311:20 – 1312:17

5   (Simpatico).)

6          Plaintiffs urge the Court to ignore how the LOCGs actually define improvement, along

7   with the testimony of the percipient witnesses who crafted and apply that definition, based on a

8   single set of meeting minutes from 2010 in which UBH's Coverage Determination Committee

9   asked for a clarification in the Custodial Care CDG that "the reasonable expectation of

10  improvement in the patient's condition is improvement in the patient's *acute* condition." (ECF

11  No. 392, at 34:2–16, citing Trial Ex. 307-0002.) To the extent this "clarification" was eventually

12  incorporated into the LOCGs, it reflects the generally accepted principle that improvement in the

13  member's acute condition is one essential, but non-exclusive, indication of improvement.[51]

14         Plaintiffs also briefly argue that the phrase "reasonable period of time" as used in the

15  definition of improvement is inconsistent with generally accepted standards of care because it

16  suggests "that improvement should occur quickly" and "setting *any* deadline within which a

17  patient must demonstrate improvement . . . is itself inconsistent with generally accepted

18  standards." (ECF No. 392, at 34 n.24.) The LOCGs do not set any "deadline within which a

19  patient must demonstrate improvement." Plaintiffs admit that the "Guidelines do not specify how

20  long a 'reasonable period of time' is." (*Id*.) That is because, as Dr. Martorana testified, what is a

21  _____

22         50 Dr. Martorana testified that "in this context" in section 1.8.2 refers to the requirement
    in section 1.8 that treatment should improve the member's presenting problems. (Trial Tr. 984:2–
    11 (Martorana). Dr. Martorana's testimony is confirmed by the structure of section 1.8 itself.

23         51 By Plaintiffs' own logic, if "presenting problems" were synonymous with "acute
24  symptoms," there would be no need to separately identify "acute symptoms" in the definition of
    improvement. More importantly, "improvement" as measured by the prevention of deterioration
    "must also be understood within the broader framework of the member's recovery, resiliency and
25  wellbeing." (Trial Exs. 4-0010, 5-0008–09 , 6-0010, 7-0010, 8-0007. *See also* Trial Exs. 1-0005,
    2-0007, 3-0008 (using similar language).) Defining this measure of improvement in the context of
26  a member's recovery, resiliency, and wellbeing significantly expands improvement beyond the
    control or reduction of acute symptoms, and speaks directly to chronicity. (Trial Tr. 1283:23–
27  1284:24, 1309:1–1310:9 (Simpatico); Trial Tr. 1417:16–1420:11 (Allchin). *See also* Trial Tr.
    985:4–20 (Martorana).)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    "reasonable amount of time" inherently depends on the individual circumstances of each patient.

2    There is no "set period of time" in which a member must improve because "[i]t's part of the

3    clinical judgment that the reviewer is applying." (Trial Tr. 983:9 – 984:1 (Martorana); *see also*

4    Trial Tr. 1413:23 – 1414:2 (explaining that "what is a reasonable period of time" for children and

5    adolescents "tends to be a much more expanded look than it would be with an adult").) And Dr.

6    Fishman conceded that he is not "looking for an unreasonable period of time." (Trial Tr. 110:3–4

7    (Dr. Fishman).) Consistent with generally accepted standards, the requirement that improvement

8    should occur in a reasonable period means that patients should not languish indefinitely in

9    treatment that is not actually going to help them get or stay healthy. (Trial Tr. 1184:25–1185:24,

10   (Simpatico).) As Plaintiffs' experts recognize, treatment should be effective, meaning it should

11   improve the member's condition.

12            e.      **Coverage Does Not End When An "Acute Crisis" Has Passed**

13           Plaintiffs' assertion that "coverage ends when the acute crisis has passed" is just another

14   way of stating their false premise that "acute" in the LOCGs means "severe." As discussed more

15   fully above, both the text of the LOCGs and the weight of the testimony demonstrates that

16   consistent with generally accepted standards of care, the LOCGs are written and used to provide

17   coverage for the safe and effective treatment of both acute symptoms *and* chronic conditions, all

18   within the broader context of the member's long-term recovery, resiliency, and wellbeing.

19           It is true that the Continued Service Criteria and Discharge Criteria provide that if a

20   member no longer meets the criteria for a given level of care, the member should be discharged to

21   a higher level of care, a lower level of care, or discharged from treatment, as clinically

22   appropriate. (Trial Exs. 1-0078 to -79, 2-0082, 3-0089, 4-0007 to -09, 5-0009 to -10, 6-0010 to -

23   11, 7-0010 to -11, 8-0007.) That is consistent with generally accepted standards of care. For

24   example, the CMS Medicare Benefit Policy Manual for *outpatient* hospital psychiatric services

25   provides that "[s]ervices are noncovered" if "stability can be maintained without further treatment

26   or with less intensive treatment." (Trial Ex. 656-0026 to -27 (emphasis added).)

27           Moreover, the evidence demonstrated that the Continued Service and Discharge Criteria

28   work in tandem with the admission criteria to create a "feedback loop" that ensures the member is

CROWELL
& MORING LLP
ATTORNEYS AT LAW

placed in the least restrictive level of care that is safe and effective. [52] (Trial Tr. 992:17–993:3

(Martorana).) Dr. Martorana explained this feedback loop: "if we're going to say that someone

needs a less restrictive level of care, then they'd have to meet the guidelines all over again for

that" lower level of care. (*Id.*) That necessarily requires the reviewer to determine whether the

member can be "safely, effectively, and efficiently treated in that other level of care" as part of

the admission criteria for the lower level of care. (*Id.*; *see also id.* at 994:10–995:2.) If "the

answer is no" – *i.e.*, the lower level of care is not going to be safe *and* effective *and* efficient to

treat the member's current condition – that itself is evidence that the Discharge Criteria are not

satisfied and that "they would need the higher level of care." (*Id.* at 992:17–993:3.)

Contrary to Plaintiffs' assertion, this feedback loop does not mean that the member must

continue to suffer from the *same* condition for which they initially sought treatment. Dr.

Martorana explained that the interrelation between the Continued Service and Discharge Criteria

on the one hand and the Admission Criteria on the other hand applies equally to new conditions

or symptoms that are "brought on by the treatment or unmasked by the treatment." (*Id.* at 992:1–

---

[52] In their Proposed Findings of Fact, Plaintiffs selectively excerpt portions of non-coverage determination letters for 27 of the 104 sample class members where the word "acute" is used. (ECF No. 393, ¶ 387.) This is not classwide proof that coverage ends after an "acute crisis". The use of the word "acute" varies throughout these letters, and Plaintiffs' selective list of letters omits numerous other letters that make no mention of Plaintiffs' challenged criteria like acuity, "why now," improvement, custodial care, or active treatment. (*See, e.g.*, Trial Ex, 1295-0001 to -03, 1365-0001 to -02; 1392-0002 to -03.) Numerous letters also demonstrate that UBH expressly considered co-occurring behavioral health or medical conditions that would require treatment at a higher level of care. (*See* Trial Exs. 240-0005; 1287-0002; 1319-0001.) Plaintiffs also fail to divulge that in each of the 27 letters they identify, UBH authorized services at an alternative level of care. UBH's clinicians did not ignore the chronic nature of these members' conditions; they assessed a wide range of individualized circumstances, including whether there was an "acute" crisis or whether the requested services were required to prevent "acute" deterioration or exacerbation, and determined that the services could be provided safely and effectively at a less intensive level of care or lesser frequency. (*See e.g.*, Trial Ex. 1296-0002 Redacted

Trial Ex. 1312-0002 Redacted

CROWELL
& MORING LLP
ATTORNEYS AT LAW

16.) The new or newly-identified condition would itself constitute "acute changes" in the member's presentation, which could independently satisfy the Admission Criteria (and in turn the Continued Service Criteria) and support continued coverage at the higher level of care. Even when the Discharge Criteria do apply, resulting in a non-coverage determination, that does not mean *all* coverage ends. It is uncontroverted that "[i]n almost every case an alternative level of care that's available to the member is offered." (Trial Tr. 947:22–948:10 (Martorana) (same); Trial Tr. 1369:4–1370:1, 1379:13–1380:12 (Allchin) (same); *see also* Trial Ex. 1186-0011 (2016 Utilization Management Program providing that a Peer Reviewer is required to offer "a statement of alternative services that would be available and authorized.").)

### 6. The Guidelines Account For Co-Occurring Behavioral And Mental Health Conditions.

Plaintiffs also contend that the guidelines deviate from generally accepted standards of care because they "omit any evaluation of whether a member's co-occurring conditions can be *effectively treated* in the requested level of care" and instead, in Section 1.6 of the 2015-2017 LOCGs, "call for UBH to verify only that '[c]o-occurring behavioral health and medical conditions can be *safely managed*' at the prescribed level of care." (ECF No. 392, 40:1-8.) Plaintiffs ignore the many other provisions in the LOCGs addressing effective treatment and co-occurring conditions and again dismiss the consistent and unrefuted testimony of multiple UBH doctors about what the guidelines mean, and how they are read and understood by those who use them on a daily basis.

Plaintiffs do not, and cannot, dispute that the guidelines address treatment of co-occurring behavioral and medical conditions. While the language and organization evolved throughout the class period, co-occurring conditions have been explicitly addressed in the LOCGs each year. Section 2(d) of the Common Criteria in the 2011 LOCGs required UBH's clinicians to consider "[t]he member's current and past medical and psychiatric histories including the history of substance use." (Trial Ex. 1-0005; Trial Tr. 1030:4-10 (Martorana).) The 2012 and 2013 LOCGs similarly required Peer Reviewers and Care Advocates to account for "the member's psychiatric and medical history including current and past use of alcohol and drugs, and history of treatment"

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  in determining the appropriate level of care covered under the member's plan. (Trial Exs. 2-0006,

2  3-0007; Trial Tr. 1041:10-12 (Martorana).) And between 2011 and 2013, the Common Criteria

3  explicitly directed UBH's clinicians to ensure that the proposed treatment (including the proposed

4  level of care) included any "interventions needed to address co-occurring behavioral health or

5  medical conditions." (Trial Exs. 1-0006, 2-0008, 3-0009.) Neither of Plaintiffs' experts criticized

6  these provisions, nor did they suggest that UBH's consideration of "[t]he member's current and

7  past medical and psychiatric histories" is not aligned with generally accepted standards of care.

8      Beginning in 2014, the Clinical Best Practices section of the LOCGs became even more

9  explicit in its requirement that reviewers consider co-occurring disorders. In 2014, the LOCGs

10  required that all UBH reviewers assess whether the proposed treatment plan (which includes the

11  proposed level of care) adequately addressed "the member's psychiatric and medical histories

12  including this histories of substance use, abuse and trauma," as well as "risk factors including . . .

13  risk stemming from co-occurring behavioral health or medical conditions." (Trial Ex. 4-0007 to -

14  08.) And from 2015 through 2017, the LOCGs required consideration of "[c]o-occurring

15  behavioral health and physical conditions," along with "[t]he member's medical history and

16  current physical health status," and "[t]he member's developmental history." (Trial Exs. 5-00010,

17  6-0011, 7-0011, 8-0008.)[53]

18      All of these provisions in the 2011-2017 LOCGs direct UBH's clinicians to account for a

---

[53] Many other sections of the LOCGs also address the role of co-occurring conditions in determining the appropriate level of care. For example, in every year of the class period, the LOCGs' Continued Service Criteria directed UBH clinicians to give ongoing consideration to all of the factors relating to co-occurring medical or behavioral health conditions that were considered at the time of admission. (Trial Exs. 1-0078, 2-0081, 3-0089, 4-0007, 5-0009, 6-0010, 7-0010, 8-0007.) This ongoing consideration includes not only any co-occurring conditions identified at the time of admission, but also "consideration of new symptoms" or "conditions that cropped up in the course of treatment." (Trial Tr. 992:1–993:3; 1070:21-1071:6 (Martorana).) If those newly-identified symptoms or conditions indicate that a higher level of care is clinically appropriate, the Continued Service Criteria direct UBH's clinicians to keep the member in the current level of care, or as appropriate transition to a higher level of care. (*Id.*) Additionally, from 2011 through 2017, the preamble to each of the LOCGs for intensive outpatient treatment (both mental health and substance use) emphasized that IOP "can specialize in the treatment of co-occurring mental health and substance use disorders." (Trial Exs. 1-0018, 1-0042, 2-0020, 2-0047, 3-0022, 3-0052, 4-0027, 4-0059, 5-0030, 5-0055, 6-0032, 6-0062, 7-0032, 7-0062, 8-0014, 8-0032; Trial Tr. 1003:9-23, 1022:21-1023:7 (Martorana).)

19
20
21
22
23
24
25
26
27
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   member's co-occurring disorders in making level of care determinations. Plaintiffs admit that the

2   Clinical Best Practices represent a "fairly exhaustive laundry list" of considerations for making

3   appropriate level of care decisions. (ECF No. 392, at 46:14–17.) However, Plaintiffs dismiss the

4   Clinical Best Practices as requirements that "practitioners should follow" (*Id.* at 3:22), not

5   requirements that are "sufficient for coverage." (*Id.* at 4:14–16.) Contrary to Plaintiffs' unfounded

6   speculation, the evidence reveals that the Clinical Best Practices sections of the LOCGs are

7   essential to the UBH clinicians' exercise of clinical judgment under the guidelines.

8         Dr. Martorana explained that the Clinical Best Practices are designed to ensure that

9   providers "make an appropriate diagnosis and an appropriate treatment plan, which they

10  communicate to" UBH. (Trial Tr. 997:11–19 (Martorana).) The purpose of the "exhaustive

11  laundry list" in the LOCGs is to ensure that all of this information is "considered [by UBH] when

12  evaluating whether a request for authorization should be authorized or denied." (Trial Tr. 981:6–

13  10.) In every year from 2011 through 2017, the Common Criteria directed UBH's clinicians to

14  determine whether "the member's *current condition* can be most efficiently *and effectively* treated

15  at the proposed level of care." (Trial Exs. 1-0005, 2-0006, 3-0008 (using the quoted language)

16  (emphasis added); Trial Exs. 5-0008, 6-0009, 7-0009 (using substantially similar language in

17  section 1.5 of the Common Criteria); *see also* 4-0007 (requiring consideration of whether "the

18  member's current condition cannot be safely, efficiently and effectively assessed and/or treated in

19  a less intensive setting"). UBH's clinicians testified that a member's "*current condition* includes

20  everything they bring to the table for treatment," including any co-occurring or co-morbid

21  conditions. (Trial Tr., 977: 8 -16 (Martorana); 1387:8 – 14 (Allchin).) Dr. Martorana explained

22  that the general requirement that the member's "current condition" can be effectively treated in

23  the proposed level of care *encompasses* co-occurring conditions, including "whether the co-

24  occurring problem is such that it requires a higher intensity of service." (Trial Tr. 975:3–14

25  (Martorana).) Dr. Allchin concurred, explaining that if a member's "co-occurring conditions

26  warrant or could warrant a more intensive level of care to effectively treat the member," the

27  Common Criteria direct UBH's clinicians to authorize that higher level of care. (*Id*; Trial Tr.

28  1389:2–10 (Allchin).)

1   Beginning in 2015, UBH added a new criterion (Section 1.6) that also required UBH's

2   clinicians to consider whether "[c]o-occurring behavioral health and medical conditions can be

3   safely managed." (Trial Exs. 5-0008, 6-0009, 7-009, 8-0007; Trial Tr. 972:22-973:3 (Martorana)

4   (discussing same provision); *see also* Trial Tr. 1069:15-23; 1072:81073:4, 1074:5-8 (Martorana).)

5   Plaintiffs contend that with respect to co-occurring conditions, this criterion overrides the more

6   general criterion that "[t]he member's *current condition* can be safely, efficiently, and effectively

7   assessed and/or treated in the proposed level of care." (Trial Exs. 5-0008, 6-0009, 7-009, 8-0007)

8   and means that safety is the *only* consideration for co-occurring conditions.[54]

9   To the contrary, Dr. Allchin testified that this provision is additive of the preexisting

10  requirement that the proposed level of care can "safely, effectively, and efficiently" address the

11  member's "current condition." (Trial Tr. 1387:24–1388:25 (Allchin); *see also* Trial Tr. 977:17–

12  978:20 (Martorana).) The "safely managed" requirement of Section 1.6 of the 2015-2017

13  Common Criteria (and similar language appearing in level-of-care specific portions of earlier

14  LOCGs) is intended "as a failsafe way to make sure [Care Advocates] look at the medical

15  conditions" because "the patient's safety is the paramount thing." (Trial Tr. 1387:24–1388:25

16  (Allchin) (explaining that Care Advocates, who are not medical doctors, "don't necessarily

17  automatically think of some of the medical issues involved," in their first-level review of a benefit

18  request).) Dr. Fishman conceded that this emphasis on member safety is entirely appropriate.

19  (Trial Tr. 107:20-22 (Dr. Fishman) ("[I] would want co-occurring psychiatric problems, mental

20  health problems, or co-occurring medical conditions to be able to be safely managed in this level

21  of care").)

22  Section 1.6's "safely managed" requirement also recognizes that, under certain

23  circumstances, it may be clinically appropriate to authorize behavioral health treatment for a

---

24  54 Dr. Fishman conceded it is "fine" for Section 1.6 to exclude coverage if a co-morbid
25  condition cannot be safely treated at that level of care, but confusingly opined that Section 1.6
    would somehow preclude access to a higher level of care if the lower level of care was clinically
26  inappropriate. (Trial Tr. 108:2–109:1.) As the Court observed, the basis for Dr. Fishman's
    opinion is "not . . . clear" (108:25), and as discussed herein, is refuted by both the structure of
27  Section 1.6 and the testimony of UBH's clinicians who approved and practically construe that
    Section.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    particular condition *even if* that treatment cannot equally address every co-occurring condition the

2    member may have. Dr. Allchin illustrated this point: if a member requests treatment at a

3    residential facility staffed by clinicians that specialize in treating eating disorders, it may not be

4    reasonable to expect the facility to "effectively treat" the member's co-occurring need for drug

5    detoxification. (Trial Tr. 1387:24–1388:25 (Allchin).) But even if the facility is not capable of

6    treating the member's co-occurring condition, it may still be appropriate and effective treatment

7    for her eating disorder as long as the facility can safely manage any severe withdrawal symptoms.

8    (*Id.*) Likewise if the member suffered from a co-occurring diagnosis of uncontrolled diabetes,

9    Admission Criterion 1.6 requires, at minimum, that the facility be capable of "safely managing"

10    the co-occurring condition during treatment because the "patient's safety is considered

11    paramount." (*Id.*, at 1389:16–18.)[55]

12       UBH's doctors, and the guidelines themselves, also dispel Plaintiffs' concern that the

13    LOCGs do not adequately account for co-occurring mental health disorders that may contribute to

14    substance use symptoms and require more intensive treatment. Throughout the class period, the

15    LOCGs mandated consideration of co-occurring conditions in the admission criteria for

16    residential treatment of substance use disorders. From 2011 through 2013, the LOCGS for

17    residential treatment of substance use disorders direct that if "a serious co-occurring medical

18    condition" exists which "cannot be safely treated in a lower level of care" or if the member's use

19    of alcohol or drugs would "exacerbate a co-occurring medical condition," this could justify

20    residential treatment. (1-0056, 2-0062, 3-0067; *see also* Trial Tr. 1589:11-1590:6 (Alam).) From

21    2014 through 2017, the residential rehabilitation LOCGs for substance use continued to account

22    for co-occurring conditions, providing that residential rehabilitation may be appropriate if "[a] co-

23    occurring mental health condition is stabilizing, but the remaining signs and symptoms are likely

24

25       55 Plaintiffs point to an isolated question by Lynn Wetherbee, Mr. Niewenhous' then-supervisor, about whether there were any words missing from Section 1.6 as evidence that UBH

26    understood the LOCGs did not account for the effective treatment of co-occurring conditions. (ECF No. 392, at 42:21–26, citing Trial Ex. 539.) Plaintiffs did not introduce any testimony from Ms. Wetherbee's deposition, and the only testimony Plaintiffs elicited from Mr. Niewenhous on

27    this issue was the fact that the words they read aloud in court appear on the page they presented to him. (Trial Tr. 1818:9–1820:20.)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    to undermine treatment in a less intensive setting." (Trial Exs. 4-0078, 5-0081, 6-0090, 7-0091, 8-

2    0035.) Under either formulation, the existence of a co-occurring mental health disorder, and the

3    need to treat that condition, may be sufficient to authorize residential treatment for a substance

4    use disorder, even if the severity of the member's substance use disorder standing alone would

5    not normally require residential care.

6          Plaintiffs ask the Court to ignore the plain language in the guidelines and the testimony of

7    UBH's board-certified psychiatrists who explained what that guidelines mean in practice, and

8    instead consider only Plaintiffs' experts' speculative interpretation. But the question is not

9    whether Section 1.6 in isolation *could* be interpreted as Plaintiffs' experts contend, or even

10   whether Plaintiffs' interpretation is better. The question is whether the extent to which the

11   guidelines call for the consideration of co-morbidities is so unreasonable or illogical that UBH

12   abused its discretion in interpreting the class members' plans. The evidence shows that UBH did

13   not abuse its discretion.

14              **7.    The Guidelines Account For Treatment That Is Necessary To Prevent**
                **Deterioration Or Maintain A Level Of Functioning**
15

16         Plaintiffs' contention that the LOCGs "effectively preclude coverage for treatment needed

17   to prevent deterioration or maintain a level of functioning" is baffling given the plain language of

18   the guidelines and the testimony at trial. (ECF No. 392, 47:1-3) As discussed above, it is

19   generally accepted that a primary goal of behavioral health treatment is to improve the patient's

20   condition to a point where he or she can be appropriately transitioned to a less restrictive level of

21   care. (Trial Tr. 1035:3-20 (Martorana).) This goal is expressed in multiple sources that Plaintiffs

22   agree reflect generally accepted standards of care. (*See, e.g.*, Trial Ex. 656-0026 to -27 (Medicare

23   Benefit Policy Manual for Outpatient Hospital Psychiatric Services stating that "[s]ervices are

24   noncovered" if "stability can be maintained without further treatment or with less intensive

25   treatment."); Trial Ex. 1507-0010 (CMS Local Coverage Determination: Psychiatric Partial

26   Hospitalization Program Guideline stating that "[t]reatment goals should be . . . to restore the

27   individual patient to a higher level of functioning that would permit discharge from the program .

28   . . .").) When transition to a less restrictive level of care is not feasible, generally accepted

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  standards of care, as set forth by CMS, also provide that "control of symptoms and maintenance

2  of a functional level to avoid further deterioration or hospitalization is an acceptable expectation

3  of improvement." (Trial Ex. 656-0026 (Medicare Benefit Policy Manual, Chapter 6, Hospital

4  Services Covered under Part B).)

5      As discussed in Section VI.C.5.d (p. 67), in every year from 2011 through 2017, the

6  LOCGs defined the concept of improvement to account for both "reduction or control" of acute

7  symptoms and the prevention of deterioration in the member's condition, consistent with CMS

8  and generally accepted standards of care.[56] Dr. Martorana explained that the concept of preventing

9  deterioration reflected in UBH's definition of improvement "would incorporate maintenance"

10  (Trial Tr. 982:21–25 (Martorana)), and, as discussed above, must be understood within the

11  broader framework of the member's recovery, resiliency, and wellbeing, not merely an acute

12  crisis.[57]

13      Language in other LOCG provisions specific to certain levels of care also explicitly

14  provide for the consideration of deterioration and maintenance of function in determining

15  coverage. For example, the 2011 LOCGs state that residential treatment may be appropriate if

16  "[t]here is an imminent risk of deterioration in the member's functioning due to the presence of

17  severe, multiple and complex psychosocial stressors that are significant enough to undermine

18  treatment at a lower level of care," or if the member's support system outside of treatment "has

19

20      56 Plaintiffs point to language in the 2011 Continued Service Criteria stating that there
   should be "clear and compelling evidence" that treatment is necessary to prevent deterioration as
21  evidence that the definition of improvement in the LOCGs was inconsistent with generally
   accepted standards of care. (ECF No. 392, at 44:12.) Plaintiffs' experts criticized this phrase, but
22  Dr. Fishman conceded it is "not really a medical term" and "it would be hard to know what that
   would exactly mean in a clinical treatment context . . . ." (Trial Tr. 137:3–5 (Dr. Fishman). See
23  also Trial Tr. 1239:2–3 (Simpatico).) While Plaintiffs' experts guessed about how that language
   might "result in over-restrictiveness" (Trial Tr. 137:14–15 (Dr. Fishman)), Dr. Martorana's
24  unrefuted testimony is that UBH's clinicians did not interpret this non-medical language in the
   "overly-restrictive" way Plaintiffs' experts speculate. (Trial Tr. 1040:5–10 (Martorana)
25  Moreover, this language appeared in the LOCG Continued Service Criteria only in 2011, which
   were used for only a small percentage of class members.

26      57 UBH's understanding that recovery, resiliency, and wellbeing look beyond an acute
   crisis was supported by their reliance on Mr. Shulman's work. Mr. Shulman told UBH that
27  recovery and resiliency are "very important" and he "agree[d] whole heartedly" with UBH's
   focus on recovery and resiliency because those concepts are broader than "merely stabilization . .
   . ." (Trial Ex. 412-0053.)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   heightened the risk that the member will use substances if not in residential rehabilitation." (Trial

2   Ex. 1-0026 to -56.) Likewise, the 2011 and 2012 intensive outpatient criteria provide that

3   intensive outpatient treatment may be appropriate if "the member's mental health condition is

4   likely to worsen" or the member "is unlikely to remain sober" without the structure and support

5   of an intensive outpatient program." (Trial Exs. 1-0018, -42; 2-0020-47.) From 2014 through

6   2017, this same concept was reflected in the preamble to the intensive outpatient criteria for

7   mental health and substance use disorders, which stated that one purpose of IOP is to "monitor

8   and maintain stability . . . ." (Trial Exs. 4-0027–59; 5-0030–55; 6-0032-62; 7-0032-62; 8-0014-

9   32.) These provisions highlight the emphasis UBH places on the prevention of deterioration, and

10  they correspond directly to the Medicare Benefit Policy Manual's reference to "maintenance of a

11  functional level." (Trial Tr. 987:15-19, 1032:18–1033:2, 1034:6–10 (Martorana), 1415:5–1416:19

12  (Allchin).) Plaintiffs ignore these provisions when critiquing UBH's definition of improvement.

13  (ECF No. 392 at 56:20–57:3.)[58]

14          By allowing for treatment designed to prevent deterioration, the UBH LOCGs, like the

15  Medicare Benefit Policy Manual, do not demand that a member continually improve as Plaintiffs

16  suggest. (Trial Tr. 985:21-23, 1034:22-1035:2 (Martorana), 1228:10-12 (Simpatico), 1420:3-11

17  (Allchin).) Plaintiffs did not offer evidence that the LOCGs *preclude* coverage for services to

18  prevent deterioration or maintain a level of functioning, and Plaintiffs did not offer evidence that

19  the LOCGs *require* that services would cause a patient to continually progress toward recovery.

20  By simply ignoring large portions of the LOCGs' definition of improvement in favor of an overly

21  narrow reading of a single part of that provision, Plaintiffs failed to satisfy their burden to prove

22  that the LOCGs are an unreasonable interpretation of generally accepted standards of care in this

23  respect.

24

25

26          58 Plaintiffs even ignore testimony from their own expert, Dr. Fishman, who
    complimented Section 1.8.2 of the Common Criteria in the 2015 LOCGs because "it says that
27  improvement in this context is measured by considering prevention of deterioration." (Trial Tr.
    110:19–21 (Dr. Fishman).)
28

1

**8.      The Guidelines Account For The Member's Motivation To Recover.**

2      Next, Plaintiffs briefly argue that the LOCGs "deviate from the generally accepted

3   standards of care by discontinuing coverage when a patient is 'unwilling or unable to participate

4   in treatment.'" (ECF No. 392, 50:7-8.) Under generally accepted standards of care, a patient's

5   willingness and ability to participate in treatment *should* be considered when assessing the

6   medical necessity of that treatment. This standard is laid out clearly in national guidelines. For

7   example, the section of the Medicare Benefit Policy Manual discussing partial hospitalization

8   services states that it is "reasonable and necessary" to deny coverage when a patient "cannot, or

9   refuse[s], to participate (due to their behavioral or cognitive status) with active treatment of their

10   mental disorder (except for a brief admission necessary for diagnostic purposes), or . . . cannot

11   tolerate the intensity of [partial hospitalization services]." (Trial Ex. 656-0033; *see also* Trial Tr.

12   1013:2–22 (Martorana) (discussing this language).) As Dr. Martorana testified, a lack of

13   motivation or participation on the part of the patient can ideally be addressed by a change to the

14   treatment plan. (Trial Tr. 995:21-996:21 (Martorana).) However, if after a period of stabilization

15   and after necessary adjustments to the treatment plan are made, a patient still fails to participate in

16   treatment, discharge is appropriate. (Trial Tr. 996:13-21 (Martorana) (noting that treatment in

17   which patient does not participate fails to "address[ ] the patient's condition or their suffering.").)

18      Based on testimony from Dr. Fishman, Plaintiffs assert that a patient's lack of motivation

19   should *never* serve as a basis for discharge, and may even justify moving the patient involuntarily

20   to a *higher* level of care. (Trial Tr. 115:10-24 (Dr. Fishman), ECF No. 392 at 50:8–28). This not

21   only directly contradicts guidance from CMS, but when taken literally, risks converting treatment

22   into a form of punishment by requiring patients in more intensive levels of care to be held against

23   their will. In offering this opinion, Dr. Fishman cited no evidence or source of generally accepted

24   standards of care to support this proposition.

25      On the other hand, UBH's approach to patient motivation is consistent with, if not more

26   liberal than, guidance from CMS. Contrary to the assertions of Dr. Fishman, UBH does not

27   require members "to be motivated at the door . . . ." (Trial Tr. 116:1-3 (Dr. Fishman).) Rather, the

28   express language of the LOCGs recognizes that members need both a period of stabilization and

1   motivational support before a clinician can determine whether the member is actively engaging in

2   treatment. For example, the Continued Service Criteria in the 2011 LOCGs instructs Care

3   Advocates to consider whether a member "is reasonably likely [to adhere to treatment] after an

4   initial period of stabilization and/or *motivational support*." (Trial Ex. 1-0078 (emphasis added);

5   Trial Tr. 1038:5-20 (Martorana) (discussing same).) In 2012 and 2013, the Continued Service

6   Criteria similarly provide that treatment may continue despite a "lack of progress" so long as the

7   provider is attempting appropriate "intervention to engage the member in treatment." (Trial Exs.

8   2-0082; 3-0089.) Furthermore, the LOCGs do not treat a member's unwillingness to participate in

9   treatment as an automatic trigger leading to discharge. Rather, it is a single non-dispositive factor

10   that UBH clinicians may consider when determining whether discharge is appropriate. (*See, e.g.,*

11   Trial Exs. 4-0007–08, 5-0009–010, 8-007; *see also* Trial Tr. 995:21–996:21, 1064:25–1065:7,

12   1071:13–20 (Martorana).)

13          Because consideration of the member's willingness and ability to participate in treatment

14   is consistent with generally accepted standards of care and with patient autonomy, the LOCG

15   provisions calling for UBH's clinicians to consider the member's motivation to participate in

16   treatment is not an unreasonable interpretation of the plans or of generally accepted standards of

17   care.

18          **9.       The Guidelines Account For The Unique Needs Of Children And
19                     Adolescents.**

20          Plaintiffs also argue that UBH abused its discretion because it "failed to adopt separate

21   level-of-care criteria" specific to children and adolescents. (ECF No. 392, 51:2-3.) But consistent

22   with generally accepted standards of care, UBH's LOCGs sufficiently address the behavioral

23   health and developmental needs of children and adolescents. As explained by Dr. Allchin, the

24   only board-certified child and adolescent psychiatrist to testify at trial, generally accepted

25   standards of care recognize that children and adolescents have unique mental health and

26   substance abuse treatment needs.[59] (Trial Tr. 1383:2–1384:15, 1385:11–21 (Allchin).) For

---

27          59 While Dr. Allchin provided extensive commentary on what constitutes generally
28   accepted standards of care for children and adolescents, Plaintiffs' experts—neither of whom are
     (Continued...)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   example, treatment plans for children and adolescents may need to give heightened attention to

2   social and environmental factors such as the child's relationship with her family and her

3   performance in school. (Trial Tr. 1383:5–23 (Allchin).) Such factors may impact the appropriate

4   level of care for a child or adolescent because removal of the child or adolescent from the family

5   or community can often have detrimental effects. (Trial Tr. 1393:3–15 (Allchin).) In addition,

6   factors such as developmental history and sexual orientation may have a unique impact on the

7   treatment needs of children and adolescents. (Trial Tr. 1409:12-1410:15 (Allchin).)

8       Despite these unique considerations, it is not necessary that clinical guidelines include

9   wholly separate criteria for children and adolescents, and many do not. For example, while the

10  ASAM and CALOCUS criteria include separate diagnostic and dimensional admission criteria for

11  adolescents (Trial Tr. 1450:3–5 (Allchin); *see also* Trial Ex. 662-0024), other sources reflecting

12  generally accepted standards of care, such as the TDI guidelines (applicable in Texas) and

13  LOCADTR (applicable in New York), do not have separate criteria for children and adolescents.

14  (Trial Tr. 1378:2–7, 20–22 (Allchin).) The question is not whether UBH should have had a

15  separate set of criteria for children and adolescents, but whether its guidelines are a reasonable

16  reflection of generally accepted standards of care with respect to that portion of the class.

17      UBH's LOCGs address the unique needs of children and adolescents both in their overall

18  criteria applicable to all members and through the Clinical Best Practices sections, which

19  specifically direct UBH clinicians to take into account factors especially pertinent to children and

20  adolescents when making coverage determinations. (Trial Tr. 1376:16–22, 1385:22–1386:4

21  (Allchin).) These factors include:  the member's age, the member's developmental history;

22  history of trauma; physical health history and status (including whether they are pre- or post-

23  pubertal); the member's living situation; the member's family history; the member's relationship

24  with family, friends, and others; barriers to care; spiritual history; education history; and sexual

25  _____

26  experts in child and adolescent psychiatry—did not offer any testimony on what constitutes generally accepted standards of care for children and adolescents. (*See* ECF 393 at ¶¶ 493–505;

27  *also* Trial Tr. 658:18–25 (Dr. Plakun) (admitting that he does not treat children and adolescents and is not an expert in child and adolescent psychiatry), Trial Tr. 62:20–23 (Dr. Fishman) (noting that he has treated only adolescents and young adults in the field of addiction medicine).)

28

Crowell & Moring LLP
ATTORNEYS AT LAW

1    orientation. (*See, e.g.,* Trial Tr. 1408:23–1411:25 (Allchin); Trial Ex. 6-0011 to -13).)[60]

2           At trial, Dr. Allchin explained how UBH clinicians address these factors specifically when

3    making coverage decisions for children or adolescents. (Trial Tr. 1408:23–1411:25 (Allchin).) He

4    also testified that UBH provides training to its clinicians to ensure they take these nuanced

5    considerations into account when dealing with children and adolescents. (Trial Tr. 1373:7–11

6    (Allchin).) Additionally, approximately twenty percent of UBH's Peer Reviewers are specialists

7    in treating children and adolescents. (Trial Tr. 1077:8–11 (Martorana), 1380:13-21 (Allchin).)

8    These specialists focus their work on child and adolescent coverage decisions and are readily

9    available to consult with other Peer Reviewers and Care Advocates during twice-weekly "child

10   rounds" and through direct outreach. (Trial Tr. 1380:22–1381:16 (Allchin).)

11          UBH's LOCGs, on their face and as they are understood and applied by its trained

12   clinicians, account for the unique needs of children and adolescents in behavioral health treatment

13   consistent with generally accepted standards of care, and are a reasonable interpretation of

14   generally accepted standards of care and the plans in this regard.

15          **10.    UBH's Definitions Of Custodial Care And Active Treatment Are
                     Consistent With The Plans And With Generally Accepted Standards
16                   Of Care.**

17          Plaintiffs' expert Dr. Plakun does not dispute that exclusion of services solely or primarily

18   for the purpose of custodial care is consistent with generally accepted standards of care. (Trial Tr.

19   560:8-15 (Dr. Plakun).) Plaintiffs, however, argue that UBH's guidelines include an *overly broad*

20   definition of "custodial care" and an *overly restrictive* definition of its flip-side, "active

21   treatment." UBH's definitions of these terms are consistent with generally accepted standards of

22   care and do not work to deny, or unduly shorten, treatment at residential facilities. (ECF No. 392

23

24          60 In some instances, the LOCGs do explicitly differentiate between child and adolescent
       treatment protocols and adult treatment protocols for particular levels of care. For example, the
25     2017 LOCG on Intensive Outpatient treatment provides different minimum hours of treatment for
       adults and children/adolescents to account for the unique needs of children and adolescents,
26     including their shorter attention spans and school and homework schedules. (Trial Ex. 8-0014
       (defining intensive outpatient treatment as "[a] structured program that maintains hours of service
27     for at least 9 hours per week for adults and 6 hours per week for children/adolescents."); Trial Tr.
       1003:24–1004:13(Martorana).)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1 | at 52-56).

2 |       UBH's LOCGs did not define "custodial care" in 2011.  Plaintiffs base their criticism of

3 | UBH's "custodial care" language in 2012 and later on Chapter 16 of the Medicare Benefit Policy

4 | Manual. (ECF No. 392 at 52:9-18.) That chapter lists general exclusions from coverage under

5 | Medicare, and is not tailored to treatment for behavioral health conditions. (Trial Ex. 654-

6 | 0004). In fact, every example of custodial care in Chapter 16 of the Medicare Benefit Policy

7 | Manual involves a patient receiving *medical* care in an inpatient hospital setting. (*See id.* at -

8 | 0030). In contrast, when discussing inpatient psychiatric hospital services, the Chapter 2 of the

9 | Medicare Benefit Policy Manual makes no mention of custodial care and instead evaluates the

10 | appropriateness of treatment based on whether treatment is considered "active treatment." (*See*

11 | Trial Ex. 655-0004 (noting that inpatient psychiatric facilities "are required to admit only those

12 | patients whose admission to the unit is required for *active treatment*"); *also* -0006 (noting that

13 | recertification of a patient is appropriate only if "the patient continues to need, on a daily basis,

14 | active treatment"); *also* -0007 (noting that "[p]ayment for IPF services is to be made only for

15 | 'active treatment' that can reasonably be expected to improve the patient's condition").)

16 | Similarly, the UBH guidelines provide that treatment in a 24-hour care center "is not for the

17 | purpose of providing custodial care, *but is for the active treatment of a behavioral health*

18 | *condition*." (Trial Ex. 10-0003; 47-0002.)

19 |       A close comparison of how Chapter 2 of the Medicare Benefit Policy Manual defines

20 | "active treatment" and how UBH defines "custodial care" shows that UBH's definition is

21 | consistent with generally accepted standards of care. From 2012 to 2014, UBH defined custodial

22 | care as treatment in an inpatient or residential setting consisting of "clinical or non-clinical

23 | services that do not seek to cure, or which are provided during periods when the member's

24 | behavioral health condition is not changing." (Trial Exs. 47-0003, 84-0003, 108-0003.) This

25 | definition was revised in 2015 to define custodial care as including treatment "for the primary

26 | purpose of meeting the personal needs of the patient or maintaining a level of function… as

27 | opposed to improving that function to an extent that might allow for a more independent

28 |

CROWELL
& MORING LLP
ATTORNEYS AT LAW

existence." (Trial Ex. 148-008, 195-003, 221-003.)[61]

Plaintiffs point to the phrase "clinical or non-clinical services" in the pre-2015 Custodial Care CDG to argue that UBH's definition is overly broad. But Chapter 2 of the Medicare Benefit Policy Manual contains the following instruction:

> The fact that a patient is under the supervision of a physician does not necessarily mean the patient is getting active treatment. For example, *medical supervision* of a patient may be necessary to assure the early detection of significant changes in his/her condition; however, in the absence of a specific program of therapy designed to effect improvement; a finding that the patient is receiving active treatment would be precluded.

(Trial Ex. 655-0007 (emphasis added).) As the CMS instruction emphasizes, under generally accepted standards of care, clinical services (including active clinical supervision) can constitute custodial care in the absence of active treatment.

In parallel, Plaintiffs criticize UBH's definition of "active treatment." (ECF No. 392 at 54-56). While recognizing that the bulk of UBH's "active treatment" definition tracks verbatim the Medicare Benefit Policy Manual, Plaintiffs contend that the definition fails to comport with generally accepted standards of care because it imposes two additional requirements beyond those listed in Section 30.2.2 of Chapter 2 of the Medicare Benefit Policy Manual.

The first additional requirement is that treatment must be "[u]nable to be provided in a less restrictive setting." (Trial Ex. 10-0003).) This requirement tracks language in numerous CMS guidelines, including the guidelines for "Outpatient Hospital Psychiatric Services" (Medicare Benefit Policy Manual § 70.1), which provides that "[s]ervices are noncovered" if "stability can be maintained without further treatment or with less intensive treatment." (Trial Ex. 656-0025 to -26; *see also* Trial Ex. 665-0004 (Medicare inpatient guidelines providing 24-hour care should be limited "only those patients whose admission to the unit is required for active treatment, of an intensity that can be provided appropriately only in an inpatient hospital setting."); Trial Ex. 1507-0017 (CMS partial hospitalization guidelines, providing: "In general, patients should be

---

61 As explained in Section V.C, (p. 22), Plaintiffs' challenge to the custodial care provisions of the guidelines fails for the more fundamental reason that the definition of custodial care comes from the benefit plans, and plan language is not subject to challenge under ERISA.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    treated in the least intensive and restrictive setting which meets the needs of their illness.").) And

2    as discussed in Section VI.C.4 (p. 53), matching the patient to the least restrictive level of care

3    where treatment can be safe and effective is consistent with generally accepted standards of care.

4        UBH also includes the requirement that treatment be "[f]ocused on interventions that are

5    based on generally accepted standard medical practice and are known to address the critical

6    presenting problem(s), psychosocial issues and stabilize the patient's condition to the extent that

7    they can be safely treated in a lower level of care."  (Trial Ex. 10-0003.) This requirement is fully

8    consistent with CMS guidance for even lower levels of care than residential treatment. For

9    example, the Medicare Benefit Policy Manual for partial hospitalization provides that the purpose

10   of partial hospitalization is to treat the patient's "serious *presenting* psychiatric symptoms" and is

11   characterized by patients with "an *acute* onset or decompensation of a covered . . . mental health

12   disorder. . . ." (Trial Ex. 656-0029 to -33 (CMS Medicare Benefit Policy Manual for partial

13   hospitalization).)[62]

14       The only evidence Plaintiffs presented to challenge this requirement was a hypothetical

15   from their expert, Dr. Plakun, in which a rape victim undergoes treatment after attempting

16   suicide. (ECF No. 392 at 56 (citing Trial Tr. 520:10-19 (Dr. Plakun).) According to Dr. Plakun,

17   this requirement would limit treatment to only "the issues that led to the acute suicide attempt"

18   and would prevent the patient from being treated for the underlying trauma stemming from the

19   rape. (Trial Tr. 520:13-19 (Dr. Plakun).) Plaintiffs offer no evidence to support Dr. Plakun's

20   speculation as to how this provision might be applied. In direct contrast, Dr. Martorana testified

21   that the phrase "presenting problem" requires clinicians to conduct a thorough evaluation of a

22   member seeking treatment:

23       ["Presenting problems" is] the totality of the – what the member is
         presenting when you consider treatment planning.  So they may

24   _____

25       62 Dr. Martorana explained that because Medicare does not cover residential treatment,
     CMS guidelines for partial hospitalization and inpatient treatment are the closest analogues to
26   residential treatment. (Trial Tr. 936:18–937:9 (Martorana).) Recognizing that UBH's definition of
     custodial care and active treatment are consistent with CMS guidance for partial hospitalization,
     Plaintiffs now attempt to cast partial hospitalization as somehow more intensive than residential
27   treatment. (ECF No. 392 22:14–23:6.) But as Dr. Plakun acknowledged, partial hospitalization is
     "lower than residential or inpatient" on the "continuum of care." (Trial Tr. 488:3–8 (Dr. Plakun).)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1
2
3

> come in and say, you know, I'm depressed.  But then if it's
> depression that's on top of, you know, co-morbidity or chronic
> depression or chronic medical issue, then all that will impact on
> how you treat this person effectively.

4
5
6
7

(Trial Tr. 983:3-8 (Martorana).) The requirement that treatment address the "presenting problems" demands that the provider address the underlying trauma of Dr. Plakun's hypothetical patient, and is consistent with generally accepted standards of care regarding the scope of active treatment in a 24-hour treatment setting.

8
9
10
11
12
13
14
15

Even under Plaintiffs' overly-narrow view of ERISA, UBH was not obligated to write Custodial Care CDGs that were identical to CMS' definition of "custodial care" and "active treatment." The evidence shows that, while UBH exercised its discretion to adopt certain criteria from CMS' definitions of those terms, UBH also appropriately exercised its discretion to look at other sources of generally accepted standards of care, including widely-acknowledged principles appropriate for every level of care, and other CMS guidelines that are equally appropriate for residential treatment. That UBH may have articulated those standards in a slightly different way than CMS is not an abuse of UBH's broad discretion under ERISA.

16
17

**D.     The Feedback UBH Received On Its Guidelines Demonstrates That UBH's Interpretation Of Generally Accepted Standards Of Care Is Reasonable.**

18
19
20
21
22
23
24
25
26

As discussed in Section VI.A.1 (p. 25), UBH annually solicited feedback on its guidelines from a host of external clinicians and professional societies, including specifically asking whether there were any "criteria that should be added or deleted" from the LOCGs. (Trial Ex. 1114-0002.) UBH reasonably expected that these clinicians would identify "if there was something in the [LOCGs] that was inconsistent with generally accepted standards of care . . . ."  (Trial Tr. 1757:14–20 (Triana).) Dr. Triana, a member of the LOCG Work Group who reviewed this feedback throughout the class period, explained that it was "very important" to UBH's understanding that its "guidelines are consistent with generally accepted standards of medical practice." (Trial Tr. 1726:12–20 (Triana); *see also id.*, at 1695:15–24.)

27
28

Over the years, UBH received hundreds of comments on the LOCGs. Some of that feedback was negative, some was neutral, and much of it was positive. (Trial Tr. 1702:23–1703:1,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   1726:12–20 (Triana). *See* Trial Exs. 1252 (Feedback on 2011 LOCGs); 1253 (2012); 1254

2   (2013); 408 (2014); 516 (2016).) Plaintiffs cherry-pick a handful of critical comments over the

3   years (ECF No. 392, at 84:18–85:5), but ignore the numerous comments from providers and

4   professional societies complementing the clinical soundness of the LOCGs. (*See, e.g.*, Trial Exs.

5   1252-0002 (2011 comment that "As a whole, this document seems clear, comprehensive and well

6   thought out"); 1253-0010 (2012 comment that "UBH should be praised for providing these

7   guidelines and following them"); 408-0004 (2014 comment that "I have reviewed the guidelines

8   and cannot find anything at all to recommend!"); 516-0005 (2016 comment that the LOCGs were

9   "Well written, detailed, comprehensive.").)[63] While a handful of clinicians expressed concerns

10  that are similar to some (but not all) of Plaintiffs' criticisms in this case, those comments were

11  neither widespread nor consistent.

12          This diversity of opinions among clinicians from across the spectrum crystalizes why

13  Plaintiffs have failed to carry their burden.[64] If reasonable, medically-trained minds can disagree

14  about whether UBH's guidelines, or specific aspects of them, are consistent with generally

15  accepted standards of care, the decision to develop, adopt, and use them cannot constitute an

16  abuse of discretion under ERISA. *Webb*, 608 F. Supp. 2d at 1227; *Voight*, 28 F. Supp. 2d at 580.

17

18

19  _____

20          63 When the "why now" language appeared in the 2014 LOCGs, Dr. Bernstein, a non-
    UBH psychologist who focused on outpatient treatment, commented that the "idea of 'why now'
21  … is less clear for more chronic people who seem to be going through one crisis after another."
    (Trial Tr. 741:3-16, 797:16-798:1 (Triana); Trial Ex. 412-0008).) But after a year using the
22  guidelines in his outpatient practice as an in-network provider for UBH, Dr. Bernstein expressed
    no concerns about the "why now" language at all. Dr. Bernstein told UBH that the 2015 LOCGs
23  with the same "why now" language were "clear, exhaustive, and seem to offer adequate support
    for making decisions" for his patients (Trial Tr. 1705:16–1706:8 (Triana) (discussing feedback on
24  2015 LOCGs). In 2016, Dr. Bernstein again expressed no concerns about the use of "why now,"
    stating that the LOCGs were "more complete and better thought out than many such documents I
25  have read" and "offer adequate support for making decisions about care when facilities or
    practitioners are available." (Trial Ex. 516-0005. *See also* Trial Tr. 798:4-18 (Triana).)

26          64, UBH also received feedback that directly contradicted Plaintiffs' critiques. For
    example, in their comments on the 2011 LOCGs, the American Psychological Association
27  recommended adding a criterion that "stabilizing individuals and transitioning them to a less
    intensive level of care" should be the goal of treatment. (Trial Ex. 1252-0003.)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

E.     **Plaintiffs Failed To Offer Classwide Proof That UBH's Guidelines Are Inconsistent With Plan Terms And Generally Accepted Standards Of Care For Residential Treatment Of Substance Use Disorders.**

In addition to alleging that the LOCGs are inconsistent with standards of care generally, Plaintiffs also contend they are inconsistent with the ASAM criteria specifically, in that the LOCGs fail to provide coverage for certain types of residential treatment addressed in ASAM. The ASAM criteria subdivide residential treatment into four levels of intensity. (Trial Ex. 662-0196.) These levels range from Level 3.1, which the ASAM criteria defines as "clinically managed low-intensity residential services," to Level 3.7, defined as "medically monitored intensive inpatient services." (*Id.*). At Level 3.7, patients require "24-hour medical monitoring but not intensive treatment." (*Id.*) Medical staff is responsible for supervising and directing all treatment; however, they are not required to deliver all care. (Trial Tr. 87:7-11 (Dr. Fishman).)

Plaintiffs' expert conceded that the requirements for residential treatment set forth in UBH's LOCGs are consistent with the requirements imposed by the ASAM criteria for Level 3.7 treatment. At trial, Dr. Fishman listed a number of homologous provisions, including:

- Consideration of whether the member is in immediate or imminent danger of relapse, (*see* Trial Tr. 125:25-126:1 (Dr. Fishman) (noting that the requirement that "the member [be] in immediate or imminent danger of relapse . . . [is] a permissive requirement for 3.7"); *see also* Trial Ex. 5-0081 (listing "imminent or current risk of relapse" as a criteria for residential treatment));

- The requirement that a member have his or her treatment plan updated every five days,  (Trial Tr. 143:11-144:2 (Dr. Fishman); Trial Ex. 1-0057);

- The requirement that a psychologist or addictionologist perform a comprehensive evaluation of the member, (Trial Tr. 142:24-143:1 (Dr. Fishman); *see also* Trial Tr. 1249:16-1250:1 (Simpatico)); and

- The requirement that "subsequent psychiatric evaluations and consultations are available 24 hours a day" and that "[v]isits with the treating psychiatrist addictionologist occur at least two times per week." (Trial Ex. 2-0063; Trial Tr. 223:12-14 (Dr. Fishman).)

Furthermore, in 2013, UBH hired one of the authors of the ASAM criteria, Dr. Jerry Shulman, to assess whether its residential rehabilitation criteria was consistent with ASAM Level 3.7. (Trial Tr. 1634:18-20 (Alam).) Dr. Shulman confirmed that UBH's criteria correspond to Level 3.7 of

1    the ASAM criteria. (Trial Tr. 1641:19-1642:9 (Alam); Trial Ex. 412-0093.)

2          On the other end of the ASAM spectrum, Level 3.1 residential treatment consists of low-

3    intensity, clinically-managed residential treatment. (Trial Ex. 412-0093; Trial Tr. 1574:17

4    (Alam).) This level of treatment is colloquially referred to as a "halfway house" or sometimes as

5    "drug-free housing." (Trial Tr. 168:8-11 (Dr. Fishman), 1024:9-23 (Martorana).) Plaintiffs

6    criticize UBH's residential treatment guidelines as not allowing coverage for Level 3.1 facilities,

7    but Mr. Niewenhous and Dr. Martorana testified that UBH does not use the residential treatment

8    criteria in its LOCGs to make coverage determinations for treatment in sober living homes or

9    halfway houses. (Trial Tr. 406:12-25 (Niewenhous), 1024:9-12, 1137:25-1138:3 (Martorana).)

10   Instead, UBH uses separate guidelines called "sober living" and "supervised living" guidelines.[65]

11   (*Id.*) Plaintiffs do not challenge those guidelines in this case. (*See* ECF No. 296-3 at 4 (defining

12   "Request for Coverage" as "a request for insurance coverage . . . for outpatient, intensive

13   outpatient or residential treatment for mental health conditions or substance use disorders"); Trial

14   Exs. 880-0003 (same); 896-0002 (same).) Furthermore, some plans simply exclude from

15   coverage treatment in sober living homes or halfway houses. (Trial Tr. 1024:4-8 (Martorana).)

16   Because it is either (a) not a covered benefit; and/or (b) not the subject of the guidelines at issue

17   in this case, Plaintiffs' reliance on Level 3.1 as a basis for critiquing UBH's residential treatment

18   guidelines is misplaced. Plaintiffs also failed to offer any evidence that any class member sought

19   or was denied coverage for treatment at a Level 3.1 facility.

20         In the middle of the ASAM residential facility spectrum is Level 3.5, which consists of

21   clinically-managed, high-intensity residential services.[66] (Trial Ex. 662-0196; Trial Tr. 85:4-11,

22   _____

23         65 Plaintiffs' only rebuttal to the evidence that ASAM Level 3.1 is addressed under
     UBH's  sober living and supervised living guidelines is to point to a section of the ASAM criteria
24   stating that "Level 3.1 is not intended to describe or include sober houses, boarding houses, or
     group homes where treatment services are not provided." (ECF No. 392, at 22 n. 18, quoting Trial
25   Ex. 662-0245 (emphasis added).) But Plaintiffs offered no evidence that UBH's sober living or
     supervised living guidelines are limited to facilities where treatment services are not provided. In
26   fact, Plaintiffs offered no testimony about these guidelines whatsoever, and offered no expert
     opinion that UBH's sober living and supervised living guidelines are inconsistent with generally
27   accepted standards of care or fail to encompass ASAM Level 3.1.

28         66 The ASAM criteria also describe Level 3.3, Clinically Managed Population-Specific
     High-Intensity Residential Services for individuals with cognitive and functional limitations.
     (Continued...)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

87:17-88:21 (Dr. Fishman); Trial Tr. 1574:9-15 (Alam).) This level of care differs from Level 3.7 because it includes treatment centers in which medical staff may not be available and treatment is directed, supervised, and delivered by other health professionals, such as therapists and counselors. (Trial Tr. 88:1-12 (Dr. Fishman); Trial Ex. 662-0196.) Many UBH plans exclude treatment at Level 3.5 facilities because the plans require the active participation or direction of a physician for a treatment center to be considered a residential facility. (Trial Ex. 225-0097, Trial Tr. 867:19-868:19 (Dehlin)); *see* Section VI.B.1.b (p. 43). In addition, Plaintiffs offered no evidence that any class member sought coverage, much less was denied coverage, for treatment at a Level 3.5 facility.

> **F.    Plaintiffs Failed To Offer Classwide Proof That Their Critiques Apply Equally To Each Of The Level Of Care Guidelines At Issue In Each Of The Years In The Class Period.**

This was a class action trial, and Plaintiffs were required to prove their claims on a classwide basis. *See* Section IV (p. 16). In addition to the reasons stated above, Plaintiffs cannot prevail on their claims because they did not demonstrate with common proof that their criticisms of the guidelines apply equally to all class members. As noted throughout the preceding sections, the language of the guidelines changed from year to year, and often the language Plaintiffs criticize only appeared in certain guidelines. For example, the "why now" and "acute changes" language Plaintiffs attack did not appear in the LOCGs until 2014, and was gone after 2016. Likewise, the guidelines addressed co-occurring conditions differently in 2011-2013 than in later years. Plaintiffs also failed to establish that their critique of the Continued Service Criteria and the Discharge Criteria applies equally to all of the LOCGs at issue. For example, 2011, 2012, and 2013 LOCGs do not contain any Discharge Criteria, and the Continued Service Criteria in those years do not contain any references to "why now" factors, "acute changes," "acute symptoms," or "presenting problems." (Trial Exs. 1-0078–79, 2-0082, 3-0088.) Although the 2017 LOCGs do include both Continued Service Criteria and Discharge Criteria, those criteria lack any reference

---

Plaintiffs offered no evidence that any class members sought coverage for treatment at a Level 3.3 facility, and Plaintiffs' experts did not opine as to this level of care.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   to "why now" factors, "acute changes," or "acute symptoms." (Trial Ex. 8-0007.)

2           Even if the Court were to find that a particular portion of a particular guideline was an

3   unreasonable or illogical interpretation of generally accepted standards of care and plan terms,

4   Plaintiffs did not establish that on a classwide basis, and they are not entitled to judgment in favor

5   of the class. "Common proof of some kind is necessary to support [a] classwide determination."

6   *Marlo I*, 251 F.R.D. at 488. The "existence of a policy," even a common policy, "does not

7   necessarily establish" classwide proof of liability if "the policy may have accurately" applied to

8   some individuals, but not others. *Marlo II*, 639 F.3d at 948.[67]

9   **VII.  PLAINTIFFS FAILED TO SATISFY THEIR BURDEN OF CLASSWIDE PROOF**
       **WITH RESPECT TO THE CDGS**

10

11          Plaintiffs introduced 224 different guidelines into evidence. (Trial Exs. 1–224.) Plaintiffs

12  now argue that every single one of those guidelines is *on its face* inconsistent with the terms of

13  every class member's plan and with generally accepted standards of care. Yet Plaintiffs offered

14  testimony about only 15 of those 224 guidelines: 8 LOCGs (Trial Exs. 1–8), and 7 Custodial Care

15  CDGs. (Trial Exs. 10, 47, 84, 108, 148, 195, 221). Plaintiffs offered no testimony about the

16  remaining 209 diagnosis-specific CDGs. As for those 209 guidelines, which relate to the claims

17  of roughly half of all class members, Plaintiffs failed to satisfy their burden of classwide proof.

18          **A.    Plaintiffs Did Not Offer Classwide Proof That Each Of The CDGs**
                  **Incorporated The LOCGs.**

19

20          Plaintiffs' failure of proof on more than 93 percent of the guidelines at issue was not an

21  accident. "Plaintiffs challenge these CDGs *only to the extent they incorporate the Level of Care*

22  *Guidelines*." (ECF No. 392, at 5:6–7 (emphasis added).) According to Plaintiffs, "[i]f the Court

23  finds that a given year's LOCGs are more restrictive than generally accepted standards of care

24  (and thus inconsistent with the Class Members' plans), a denial pursuant to the CDGs

25  incorporating those criteria is wrongful for the same reasons." (*Id*. at 6:16 – 19.) But a necessary

26

27          67 The material variation in the eight LOCGs at issue also demonstrates that
    decertification of the class is warranted, as UBH will include in its motion to decertify the class.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    condition of such a finding is that each CDG incorporates the challenged provisions of the

2    LOCGs. The evidence does not support such a finding.

3         Plaintiffs contend that each of the 209 diagnosis-specific CDGs in evidence incorporates

4    at least one (but sometimes more than one) LOCG by at least one (but sometimes more than one)

5    of eight different theories of incorporation, which are described in the parties' "Stipulations of

6    Fact." (*See* ECF No. 392, at 5:2–6:19;  Trial Ex. 880.)[68] Assuming for the sake of argument that

7    proving a CDG incorporated the LOCGs is, by itself, sufficient to prove Plaintiffs' claims relating

8    to that CDG (as discussed below, it is not), Plaintiffs failed to meet their burden to prove that

9    each of the CDGs incorporated the LOCGs *in toto*.

10        UBH's doctors who are responsible for adopting the CDGs, construing the CDGs, and

11   training other UBH reviewers on how to use the CDGs uniformly testified that the CDGs *did not*

12   fully incorporate the LOCGs from 2011 through 2017. (Trial Tr. 793:7–19 (Triana); 940:4-7

13   (Martorana); Trial Tr. 1444:4-19 (Allchin).) Unlike the LOCGs, CDGs are used for plans that do

14   not have a medical necessity term (Trial Tr. 939:23-940:3 (Martorana)), and are organized

15   according to medical conditions. (Trial Tr. 939:4-10 (Martorana).) The CDGs are distinct from

16   the LOCGs both in purpose and structure, and the unrefuted evidence shows that UBH clinicians

17   do not refer to the LOCGs when applying the CDGs. (Trial Tr. 1725:20–22 (Triana).) Dr. Triana

18   chaired the BPAC committee responsible for approving the CDGs and was responsible for

19   overseeing all of UBH's Peer Reviewers. He testified that UBH's Peer Reviewers are not

20   "allowed to open up the Level of Care Guidelines and apply them in a CDG benefit

21   determination." (Trial Tr. at 1725:15–19 (Triana).) This is true "even if the CDG made a

22   reference to the level of care guideline." (*Id*. at 1725:15-22 (Triana).) Accordingly, the vast

23   majority of Plaintiffs' "incorporation" theories fail. There is no evidence in the record that the

24   LOCG cross-references Plaintiffs point to were actually used to make a single benefit

25

26   _____

27        68 UBH did not stipulate that any of the CDGs actually "incorporates" any of the LOCGs
     in full. UBH merely agreed that: (a) certain language appears in certain CDGs, and (b) Plaintiffs
     contend that language is sufficient to incorporate the LOCGs. (*See* Trial Ex. 880, 1:2–2:8.)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   determination for any member for whom a CDG was used.[69]

2          It is true that certain CDGs, in certain years, did contain certain portions of the LOCGs

3   "copied and pasted into the Coverage Determination Guidelines." (Trial Tr. 1725:9–12 (Triana).)

4   In total, 29 of the 209 diagnosis-specific CDGs in evidence "contain[] all of the provisions of the

5   'Common Criteria and Clinical Best Practices for All Levels of Care' of UBH's 2015 and 2016

6   Level of Care Guidelines." (Trial Ex. 880-0010 (describing Plaintiffs' Guideline "Category G").)

7   These 29 CDGs are the only CDGs in evidence that even *arguably* would allow for the

8   application of LOCG criteria under UBH's unrefuted policy governing the use of an LOCG in a

9   CDG benefit decision. (*See* ECF No. 392, at 5:9–6:5 (discussing Plaintiff's various

10  "incorporation" categories, and identifying "Category G" as the only category for which the

11  language in a CDG is "identical" to the language in an LOCG); Trial Ex. 880-0008 to -10 (same);

12  Trial Ex. 880-0012 – 20 (identifying 29 CDGs in "Category G").)[70]

13         Even where the language from the Common Criteria of the LOCGs appears verbatim in

14  those 29 CDGs, Plaintiffs failed to offer any evidence about: (a) how that language is used in the

15  context of each CDG; (b) how that language interacts with other language in the CDGs that may

16  either enhance or diminish its significance in that specific CDG; or (c) that those criteria are

17  _____

18         69 As discussed in Section V.B.1 (p. 18)), the language Plaintiffs rely on in their
    incorporation Categories A, C and D also appears in many of the class members' plans. This
19  language is either sufficient to incorporate the LOCGs into those class members' plans, rendering
    them immune from challenge and ending the inquiry, or it is not sufficient to incorporate them
20  into either the plans or the CDGs. In the event the Court concludes the LOCGs are not
    incorporated as plan terms through this language, the unrefuted evidence demonstrates that
21  UBH's policy requires CDG benefit determinations to be based on criteria found in the CDG and
    the Peer Reviewers' clinical judgment, not language separately found in the LOCGs. (Trial Tr.
22  1725:3–22 (Triana).)

23         70 In their "Category F," Plaintiffs contend that certain CDGs contain language that is
    "similar to the 'Common Criteria' and/or language relating to various levels of care from specific
24  Level of Care Guidelines." (Trial Ex. 880-0009.) But Plaintiffs fail to explain which specific
    criteria are "similar" to the LOCGs, whether the other levels of care with "similar" language are
25  the levels of care at issue in this case, whether that "similar" language is actually similar to the
    specific provisions Plaintiffs' experts criticized and, if so, how their experts' opinions apply to
26  that similar-but-not-identical language. Category F does not even specify whether the language in
    those CDGs is similar to language in the Common Criteria or an unspecified level of care in the
27  LOCG. Category F is so vague that it does not really prove anything at all, let alone that the
    CDGs in Category F constitute a breach of UBH's fiduciary duty or a wrongful denial of benefits
    on a classwide basis.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    inconsistent with generally accepted standards of care for the treatment of the diagnosis that is the

2    subject of that CDG. As UBH's Manager of Clinical Guidelines, Loretta Urban, testified, even

3    when the CDGs did incorporate level of care criteria, the CDGs include other "nuances . . . that

4    speak about level of care." (Trial Ex. 1661 at 223:10–15 (Urban).) These CDGs include "callouts

5    and conditions . . . that would account for other variations from the Level of Care Guidelines that

6    would need to be taking into account for that specific condition." (*Id.* at 222:25–223:8.) Plaintiffs

7    offered no analysis about any of those CDGs whatsoever, and their experts did not discuss them.

8    At best, the unrefuted evidence demonstrates that certain portions of the 2015 and 2016 LOCGs

9    were "incorporated" into 29 of the 209 diagnosis-specific CDGs and, even there, Plaintiffs did not

10   offer any evidence to prove on a classwide basis the import of that fact on any of those CDGs or

11   UBH's obligations under ERISA.[71]

12            **B.      Plaintiffs Did Not Offer Classwide Proof That The CDGs Were Designed To
                        Reflect Generally Accepted Standards Of Care.**
13

14            Even if Plaintiffs had proven that the CDGs fully incorporated each one of the provisions

15   they challenge in the LOCGs, that fact by itself is irrelevant. Plaintiffs were also required to prove

16   that UBH owed class members a fiduciary obligation to develop CDGs that were consistent with

17   generally accepted standards of care *to the exclusion of other plan terms*. The evidence at trial

18   showed just the opposite.

19            The CDGs are designed to do precisely what their name suggests: *determine coverage*

20   according to the full terms of a member's benefit plan. Throughout the class period, UBH's

21   Guideline Applicability Tool directed Care Advocates and Peer Reviewers to utilize the CDGs

22   "[w]hen determinations are *based on the terms of the benefit plan*." (*See* Trial Ex. 450-0005

23   (emphasis added); *see also* Trial Tr. 388:23–389:4 (Niewenhous).) It is for this reason that each

24

25            [71] Plaintiffs attempt to avoid their failure of proof by arguing that any inquiry into the
     CDGs is "most relevant to the remedy" stage. (ECF No. 392, at 5 n.7.) Plaintiffs cannot punt to
26   the remedy phase the central question of whether *93 percent of the Guidelines at issue in this case*
     represent a breach of fiduciary duty and led to an improper denial of benefits. If Plaintiffs wanted
27   the Court to find UBH liable for its development and application of the CDGs, they were required
     to prove liability as to those CDGs on a classwide basis at trial.
28

UBH'S POST-TRIAL BRIEF
                                                             CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

1   CDG indicates on its face the UnitedHealthcare Certificate of Coverage or Summary Plan

2   Description templates to which it applies, states in one way or another that the purpose of the

3   CDG is to "provide[] assistance in interpreting behavioral health benefit plans that are managed

4   by Optum," that "the enrollee specific benefit document must be referenced" before applying the

5   CDG, and that the CDG does not apply where the plan terms do not align with the CDG's

6   coverage criteria. (*See*, *e.g.*, Trial Ex. 11-0002 to -03 (2010 CDG for Residential Rehabilitation of

7   Substance Use Disorders); Trial Ex. 120-0002 (2014 CDG for Treatment of Bulimia Nervosa);

8   Trial Ex. 224-0002, -05 (2017 CDG for Trauma- and Stress-Related Disorders).)

9        While UBH sought to incorporate generally accepted standards into the CDGs (Trial Tr.

10   298:19–21 (Niewenhous)), each CDG was expressly intended to describe the full extent of benefit

11   coverage available under class members' plans, even if the scope of that coverage was more

12   limited than generally accepted standards of care. (*See, e.g.*, Trial Ex. 167-0003, 04 (providing

13   that treatment must be a "Covered Service" as defined in the member's benefit plan and "[n]ot

14   otherwise excluded the plan"); Trial Tr. 855:11–19 (Dehlin) (there is no "requirement that the

15   plans cover all treatment that falls within the scope of generally accepted standards of care", and

16   plans can "limit or exclude benefits even where the treatment is consistent with . . . prevailing

17   medical standards").) Plaintiffs offered no evidence that any CDG was an unreasonable

18   interpretation of coverage under any class members' plan, and they failed to satisfy their burden

19   of classwide proof for all of the CDGs.

20   **VIII.   PLAINTIFFS FAILED TO OFFER CLASSWIDE PROOF THAT ANY OF THE
21           "FLAWS" THEIR EXPERTS IDENTIFIED IN THE GUIDELINES WAS
            RELEVANT TO OR AFFECTED CLASS MEMBERS' BENEFIT DECISIONS**

22        Whether styled as a claim for breach of fiduciary duty or improper denial of benefits,

23   Plaintiffs' claims under Counts I and II (or alternatively Counts III and IV) require proof that

24   UBH's alleged abuse of discretion in interpreting the plans caused class members harm. *See, e.g.*,

25   *Romberio*, 385 F. App'x at 429 (emphasis omitted) ("Absent a showing that benefits were

26   wrongfully denied, there can be no causal link between an alleged breach and a denial of

27   benefits"); *Patel-Puri v. Metro. Life Ins.* Co., No. C-05-0455 MMC, 2008 WL 2609711, at *5

28   n.12 (N.D. Cal. June 27, 2008) ("A showing of injury is, of course, also required to obtain

1    equitable relief" under section (a)(3)); *Payne v. POMCO Grp.*, No. 10 Civ. 7285 (BSJ),  2011

2    WL 4576545, at *2 (S.D.N.Y. Sept. 30, 2011) (claims for arbitrary and capricious denial of

3    benefits "rest[] upon three elements, namely that 1) the plan at issue is an employee benefit plan

4    covered by ERISA, 2) the plaintiff is covered by this plan, and 3) the plaintiff was wrongfully

5    denied benefits under the plan."); *Biba v. Wells Fargo & Co.*, No. C09-3249 MEJ, 2010 WL

6    4942559, at *7 (N.D. Cal. Nov. 10, 2010) (similar).

7        Causation is an independent element of Plaintiffs' claims, distinct from the element of

8    breach. *Brosted*, 421 F.3d at 465 ("To state a claim for breach of fiduciary duty under ERISA, the

9    plaintiff must establish: (1) that the defendants are plan fiduciaries; (2) that the defendants

10   breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff."). Absent

11   classwide evidence that UBH's alleged unreasonable interpretation of the plans caused tangible

12   harm to class members, Plaintiffs cannot prevail. *Graddy*, 2010 WL 670081, at *8; *see also*

13   *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012) ("Appellants

14   argue that the 'harm' of being deprived of their statutory right [under ERISA] is a compensable

15   harm, but we disagree."). Plaintiffs have failed to satisfy the causation element in two respects.

16       *First*, Plaintiffs did not attempt to prove on a classwide basis that they were actually

17   entitled to benefits under their view of the plan terms properly construed.  *See*, *e.g.*, *Romberio*,

18   385 F. App'x at 429; *Hein v.*, 88 F.3d at  224 ; *Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d

19   1067, 1079 (C.D. Cal. 2015); *Biba* , 2010 WL 4942559, at *7. UBH recognizes that this Court

20   has disagreed that such proof is required, but raises the issue to preserve it for appeal.

21       *Second*, and relatedly, Plaintiffs offered no evidence connecting their criticisms of the

22   guidelines with the class members' benefit determinations. Nor could they, for the "harm"

23   Plaintiffs allege is not capable of classwide proof. "Where, as here, the alleged breach purportedly

24   results in the wrongful denial or termination of a participant's benefits, the existence of a causal

25   link between the breach and the harm is particularly dependent upon the equities of the

26   participant's claim" and inherently "depends on a number of factors peculiar to the claimant's

27   case." *Romberio*, 385 F. App'x at 429.

28       Rather than prove that the alleged "flaws" in the guidelines led UBH to improperly deny

CROWELL
& MORING LLP
ATTORNEYS AT LAW

benefits due under the class members' plans, Plaintiffs focused on two facts that they claim are sufficient to prove causation and harm under their facial challenge: (1) all class members were denied coverage for behavioral health treatment at one of the relevant levels of care during the class period; and (2) UBH referenced one of its guidelines in making each determination. But it is not enough for Plaintiffs to show that UBH "applied" a guideline to class members' benefit decisions. UBH's guidelines, some of which exceed 100 pages, consist of countless individual provisions, only a handful of which Plaintiffs challenge. Plaintiffs' experts concede that many, if not most, of the provisions in the guidelines are unobjectionable, focusing only on certain words and phrases that they contend are problematic. Yet Plaintiffs did not prove, on a classwide basis, that the specific "flaws" were relevant—let alone consequential—to the benefit decisions. A class member was not harmed if UBH "applied" and denied benefits based on a portion of the guidelines that is indisputably consistent with generally accepted standards of care, was otherwise consistent with the class member's plan, or which Plaintiffs do not challenge.

This failure of proof is even greater with respect to the approximately half of the class members whose benefit decisions referenced a CDG, not an LOCG. Plaintiffs do not challenge the unique content of any of the 209 diagnosis-specific CDGs in this case, despite the fact that thousands of class members had their benefit decisions reviewed according to a CDG. While Plaintiffs contend that each of the CDGs incorporates some portion of the LOCGs by several different theories, a majority of the CDGs at issue do not include the substantive provisions of the LOCGs or any of the specific "flaws" Plaintiffs allege. *See* Section VII.A (p. 93). Nor did the Plaintiffs' experts dispute any of the unique condition-specific criteria found in any one of the CDGs beyond the Custodial Care CDG. And Plaintiffs offered no evidence showing that for the thousands of class members who were denied coverage according to a CDG, the UBH reviewer relied on the language of the LOCGs in reaching those decisions.

## IX.   PLAINTIFFS FAILED TO PROVE THAT THEY HAVE ARTICLE III STANDING TO BRING THEIR CLAIMS

For similar reasons, Plaintiffs also failed to prove that they have Art. III standing to bring

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   their claims.[72] As the Supreme Court has explained, "the irreducible constitutional minimum of

2   standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The

3   plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

4   conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

5   decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). A plaintiff "must demonstrate

6   standing separately for each form of relief sought," including injunctive relief. *Friends of the*

7   *Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

8        It is well established that "[t]he actual or threatened injury required by Article III may

9   exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."

10  *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Some courts have relied on that authority to hold that

11  "when plan participants seek injunctive relief for violations of ERISA's disclosure or fiduciary

12  requirements, they can demonstrate Article III standing by showing a violation of ERISA and

13  need not prove actual injury." *Wells v. Cal. Physicians' Serv.*, No. C05-01229 CRB, 2007 WL

14  926490, at *3 (N.D. Cal. Mar. 26, 2007); *see Slack v. Int'l Union of Operating Engineers*, No. C-

15  13-5001 EMC, 2014 WL 4090383, at *12 (N.D. Cal. Aug. 19, 2014) (ERISA confers statutory

16  standing to seek injunctive relief under § 1132(a)(3) and a plaintiff need not experience an actual

17  loss to have Article III standing to assert such a claim). But although a plaintiff may in some

18  circumstances be permitted to sue for an injunction to remedy a breach of fiduciary duty under

19  § 1132(a)(3) without demonstrating any individual harm, a plaintiff does *not* have Article III

20  standing to sue under § 1132(a)(1)(B) absent a showing of individualized harm.  This is so

21  because "ERISA § [1132](a)(1)(B) does not *create* a claim (*i.e.,* a statutory injury) which

22  otherwise would not exist; it merely provides that claims for employee benefits, which . . .

23  previously would have been presented under common law theories such as breach of contract, are

24  preempted."  *Slack*, 2014 WL 4090383, at *13 (quoting *Spinedex Physical Therapy, USA, Inc. v.*

25  *United Healthcare of Arizona, Inc.*, No. CV-08-004457-PHX-ROS, 2012 WL 8147128, at *2 n.3

26

27        _____
          72 UBH recognizes that the Court has previously rejected this argument, but includes it

28        here for preservation purposes.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

UBH'S POST-TRIAL BRIEF
CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

1    (D. Ariz. Oct. 24, 2012). Thus, when dealing with claims under ERISA § 1132(a)(1)(B), "normal

2    standing rules should apply." *Spinedex*, 2012 WL 8147128, at *2 n.3.

3         This principle applies regardless of whether plaintiff seeks retrospective or prospective

4    relief. For example, in *Meidl v. Aetna, Inc.*,  No. 15-CV- 1319(JCH), 2017 WL 1831916 (D.

5    Conn. May 4, 2017), the court concluded that the plaintiff lacked standing "to pursue an order

6    permanently enjoining the defendants from treating TMS as experimental or investigational,

7    which is a form of prospective injunctive relief," because he had "not established a likelihood that

8    the defendants will deny hi[s] TMS claims in the future" and had testified in his deposition that

9    "he ha[d] no plans to seek TMS again." *Id.* at *4, *5. Plaintiffs here have similarly failed to

10   establish an actual or imminent threat of future harm based on UBH's use of its current

11   guidelines, because they have not demonstrated that they are likely be denied coverage based on

12   the challenged guidelines criteria in the future. Even as to those Plaintiffs who are still plan

13   participants, the mere fact that they sought and were denied benefits in the past does not on its

14   own support a finding that they are likely to seek and wrongfully be denied benefits again in the

15   future.

16        To have standing to seek reprocessing, which is a retrospective remedy, a plaintiff must

17   establish that he has suffered "an injury in fact, in the form of a deprivation of the health

18   insurance benefits to which … he was entitled" and that "there is a causal connection between

19   this injury and the conduct complained of'—here, UBH's alleged application of guidelines that

20   deviated from plan terms. *Id.* at *6. Yet for the reasons explained above, Plaintiffs have neither

21   shown that they would have been entitled to benefits under their plan construction or even

22   attempted to establish some causal connection between the asserted flaws in the guidelines and

23   the denial of benefits, and they have therefore failed to demonstrate an actual, concrete and

24   particularized injury that is "fairly traceable to the challenged conduct of the defendant." *Spokeo*,

25   136 S. Ct. at 1547. The mere possibility that Plaintiffs *might have* been wrongfully denied

26   benefits as a result of UBH's application of the guidelines is insufficient to establish Article III

27   standing for retrospective relief.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-102-

UBH'S POST-TRIAL BRIEF
CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

1

## X. PLAINTIFFS ARE NOT ENTITLED TO FINDINGS OF LIABILITY ON COUNTS III AND IV UNDER § 1132(A)(3) BECAUSE THOSE CLAIMS ARE DUPLICATIVE OF COUNTS I AND II

2

3    In addition to the reasons set forth above, Plaintiffs did not satisfy their burden of proof on

4    Counts III and IV because "equitable relief under § 1132(a)(3) is not available if § 1132(a)(1)(B)

5    provides an adequate remedy." *Moyle*, 823 F.3d at 959. "[R]elief under § [1132](a)(3) is

6    contingent on a showing that the claimant could not avail himself or herself of an adequate

7    remedy pursuant to § [1132](a)(1)(B)." *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372 (6th

8    Cir. 2015) (en banc); *see Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997),

9    *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012).

10    This is not a question of which remedies the Court should allow, which will be addressed

11    if necessary in a later phase of briefing, but whether Plaintiffs have proven liability under §

12    1132(a)(3) in light of their duplicative claims under § 1132(a)(1)(B). Because § 1132(a)(1)(B)

13    "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of

14    plan documents and the payment of claims," Varity, 516 U.S. at 512, Plaintiffs' remedies under §

15    1132(a)(1)(B) are adequate. See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 146–47 (1985)

16    (declaratory relief and prospective injunction clarifying rights to future benefits available under

17    section (a)(1)(B)); Saffle, 85 F.3d at 460–61 (reprocessing available under (a)(1)(B). This is so

18    even if Plaintiffs fail to prove their claims under section (a)(1)(B) because the "availability of an

19    adequate remedy under the law for Varity purposes does not mean, nor does it guarantee, an

20    adjudication in one's favor." Katz v. Comprehensive Plan of Grp. Ins., 197 F.3d 1084, 1089 (11th

21    Cir. 1999); see Rochow, 780 F.3d at 372 (Varity rule operates "irrespective of the degree of

22    success obtained on a claim for recovery of benefits under § [1132](a)(1)(B)"); Tolson v.

23    Avondale Indus., 141 F.3d 604, 610 (5th Cir. 1998) (same).

24    Plaintiffs offer no cogent legal support to establish that remedies available under §

25    1132(a)(1)(B) are inadequate. UBH is entitled to judgment in its favor on Counts III and IV.

26    ## XI. PLAINTIFFS DID NOT CARRY THEIR BURDEN WITH RESPECT TO THE STATE MANDATE CLASS

27    On behalf of the Wit State Mandate Class, Plaintiffs contend that UBH applied its own

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    guidelines to claims for benefits in Texas, Illinois, Rhode Island and Connecticut, and in doing so,

2    breached its duty to comply with state law. Plaintiffs failed to prove these claims.

3    **A.    Plaintiffs Did Not Prove UBH Violated Texas Law.**

4
        Throughout the relevant class period, Texas law required health plan administrators to
5
     apply criteria issued by the Texas Department of Insurance (known as the TDI and previously
6
     known as TCADA criteria) when making medical necessity determinations for members
7
     receiving or seeking substance use disorder treatment from providers in Texas. See 28 Tex.
8
     Admin. Code § 3.8003 (2017). Plaintiffs contend that "in practice, UBH has regularly ignored"
9
     this requirement. (ECF No. 392, 65:24.) But the only evidence Plaintiffs could marshal at trial to
10
     support their Texas claim is a single email (Trial Ex. 493) from Jerry Niewenhous to Carolyn
11
     Regan in 2015 setting out bulleted notes for "Our Next 1:1" meeting. In that email, Mr.
12
     Niewenhous notes a "[q]uestion from Houston about whether the TCADA guidelines apply or the
13
     CDGs. Former required by State reg. latter thought to apply because of Parity. Houston has been
14
     using the CDGs" and indicates that he is meeting with others "later this week" to discuss. (Trial
15
     Ex. 493-0002.) This single bullet point in a single email constitutes the entirety of the evidence
16
     Plaintiffs offered at trial and is insufficient to carry Plaintiffs' burden of classwide proof on those
17
     claims.[73] The email is devoid of context or explanation. Even if the Court could infer from Mr.
18
     Niewenhous' email that "Houston" improperly applied the UBH CDGs in a good-faith effort to
19
     comply with federal parity law, Plaintiffs offered no evidence that any UBH Peer Reviewer
20
     actually failed to apply the Texas guidelines in connection with any State Mandate Class
21
     Member's benefit request, much less all of them. Moreover, Plaintiffs offered no evidence about
22
     what "Houston" is, or how it relates to the administration of plans governed by Texas law.
23
     Plaintiffs also offered no evidence of how long "Houston" was allegedly using the CDGs in
24
     Texas. The Court cannot discern the answers to these questions from the paltry evidence.
25

26
     _____
        [73] Dr. Fishman admits he did not investigate whether UBH uses the TDI guidelines in
27   Texas, and offered no opinion on whether UBH used proper guidelines under Texas law. (Trial
     Tr. 200-201 (Dr. Fishman).)
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   Weighed against this solitary email is UBH's clear evidence of its compliance with Texas

2   law. Dr. Martorana, Dr. Allchin, and Mr. Niewenhous all testified that UBH clinicians have been

3   using TDI Criteria continuously since as early as 2002, well before the beginning of the class

4   period. (Trial Tr.  951:21-952:2 (Martorana); Trial Tr. 1377:21-1378:1 (Allchin); and Trial Tr.

5   430:5-431:3 (Niewenhous).) Throughout the class period, UBH's Guideline Applicability Tool,

6   used by UBH's Care Advocates and Peer Reviewers to determine which guidelines to apply to a

7   member's benefit request, consistently shows that Texas guidelines are to be applied to coverage

8   requests for substance use disorder treatment in Texas under plans governed by Texas law. (See

9   Trial Tr. 389:5-20 394:2-7 (Niewenhous); Trial Exs. 450, 268 (October 2014 version); 270

10  (January 2015 batch); 271 (March 2015); 272 (May 2015); 273 (September 2015); 274 (January

11  2016); 275 (May 2016); 276 (July 2016); 277 (August 2016); 278 (January 2017).) Plaintiffs did

12  not satisfy their burden of classwide proof on their claims based on violation of Texas law.

### B.  Plaintiffs Did Not Prove UBH Violated Illinois Law.

14  Effective August 18, 2011, Illinois law provided that "medical necessity determinations

15  for substance use disorders shall be made in accordance with appropriate patient placement

16  criteria established by the American Society of Addiction Medicine." 215 Ill. Comp. Stat. §

17  5/370c(b)(3) (eff. Aug. 18, 2011) (applicable to patients who are residents of or employed in

18  Illinois). UBH assessed this change in the law, and determined that because its guidelines are "in

19  accordance with" ASAM criteria, it was appropriate to continue to use UBH's guidelines in

20  Illinois. (Trial Ex. 353.) In late 2015, the Illinois legislature amended the statute to provide that

21  plan administrators must actually use the ASAM criteria, adding "[n]o additional criteria may be

22  used to make medical necessity determinations for substance use disorders." 215 Ill. Comp. Stat.

23  5/370c(b)(3). It is undisputed that UBH adopted ASAM in Illinois in January 2016, a few months

24  after the statute was amended. (Trial Tr. 951:16–20 (Martorana).)

25  Plaintiffs' Illinois state mandate claims, which are subject to review for abuse of

26  discretion, turn on whether UBH's interpretation of the 2011 statute was reasonable. Plaintiffs

27  contend that the 2011 law was "clear and unambiguous" and that "[t]here is no reasonable way to

28  read the statute to mean anything other than requiring UBH to use the ASAM criteria

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    themselves." (ECF No. 392, 80:14-16). The legislative history of the 2015 amendment proves that

2    UBH's interpretation was not only reasonable, but correct.

3         In 2015, the Illinois Department of Insurance assembled a working group to address

4    treatment and coverage of substance use disorders. The group noted that the original version of

5    the law did not require the use of ASAM, leading to a lack of uniformity in utilization review

6    practices: "Sometimes providers use ASAM guidelines while payers use other guidelines. The

7    combination of systems and approaches to obtain information regarding medical necessity leads

8    to confusion."[74] The working group suggested that "[i]ncreased transparency may help decrease

9    misunderstanding" and recommended that Illinois providers and payers "continue to work to find

10   a consistent set of criteria so needed services can be provided." Id. This shows that between 2011

11   and 2015, payers commonly interpreted the 2011 Illinois statute to allow the use of either ASAM

12   or other guidelines that were "in accordance with" ASAM. Consistent with the working group's

13   recommendation to adopt a uniform set of guidelines, the Illinois Senate, in enacting the 2015

14   amendment, explained that the amended law was meant to "specify" that insurers must use

15   ASAM.  See Ill. Senate Tr., 2015 Reg. Sess. No. 52. Erasing any doubt about the meaning of the

16   original law, Illinois Governor Bruce Rauner initially vetoed the 2015 amendment because it

17   would eliminate payers' ability to apply other guidelines.  See Ill. Gen. Assembly re Full Text of

18   HB0001, Governor's Message[75] (vetoing amendment because it "removes utilization controls"

19   other than ASAM and may hinder the state's "ability to contain rising costs"). The legislative

20   history aligns with UBH's interpretation, which was shared by the governor and other payers in

21   the state. Because UBH reasonably concluded that its guidelines are "in accordance with" ASAM

22   criteria, UBH did not breach its fiduciary duties or wrongfully deny benefits to Illinois members

23   of the State Mandate Class.

---

24

25       74 Ill. Dept. of Ins. Working Group re Treatment and Coverage of Substance Abuse
     Disorders and Mental Illness Annual Report at 2, *available at*
26   https://insurance.illinois.gov/newsrls/2017/01/MHSUDWGRptToGA_Jan2017.pdf

27       75 *Available at*
     http://www.ilga.gov/legislation/fulltext.asp?DocName=09900HB0001gms&GA=99&SessionId=
     88&DocTypeId=HB&LegID=83490&DocNum=0001&GAID=13&Session=

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1

### C.       Plaintiffs Did Not Prove UBH Violated Rhode Island Law.

2        Since July 10, 2015, Rhode Island law required that health plan administrators "rely upon"

3   ASAM criteria "when developing coverage for levels of care for substance use disorder

4   treatment." 27 R.I. Gen. Laws § 27-38.2-1(g). This law, which is limited to services provided by

5   in-network providers (id. § 27-38.4), does not require UBH to adopt or use the ASAM criteria. It

6   simply requires that UBH "rely upon" those criteria in developing its own guidelines, and UBH

7   complied with that requirement. The uncontroverted evidence is that UBH relied upon the ASAM

8   criteria in developing those guidelines. (See, e.g., Trial Exs. 5-0013, 6-0015, 7-0015, 7-0093, 8-

9   009 (ASAM Criteria listed as reference for development of 2015-2017 LOCGs); Trial Exs. 3-

10  0002, 4-0002, 5-004 and 6-004, 7-004, 8-0002 (2013-2017 LOCGs relying on ASAM's definition

11  of recovery); see also Section VI.A.1 (p. 26) (discussing UBH's reliance on Mr. Shulman's

12  comparison of UBH guidelines to ASAM Criteria).) Moreover, Plaintiffs offered no evidence to

13  establish that any class member sought benefits for treatment at an in-network provider in Rhode

14  Island. Plaintiffs have not satisfied their burden of classwide proof on their claims based on

15  violation of Rhode Island law.

16

### D.       Plaintiffs Did Not Prove UBH Violated Connecticut Law.

17       Beginning in 2013, Connecticut law required that health plan administrators either (a) use

18  the ASAM criteria in making medical necessity determinations for substance use disorder

19  treatment in that state, or (b) "demonstrate[]" that the administrator's own guidelines are

20  "consistent with the most recent ASAM criteria" by "creat[ing] and maintain[ing] a document in

21  an easily accessible location" on the administrator's web site that "compare[s] each aspect of such

22  clinical review criteria with the [ASAM] criteria" and citing the evidence base for any deviations

23  from the ASAM criteria. Former Conn. Gen. Stat. § 38a-591c(a)(3), superseded by amendment,

24  2016 Conn. Legis. Serv. P.A. 16-175 (S.B. 372).[76] As Mr. Niewenhous explained, UBH chose the

25  latter option. UBH created a crosswalk disclosing ways in which its guidelines deviate from

26

_____

27       76 Connecticut amended the statute effective January 1, 2017 to remove the crosswalk
requirement. Conn. Gen. Stat. § 38a-591c(a)(3). Plaintiffs offered no evidence regarding UBH's
28  compliance with Connecticut law after January 1, 2017.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   ASAM, which it posted publicly and submitted to the Connecticut Insurance Department. (Trial

2   Exs. 402 (2013 crosswalk) and 506 (2015 crosswalk); Trial Tr. 398:16-22, 399:14-400:11

3   (Niewenhous).)

4        Plaintiffs contend that UBH failed to comply with Connecticut law because (a) its

5   guidelines are not consistent with ASAM and (b) the crosswalk UBH submitted to the

6   Connecticut Insurance Department "misrepresented" that its guidelines cover ASAM Levels 3.5,

7   3.3, and 3.1. Plaintiffs did not prove that UBH failed to comply with Connecticut law.

8        During the class period, UBH met twice with the Connecticut Department of Insurance to

9   review the crosswalk and answer any questions. The Insurance Department did not find any

10  deficiencies with UBH's guidelines or crosswalk, and did not instruct UBH to use ASAM criteria

11  rather than its own guidelines. (Trial Tr. 446:5-22 (Niewenhous).) Plaintiffs' criticism of the

12  crosswalk is both unfounded and irrelevant. UBH's guidelines allow coverage for ASAM Levels

13  3.5 and 3.3 when available under the member's benefit plan, including any limitations that require

14  residential treatment be under the active supervision of a physician. (*See* Trial Ex. 1657, at 189:3–

15  190:2 (Robinson-Beale); Trial Tr. 1575.)  With respect to ASAM Level 3.1, the crosswalk

16  contained an error indicating that UBH's residential rehabilitation criteria include criteria that are

17  consistent with coverage at ASAM Level 3.1. (*See* Trial Tr. 406:7-25; 408:9-17; 410-23:411:11

18  (Niewenhous).) UBH did not discover this error until Mr. Niewenhous was reviewing the

19  crosswalk in preparation for trial in this case. (Trial Tr. 461:2-21 (Niewenhous).) Moreover, this

20  was an error regarding *which* UBH guideline encompassed ASAM Level 3.1, not *whether* UBH's

21  guidelines covered ASAM Level 3.1. As discussed above, the uncontroverted evidence shows

22  that ASAM Level 3.1 is governed by UBH's sober living guidelines. This error in a submission to

23  the Connecticut Department of Insurance for a level of care that was never sought by any of the

24  class members in this case does not prove a breach of fiduciary duty or improper denial of

25  benefits to the class members.

26  **XII.   CLASS MEMBERS FAILED TO EXHAUST THEIR ADMINISTRATIVE
        REMEDIES**

27

28       The uncontroverted evidence shows that some of the class members failed to exhaust their

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   available administrative remedies. As explained by UBH witness Mr. Dehlin, UBH members

2   generally have the right to appeal adverse benefit determinations, although the plans vary in the

3   specific terms that govern appeals. (Trial Tr. 839:6-8 (Dehlin).) If the Peer Reviewer determines

4   that coverage is not provided under the guidelines, the Peer Reviewer will provide information

5   including the last covered day for treatment and the ability to appeal. (Trial Tr. 947:22-948:2

6   (Martorana).) Many plans provide multiple levels of internal appeal, and often an option to appeal

7   an adverse benefit determination to a third party not related to UBH or to a state insurance

8   agency. (Trial Tr. 948:25-949:6 (Martorana).)

9        Before a plaintiff may bring suit under ERISA to enforce a right conferred by a benefit

10  plan, the plaintiff must exhaust his or her available administrative remedies irrespective of

11  whether the plaintiff's claims are characterized as a breach of fiduciary duty or denial of benefits.

12  *Amato v. Bernard*, 618 F.2d 559, 566–67 (9th Cir. 1980); *see also Stephens v. Pension Ben.*

13  *Guar. Corp.*, 755 F.3d 959, 966 n.7 (D.C. Cir. 2014) (a plaintiff cannot "avoid the exhaustion

14  requirement by recharacterizing a claim for benefits as a claim for breach of fiduciary duty"

15  because all "plan-based claims" require exhaustion); *see also Wal-Mart Stores, Inc. v. Dukes*, 564

16  U.S. 338, 367 (2011) (under the Rules Enabling Act "a class cannot be certified on the premise

17  that [a defendant] will not be entitled to litigate its statutory defenses to individual claims.").

18       Plaintiffs try to skirt the exhaustion requirement in two ways. First, they argue that

19  exhaustion is not required for claims alleging a breach of ERISA's statutory duty of loyalty or

20  care. (ECF No. 392 at 89:2–6.) But the Ninth Circuit has made clear that a claimant cannot

21  "attach a 'statutory violation' sticker to his or her [denial of benefits] claim and then . . . use that

22  label as an asserted justification" for failure to exhaust. *Diaz v. United Agr. Empl. Welfare Ben.*

23  *Plan and Tr.*, 50 F.3d 1478, 1484 (9th Cir. 1995); *Stephens*, 755 F.3d at 996 n.7. In addition, as

24  discussed in Section VI.A.3 (p. 30), Plaintiffs did not offer evidence at trial showing that UBH

25  breached a duty of loyalty or care to the class members by allowing financial considerations to

26  influence the content of the guidelines challenged in this case.

27       Second, Plaintiffs argue that in the context of a class action, the exhaustion requirement

28  applies only to the named plaintiffs. Plaintiffs' only cited authority is the class certification

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-109-

UBH'S POST-TRIAL BRIEF
CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

1    decision in *Des Roches v. California Physicians' Services*, 320 F.R.D. 486, 500 (N.D. Cal. 2017);

2    (ECF No. 392 at 89–90.) A close reading of *Des Roches* refutes Plaintiffs' reliance on it. In *Des*

3    *Roches*, the defendants argued that failure of absent class members to exhaust their administrative

4    remedies would "present individual issues that defeat commonality" and preclude class

5    certification. Relying on an overly broad interpretation of a Seventh Circuit opinion (*In re*

6    *Household Int'l Tax Reduction Plan*, 441 F.3d 500 (7th Cir. 2006)), the district court held that

7    "unnamed class members in an ERISA class action need not exhaust their administrative

8    remedies." *Des Roches*, 320 F.R.D. at 501. But the opinion in *In re Household* announced a much

9    more restricted holding, stating only that a district court has the *discretion* to waive the

10   exhaustion requirement for the purposes of granting class certification in instances when the plan

11   document itself *does not* require exhaustion. *In re Household*, 441 F.3d at 502.

12        Here, the plans *did* require members to exhaust the administrative remedies. (*See, e.g.,*

13   Trial Exs. 1535-0057 (plan for class member 659 prohibiting legal action "until you have

14   completed all of the steps in the appeal process"); 1557-0084 (same for class member 6600);

15   1583-0085 (same for class member 12605); 1633-0090 (same for class member 7292); 1635-0080

16   (same for class member 0080).) There is no dispute here that a substantial number of class

17   members failed to exhaust those remedies. (*See* Trial Ex. 1655-0002, 03 to -06 (summary exhibit

18   showing that class members 659, 6600, 12605, 7292 and 8242 did not file administrative

19   appeals).) UBH witness Frances Bridge testified at length about the class members who were part

20   of the agreed sample selected in this case. This subset of class members includes members who

21   appealed their adverse benefit decisions, and those who did not. Some successfully overturned

22   their initial adverse benefit decisions (and were paid the benefits they sought), rendering their

23   claims here moot. Many others failed to exhaust their available administrative remedies. (Trial

24   Ex. 1655; Trial Tr. 839:6-8 (Dehlin).). This evidence was uncontroverted, and the class members'

25   claims are barred to the extent they did not exhaust their administrative remedies.

26        Plaintiffs identify no case law holding that judicial discretion can override the express

27   terms of a plan requiring exhaustion of available remedies. To the contrary, "applying federal

28   common law doctrines to alter ERISA plans is inappropriate where the terms of an ERISA plan

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   are clear and unambiguous." *Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1237 (11th Cir.

2   2010); *see also Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76,

3   81 (2d Cir. 2009) (enforcing plan limitation on filing suit because courts cannot "rewrite" ERISA

4   plans, and plan administrator had an enforceable "expectation based on a term in [the] plan").

5           Furthermore, waiver of exhaustion is not automatic simply because a plaintiff seeks class

6   relief. Plaintiffs bear the burden of proving an exception to the exhaustion requirement applies.

7   *Casatelli v. Horizon Blue Cross Blue Shield of New Jersey*, 2010 WL 3724526, at *6 (D.N.J.

8   Sept. 13, 2010). Before exercising its judicial discretion to waive exhaustion, a court must

9   examine "whether some useful purpose would be served by requiring any of the unnamed class

10  members to have exhausted their internal remedies." *In re Household*, 441 F.3d at 502. In this

11  instance, exhaustion would have resulted in a more sharply defined class limited to individuals

12  who adhered to the express requirements of their plans, and proceeded with each level of

13  appellate review, which might have resulted in authorization of benefits without filing suit.

14          Nor can Plaintiffs argue exhaustion should be excused because seeking appeal would have

15  been futile. "The party invoking the futility exception to the requirement of administrative

16  exhaustion bears the burden of proof." *Casatelli ,*2010 WL 3724526, at *6.  Plaintiffs make no

17  such showing and instead argue that futility is established because, on appeal, UBH always

18  applied the same coverage criteria it used to deny the claim in the first instance. (ECF No. 392 at

19  90.) Under Plaintiffs' logic, UBH never overturns denials. However, the uncontroverted evidence

20  shows otherwise: Ms. Bridge's testimony confirmed that the administrative appeals process

21  resulted in the approval and payment of benefits for numerous class members. (Trial Tr. 1504:8-

22  1505:4 (Bridge).) *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, No.

23  MDL092074PSGFFMX, 2013 WL 12130034, at *20 (C.D. Cal. July 19, 2013) ("In order to

24  come under the futility exception to the exhaustion requirement a plaintiff must show that it is

25  certain that her claim will be denied on appeal, not merely that she doubts that an appeal will

26  result in a different decision."); *see also Churchill v. Cigna Corp.*, No. CIV.A. 10-6911, 2011 WL

27  3563489, at *7 (E.D. Pa. Aug. 12, 2011) ("In the class action context, it is impossible to adduce

28  clear evidence of futility…, since the class action device precludes consideration of individual

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-111-

UBH'S POST-TRIAL BRIEF
CASE NOS. 14-CV-02346 JCS; 14-CV-05337 JCS

1  circumstances"). Furthermore, unlike in *Barnes v. AT&T Pension Benefit Plan*—the only case on

2  which Plaintiffs rely for support—the dispute in this case does not involve the interpretation, and

3  universal application, of a single term or phrase. 270 F.R.D. 488, 491–92 (N.D. Cal. 2010).

4  Rather, this case involves clinicians exercising their clinical judgment, and this application of

5  clinical judgment means members are entitled to an individualized interpretation of the coverage

6  criteria at each stage of the review process. Plaintiffs' claim of futility is baseless.

7  UBH satisfied its burden of proof with respect to its affirmative defense based on failure

8  to exhaust administrative remedies.[77]

9  **XIII. CONCLUSION**

10  Plaintiffs failed to carry their burden of proof to establish classwide liability against UBH

11  under 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3). First, Plaintiffs failed to prove on a

12  classwide basis that UBH's creation and application of the guidelines is a fiduciary act because

13  the guidelines are part of the plan terms and therefore are not subject to challenge by the class

14  under ERISA. Second, Plaintiffs failed to prove on a classwide basis that UBH's guidelines are an

15  illogical or unreasonable interpretation of the terms of all of the class members' plans or of

16  generally accepted standards of care. Third, Plaintiffs failed to prove on a classwide basis that the

17  alleged "flaws" in the 222 challenged guidelines, which changed from year to year, caused harm

18  to each of the class members.

19  Plaintiffs further failed to satisfy their burden to prove they have Article III standing to

20  pursue their claims. Plaintiffs also failed to satisfy their burden to prove on a classwide basis that

21

22  [77] UBH asserted the following additional affirmative defenses:  good faith, lack of standing, no claim under 29 U.S.C. §1132(a)(3) since adequate remedies are available under 29 U.S.C. §132(a)(1)(B), waiver, failure to satisfy conditions precedent/subsequent, and protection by the settlor function. Inclusion of these defenses is not a concession by UBH that it bore the burden of proof on any issue raised through the pleadings. Specifically, UBH contends that it was Plaintiffs' burden to prove on a classwide basis that UBH's actions were not in good faith, that Plaintiffs and the class members have standing to pursue their claims, that inadequate remedies are available under 29 U.S.C. §1132(a)(1)(B), that Plaintiffs and the class members satisfied conditions precedent and subsequent, and that UBH's development of the guidelines was a fiduciary action. In addition, UBH reserves the right to raise these arguments as components of Plaintiffs' burden of proof or as affirmative defenses in post-trial briefing relating to remedies and class decertification, if applicable.

28

CROWELL & MORING LLP
ATTORNEYS AT LAW

1    UBH is liable under 29 U.S.C. § 1132(a)(3) because adequate remedies are available under 29

2    U.S.C. § 1132(a)(1)(B). Plaintiffs failed to satisfy their burden to prove on a classwide basis that

3    UBH breached its fiduciary duty, improperly denied benefits or violated any law with respect to

4    class members whose coverage decisions were governed under Texas, Illinois, Rhode Island or

5    Connecticut law. And UBH satisfied its burden of proof on its affirmative defense that multiple

6    class members failed to exhaust their administrative remedies and such exhaustion would not

7    have been futile.

8            For these reasons, the Court should enter judgment in favor of UBH on all Counts.

9    Dated:        January 22, 2018            **CROWELL & MORING LLP**

10                                             */s/ Jennifer S. Romano*
                                               Jennifer S. Romano
11                                             Attorneys for UNITED BEHAVIORAL HEALTH

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28